**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **GWACS ARMORY, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.:20-cv-0341-CVE-SH** |
| **KE ARMS, LLC, RUSSELL PHAGAN,** | ) | **BASE FILE** |
| **SINISTRAL SHOOTING** | ) | |
| **TECHNOLOGIES, LLC, BROWNELLS,** | ) | Consolidated with: |
| **INC., and SHAWN NEALON,** | ) | Case No. 21-CV-0107-CVE-JFJ |
| | ) | |
| **Defendants.** | ) | |
| **and** | ) | |
| | ) | |
| **KE ARMS, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **GWACS ARMORY, LLC, GWACS** | ) | |
| **DEFENSE INCORPORATED, JUD** | ) | |
| **GRUDEL, RUSSEL ANDERSON, DOES I** | ) | |
| **through X, and ROE CORPORATIONS I** | ) | |
| **through X,** | ) | |
| **Defendants.** | ) | |

**DECLARATION OF SHAWN NEALON IN SUPPORT OF HIS MOTION FOR
SUMMARY JUDGMENT**

Shawn Nealon, declares as follows:

1. I am over the age of 18 years and have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true. I am competent to testify as to the facts stated herein in a court of law and will so testify if called upon.

2. I am currently the owner of Cavalry Medical, LLC, a company based in Arizona.

1

3.      In the early 2000s, I started a company called Cavalry Arms Corporation ("**Cavalry**"). Cavalry's main product was a semi-automatic rifle called the CAV-15, which Russell Phagan ("**Phagan**") and a number of other Cavalry employees helped design, manufacture, and assemble. Phagan later became the vice president of Cavalry.

4.      One of the features of the CAV-15 was its lower receiver.[1] The lower receiver on the CAV-15 was made of polymer which made it comparatively lighter than standard semi-automatic rifles that are traditionally made of wood of metal alloy, such as aluminum. The lower receiver on the CAV-15 was also monolithic, meaning the entire lower receiver, including its stock, grip, and magazine well, were all one piece.

5.       Cavalry openly shared all its information related to the manufacturing techniques, processes, and designs on its website and with customers. Over the course of Cavalry's existence, every piece of information related to the production, manufacture, and design of the CAV-15 and its lower receiver was publicly disclosed. Cavalry did this, in part, because customers were generally leery of the use of polymer in firearms and transparency helped alleviate concerns.

6.      Cavalry's first polymer lower receiver was called the CAV-15, which was later retroactively named the MKI ("**MKI**"). The MKI was inspired by other polymer rifles available at the time, including the Colt polymer lower receiver rifle developed in the late 1960s, and the Steyr Aug bullpup semi-automatic rifle. Cavalry later developed an improved iteration or derivative of the MKI which was called the CAV-15 MKII ("**MKII**"). Cavalry's final iteration of the CAV-15 was called the MKIII (the "**MKIII**"), but the MKIII just a prototype and was never manufactured due to issues Cavalry had with its federal firearms license.

---

[1] In firearms terminology, the receiver is the part of a firearm which integrates other components by providing housing for internal action components such as the hammer, bolt or breechblock, firing pin and extractor, and has threaded interfaces for externally attaching (also known as receiving) components such as the barrel, stock, trigger mechanism and iron/optical sights. The receiver is often made of forged, machined, or stamped steel or aluminum; in addition to these traditional materials, modern science and engineering have introduced polymers and sintered metal powders to receiver construction.

7.      To my knowledge, Cavalry never registered any patents, trademarks, and copyrights for the CAV-15, the MKI, the MKII, or the MKIII.

8.      In early 2010, Cavalry ceased operations, surrendered its Federal Firearms License ("**FFL**"), and began selling off all of its assets.

9.      On or about March 3, 2010, Cavalry and Phagan, through his entity Sinistral Shooting Technologies, LLC ("**SST**"), entered into an asset purchase agreement (the "**Cavalry-SST APA**"). **Exhibit 1** is a true and correct copy of the Cavalry-SST APA. The assets that Cavalry sold SST are expressly defined in the agreement. *See id.* The Cavalry-SST APA does not expressly contain any intellectual property, design prints, or CAD/CAM files. *See id.*

10.     Around this time, Cavalry's former operations manager, Christian Capello, started Cavalry Manufacturing, LLC ("**Cavalry Mfg.**"). On or about June 18, 2010, Cavalry Mfg. entered into an agreement of sale (the "**Cavalry IP Agreement**"). **Exhibit 2** is a true and correct copy of the Cavalry IP Agreement. Under this Cavalry IP Agreement, Cavalry sold to Cavalry Mfg.:

> All of the intangible property of [Cavalry], including but not limited to [Cavalry's]... **intellectual property rights, know-how, trade secrets, confidential information, software**, business and financial records, supplier and distribution lists and marketing material, price lists, catalogs and marketing material, price lists, technical information, trade information, consulting plans, and every other item of intangible personal property owned, licensed, leased, or held through any other means or rights by [Cavalry] and used in [Cavalry]'s business including, without limitation, … The names "Calvary Arms," "Cavalry Arms" and "Cavalry Manufacturing.

*See id.*, at Article 1.1 (emphasis added).

11.     A few years later, I found out that SST had sold some manufacturing equipment related to the CAV-15 to GWACS Armory, LLC ("**Armory**"). I don't recall the specific date that I found out about that sale. However, on February 14, 2012, through my new entity, Cavalry

Medical LLC ("**Cavalry Medical**"), I wrote a letter to Armory generally congratulating them on the sale. **Exhibit 3** is a true and correct copy of a letter of the letter I wrote a letter to Armory dated February 14, 2012. As stated in the letter, my understanding is that Armory had purchased manufacturing equipment to the CAV-15, specifically the "molds, welder, and press." *Id.*  In the letter, I volunteered all of my knowledge and experience related to the CAV-15 aluminum tooling and molds. *Id.* Armory never responded to the letter. *See id.*

12.     In early 2016, I found some boxes containing an old thumb drive and various firearm "blue prints" at my house (the "**Nealon Files**"). At the time, I didn't know the exact content of the digital Nealon Files as I no longer had the software needed to even open them. As the inventor of the CAV-15, I believed then, and still believes now, that the Nealon Files did not contain any protectable intellectual property. Anything that might have been protectable at the time was shared with the world on blogs, forums, trade shows, and Cavalry's own website. I shared these Nealon files with lots of firearm enthusiasts and businesses that might have an interest, including KE Arms, LLC ("**KEA**").

13.     On or about February 25, 2016, Cavalry Medical sold KEA two (2) boxes of assorted "Blue prints" and "one thumb drive of assorted CAD/CAM files" from the Nealon Files. **Exhibit 4** is a true and correct copy of the letter between Calvary Medical and KEA dated February 25, 2016.

14.     On July 15, 2020, Armory filed its Complaint against me personally for (1) misappropriation of trade secrets, and (2) misappropriation of intellectual property. Armory did not give me notice that it was going to sue me. As a result of Armory's Complaint, I was forced to retain an attorney to defend myself.

15.     On or about October 7, 2021, I had my attorneys serve an offer of judgment on Armory. I made this offer because this lawsuit has been especially stressful for me and my family because I am caring for my wife who, unfortunately, is still battling with cancer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of July, 2022.

Shawn Nealon

## APPENDIX OF EXHIBITS TO DECLARATION OF SHAWN NEALON

| EXHIBIT NO. | DOCUMENT DESCRIPTION |
| --- | --- |
| 1 | 2010-03-22 Cavalry-SST Asset Purchase Agreement |
| 2 | 2010-06-18 Agreement of Sale between Calvary Arms Corp and Cavalry Manufacturing, LLC |
| 3 | 2016-02-25 Letter from The Tactical Medic to KE Arms re Delivery of Blue Prints and Thumb Drive |
| 4 | 2012-02-14 Letter from Nealon to GWACS re Equipment for the CAV-15 |

Exhibit 1
2010-03-22 Cavalry-SST Asset
Purchase Agreement

ASSET PURCHASE AGREEMENT


by and among


SINISTRAL SHOOTING TECHNOLOGIES, LLC
an Arizona limited liability company


and


CALVARY ARMS CORPORATION
an Arizona corporation


and


SHAWN M. NEALON and NICOLE G. NEALON


As of MAY __3__ 2010

KEA000001

TABLE OF CONTENTS

Page

ARTICLE I CONSTRUCTION; DEFINITIONS ............................................................. 1

    Section 1.1    Definitions ........................................................................ 1
    Section 1.2    Definitions ........................................................................ 2

ARTICLE II PURCHASE AND SALE ........................................................................... 4

    Section 2.1    Agreement to Purchase and Sell ....................................... 4
    Section 2.2    Assets. .............................................................................. 4
    Section 2.3    Excluded Assets. .............................................................. 5
    Section 2.4    Assumption of Liabilities. .................................................. 5

ARTICLE III PURCHASE PRICE; ADJUSTMENTS; ALLOCATIONS ........................ 5

    Section 3.1    Purchase Price ................................................................. 5
    Section 3.2    Payment of Purchase Price. ............................................. 5

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS AND
                SHAREHOLDERS .................................................................... 5

    Section 4.1    Organization ..................................................................... 5
    Section 4.2    Authorization. ................................................................... 5
    Section 4.3    Absence of Restrictions and Conflicts. ............................. 6
    Section 4.4    Title to Assets; Related Matters ........................................ 6
    Section 4.5    Licenses .......................................................................... 7
    Section 4.6    Ethical Practices. ............................................................. 7

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER .............. 7

    Section 5.1    Organization ..................................................................... 7
    Section 5.2    Authorization. ................................................................... 7
    Section 5.3    Absence of Restrictions and Conflicts. ............................. 8

ARTICLE VI CERTAIN COVENANTS AND AGREEMENTS ...................................... 8

    Section 6.1    Conduct of Business by the Sellers. ................................. 8
    Section 6.2    Notices of Certain Events ................................................. 8
    Section 6.3    No Solicitation of Transactions. ........................................ 9
    Section 6.4    Reasonable Efforts; Further Assurances; Cooperation ..... 9
    Section 6.5    Supplements to Schedules. ....................................... ..... 10
    Section 6.6    Transfer Taxes; Expenses. .............................................. 10
    Section 6.7    Confidential Information ................................................... 10
    Section 6.8    Risk of Loss. ................................................................... 10

ARTICLE VII CONDITIONS TO CLOSING .............................................................. 11

    Section 7.1    Conditions to Each Party's Obligations ............................ 11
    Section 7.2    Conditions to Obligations of the Purchaser ...................... 11
    Section 7.3    Conditions to Obligations of the Sellers and Shareholders. .......................... 12

ARTICLE VIII CLOSING ......................................................................................... 12

    Section 8.1    Closing ............................................................................ 12
    Section 8.2    Sellers Closing Deliveries ................................................ 13

KEA000002

Section 8.3     Purchaser Closing Deliveries ..............................................................13

ARTICLE IX TERMINATION ...................................................................................14
Section 9.1     Termination. ................................................................................14
Section 9.2     Specific Performance and Other Remedies...................................................14
Section 9.3     Effect of Termination. ....................................................................14

ARTICLE X INDEMNIFICATION ..............................................................................14
Section 10.1    Indemnification Obligations of the Sellers and Shareholders.........................14
Section 10.2    Indemnification Obligations of the Purchaser. .......................................15
Section 10.3    Indemnification Procedure..............................................................16
Section 10.4    Claims Period..........................................................................17
Section 10.5    Investigations. .......................................................................18

ARTICLE XI MISCELLANEOUS PROVISIONS ................................................................18
Section 11.1    Notices.................................................................................18
Section 11.2    Schedules and Exhibits. ...............................................................19
Section 11.3    Assignment; Successors in Interest.....................................................19
Section 11.4    Captions...............................................................................19
Section 11.5    Controlling Law; Amendment. ...........................................................19
Section 11.6    Consent to Jurisdiction, Etc. .........................................................19
Section 11.7    Severability. .........................................................................19
Section 11.8    Counterparts. .........................................................................20
Section 11.9    Enforcement of Certain Rights. ........................................................20
Section 11.10   Waiver.................................................................................20
Section 11.11   Integration. ..........................................................................20
Section 11.12   Compliance with Bulk Sales Laws. ......................................................20
Section 11.13   Cooperation Following the Closing. ....................................................20
Section 11.14   Transaction Costs. ....................................................................20
Section 11.15   Shareholders' Representative ..........................................................20

KEA000003

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of April _____, 2010, is made and entered into by and among **SINISTRAL SHOOTING TECHNOLOGIES, LLC**, an Arizona limited liability company (the "Purchaser"), **CALVARY ARMS CORPORATION**, an Arizona corporation (the "Company"), and **SHAWN M. NEALON** and **NICOLE G. NEALON** (together the "Shareholders"). The corporate entity, Calvary Arms Corporation is included herein to the extent that it holds legal or equitable title, if any, to the Assets defined in Section 2.1 that are subject to this Asset Purchase Agreement. The Company and the Shareholders are sometimes individually referred to herein as a "Seller" and collectively as the "Sellers".  The Purchaser, the Company and the Shareholders are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

W I T N E S S E T H :

WHEREAS, the Seller is engaged in the business of serving as a retailer of certain non-firearms and non-ammunition goods and services related thereto (the "Business") at 723 W. Commerce, Suite A, Gilbert, AZ 85233; and

WHEREAS, the Parties desire to enter into this Agreement pursuant to which the Seller proposes to sell to the Purchaser, and the Purchaser proposes to purchase from the Seller (the "Acquisition"), certain injection molds used or held for use by the Seller in the conduct of its business as a going concern without the assumption of the liabilities and obligations of the Sellers;

WHEREAS, the Parties desire to make certain representations, warranties and agreements in connection with the Acquisition;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, each Party hereby agrees as follows:

ARTICLE I
CONSTRUCTION; DEFINITIONS

Section 1.1    Definitions.  Unless the context of this Agreement clearly requires otherwise, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to any gender include the other genders, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (e) the terms "day" and "days" mean and refer to calendar day(s) and (f) the terms "year" and "years" mean and refer to calendar year(s).   Unless otherwise set forth herein, references in this Agreement to (a) any document, instrument or agreement (including this Agreement) (i) includes and incorporates all exhibits, schedules and other attachments thereto, (ii) includes all documents, instruments or agreements issued or executed in replacement thereof and (iii) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (b) a particular Law (as hereinafter defined) means such Law as amended, modified, supplemented or succeeded, from time to time and in effect at any given time.

1

KEA000004

All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it.

Section 1.2    Definitions.    The following terms, as used herein, have the following meanings:

"ATF" means the United States Department of Justice Bureau of Alcohol, Firearms, Tobacco and Explosives.

"Affiliate" of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in the City of Phoenix, Arizona.

"Claims Period" means the period during which a claim for indemnification may be asserted hereunder by an Indemnified Party.

"Closing" means the consummation of the transactions contemplated by Article II.

"Closing Date" means the date on which the Closing occurs.

"Company Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by any Seller or an Affiliate thereof other than any Shareholder in connection with the transactions contemplated hereby.

"Company Indemnified Parties" means each Seller, each Shareholder and their respective officers, directors, employees, agents and representatives and the heirs, executors, successors and assigns of any of the foregoing.

"Confidential Information" means any data or information of any Seller (including trade secrets) that is valuable to the operation of the Business and not generally known to the public or competitors.

"Control" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Governmental Entity" means any federal, state or local or foreign government, any political subdivision thereof or any court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency, domestic or foreign.

"Indemnified Party" means a Purchaser Indemnified Party or a Company Indemnified Party.

2

KEA000005

"Knowledge" with respect to any Seller means (a) all facts known by any officer or director of any Seller or any Shareholder or those additional individuals listed on Exhibit 1.2(b) on the date hereof following due inquiry and diligence with respect to the matters at hand and (b) all facts that any of the foregoing Persons should have known with respect to the matters at hand if such Person had made due inquiry and exercised reasonable diligence.

"Laws" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, injunctions, writs, awards and decrees of, or issued by, all Governmental Entities.

"Legal Dispute" means any action, suit or proceeding between or among the Parties and their respective Affiliates arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

"Licenses" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, exemptions, classifications, registrations and other similar documents and authorizations issued by any Governmental Entity, and applications therefor.

"Liens" mean all mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever.

"Material Adverse Effect" means any state of facts, change, event, effect or occurrence (when taken together with all other states of fact, changes, events, effects or occurrences) that the Purchaser believes is or may reasonably likely to be materially adverse to the financial condition, results of operations, prospects, properties, assets or liabilities (including contingent liabilities) of the Sellers, the Business or the Assets taken as a whole. A Material Adverse Effect shall also include any state of facts, change, event or occurrence that shall have occurred or been threatened that (when taken together with all other states of facts, changes, events, effects or occurrences that have occurred or been threatened) the Purchaser believes is or would be reasonably likely to prevent or materially delay the performance by any Seller or any Shareholder of its obligations hereunder or the consummation of the transactions contemplated hereby.

"Noncompete Period" means the period beginning on the Closing Date and continuing for a period of five years from the Closing Date.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization or Governmental Entity.

"Purchaser Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Purchaser in connection with the transactions contemplated hereby.

"Purchaser Indemnified Parties" means the Purchaser and its Affiliates, their respective officers, directors, employees, agents and representatives and the heirs, executors, successors and assigns of any of the foregoing.

"Release" means, with respect to any Hazardous Material, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping,

KEA000006

leaching, dumping or disposing into any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

"Shareholder Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Shareholders or any Affiliate of one or more Shareholders in connection with the transactions contemplated hereby (including the Real Estate Agreements relating to the business of the Sellers).

"Taxes" means all taxes, assessments, charges, duties, fees, levies and other governmental charges, including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, disability, transfer, sales, use, excise, gross receipts, value-added and all other taxes of any kind for which any Seller may have any liability imposed by any Governmental Entity, whether disputed or not, and any charges, interest or penalties imposed by any Governmental Entity.

"Termination Date" means the date prior to the Closing when this Agreement is terminated in accordance with Article IX.

"Territory" means the State of Arizona.

ARTICLE II
PURCHASE AND SALE

Section 2.1   Agreement to Purchase and Sell.   Subject to the terms and conditions hereof, at the Closing and except as otherwise specifically provided in this Article II, each  Seller, in consideration for the payment of the Purchase Price in accordance with Section 3.2, shall grant, sell, assign, transfer and deliver to the Purchaser, and the Purchaser shall purchase and acquire from such Seller, all right, title and interest of such Seller in and to the Assets listed in Section 2.2 (which assets, properties and rights are collectively referred to herein as the "Assets"), free and clear of all Liens.

Section 2.2   Assets.   Except as otherwise expressly set forth in Section 2.3, the Assets shall include the following assets, properties and rights of each Seller as of the close of business on the Closing Date:

(a) One (1) CAV-15 MKII cores and cavities;

(b) One (1) CAV-15 MKI cores and cavities;

(c) One (1) CAV-15 mold base;

(d) One (1) CAV-15 linear vibration welding resin base fixtures;

(e) all of Seller's CAV-15 drilling fixtures; all CAV-15 specific hand tools; all CAV-15 specific nuts, bolts, screws, roll pins: all CAV-15 front and rear pivot; take down pins; all CAV-15 serial number tags;

4

KEA000007

(f)  all Licenses for the above described assets to the extent that they are assignable, including those set forth on Schedule 4.1;

(g)  all records required to be kept on the above described assets pursuant to parts 447, 478, and, 479 of C.F.R. title 27.

Section 2.3    Excluded Assets.   Notwithstanding anything to the contrary set forth herein, the Assets shall not include any assets not listed in Section 2.2 nor shall the Purchase assume any liabilities of (collectively, the "Excluded Assets"):

Section 2.4    Assumption of Liabilities.     The Purchaser shall not assume, in connection with the transactions contemplated hereby, any liability or obligation of any Seller whatsoever, and the Sellers shall retain responsibility for all liabilities and obligations accrued as of or on the Closing Date and all liabilities and obligations arising from the Sellers' operations prior to or on the Closing Date, whether or not accrued .

ARTICLE III
PURCHASE PRICE; ADJUSTMENTS; ALLOCATIONS

Section 3.1    Purchase Price.   Subject to adjustment and to the indemnification obligations under Section 10.1, the aggregate amount to be paid for the Assets (the "Purchase Price") shall be the outstanding number of shares of stock which is owned by Purchaser in the Company which is four (4%) of the outstanding shares of Company (the "Company Shares").

Section 3.2    Payment of Purchase Price. On the Closing Date, the Purchaser shall endorse in blank the Company Shares for the benefit of the Sellers.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF SELLERS AND SHAREHOLDERS

Sellers and the Shareholders hereby represent and warrant to the Purchaser as follows as of the date hereof and the Closing Date:

Section 4.1    Organization.

(a) The Seller is a corporation duly formed and validly existing under the Laws of the jurisdiction set forth in the introductory paragraph hereof and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Each Seller is duly qualified or registered as a foreign corporation to transact business under the Laws of each jurisdiction where the character of its activities or the location of the properties owned or leased by it requires such qualification or registration.  Each Seller has heretofore made available to the Purchaser true, correct and complete copies of its charter documents as currently in effect and its corporate record books with respect to actions taken by its shareholders and board of directors.  Schedule 4.2 contains a true and correct list of the jurisdictions in which each Seller is qualified or registered to do business as a foreign corporation.

Section 4.2    Authorization.

(a) Each Shareholder has the right, power and capacity to execute and deliver this Agreement and each Shareholder Ancillary Document which such

5

KEA000008

Shareholder is a party to and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement has been, and the Shareholder Ancillary Documents shall be as of the Closing Date, duly executed and delivered by each Shareholder and do or shall, as the case may be, constitute the valid and binding agreements of each Shareholder, enforceable against each Shareholder in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

(b) Each Seller has full power and authority to execute and deliver this Agreement and the Company Ancillary Documents and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Company Ancillary Documents by each Seller and the performance by each Seller of its obligations hereunder and thereunder and the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary board and shareholder action on the part of each Seller.  The board of directors and shareholders of each Seller has approved the execution, delivery and performance of this Agreement and the Company Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been, and the Company Ancillary Documents shall be as of the Closing Date, duly executed and delivered by each Seller and do or shall, as the case may be, constitute the valid and binding agreements of each Seller, enforceable against each Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 4.3    Absence of Restrictions and Conflicts.  The execution, delivery and performance of this Agreement, the Shareholder Ancillary Documents and the Company Ancillary Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of and compliance with the terms and conditions hereof and thereof do not or shall not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel, (a) any term or provision of the charter documents of any Seller, (b)  any judgment, decree or order of any Governmental Entity to which any Seller or any Shareholder is a party or by which any Seller or any Shareholder or any of their respective properties are bound or (c) any Law or arbitration award applicable to any Shareholder or the Business.  Subject to the terms of this Agreement, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required with respect to any Seller or any Shareholder in connection with the execution, delivery or performance of this Agreement, the Shareholder Ancillary Documents or the Company Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.

Section 4.4    Title to Assets; Related Matters. Sellers have (and shall convey to the Purchaser at the Closing) good and marketable title to the Assets, free and clear of all Liens.  All equipment and other items of tangible personal property and assets included in the Assets (a) are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, (b) were acquired and are usable in the regular and ordinary course of business and (c) conform to all applicable

6

KEA000009

Laws.  No Seller has Knowledge of any defect or problem with any Asset, other than ordinary wear and tear.

Section 4.5    Licenses.

(a) Schedule 4.1 is a true and complete list of all Licenses held by any Seller.  The Sellers own or possess all Licenses that are necessary to enable it to carry on the Business as presently conducted.  All Licenses are valid, binding and in full force and effect.  The execution, delivery and performance hereof and the consummation of the transactions contemplated hereby shall not adversely affect any License.   The Sellers have taken all necessary action to maintain each License, except where the failure to so act shall not have an adverse effect on any Seller or the Business.  No loss or expiration of any License is threatened, pending or reasonably foreseeable (other than expiration upon the end of any term).

Section 4.6    Ethical Practices.  No Seller nor any representative thereof has offered or given, and no Seller has any Knowledge of any Person that has offered or given on its behalf, anything of value to: (a) any official of a Governmental Entity, any political party or official thereof or any candidate for political office; (b) any customer or member of any Governmental Entity; or (c) any other Person, in any such case while knowing or having reason to know that all or a portion of such money or thing of value may be offered, given or promised, directly or indirectly, to any customer or member of any Governmental Entity or any candidate for political office for the purpose of the following: (x) influencing any action or decision of such Person, in such Person's official capacity, including a decision to fail to perform such Person's official function; (y) inducing such Person to use such Person's influence with any Governmental Entity to affect or influence any act or decision of such Governmental Entity to assist any Seller in obtaining or retaining business for, with, or directing business to, any Person; or (z) where such payment would constitute a bribe, kickback or illegal or improper payment to assist any Seller in obtaining or retaining business for, with, or directing business to, any Person.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to each Seller and each Shareholder as follows:

Section 5.1    Organization.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction set forth in the introductory paragraph hereof as its jurisdiction of incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

Section 5.2    Authorization.   The Purchaser has full corporate power and authority to execute and deliver this Agreement and the Purchaser Ancillary Documents, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Purchaser Ancillary Documents by the Purchaser, the performance by the Purchaser of its obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary corporate action on the part of the Purchaser.  This Agreement has been and, as of the Closing Date, the Purchaser Ancillary Documents shall be, duly executed and delivered

7

KEA000010

by the Purchaser and do or shall, as the case may be, constitute the valid and binding agreements of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 5.3    Absence of Restrictions and Conflicts.   The execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents, the consummation of the transactions contemplated hereby and thereby and the fulfillment of, and compliance with, the terms and conditions hereof and thereof do not or shall not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, or permit the acceleration of any obligation under, (a) any term or provision of the charter documents of the Purchaser, (b) any contract to which the Purchaser is a party, (c) any judgment, decree or order of any Governmental Entity to which the Purchaser is a party or by which the Purchaser or any of its properties is bound or (d) any statute, law, rule or regulation applicable to the Purchaser.

ARTICLE VI<br>CERTAIN COVENANTS AND AGREEMENTS

Section 6.1    Conduct of Business by the Sellers.   For the period commencing on the date hereof and ending on the Closing Date, each Seller and the Shareholders will cause the  Seller to maintain its existence and good standing in its jurisdiction of organization and in each jurisdiction in which the ownership or leasing of its property or the conduct of its business requires such qualification, except as expressly required hereby and except as otherwise consented to in advance in writing by the Purchaser;

Section 6.2    Notices of Certain Events.   The Sellers shall promptly notify the Purchaser of:

(a) any change or event that, individually or in the aggregate, have had or could reasonably be expected to have a Material Adverse Effect on the Assets or otherwise result in any representation or warranty of any Seller or any Shareholder hereunder being inaccurate in any material respect;

(b) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated hereby;

(c) any notice or other communication from any Governmental Entity in connection with the transactions contemplated hereby; and

(d) the damage or destruction by fire or other casualty of any Asset or part thereof or (ii) any Asset or part thereof becoming the subject of any proceeding (or, to the Knowledge of any Seller, threatened proceeding) for the taking thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

The Sellers hereby acknowledge that the Purchaser does not and shall not waive any right it may have hereunder as a result of such notifications.

8

KEA000011

Section 6.3    <u>No Solicitation of Transactions</u>.  No Seller nor any of its Affiliates nor any of the Shareholders shall, directly or indirectly, through any officer, director, manager or agent of any of them or otherwise, initiate, solicit or encourage (including by way of furnishing non-public information or assistance), or enter into negotiations of any type, directly or indirectly, or enter into a confidentiality agreement, letter of intent or purchase agreement, merger agreement or other similar agreement with any Person other than the Purchaser with respect to a sale of any of the Assets.

Section 6.4    <u>Reasonable Efforts; Further Assurances; Cooperation</u>.  Subject to the other provisions hereof, each Party shall each use its reasonable, good faith efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to obtain all consents required and all regulatory approvals and to satisfy all conditions to its obligations hereunder and to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Expiration Date, in accordance with the terms hereof and shall cooperate fully with each other Party and its officers, directors, employees, agents, counsel, accountants and other designees in connection with any step required to be taken as a part of its obligations hereunder, including the following:

(a) Each Party promptly shall make its filings and submissions and shall take all actions necessary, proper or advisable under applicable Laws to obtain any required approval of any Governmental Entity with jurisdiction over the transactions contemplated hereby (except that the Purchaser shall have no obligation to take or consent to the taking of any action required by any such Governmental Entity that could adversely affect the Business, the Assets or the transactions contemplated by this Agreement or the Purchaser Ancillary Documents).  The Sellers shall furnish to the Purchaser all information required for any application or other filing to be made by any Seller pursuant to any applicable Law in connection with the transactions contemplated hereby.

(b) In the event any claim, action, suit, investigation or other proceeding by any Governmental Entity or other Person is commenced that questions the validity or legality of the Acquisition or any other transaction contemplated hereby or seeks damages in connection therewith, the Parties shall (i) cooperate and use all reasonable efforts to defend against such claim, action, suit, investigation or other proceeding, (ii) in the event an injunction or other order is issued in any such action, suit or other proceeding, use all reasonable efforts to have such injunction or other order lifted, and (iii) cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(c) The Sellers shall give all notices to third parties and use its best efforts (in consultation with the Purchaser) to obtain all third-party consents (i) necessary, proper or advisable to consummate the transactions contemplated hereby, (ii) required to be given or obtained, including those required to be given or obtained pursuant to this Agreement, (iii) required to avoid a breach of or default under any Assumed Contract in connection with the consummation of the transactions contemplated hereby or (iv) required to prevent a Material Adverse Effect, whether prior to, on or following the Closing Date.

(d) Each Party shall give prompt notice to the other Parties of (i) the occurrence, or failure to occur, of any event that the occurrence or failure of which would be likely to cause any representation or warranty of any Seller, any

9

Shareholder or the Purchaser, as the case may be, contained herein to be untrue or inaccurate at any time from the date hereof to the Closing Date or that shall or may result in the failure to satisfy any condition specified in Article VII and (ii) any failure of any Seller, any Shareholder or the Purchaser, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by any of them hereunder.  Each Seller and each Shareholder hereby acknowledges that the Purchaser does not and shall not waive any right it may have hereunder as a result of such notifications.

Section 6.5    Supplements to Schedules.  From time to time up to the Closing, the Sellers and the Shareholders shall promptly supplement or amend the Schedules that they have delivered with respect to any matter first existing or occurring following the date hereof that (a) if existing or occurring at or prior to the date hereof, would have been required to be set forth or described in the Schedules, or (b) is necessary to correct any information in the Schedules that has been rendered inaccurate thereby.  No supplement or amendment to any Schedule shall have any effect for the purpose of determining satisfaction of the conditions set forth in Section 7.2 or the obligations of the Sellers and the Shareholders under Section 10.1(c).

Section 6.6    Transfer Taxes; Expenses.  Any Taxes or recording fees payable as a result of the Acquisition or any other action contemplated hereby (other than any federal, state, local or foreign Taxes measured by or based upon income or gains imposed upon the Purchaser) shall be paid by the Sellers.  The Parties shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions contemplated hereby that are required or permitted to be filed at or prior to the Closing.

Section 6.7    Confidential Information.

(a) Confidential Information.  Each Seller and each Shareholder shall hold in confidence at all times following the date hereof all Confidential Information and shall not disclose, publish or make use of Confidential Information at any time following the date hereof without the prior written consent of the Purchaser.

Section 6.8    Risk of Loss.  The risk of loss with respect to the Assets shall remain with the Sellers until the Closing.  Until the Closing, the Sellers shall maintain in force all the policies of property damage insurance under which any Asset is insured.  In the event prior to the Closing any Asset is lost, damaged or destroyed and such loss, damage or destruction would likely result in a Material Adverse Effect, then:

(a) the Purchaser may terminate this Agreement in accordance with the provisions of Section 9.1(d); or

(b) the Purchaser may require the Sellers to assign to the Purchaser the proceeds of any insurance payable as a result of the occurrence of such loss, damage or destruction and to reduce the Purchase Price by the amount of the replacement cost of the Assets that were lost, damaged or destroyed less the amount of any proceeds of insurance payable as a result of the occurrence.

10

KEA000013

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    <u>Conditions to Each Party's Obligations</u>.  The respective obligations of each Party to effect the transactions contemplated hereby shall be subject to the satisfaction of the conditions below:

(a) Subject to the terms and conditions herein provided, each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including using its reasonable efforts to obtain all necessary or appropriate waivers, consents and approvals, to effect all necessary registrations, filings and submissions (including, but not limited to, any submissions requested by the Federal Trade Commission, the Department of Justice, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("<u>BATFE</u>") or the United States Department of State ("<u>State</u>")) and to lift any injunction or other legal bar to the consummation of the transactions contemplated by this Agreement (and, in such case, to proceed with such transactions as expeditiously as possible).

Section 7.2    <u>Conditions to Obligations of the Purchaser</u>.  The obligations of the Purchaser to consummate the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing of each of the following additional conditions:

(a) <u>Injunction</u>. There shall be no effective injunction, writ or preliminary restraining order or any order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the Acquisition may not be consummated as provided herein, no proceeding or lawsuit shall have been commenced by any Governmental Entity for the purpose of obtaining any such injunction, writ or preliminary restraining order and no written notice shall have been received from any Governmental Entity indicating an intent to restrain, prevent, materially delay or restructure the transactions contemplated hereby.

(b) <u>Governmental Consents</u>. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Entities required in connection with the execution, delivery or performance hereof shall have been obtained or made.

(c) <u>Representations and Warranties</u>.  The representations and warranties of the Sellers and the Shareholders set forth in Article IV shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(d) <u>Performance of Obligations of the Sellers</u>.  Each Seller and each Shareholder shall have performed all covenants and agreements required to be performed by each of them hereunder at or prior to the Closing.

(e) <u>No Material Adverse Effect</u>.  Between the date hereof and the Closing Date, there shall not have occurred (nor shall the Purchaser have become aware of) any Material Adverse Effect or any development likely to result in a Material

11

KEA000014

Adverse Effect.

(f) <u>Consents</u>.  The Sellers shall have obtained and delivered to the Purchaser the written consents and notices or waivers with respect thereto as.

(g) <u>Closing Date Indebtedness; Release of Liens</u>.  The Closing Date Indebtedness shall have been repaid in full by disbursement of a portion of the Purchase Price, and the Sellers shall have delivered to the Purchaser satisfactory evidence that all Liens affecting the Assets have been released.

(h) <u>Ancillary Documents</u>.  The Sellers shall have delivered, or caused to be delivered, to the Purchaser the documents listed in Section 8.2.

Section 7.3    <u>Conditions to Obligations of the Sellers and Shareholders</u>.  The obligations of the Seller and the Shareholders to consummate the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing of each of the following additional conditions:

(a) <u>Injunction</u>. There shall be no effective injunction, writ or preliminary restraining order or any order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the Acquisition may not be consummated as provided herein, no proceeding or lawsuit shall have been commenced by any Governmental Entity for the purpose of obtaining any such injunction, writ or preliminary restraining order and no written notice shall have been received from any Governmental Entity indicating an intent to restrain, prevent, materially delay or restructure the transactions contemplated hereby.

(b) <u>Governmental Consents</u>.  All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, any Governmental Entity required in connection with the execution, delivery or performance hereof shall have been obtained or made.

(c) <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser set forth in Article V shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(d) <u>Performance of Obligations by the Purchaser</u>.  The Purchaser shall have performed all covenants and agreements required to be performed by it hereunder on or prior to the Closing Date.

(e) <u>Ancillary Documents</u>.  The Purchaser shall have delivered, or caused to be delivered, to the Sellers the documents listed in Section 8.3.

ARTICLE VIII
CLOSING

Section 8.1    <u>Closing</u>.  The Closing shall occur on the later of (a) a date designated by the Purchaser within five Business Days following the satisfaction or waiver of the conditions set forth in Article VII that are contemplated to be satisfied prior to the Closing Date, (b) April 30, 2010 or (c) such other date as the Parties may agree.

12

KEA000015

The Closing shall take place at the offices of Boland Law Group PLLC, 14850 North Scottsdale Road, Suite 265, Scottsdale, AZ 85254, or at such other place as the Parties may agree.

Section 8.2    Sellers Closing Deliveries.   On the Closing, the Sellers shall deliver, or cause to be delivered, to the Purchaser the following:

(a) a certificate executed by the President and Chief Financial Officer of each Seller as to compliance with the conditions set forth in Sections 7.2(b), (c), (d) and (e) hereof;

(b) a certificate executed by each Shareholder as to compliance with the conditions set forth in Sections 7.2(b), (c) and (d) hereof;

(c) executed bills of sale, instruments of assignment, certificates of title and other conveyance documents, dated as of the Closing Date, transferring to the Purchaser all of the Sellers' right, title and interest in and to the Assets, together with possession of the Assets, including the Bill of Sale (the "Bill of Sale") substantially in the form of Exhibit 8.2(c);

(d)    a certificate by the Secretary or any Assistant Secretary of each Seller, dated the Closing Date, as to (i) the good standing of such Seller in its jurisdiction of incorporation and in each other jurisdiction where it is qualified to do business, (ii) no amendments to such Seller's charter documents and (iii) the effectiveness of the resolutions of the board of directors of such Seller authorizing the execution, delivery and performance hereof by such Seller passed in connection herewith and the transactions contemplated hereby; and

(e) all other documents required to be entered into by the Sellers and the Shareholders pursuant hereto or reasonably requested by the Purchaser to convey the Assets to the Purchaser or to otherwise consummate the transactions contemplated hereby.

Section 8.3    Purchaser Closing Deliveries.   On the Closing, the Purchaser shall have delivered, or caused to be delivered, to the Sellers the following:

(a) the Purchase Price to be paid at Closing pursuant to Section 3.2 paid and delivered in accordance with such Section;

(b) a certificate of an authorized officer as to compliance with the conditions set forth in Sections 7.3(b) and (c);

(c) a certificate by the Secretary or any Assistant Secretary of the Purchaser, dated the Closing Date, as to (i) the good standing of the Purchaser in its jurisdiction of incorporation and (ii) the effectiveness of the resolutions of the board of directors of the Purchaser or committee thereof authorizing the execution, delivery and performance hereof by the Purchaser passed in connection herewith and the transactions contemplated hereby; and

(d) all other documents required to be entered into or delivered by the Purchaser at or prior to the Closing pursuant hereto.

13

KEA000016

ARTICLE IX
TERMINATION

Section 9.1    Termination.  This Agreement may be terminated:

(a) in writing by mutual consent of the Parties;

(b) by written notice from the Sellers to the Purchaser, in the event the Purchaser (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it at or prior to the Closing or (ii) materially breaches any of its representations and warranties contained herein, which failure or breach is not cured within 10 days following the Sellers having notified the Purchaser in writing of its intent to terminate this Agreement pursuant to this Section 9.1(b);

(c) by written notice from the Purchaser to the Sellers, in the event any Seller or any Shareholder (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it at or prior to the Closing or (ii) materially breaches any of its representations and warranties contained herein, which failure or breach is not cured within 10 days following the Purchaser having notified the Sellers of its intent to terminate this Agreement pursuant to this Section 9.1(c); or

(d) by written notice by the Sellers to the Purchaser or the Purchaser to the Sellers, as the case may be, in the event the Closing has not occurred on or prior to June 30, 2010 (the "Expiration Date") for any reason other than delay or nonperformance of the Party seeking such termination.

Section 9.2    Specific Performance and Other Remedies.  Each Party hereby acknowledges that the rights of each Party to consummate the transactions contemplated hereby are special, unique and of extraordinary character and that, in the event that any Party violates or fails or refuses to perform any covenant or agreement made by it herein, the non-breaching Party may be without an adequate remedy at law. In the event that any Party violates or fails or refuses to perform any covenant or agreement made by such Party herein, the non-breaching Party or Parties may, subject to the terms hereof and in addition to any remedy at law for damages or other relief, institute and prosecute an action in any court of competent jurisdiction to enforce specific performance of such covenant or agreement or seek any other equitable relief.

Section 9.3    Effect of Termination.   In the event of termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or its partners, officers, directors or stockholders, except for Section 11.1 (Notices), Section 11.5 (Controlling Law; Amendment), Section 11.6 (Consent to Jurisdiction, Etc.), Section 11.7 (Severability), Section 11.9 (Enforcement of Certain Rights), Section 11.10 (Waiver) and Section 11.14 (Transaction Costs) and this Section 9.3, all of which shall survive the Termination Date. Notwithstanding the foregoing, nothing contained herein shall relieve any Party from liability for any breach hereof.

14

KEA000017

ARTICLE X
INDEMNIFICATION

Section 10.1   Indemnification Obligations of the Sellers and Shareholders.  Each Seller and each Shareholder shall, jointly and severally, indemnify, defend and hold harmless the Purchaser Indemnified Parties from, against, and in respect of, any and all claims, liabilities, obligations, damages, losses, costs, expenses, penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' fees and expenses) arising out of or relating to:

(a) any liability or obligation of any Seller or any Shareholder of any nature whatsoever;

(b) events or circumstances occurring or existing with respect to the ownership, operation and maintenance of the Assets on or prior to the Closing Date,

(c) any breach or inaccuracy of any representation or warranty made by any Seller or any Shareholder in this Agreement such representations and warranties shall be read without reference to materiality, Material Adverse Effect or similar monetary and non-monetary qualifications);

(d) any breach of any covenant, agreement or undertaking made by any Seller or any Shareholder in this Agreement, the Company Ancillary Documents or the Shareholder Ancillary Documents;

(e) any fraud, willful misconduct or bad faith of any Seller or any Shareholder in connection with this Agreement, the Company Ancillary Documents or the Shareholder Ancillary Documents;

(f)  non-compliance by the Parties with any applicable bulk sales Law.

The claims, liabilities, obligations, losses, damages, costs, expenses, penalties, fines and judgments of the Purchaser Indemnified Parties described in this Section 10.1 as to which the Purchaser Indemnified Parties are entitled to indemnification are collectively referred to as "Purchaser Losses".

Section 10.2   Indemnification Obligations of the Purchaser.  The Purchaser shall indemnify and hold harmless the Company Indemnified Parties from, against and in respect of any and all claims, liabilities, obligations, losses, damages, costs, expenses, penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation and reasonable attorneys' fees and expenses) arising out of or relating to:

(a) any breach of any covenant, agreement or undertaking made by the Purchaser in this Agreement; or

(b) any fraud, willful misconduct or bad faith of the Purchaser in connection with this Agreement.

KEA000018

The claims, liabilities, obligations, losses, damages, costs, expenses, penalties, fines and judgments of the Company Indemnified Parties described in this Section 10.2 as to which the Company Indemnified Parties are entitled to indemnification are collectively referred to as "Company Losses".

Section 10.3    Indemnification Procedure.

(a) Promptly following receipt by an Indemnified Party of notice by a third party (including any Governmental Entity) of any complaint or the commencement of any audit, investigation, action or proceeding with respect to which such Indemnified Party may be entitled to receive payment from the other Party for any Purchaser Loss or any Company Loss (as the case may be), such Indemnified Party shall notify the Purchaser or the Sellers and the Shareholders, as the case may be (the "Indemnifying Party"), promptly following the Indemnified Party's receipt of such complaint or of notice of the commencement of such audit, investigation, action or proceeding; provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from liability hereunder with respect to such claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within 20 days thereafter assuming full responsibility for any Purchaser Losses (as the case may be) resulting from such audit, investigation, action or proceeding, to assume the defense of such audit, investigation, action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel.  In the event, however, that the Indemnifying Party declines or fails to assume the defense of the audit, investigation, action or proceeding on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such 20-day period, then the Indemnifying Party shall pay the reasonable fees and disbursements of counsel for the Indemnified Party as incurred; provided, however, that the Indemnifying Party shall not be required to pay the fees and disbursements of more than one counsel for all Indemnified Parties in any jurisdiction in any single audit, investigation, action or proceeding.  In any audit, investigation, action or proceeding for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such action, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter the defense of which it is maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

KEA000019

(b) No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless (i) the Indemnifying Party fails to assume and maintain the defense of such claim pursuant to Section 10.3(a) or (ii) such settlement, compromise or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all liability arising out of such claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless (i) such settlement, compromise or consent includes an unconditional release of the Indemnified Party and its officers, directors, employees and Affiliates from all liability arising out of such claim, (ii) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party and (iii) does not contain any equitable order, judgment or term that in any manner affects, restrains or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c) In the event an Indemnified Party claims a right to payment pursuant hereto, such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party.  Such notice shall specify the basis for such claim.  The failure by any Indemnified Party so to notify the Indemnifying party shall not relieve the Indemnifying Party from any liability that it may have to such Indemnified Party with respect to any claim made pursuant to this Section 10.3(c), it being understood that notices for claims in respect of a breach of a representation or warranty must be delivered prior to the expiration of the survival period for such representation or warranty under Section 10.4.  In the event the Indemnifying Party does not notify the Indemnified Party within 30 days following its receipt of such notice that the Indemnifying Party disputes its liability to the Indemnified Party under this Article or the amount thereof, the claim specified by the Indemnified Party in such notice shall be conclusively deemed a liability of the Indemnifying Party under this Article X, and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand or, in the case of any notice in which the amount of the claim (or any portion of the claim) is estimated, on such later date when the amount of such claim (or such portion of such claim) becomes finally determined.  In the event the Indemnifying Party has timely disputed its liability with respect to such claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such claim (by mutual agreement, litigation, arbitration or otherwise) and, within five Business Days following the final determination of the merits and amount of such claim, the Indemnifying Party shall pay to the Indemnified Party immediately available funds in an amount equal to such claim as determined hereunder.

Section 10.4   Claims Period.  The Claims Periods hereunder shall begin on the date hereof and terminate as follows:

(a) with respect to Purchaser Losses arising under (i) Section 10.1(c) with respect to any breach or inaccuracy of any representation or warranty in Section 4.2 (Authorization), Section 4.3 (Absence of Restrictions and Conflicts),  the second sentence of Section 4.4 (Title to Assets; Related Matters), or (ii) Sections 10.1(a), 10.1(b), 10.1(d), 10.1(e), 10.1(f), and 10.1(g) (collectively, the "Surviving Obligations"), the Claims Period shall continue indefinitely;

17

KEA000020

(b) with respect to Company Losses arising under Sections 10.2(a), 10.2(c) or 10.2(d), the Claims Period shall continue indefinitely, except as limited by law (including any applicable statutes of limitation); and

(c) with respect to all other Purchaser Losses or Company Losses arising hereunder, the Claims Period shall terminate on the date that is three years following the Closing Date.

Notwithstanding the foregoing, if, prior to the close of business on the last day of the applicable Claims Period, an Indemnifying Party shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim shall continue to survive and shall remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.

Section 10.5   Investigations.  The respective representations and warranties of the Parties contained in this Agreement or any certificate or other document delivered by any Party at or prior to the Closing and the rights to indemnification set forth in Article X shall not be deemed waived or otherwise affected by any investigation made, or knowledge acquired, by a Party.

ARTICLE XI
MISCELLANEOUS PROVISIONS

Section 11.1   Notices.  All notices, communications and deliveries required or made hereunder must be made in writing signed by or on behalf of the Party making the same, shall specify the Section hereunder pursuant to which it is given or being made, and shall be delivered personally or by telecopy transmission or by a national overnight courier service or  by registered or certified mail (return receipt requested) (with postage and other fees prepaid) as follows:

To the Purchaser:       Russell Phagan, Member
                        2248 N. Power Rd.
                        Mesa, AZ 85215

with a copy to:         Boland Law Group PLLC
                        14850 North Scottsdale Road, Suite 265
                        Scottsdale, AZ 85254
                        Attn:  Robert W. Boland, Jr.
                        Telecopy No.:  (480) 656-5260
                        Email: rob@bolandlawgroup.com

To the Sellers or
the Shareholders:       Shawn M. Nealon

with a copy to:

or to such other representative or at such other address of a party as such party may furnish to the other parties in writing.  Any such notice, communication or delivery shall be deemed given or made (a) on the date of delivery, if delivered in person, (b) upon

18

KEA000021

transmission by facsimile if receipt is confirmed by telephone, (c) on the first Business Day following delivery to a national overnight courier service or (d) on the fifth Business Day following it being mailed by registered or certified mail.

Section 11.2    Schedules and Exhibits.  The Schedules and Exhibits are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.

Section 11.3    Assignment; Successors in Interest.  No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Parties; provided that the Purchaser shall, without the obligation to obtain the prior written consent of any other Party, be entitled to assign this Agreement or all or any part of its rights or obligations hereunder to one or more Affiliates of the Purchaser.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns, and any reference to a Party shall also be a reference to the successors and permitted assigns thereof.

Section 11.4    Captions.  The titles, captions and table of contents contained herein are inserted herein only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

Section 11.5    Controlling Law; Amendment.  This Agreement shall be governed by and construed and enforced in accordance with the internal Laws of the State of Arizona without reference to its choice of law rules.  This Agreement may not be amended, modified or supplemented except by written agreement of the Parties.

Section 11.6    Consent to Jurisdiction, Etc.  Each Party hereby irrevocably agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction of the courts of the State of Arizona or the federal courts located in the State of Arizona, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocable waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that they any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.  During the period a Legal Dispute that is filed in accordance with this Section 11.6 is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject thereto, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum or (e) the venue of such action, suit or proceeding is improper.  A final judgment in any action, suit or proceeding described in this Section 11.6 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws.

Section 11.7    Severability.    Any  provision  hereof  that  is  prohibited  or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions

KEA000022

hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Law, each Party hereby waives any provision of law that renders any such provision prohibited or unenforceable in any respect.

Section 11.8  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or the terms hereof to produce or account for more than one of such counterparts.

Section 11.9  Enforcement of Certain Rights. Nothing expressed or implied herein is intended, or shall be construed, to confer upon or give any Person other than the Parties, and their successors or permitted assigns, any right, remedy, obligation or liability under or by reason of this Agreement, or result in such Person being deemed a third-party beneficiary hereof.

Section 11.10  Waiver. Any agreement on the part of a Party to any extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such Party. A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by any Party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 11.11  Integration. This Agreement and the documents executed pursuant hereto supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter hereof and constitute the entire agreement among the Parties with respect thereto.

Section 11.12  Compliance with Bulk Sales Laws. Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement. Seller shall provide an Affidavit of Creditors.

Section 11.13  Cooperation Following the Closing. Following the Closing, each Party shall deliver to the other Parties such further information and documents and shall execute and deliver to the other Parties such further instruments and agreements as any other Party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other Party the benefits hereof.

Section 11.14  Transaction Costs. Except as provided above or as otherwise expressly provided herein, (a) the Purchaser shall pay its own fees, costs and expenses incurred in connection herewith and the transactions contemplated hereby, including the fees, costs and expenses of its financial advisors, accountants and counsel, and (b) the Sellers and the Shareholders shall pay the fees, costs and expenses of the Sellers and the Shareholders incurred in connection herewith and the transactions contemplated hereby, including the fees, costs and expenses of financial advisors, accountants and counsel to the Sellers and the Shareholders.

Section 11.15  Shareholders' Representative.

KEA000023

(a) By the execution and delivery hereof, including counterparts hereof, each Seller and each Shareholder hereby irrevocably constitutes and appoints Shawn M. Nealon as the true and lawful agent and attorney-in-fact (the "Shareholder Representative") of such Seller and such Shareholder with full powers of substitution to act in the name, place and stead of such Seller and such Shareholder with respect to the performance on behalf of such Seller and such Shareholder under the terms and provisions hereof and to do or refrain from doing all such further acts and things, and to execute all such documents, as the Shareholder Representative shall deem necessary or appropriate in connection with any transaction contemplated hereunder, including the power to:

(i) act for each Seller and each Shareholder with respect to all indemnification matters referred to herein, including the right to compromise or settle any such claim on behalf of any Seller or any Shareholder;

(ii) act for each Seller and each Shareholder with respect to all Purchase Price adjustments referred to herein;

(iii) amend or waive any provision hereof (including any condition to Closing) in any manner that does not differentiate among the Sellers or Shareholders;

(iv) employ, obtain and rely upon the advice of legal counsel, accountants and other professional advisors as the Shareholder Representative, in the sole discretion thereof, deems necessary or advisable in the performance of the duties of the Shareholder Representative;

(v) receive and receipt for any portion of the Purchase Price or any other payment due from the Purchaser to the Shareholders pursuant to this Agreement;

(vi) incur any expenses, liquidate and withhold assets received on behalf of the Sellers and the Shareholders prior to their distribution to the Sellers or the Shareholders to the extent of any amount that the Shareholder Representative deems necessary for payment of or as a reserve against expenses, and pay such expenses or deposit the same in an interest-bearing bank account established for such purpose;

(vii) receive all notices, communications and deliveries hereunder on behalf of the Sellers and the Shareholders; and

(viii) do or refrain from doing any further act or deed on behalf of each Seller or each Shareholder that the Shareholder Representative deems necessary or appropriate, in the sole discretion of the Shareholder Representative, relating to the subject matter hereof as fully and completely as any Seller or any Shareholder could do if personally present and acting and as though any reference to any Seller or any Shareholder herein was a reference to the Shareholder Representative.

(b) The appointment of the Shareholder Representative shall be deemed coupled with an interest and shall be irrevocable, and any other Person may

21

KEA000024

conclusively and absolutely rely, without inquiry, upon any action of the Shareholder Representative as the act of any Seller or any Shareholder in all matters referred to herein.  Each Seller and each Shareholder hereby ratifies and confirms that the Shareholder Representative shall do or cause to be done by virtue of such Shareholder Representative's appointment as Shareholder Representative of such Seller or such Shareholder.   The Shareholder Representative shall act for each Seller and each Shareholder on all of the matters set forth herein in the manner the Shareholder Representative believes to be in the best interest of such Seller or such Shareholder, but the Shareholder Representative shall not be responsible to any Seller or any Shareholder for any loss or damage any Seller or any Shareholder may suffer by reason of the performance by the Shareholder Representative of such Shareholder Representative's duties hereunder, other than loss or damage arising from willful misconduct or gross negligence in the performance of such Shareholder Representative's duties hereunder.

(c) Each Seller and each Shareholder hereby expressly acknowledges and agrees that the Shareholder Representative is authorized to act on behalf of such Seller or  such Shareholder notwithstanding any dispute or disagreement among the Sellers or Shareholders, and that any Person shall be entitled to rely on any and all action taken by the Shareholder Representative hereunder without liability to, or obligation to inquire of, any Seller or any Shareholder.  In the event the Shareholder Representative resigns or ceases to function in such capacity for any reason whatsoever, then the successor Shareholder Representative shall be the Person that the remaining Sellers or Shareholders appoint; provided, however, that in the event for any reason no successor has been appointed within 30 days following such resignation or cessation, then any Seller or any Shareholder shall have the right to petition a court of competent jurisdiction for appointment of a successor Shareholder Representative.   The Sellers and Shareholders, jointly and severally, shall indemnify and hold the Shareholder Representative harmless from and against any and all liabilities, losses, costs, damages and expenses (including attorneys' fees) reasonably incurred or suffered as a result of the performance of the Shareholder Representative's duties hereunder, except for willful misconduct or gross negligence.

(SIGNATURE PAGE FOLLOWS)

KEA000025

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the date first above written.

SINISTRAL SHOOTING TECHNOLOGIES, LLC

By: _____
Name: Russell Phagan
Title: Member

CALVARY ARMS CORPORATION

By: _____
Name: Shawn M. Nealon
Title: President

SHAREHOLDERS:

_____
Name: Shawn M. Nealon

_____
Name: Nicole G. Nealon

STATE OF ARIZONA )
                 )ss:
County of Maricopa )

The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _3_ day of _MAY_____, 2010, by Russell Phagan, Member of Sinistral Shooting Technologies, LLC.

_____
Notary Public

My commission expires: 11-14-2011

DREW C ETZEN
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
MY COMM. EXPIRES 11-14-2011

23

KEA000026

STATE OF ARIZONA )
                   )ss:
County of Maricopa   )

       The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _3_ day of ___MAY_____, 2010, by Shawn M. Nealon, President of Calvary Arms Corporation.

_____
Notary Public

My commission expires: 11-14-2011

DREW C ETZEN
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
MY COMM. EXPIRES 11-14-2011

STATE OF ARIZONA )
                   )ss:
County of Maricopa   )

       The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _3_ day of ___MAY_____, 2010, by Shawn M. Nealon.

_____
Notary Public

My commission expires: 11-14-2011

DREW C ETZEN
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
MY COMM. EXPIRES 11-14-2011

STATE OF ARIZONA )
                   )ss:
County of Maricopa   )

       The foregoing instrument was acknowledged before me, the undersigned Notary Public, this _3_ day of ___MAY_____, 2010, by Nicole G. Nealon.

_____
Notary Public

My commission expires: 11-14-2011

DREW C ETZEN
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
MY COMM. EXPIRES 11-14-2011

KEA000027

## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT is made this __3__ day of _May_, 2010, from CALVARY ARMS CORPORATION, An Arizona corporation ("Seller") to SINISTRAL SHOOTING TECHNOLOGIES, LLC, an Arizona limited liability company ("Purchaser").

WHEREAS, Seller and Purchaser have entered into an Asset Purchase Agreement ("Agreement"), where herein said Agreement is fully incorporated, and pursuant to which Seller has agreed to convey, transfer and assign to Purchaser, Seller's right to:

(a) One (1) CAV-15 MKII cores and cavities;
(b) One (1) CAV-15 MKI cores and cavities;
(c) One (1) CAV-15 mold base;
(d) One (1) CAV-15 linear vibration welding resin base fixtures;
(e) All Licenses for the above described assets to the extent that they are assignable, including those set forth on Schedule 4.25 of the Agreement; and
(f) All records required to be kept on the above described assets pursuant to parts 447, 478, and, 479 of C.F.R. title 27 ((a)-(f) are hereinafter collectively known as "Transferred Assets).

WHEREAS, in performance of its obligations under the Agreement, Seller desires to execute and deliver this Bill of Sale and Assignment to Purchaser to transfer Seller's right in the Transferred Assets.

NOW, THEREFORE, for and in consideration of the Purchase Price to be paid in accordance with the Agreement, Seller does hereby grant, sell, bargain, warrant, assign, convey and transfer unto Purchaser, the Transferred Assets.

TO HAVE AND TO HOLD, all of said Transferred Assets unto Purchaser and its successors and assigns forever; and Seller hereby covenants with Purchaser that it is the lawful owner of said Transferred Assets with the free and unrestricted right to sell the same; that said Transferred Assets are free and clear of any mortgages, liens, charges or encumbrances of any nature whatsoever not expressly disclosed in the Agreement or any Schedule thereto; and that Seller will warrant and defend the title of the same against the lawful claims and demands of all persons whomsoever.

IN WITNESS WHEREOF, the undersigned has caused this Bill of Sale and Assignment to be executed on the date first above written.

SELLER:

By: _____

Shawn M. Nealon, President
Calvary Arms Corporation

KEA000028

STATE OF ARIZONA          )
                          ) ss.
COUNTY OF MARICOPA)

    On this _3_ day of _MAY_____, 2010, before me appeared Shawn M. Nealon, to me personally known, who by me was duly sworn, and acknowledged to me that he is the president of Calvary Arms Corporation and acknowledged that he executed the foregoing Bill of Sale and Assignment.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year first above written.

                    _____
                    Notary Public in and for said
                    County and State

My Commission Expires:

_11-14-2011_

DREW C ETZEN
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
MY COMM. EXPIRES 11-14-2011

KEA000029

Exhibit 2
2010-06-18 Agreement of Sale
between Calvary Arms Corp
and Cavalry Manufacturing,
LLC

# AGREEMENT OF SALE

## BY AND BETWEEN

# CALVARY ARMS CORPORATION,
## AN ARIZONA CORPORATION

## AND

# CAVALRY MANUFACTURING, LLC,
## AN ARIZONA LIMITED LIABILITY COMPANY

EFFECTIVE JUNE _18_ , 2010

KEA002022

## AGREEMENT OF SALE

**THIS AGREEMENT OF SALE** (this "**Agreement**") is entered into effective as of the 18 day of June, 2010 (the "**Closing Date**"), by and between CALVARY ARMS CORPORATION, an Arizona corporation ("**Seller**"), and CAVALRY MANUFACTURING, LLC, an Arizona limited liability company ("**Buyer**").

## RECITALS

A.    Seller is engaged in the business of manufacturing medical products, firearm components and general plastic/metal parts for retail and OEM sales (the "**Business**"), which is currently operating at 723 W. Commerce, Suite A, Gilbert, AZ 85233.

B.    Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the assets of the Business, upon the terms and conditions set forth in this Agreement.

C.    Buyer and Seller are making certain representations, warranties and covenants and indemnities herein as inducements to each other to enter into this Agreement.

**NOW THEREFORE**, in consideration of the respective representations, warranties, covenants and indemnities contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## SALE OF ASSETS

**1.1 Assets**.  Subject to the terms and conditions of this Agreement, Seller hereby assigns, sells, transfers, conveys and delivers to Buyer, and Buyer purchases from Seller, all of Seller's right, title and interest in and to the Assets (as defined below).  This Agreement is for the purchase and sale of the Assets only.  Accordingly, this Agreement excludes, and Buyer does not assume, any liabilities of Seller except only those expressly assumed or taken subject to hereunder.  The Assets consist of the following:

(a) Tangible Property.  All equipment, appliances, tools, machinery, supplies, computers, furniture, fixtures, vehicles, leases and other tangible personal property of Seller wherever located, including, without limitation, the assets listed on **Exhibit A**.

(b) Inventory.  All of Seller's inventory on hand as of the Closing Date.

(c) Cash and Bank Accounts.  All cash assets of the Business and/or Seller such as checking and savings accounts, petty cash and cash on hand as of the Closing Date.

(d) Accounts Receivable.  All of Seller's accounts receivable as of the Closing Date.

(e) Intangible Property.  All of the intangible personal property of Seller, including but not limited to goodwill, contract rights, permits, licenses, customer lists,

KEA002023

designs, inventions, intellectual property rights, know-how, trade secrets, confidential information, software, business and financial records, supplier and distribution lists, catalogs and marketing material, price lists, technical information, trade information, consulting plans, and every other item of intangible personal property owned, licensed, leased or held through any other means or means by Seller and used in Seller's Business including, without limitation, all of Seller's right, title and interest in and to the following:

      (i)   <u>Name</u>. The names "Calvary Arms," "Cavalry Arms" and "Cavalry Manufacturing."

      (ii)   <u>Trademarks and Trade Names</u>. All trademarks and trade names of the Seller including, without limitation, the trademark registered with the Arizona Secretary of State at File No. 44156, and described as follows: "A pair of crossed sabers, in their scabbards, hilts down, blades facing out and upward. Above the sabers in a Bakersville old face font in a scrolled banner are the words "Cavalry Arms". The word "Corporation" appears below in a banner." Seller shall execute an Assignment of Trademark to assign its rights to this trademark (the "**Assignment of Trademark**").

      (iii)   <u>URL</u>. All URLs of Seller including, without limitation, www.cavalryarms.com.

      (iv)   <u>Telephone, Etc</u>. All telephone numbers (including 480-833-9685, 480-558-7192, and 480-497-4002) and advertisements currently used in the operation of the Business. Buyer shall open new accounts for telephone and other trade accounts not assigned hereunder beginning with the Closing Date.

    (f)   <u>Leased Equipment</u>. Seller is a party to two equipment leases, each of which is subject of a Financing Statement (UCC-1) (the "**Equipment Leases**"). Seller hereby represents and warrants to Buyer that each of the Equipment Leases has been fully paid and Seller owns the underlying assets free and clear. As of the Closing Date, Seller has filed UCC Termination Statements (UCC-3) with respect to the Equipment Leases.

    (g)   <u>Rights to Assets Held by ATF</u>. Except for the firearms listed on *Exhibit B*, all of Seller's rights to the firearms and other assets currently held by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("**ATF**").

  **1.2 <u>Excluded Assets</u>**. Notwithstanding any other provision of this Agreement to the contrary, Buyer shall not acquire and Seller shall not sell to Buyer any of the following: personal items such as plaques and personal documents, Seller's records such as tax returns, financial statements and similar items, which shall remain the sole property of Seller and are excluded from the Assets.

  **1.3 <u>No Assumed Liabilities</u>**. Except for accounts payable to AZP & ASSOCIATES that were incurred in the ordinary course of Seller's business, Seller is not assigning and Buyer is not assuming or agreeing to pay or otherwise discharge any debt, liability or obligation of Seller of any nature whatsoever (whether accrued, absolute, contingent or otherwise), and Seller shall

2

KEA002024

continue after the Closing Date to be responsible for all such debts, obligations and liabilities, other than liabilities accruing subsequent to the Closing Date. The liabilities excluded include, without limitation, any costs associated with Seller's obligations arising out of or related to any employment agreement, pension or retirement plan, profit-sharing plan, stock purchase or stock option plan, medical insurance plan, compensation and bonus agreement, vacation or severance pay plan or agreement or any other employee benefit plan.

All other obligations accruing prior to and existing on the Closing Date are and shall remain the sole obligation and responsibility of Seller.

**1.4 Real Property Leases**. Seller is currently a party to two real property leases: (i) property located at 725 W. Commerce, Suite 120, Gilbert, AZ 85233, and (ii) property located at 723 W. Commerce, Suites 1A and 2B, Gilbert, AZ 85233 (the lease for this property has terminated and Seller is leasing this space as a month to month tenant (the "**Real Property Leases**"). Buyer is not assuming or agreeing to pay or otherwise discharge either of the Real Property Leases.

### ARTICLE II
### PURCHASE PRICE AND CLOSING

**2.1 Purchase Price**.

(a) Pre-Adjustment Purchase Price. Subject to the adjustments set forth below, the purchase price for the Assets shall be Two Hundred Ninety Thousand and No/100 Dollars ($290,000.00) (the "**Pre-Adjustment Purchase Price**").

(b) Adjustments to Purchase Price. Seller anticipates that it will be required to pay a fine to ATF for violation of Federal firearms laws, which is anticipated to be in the amount of Ten Thousand Dollars ($10,000) (the "**Fine**"). The Pre-Adjustment Purchase Price shall be reduced by the amount of the Fine if imposed on, and paid by, Seller prior to the Closing Date. In the event the Fine is imposed on Seller after the Closing Date, Buyer may, if requested by Seller, pay such Fine on Seller's behalf. In such event, the Pre-Adjustment Purchase Price shall be reduced by the amount of the Fine. The Pre-Adjustment Purchase Price, as reduced by the amount of the Fine pursuant to this Section 2.1(b), shall be the total amount to be paid Seller by Buyer (the "**Purchase Price**").

**2.2 Payment of Purchase Price**. Subject to the adjustment described in Section 2.2(a) below, Buyer shall pay the Purchase Price to Seller in monthly installments of Five Thousand Dollars ($5,000.00), without interest, until the Purchase Price has been paid in full. The first payment shall be due and payable on the last day of the month which includes the Closing Date.

(a) Notwithstanding the foregoing, the payment due from Buyer to Seller in any given month shall not exceed an amount equal to fifty percent (50%) of the prior month's net profits, as determined by Buyer in its sole and absolute discretion.

3

KEA002025

**2.3 Concurrent Deliveries**.

(a) Concurrent herewith (the "**Closing**"), or as soon hereafter as practicable, Seller shall deliver to Buyer the following:

(i) An Assignment and Bill of Sale (the "**Bill of Sale**"), assigning to Buyer all of Seller's right, title, and interest in the Assets, substantially in the form of *Exhibit C*;

(ii) The Assignment of Trademark, substantially in the form of *Exhibit D*;

(iii) Possession of the Assets;

(iv) Copies of this Agreement, the Bill of Sale and the Assignment of Trademark executed by Seller; and

(v) Such other documents as may be required by this Agreement or as reasonably requested by Buyer.

(b) Buyer shall deliver to Seller concurrently herewith the following:

(i) Copies of this Agreement executed by Buyer; and

(ii) Such other documents as may be required by this Agreement or as reasonably requested by Seller.

**2.4 Allocation of Purchase Price**. After the Closing, Seller and Buyer agree to cooperate in connection with the allocation of the Purchase Price and preparation of Form 8594, and agree to report the allocation of the Purchase Price in accordance with this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, as of the Closing Date:

**3.1 Organization and Existence**. Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Arizona, and has full power and authority to carry on its business as now being conducted, to own and operate its properties and assets, and to perform all its obligations under this Agreement, the Bill of Sale and all other documents contemplated by this Agreement.

**3.2 Authority**. Seller has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement, the Bill of Sale, and all other documents anticipated to be entered into by Seller in connection with this Agreement, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding agreement of Seller enforceable against Seller in accordance with its terms. The Bill of Sale, when executed by Seller, will have been duly and

4

KEA002026

validly executed and delivered by Seller and will constitute the legal, valid, and binding agreement of Seller, enforceable against Seller in accordance with its terms. Each individual executing this Agreement, the Bill of Sale, and all other documents hereunder on behalf of Seller, has the legal power, right and actual authority to bind Seller to the terms and conditions hereof and thereof.

    **3.3**   **Title to Assets; Contracts Assignable and In Full Force and Effect.** Seller is the legal and equitable owner of the Assets free and clear of any mortgages, liens, charges, claims, security interests or encumbrances. Upon the Closing, Seller will convey to Buyer good and indefeasible title to the Assets, free and clear of any and all mortgages, liens, charges, claims, security interests and encumbrances of any kind, character or nature whatsoever.

    **3.4 Employees.** With respect to any of its present or former employees, Seller does not presently maintain, contribute to or have any liability under any employee benefit or welfare plan, including, but not limited to: (i) any nonqualified deferred compensation or retirement plan or arrangement that is an "employee benefit plan" under the Employee Retirement Income Security Act of 1974 ("**ERISA**"); (ii) any qualified defined contribution retirement plan or arrangement; (iii) any qualified defined benefit pension plan or arrangement; or (iv) any unfunded or funded medical, health or life insurance plan or arrangement for present or future retirees or present or future terminated employees that is an "employee benefit plan" under ERISA.

    **3.5 Environmental Compliance**. Seller does not use and has not used any materials or substances that any federal, state or local law may define as a "hazardous waste" or "hazardous substance" or that any applicable law or governmental authority regulates (collectively, "**Hazardous Materials**"), in any manner that: (i) affects the Assets or any facility or property used in connection with the operation of Seller's business or the use of the Assets; or (ii) violates any laws governing the use, storage, transportation, manufacture, handling, production or disposal of Hazardous Materials.

    **3.6**   **Bankruptcy.** Seller has not made any assignment for the benefit of creditors, filed any petition in bankruptcy, been adjudicated insolvent or bankrupt, petitioned or applied to any tribunal for any receiver, conservator or trustee of it or any of its property or assets, or commenced any proceeding under any reorganization arrangement, readjustment of debt, conservation, dissolution or liquidation law or statute of any jurisdiction; and no such action or proceeding has been commenced or threatened against Seller by any creditor, claimant, governmental authority or any other person.

    **3.7**   **Compliance with Laws.** Seller has conducted and continues to conduct the Business in accordance with all applicable governmental laws and regulations and is not in violation of any such law or regulation.

    **3.8**   **No Broker's or Finder's Fees.** No agent, broker, investment banker or similar person has acted directly or indirectly on behalf of Seller in connection with this Agreement or the transactions contemplated hereby, and no person, including Seller, is or will be entitled to any broker's or finder's fee or any other commission or similar fee or expense, directly or indirectly, in connection with this Agreement or the transactions contemplated hereby.

KEA002027

**3.9   Litigation**. With the exception of the activities relating to the Fine, Seller is not engaged in any pending litigation or any other claim, action or suit relating to the Business and/or Assets, and does not have any knowledge of nor has Seller received notice of any threatened litigation, claim, action or suit, or any violation, default or noncompliance on its part with respect to the Business and/or Assets.

**3.10   Undisclosed Liabilities**. To Seller's best knowledge and belief: (a) with the exception of the firearms currently held by ATF, neither Seller nor the Assets are subject to any liability or obligations of any nature, whether absolute, accrued, contingent or otherwise and whether due or to become due, arising out of or relating to the Assets; (b) there is no basis for the assertion against Seller of any such liability or obligation; (c) there are no tax liens upon any of the Assets; (d) there are no pending questions relating to, or claims asserted for, taxes or assessments against Seller with respect to the Assets; and (e) there is no basis for any such question or claim.

**3.11   Accuracy of Disclosures, Representations and Warranties**. To Seller's best knowledge and belief, the information provided to Buyer by Seller represents full and fair disclosure and is true and complete in all material respects and may be relied on by Buyer, and does not contain any untrue statement of material fact, or omit a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.

**3.12   Consents and Approvals**. The execution, performance and delivery by Seller of this Agreement and the related agreements and documents referred to in this Agreement or the performance of any act contemplated under this Agreement, do not require the consent, approval or action of, or filing with or notice to, any corporation, person, firm or federal, state, municipal or other governmental entity.

**3.13   Taxes**. Seller has filed all federal, state and other returns, reports and information returns required to be filed by it with respect to Taxes (as defined below) which relate to the Assets, results of operations or financial condition of Seller (collectively, the **"Returns"**) and has timely paid all Taxes shown to be due on the Returns. All Returns filed are complete and accurate in all material respects, and Seller owes no additional Taxes with respect to the periods covered by the Returns. All deficiencies in Taxes asserted or assessments made by any taxing authority have been fully paid or finally settled. All Taxes, which Seller has been required to collect or withhold, have been withheld or collected and, to the extent required, have been paid to the proper taxing authority. The term **"Taxes"** means all taxes, charges, fees, levies or other assessments including without limitation income, excise, property, sales, use and franchise taxes imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof, and including any interest, penalties or additions.

**3.14   No Waiver**.. No investigation by or on behalf of Buyer will constitute a waiver as to enforcement of any representation, warranty or covenant contained therein, or a waiver as to any indemnification to which Buyer may be entitled under this Agreement.

6

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that, as of the Closing Date:

**4.1** **Organization and Existence**.  Buyer is a limited liability company duly organized and validly existing under the laws of the State of Arizona and has full power and authority to carry on its business as now being conducted, to own and operate its properties and assets, and to perform all its obligations under this Agreement.

**4.2** **Authority**.  Buyer has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and all other documents anticipated to be entered into by Buyer in connection with this Agreement, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  No proceedings or authorizations that have not already been taken, are necessary to authorize the execution and delivery of this Agreement, the performance of Buyer's obligations hereunder, or the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes the legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms.  Each individual executing this Agreement on behalf of Buyer, has the legal power, right and actual authority to bind Buyer to the terms and conditions hereof.

**4.3** **No Broker's or Finder's Fees**.  No agent, broker, investment banker or similar person has acted directly or indirectly on behalf of Buyer in connection with this Agreement or the transactions contemplated hereby, and no person, including Buyer, is or will be entitled to any broker's or finder's fee or any other commission or similar fee or expense, directly or indirectly, in connection with this Agreement or the transactions contemplated hereby.

## ARTICLE V
## ADDITIONAL COVENANTS AND AGREEMENTS

**5.1** **Expenses**.  Except as otherwise expressly provided herein, each party to this Agreement shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.  The parties understand and acknowledge that Buyer is acquiring the Assets of Seller and that Buyer has not agreed to assume or pay any of Seller's costs incurred in consummating the transactions contemplated hereby, including, but not limited to, any legal, accounting, tax or transaction costs.

**5.2** **Seller's Name**.  Within thirty (30) days after the Closing Date, Seller shall file the appropriate Amendment to its Articles of Incorporation changing Seller's legal name, and Seller shall deliver a "filed" of the Articles of Amendment to Buyer within thirty (30) days after receipt from the Arizona Corporation Commission.

**5.3** **Credit Card Processing**.  It is anticipated that Buyer will obtain a separate account to process credit card transactions as soon as practicable following the Closing.  Prior to Buyer's

7

KEA002029

establishment of its own account, Seller will use its good faith efforts to change the routing number on its credit card processing account to that of Buyer. If this is not possible, Seller agrees to transfer all deposits made into its credit card processing account following the Closing to an account designated by Buyer, not less frequently than once every forty-eight (48) hours. Buyer shall cause a separate credit card processing account to be set up as quickly as is reasonably possible.

**5.4 Employees of Seller**. Buyer shall have no liabilities or obligations whatsoever with respect to Seller's employees. Without limiting the foregoing, Seller has elected to terminate all of its employees as a result of the sale of the Assets to Buyer or as a result of other reasons, and thus Seller, and not Buyer, shall be obligated to give whatever notices are required under any laws or other agreement Seller has previously entered into with respect to any of Seller's employees. Seller agrees to indemnify and hold harmless Buyer against any and all claims, suits, liabilities and damages (including Buyer's reasonable attorneys' fees and costs) relating to actions, events or omissions occurring prior to the Closing Date involving workers who as of or prior to the Closing Date are, or have been in the past, employed by Seller, including, without limitation, any liability resulting from termination or severance of Seller's employees. Buyer shall have no liability or obligation whatsoever to Seller or Seller's employees in connection with any benefit plan or personnel policy for the benefit of Seller's employees, including, but not limited to, health insurance, vacation pay, life insurance, severance benefits and disability insurance.

**5.5 Employees**. As of the Closing Date, (a) Seller will terminate the employment of each of Seller's employees; (b) Seller will notify the employees of their termination as of the Closing Date in accordance with the terms of the employment agreements between the Seller and each of Seller's employees; and (c) Buyer will offer new employment contracts to such of Seller's employees as Buyer determines, in its sole discretion. Seller and Buyer will coordinate their efforts so that the termination notice and offer for employment are made simultaneously.

**5.6   Survival of Representations and Warranties**. The respective representations, warranties and covenants of each Party hereto shall survive the Closing Date and the consummation of the transactions contemplated hereby.

## ARTICLE VI
## INDEMNIFICATION

**6.1   Indemnification by Seller**. Seller shall indemnify Buyer and hold Buyer harmless for, from and against any and all damages, costs, or expenses (including reasonable attorneys' fees) ("**Damages**") arising out of or resulting from (a) any misrepresentation or breach of any representation, warranty, covenant, or agreement made by Seller in this Agreement, or (b) any and all actions, suits, claims, or other proceedings or investigations ("**Claims**") against Buyer that relate to the Business or the Assets in which the principal event giving rise thereto occurred on or prior to the Closing Date.

**6.2   Indemnification by Buyer**. Buyer shall indemnify Seller and hold Seller harmless for, from and against any and all Damages arising out of or resulting from (a) any misrepresentation or breach of any representation, warranty, covenant, or agreement made by

8

KEA002030

Buyer in this Agreement, or (b) any and all Claims against Seller that relate to the Business or the Assets in which the principal event giving rise thereto occurred after the Closing Date.

**6.3** **Notice of Indemnification Demand**. If a party hereto (the "**Indemnitee**") receives written notice of any claim or the commencement of any action or proceeding with respect to which the other party (the "**Indemnifying Party**") is obligated to provide indemnification pursuant to Section 6.1 or 6.2 hereof, the Indemnitee shall give the Indemnifying Party written notice thereof and shall permit the Indemnifying Party to participate in the defense of any such claim, action or proceeding by counsel of the Indemnifying Party's own choosing and at the Indemnifying Party's own expense. In addition, upon written request of the Indemnitee, the Indemnifying Party shall assume the defense of any such claim, action or proceeding. In any event, the Indemnitee and the Indemnifying Party shall cooperate in the compromise of, or defense against, any such asserted liability.

**6.4 Buyer's Right to Setoff**. In the event Seller fails to perform its indemnification obligations pursuant to Section 6.1, Buyer shall have the right to setoff such amounts (including reasonable attorneys' fees), against any unpaid amounts due from Buyer to Seller under this Agreement.

**ARTICLE VII**
**MISCELLANEOUS**

**7.1** **Amendment and Modification**. This Agreement may be amended, modified, terminated, rescinded or supplemented only by written agreement of the parties hereto.

**7.2** **Further Assurances**. The parties hereto agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as another party hereto may at any time reasonably request, including before, on and after the Closing Date, for the purpose of carrying out the intent of this Agreement and the documents referred to herein.

**7.3** **Notices**. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when (a) delivered personally, (b) sent via facsimile (with receipt confirmed), provided that a copy is mailed by registered or certified mail, return receipt requested within two business days after being sent via facsimile, (c) received by the addressee, if sent by Express Mail, Federal Express or other express delivery service (receipt requested), or (d) three business days after being sent by registered or certified mail, return receipt requested, in each case to the other party at the following addresses and facsimile numbers (or to such other address or facsimile number for a party as shall be specified by like notice; provided that notices of a change of address or facsimile number shall be effective only upon receipt thereof):

If to Seller:

        CALVARY ARMS, INC.
        ATTN:  Shawn M. Nealon
        1334 S. Glenview Cir.
        Mesa, AZ  85204

9

KEA002031

If to Buyer:

      CAVALRY MANUFACTURING, LLC
      ATTN:  Christian Cappello
      723 W. Commerce, Suite A
      Gilbert, AZ 85233

    **7.4**  **Binding Effect**.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement is not intended to and shall not confer upon any person other than the parties any rights or remedies hereunder or with respect hereto.

    **7.5**  **Governing Law**.  This Agreement shall be governed by the laws of the State of Arizona (regardless of the laws that might otherwise govern under applicable Arizona principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.  It is intended by the parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against either party, and neither party shall be deemed to be the drafter of this Agreement.

    **7.6**  **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

    **7.7**  **Entire Agreement**.  This Agreement, including the Exhibits and the documents, instruments and schedules referred to herein, embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

    **7.8**  **Time of Essence**.  With regard to all time periods set forth or referred to in this Agreement, time is of the essence.

    **7.9**  **Severability**.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of the court of competent jurisdiction declares that a term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

    **7.10**  **Incorporation of Exhibits**.  The exhibits identified in this Agreement are incorporated herein by reference and are a part hereof.

KEA002032

**7.11  Facsimiles.**  In order to facilitate completion of the transaction co    .nplated by this Agreement, the parties agree that facsimile copies of documents and signatures ı ay be used and will be considered to be as valid as originals.

**7.12  Arbitration.**  The parties agree that any dispute arising out of this Agreement, or any of the documents signed in connection herewith, shall be resolved through arbitration in accordance with the then current Rules of Commercial Arbitration of the American Arbitration Association or any successor organization (the "AAA"). The party desiring to initiate the arbitration process shall give written notice to that effect to the other party and shall, in such written notice, include a brief statement of its claims. Within ten (10) days of the notice of intent to arbitrate, the parties shall meet for the purpose of attempting to jointly select a single arbitrator to serve in the matter. If they are unable to agree on the designation of the arbitrator, either party may apply to the AAA for the appointment of a single arbitrator in accordance with the rules of the AAA then in effect. The arbitration proceeding shall be held within sixty (60) days of the appointment of the arbitrator and the arbitrator shall render his or her decision within thirty (30) days after the conclusion of the arbitration proceeding. The decision of the arbitrator shall be final and binding upon, and non-appealable by, the parties and any judgment may be had on the decision and award so rendered in any court of competent jurisdiction. The prevailing party shall be entitled to all costs incurred in connection with the arbitration proceeding, including the fees of the arbitrator, its reasonable attorneys' fees, witness fees and other costs as determined by the arbitrator.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**SELLER:**                                          **CALVARY ARMS CORPORATION, an Arizona corporation**

By _____

Shawn M. Nealon, President

**BUYER:**                                           **CAVALRY MANUFACTURING, LLC, an Arizona limited liability company**

By _____           6·18-10

Christian Cappello, Manager

OFFICIAL SEAL
DEBRA BONAFIDE
NOTARY PUBLIC – ARIZONA
MARICOPA COUNTY
My Comm. Expires April 12, 2011

STATE OF ARIZONA

COUNTY OF Maricopa ss.

This instrument was acknowledged before me this 18 day of June, 20 10, by Christian Cappello

In witness whereof I herewith set my hand and official seal.

Notary

OFFICIAL SEAL
DEBRA BONAFIDE
NOTARY PUBLIC – ARIZONA
MARICOPA COUNTY
My Comm. Expires April 12, 2011

KEA002033

## ASSIGNMENT AND BILL OF SALE

THIS ASSIGNMENT AND BILL OF SALE (this "**Bill of Sale**"), effective as of the _18_ day of June, 2010, is executed by CALVARY ARMS CORPORATION, an Arizona corporation ("**Seller**"), to and in favor of CAVALRY MANUFACTURING, LLC, an Arizona limited liability company ("**Buyer**").

### RECITALS:

A. Seller and Buyer have entered into an Agreement of Sale dated effective as of the date of this Bill of Sale (the "**Purchase Agreement**") whereby Seller agreed to sell and Buyer agreed to purchase, substantially all of Seller's tangible assets and certain intangible assets.

B. Seller, for the payment by Buyer of the Purchase Price specified in the Purchase Agreement, desires to sell, convey, transfer, assign, and deliver to Buyer all of its right, title and interest in and to the Assets, as defined in the Purchase Agreement.

C. In conjunction with the closing of the transactions contemplated by the Purchase Agreement, this Bill of Sale is executed for the purpose of transferring to Buyer all of Seller's right, title and interest in and to the property covered by this Bill of Sale.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Except as otherwise provided herein, all capitalized terms contained and not defined herein (including the recitals hereto) shall have the respective meanings ascribed to them in the Purchase Agreement.

2. Seller hereby irrevocably sells, transfers, conveys, assigns, and delivers to Buyer all of its right, title and interest in and to the Assets pursuant to the representations and warranties set forth in the Purchase Agreement, with the same effect as if such representations and warranties were fully set forth herein.

3. At any time or from time to time after the date hereof, at Buyer's request and without further consideration, Seller shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment, and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order to transfer, convey, and assign to Buyer, and to confirm Buyer's title to, all of the Assets, and, to the full extent permitted by law, to put Buyer in actual possession and operating control of the Assets and to assist Buyer in exercising all rights with respect thereto.

4. This Bill of Sale is delivered pursuant to and is subject to the Purchase Agreement. In the event of any conflict between the terms of the Purchase Agreement and the terms of this Bill of Sale, the terms of the Purchase Agreement shall prevail.

KEA002034

5.  This Bill of Sale and all of the provisions hereof shall be binding upon and shall inure to the benefit of the respective parties and their assigns, transferees, and successors.  This Bill of Sale is made in the State of Arizona, and shall be governed by and construed in accordance with the laws of the State of Arizona applicable to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof, except that if it is necessary in any other jurisdiction to have the law of such other jurisdiction govern this Bill of Sale in order for this Bill of Sale to be effective in any respect, then the laws of such other jurisdiction shall govern this Bill of Sale to such extent.

IN WITNESS WHEREOF, the Seller has executed this Bill of Sale to be effective as of the day and year first above written.

**Seller:**

STATE OF ARIZONA

COUNTY OF Maricopa

This instrument was acknowledged before me this 18 day of June, 20 10 by Shawn M Nealon

In witness whereof I herewith set my hand and official seal.

Notary Public

**CALVARY ARMS CORPORATION, an Arizona corporation**

By _____

Shawn M. Nealon, President

**Agreed to by Buyer:**

OFFICIAL SEAL
DEBRA BONAFIDE
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires April 12, 2011

**CAVALRY MANUFACTURING, LLC, an Arizona limited liability company**

By _____

Christian Cappello, Manager

STATE OF ARIZONA

COUNTY OF Maricopa

This instrument was acknowledged before me this 18 day of June, 20 10 Christian Cappello

In witness whereof I herewith set my hand and official seal.

Notary Public

OFFICIAL SEAL
DEBRA BONAFIDE
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires April 12, 2011

2

KEA002035

**EXHIBIT A**
**List of Assets**

1. Van Dorn 300 ton injection molding press

2. Branson Linear Vibration Welder

3. Connex (storage container)

4. Ford Van (1995) VIN # 1FBJS31H1SHB99265

5. Trailer (title currently in possession of ATF)

6. Tourniquet Mold (located at Cavalry Arms)

7. All molds located at the premises of RED RIB, INC., an Arizona corporation doing business as AZP & ASSOCIATES, 4210 S. 36th St., Phoenix, Arizona  85040 including, without limitation, the following:

   a. C1 Mold.

   b. C2 Mold

   c. C3 + C4 Mold

   d. C6 + C8 Mold

   e. C7 + C5 Mold

   f. C9 Mold

   g. Bullet tray

   h. Letter Opener + Bushing Wrench Mold

   i. Night Vision Cap Mold

   j. Buttplate and Trap Door Mold

KEA002036

## EXHIBIT B
## Excluded Firearms

| MANUFACTURER | TYPE | MODEL | CALIBER | SERIAL NUMBER |
|---|---|---|---|---|
| Molot/Robinson Arms | Rifle | Vper | 7.62x39mm | 03kk7112 |
| Mauser/Century Arms | Rifle | M98 | .30-06 | 8868 |
| MAS/Century Arms | Rifle | Mas-36 | 7.5x54mm | 60051 |
| Savage | Rifle/Shotgun | | .22mag/20g | 24J-DL |
| Ruger | Rifle | 22-Oct | .22 Long Rifle | 237-57132 |
| Springfield Armory | Rifle | 84C | .22 Long Rifle | unknown |
| Smith & Wesson | Pistol | Airlite | .38 Spc | COHO120 |
| Smith & Wesson | Pistol | 686 | .357 Mag | CEU8617 |
| Benelli | Shotgun | M3 | 12 g | C480811 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | ASA0076 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Monkey Girl 01 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | RAD |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Voodoo 2 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | People Eater 01 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Banana Phone 01 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Problem Solver 01 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Cav Scout-001 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | C-182 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Everheart 005 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | GUNGNIR |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Castlearms-03 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | People Eater |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | A-41 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | A-46 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | A-21 |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | SANDMAN |
| Cavalry Arms | Rifle | CAV-15 | .223 Rem | Voodoo |
| Sabre Defense | Rifle | SR15 | 5.56 | SDI1473 |
| American Spirit Arms | Rifle | ASA-PR15 | .223 Rem | PROTO |
| Glock | Pistol | 34 | 9mm | HPE111 |
| Glock | Pistol | 19 | 9mm | CZD814 |
| Glock | Pistol | 17 | 9mm | GKS532 |
| Taurus | Pistol | PT-22 | .22 Long Rifle | USA0689 |
| Cz | Pistol | CZ40V | .20 S&W | A7529 |
| Kel Tec | Pistol | P32 | .32 ACP | 53606 |
| Kel Tec | Pistol | P3AT | .380 ACP | H6V22 |
| Mauser | Pistol | ST A1B | .30 Mauser | 489407 |
| Browning | Shotgun | Invictor Plus | 12g | 13371PX152 |
| Mossberg | Shotgun | 500A | 12g | L338867 |
| Armalite | Rifle | AR-180B | 5.56mm | US202845 |
| Armalite | Rifle | AR-10 | 7.62mm | US347774 |
| ITM Arms Co. | Rifle | AK-74 | 5.45x39mm | 303382 |
| Arsenal | Rifle | SLR-95 | 7.62x39mm | AE37296 |

KEA002037

| MANUFACTURER | TYPE | MODEL | CALIBER | SERIAL NUMBER |
|---|---|---|---|---|
| Vulcan Arms | Rifle | V15 | 5.56mm | P008142 |
| Savage | Pistol | 1907 | .32 ACP | 1913 |
| Russian American Arms | Shotgun | Saiga-12 | 12g | H06421746 |
| Unknown (German) | Pistol | | 7.72mm | 8591 |
| CCF Race Frames | Pistol | G17/22 | .40 S&W | CGL919 |
| Savage | Shotgun | 720 | 12g | 72020 |
| Winchester/Sears | Shotgun | M200 | 12g | P294612 |
| Remington | Shotgun | 870 Express | 12g | A925675M |
| Cavalry Arms | Rifle | Cav 15 | .223 Rem | PHXPD01 |
| Cavalry Arms | Rifle | Cav 15 | .223 Rem | PHXPD02 |
| Cavalry Arms | Rifle | Cav 15 | .223 Rem | PHXPD03 |
| Cavalry Arms | Rifle | Cav 15 | .223 Rem | PHXPD04 |
| Cavalry Arms | Rifle | Cav 15 | .223 Rem | KIRCHER2005 |
| Cavalry Arms | Rifle | Cav 15 | .223 Rem | CAVDAR |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000001 |
| Cavalry Arms | SBR | Cav 15A | .223 Rem | CA000002 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000003 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000004 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000005 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000006 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000007 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000008 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000009 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000010 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000016 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000100 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000200 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000242 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000300 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000400 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000500 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000600 |
| Cavalry Arms | Rifle | Cav 15A | .223 Rem | CA000700 |
| Cavalry Arms | SBR | PS90 | 5.7mm | FN037949 |
| Sabre Defense | Rifle | SR-15 | 5.56mm | SDI0023 |
| Sabre Defense | Rifle | SR-15 | 5.56mm | SDI0053 |
| Century Arms | Rifle | WASR-2 | 5.45x39mm | 217649-06 |
| Century Arms | Rifle | PSL54C | 7.62x54R | H376678 |
| DC Industries | SBR | NDS-M92 | 7.62x39mm | K1210 |
| DC Industries | Rifle | NDS-2SF | 5.45x39mm | AKS740277 |
| Benelli | SBS | M1 Entry | 12g | M132271 |
| IMI | Rifle | Uzi | .45 ACP | 9677 |
| RPB Industries | Pistol | M-10 | .45ACP | SAP453448 |
| Foster Industries | Pistol | 1911 | Multi | F21075 |
| Ruger/SJM | Surpressed Pistol | MK2 / MK2S | .22 lr | PA12 |
| SJM | Surpressor | Q | 9mm | PA02 |

B-2

KEA002038

| MANUFACTURER | TYPE | MODEL | CALIBER | SERIAL NUMBER |
|---|---|---|---|---|
| Smith & Wesson | Machinegun | 76 | 9mm | U4257 |
| Colt | Machinegun | M16A1 | 5.56mm | 9244331 |
| Shawn Nealon | Machinegun | PKM | 7.62x54R | S0069 |
| Shawn Nealon | Machinegun | PKM | 7.62x54R | S0057 |
| Shawn Nealon | Machinegun | M1919A6 | .30 Cal | 4038 |
| Shawn Nealon | Machinegun | M-60 | 7.62mm | 7269239 |
| Shawn Nealon | Machinegun | Bren Mk1 | 0.303 | 1943 |
| Shawn Nealon | Surpressor | Reflex | 5.56mm | REFLEX001 |
| Gemtec | Surpressor | HALO | 5.56mm | S05-12960 |
| Gemtec | Surpressor | Outback | .22 Long Rifle | S03-8905 |
| Gemtec | Surpressor | HVT | 7.62mm | S06-14812 |
| Gemtec | Surpressor | M402 | 5.56mm | S05-13255 |
| Gemtec | Surpressor | Trinity | 9mm | S06-17271 |
| Rock Creek Gun Service | Surpressor | VKII | 9mm | 99255 |
| Military Armament Co | Surpressor | none | 9mm | S2-2000693 |
| Springfield Armory | Rifle | M1A | 0.308 | 206454 |
| VLTOR Weapon Systems | rifle | PKM | 7.62x54R | S0009 |
| Cavalry Arms Corp. | Short Barreled Rifle | CAV-15A | .223-5.56mm | CA000013 |
| Cav Arms | Machine Gun | Cav-16 | 0.223 | CavScout07 |
| Cav Arms | Machine Gun | Cav-16 | 0.223 | CavScout23 |
| Heckler & Koch | Machinegun | G36K | 5.56mm | 84-004414 |
| Century Arms International | Rifle | M44 | 7.62x54R | M44056006 |

B-3

KEA002039

**EXHIBIT C**
**Assignment And Bill of Sale**

KEA002040

**EXHIBIT D**
**Assignment of Trademark**

KEA002041

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Christian Cappello

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Calvary Arms Corporation
ATTN: Christian Cappello
723 W. Commerce, Suite A
Gilbert, AZ 85233

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
**20031278780-9**

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT (full or partial).** Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 8.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☐ CHANGE name and/or address. Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name. Give record name to be deleted in item 6a or 6b. | ☐ ADD name. Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable). |
|---|---|---|

6. CURRENT RECORD INFORMATION

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this Amendment

| OR | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **CALVARY ARMS CORPORATION** | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

10. OPTIONAL FILER REFERENCE DATA

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

KEA002042

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Christian Cappello**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Calvary Arms Corporation**
**ATTN: Christian Cappello**
**723 W. Commerce, Suite A**
**Gilbert, AZ 85233**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. ☐ |
|---|---|
| **20081538465-9** | |

2. ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial). Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **CALVARY ARMS CORPORATION** | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

KEA002043

Exhibit 3
2016-02-25 Letter from The
Tactical Medic to KE Arms re
Delivery of Blue Prints and
Thumb Drive



**Cavalry Medical LLC**
4811 E. Julep St. Suite 122
Mesa, AZ 85205
(480) 686-8844

February 25th, 2016

KE Arms
4343 E Magnolia St
Phoenix AZ 85034
Attn.: Mike

Mike,

As per the agreement we reached at your facility. I have delivered 2 boxes of assorted "Blue prints" and one thumb drive of assorted CAD/CAM files. KE Arms has agreed to compensate me for them with $1000.00 cash and $9000.00 in credit on KE Arms products (at dealer price). I will do my best to answer any future questions related to those files as well as any advice on plastics related projects.

Thank You,

Shawn M. Nealon

**Armory-0118**

KE Arms, LLC

AZ 85034

# Invoice

| Date | Invoice # |
| --- | --- |
| 11/3/2016 | 108305 |

**PAID**

**Bill To**

Shawn Nealon
4811 E Julep St Suite 122
Mesa, AZ 85205

**Ship To**

Shawn Nealon
4811 E Julep St Suite 122
Mesa, AZ 85205

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
| --- | --- | --- | --- | --- | --- | --- |
| | Website | RP | 11/3/2016 | Pick Up | | |

| Quantity | Item Code | Description | Price Each | Amount |
| --- | --- | --- | --- | --- |
| 12 | 1-50-03-416 | Carbine Length Gas Tube (Stainless Steel) | 10.36 | 124.32 |
| 10 | 1-50-03-008 | KE-15 UPPER RECEIVER | 89.95 | 899.50 |
| 10 | 1-50-03-304 | M16 BLACK BOLT CARRIER GROUP | 95.00 | 950.00 |
| 10 | 1-50-01-329 | CHARGING HANDLE | 14.95 | 149.50 |
| 15 | 1-50-01-007 | FORGED 80% KE-15 LOWER (RAW) | 43.95 | 659.25 |
| 5 | 1-50-02-007 | FORGED 80% KE-308 LOWER (RAW) | 96.95 | 484.75 |
| 25 | 1-50-01-035 | Complete Buttstock Assembly | 54.95 | 1,373.75 |
| 41 | 1-50-01-341 | KE Arms AR-15 Enchanced Lower Reciever Parts Kit | 54.95 | 2,252.95 |
| 2 | 1-50-01-510 | Trigger Test Block | 49.95 | 99.90 |
| 11 | 1-50-03-402 | Low Profile Gas Block 4130 Melonite 0.750" Diameter | 24.95 | 274.45 |
| 1 | 1-50-03-417 | Mid-Length Gas Tube (Stainless Steel) [KE Arms] | 10.36 | 10.36 |
| 10 | MISC | Ballistic Advantage M4 Barrel | 125.00 | 1,250.00 |
| 1 | DISCOUNT | Trade Discount for blueprints and part designs | -8,528.73 | -8,528.73 |
| | | Sales Tax - State and City | 8.60% | 0.00 |

| **Total** | **$0.00** |
| --- | --- |

Armory-0210

Exhibit 4
2012-02-14 Letter from Nealon
to GWACS re Equipment for
the CAV-15



February 14th, 2012

GWACS ARMORY LLC
907 S DETROIT AVE
TULSA, OK 74120

Hello,

I understand that you bought the equipment (molds, welder and press) for the CAV-15. I was the inventor of the product and did a lot of the mold work. I do not know what level of plastics experience your company has, so I thought I should introduce myself to you. The mold is less than ideal and short cuts were taken to keep the costs down. Aluminum tools are very delicate, but I was always confident I would be able to keep it running if a problem would come up. I am still on very friendly terms with most of the industry and several of the larger CAV-15 retailers are personal friends. If you need any help getting the product back into the market or have Molding issues, my services are available. Either way I wish you luck in this endeavor as I still believe it's a good product with a lot of potential.

Sincerely,

Shawn Nealon

KEA002044