**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **GWACS ARMORY, LLC** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No.:20-cv-0341-CVE-SH** |
| **KE ARMS, LLC, RUSSELL PHAGAN,** ) | **BASE FILE** |
| **SINISTRAL SHOOTING** ) | |
| **TECHNOLOGIES, LLC, BROWNELLS,** ) | Consolidated with: |
| **INC., and SHAWN NEALON,** ) | Case No. 21-CV-0107-CVE-JFJ |
| ) | |
| **Defendants.** ) | |
| **and** ) | |
| ) | |
| **KE ARMS, LLC,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| **GWACS ARMORY, LLC, GWACS** ) | |
| **DEFENSE INCORPORATED, JUD** ) | |
| **GRUDEL, RUSSEL ANDERSON, DOES I** ) | |
| **through X, and ROE CORPORATIONS I** ) | |
| **through X,** ) | |
| **Defendants.** ) | |

<u>**DECLARATION OF RUSSELL PHAGAN IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**</u>

Russell Phagan, declares as follows:

1. I am over the age of 18 years and have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true. I am competent to testify as to the facts stated herein in a court of law and will so testify if called upon.

2. I have worked in the firearm industry for about 20 years. I have broad knowledge and experience both with firearms and the firearm industry. Over the years, I have received

1

instructor certifications for various types of firearms, including rifle, pistol, personal protection, and tactical firearms. I am an also a competitive action shooter and I have competed in both locally in my home state of Arizona and nationally.

3. I am the controlling member of Sinistral Shooting Technologies, LLC ("SST"). I designed, developed, and sold stock adapter systems for Remington and Mossberg Shotguns through SST. SST also provides various firearm related consulting services for firearm companies.

## WORK AT CAVALRY

4. From 2001 to 2010, I worked or an Arizona-based firearm manufacturing company called Cavalry Arms Corporation ("**Cavalry**") which was owned by Shawn Nealon ("**Nealon**"). Over the years, I worked my way up and eventually became vice president of the company. **Exhibit 14** is a true and correct copy of my 2013 resume that outlines some of my duties and roles at Cavalry from 2001-2010.

5. My job duties at the company were very broad, and eventually, I managed most aspects of the business. My job duties included administerial work, sales, marketing purchasing, customer service, bookkeeping, overseeing employees, manufacturing, assembly, packaging, quality control, product testing, research and development, etc. *Id.*

6. Cavalry's main product was a semi-automatic rifle called the CAV-15, which I helped design, manufacture, and assemble. One of the features of the CAV-15 was its lower receiver.[1] The lower receiver on the CAV-15 was made of polymer which made it comparatively lighter than standard semi-automatic rifles that are traditionally made of wood of metal alloy, such

---

[1] In firearms terminology, the receiver is the part of a firearm which integrates other components by providing housing for internal action components such as the hammer, bolt or breechblock, firing pin and extractor, and has threaded interfaces for externally attaching (also known as receiving) components such as the barrel, stock, trigger mechanism and iron/optical sights. The receiver is often made of forged, machined, or stamped steel or aluminum; in addition to these traditional materials, modern science and engineering have introduced polymers and sintered metal powders to receiver construction.

as aluminum. The lower receiver on the CAV-15 was also monolithic, meaning the entire lower receiver, including its stock, grip, and magazine well, were all one piece.

7.      Cavalry openly shared all its information related to the manufacturing techniques, processes, and designs on its website and with customers Over the course of Cavalry's existence, every piece of information related to the production, manufacture, and design of the CAV-15 and its lower receiver was publicly disclosed. Cavalry did this in part because customers were generally leery of the use of polymer in firearms and transparency helped alleviate concerns.

8.      Cavalry's first polymer lower receiver was called the CAV-15, which was later retroactively named the MKI ("**MKI**"). The MKI was inspired by other polymer rifles available at the time, including the Colt polymer lower receiver rifle developed in the late 1960s, and the Steyr Aug bullpup semi-automatic rifle. Cavalry later developed an improved iteration or derivative of the MKI which was called the CAV-15 MKII ("**MKII**"). Cavalry's final iteration of the CAV-15 was called the MKIII (the "**MKIII**"), but the MKIII just a prototype and was never manufactured due to issues Cavalry had with its federal firearms license.

9.      To my knowledge, Cavalry never registered any patents, trademarks, and copyrights for the CAV-15, the MKI, the MKII, or the MKII.  I have searched the United States Patent and Trademark Office ("**USPTO**") database and found no registered trademarks or patents for the CAV-15, the MKI, the MKII, or the MKII.

## CAVALRY ASSET SALE

10.     In early 2010, Cavalry ceased operations, surrendered its Federal Firearms License ("**FFL**"), and began selling off all of its assets, including its assets related to the CAV-

11.     On or about March 3, 2010, Cavalry and SST entered into an asset purchase agreement (the "**Cavalry-SST APA**"). **Exhibit 1** is a true and correct copy of the Cavalry-SST APA. The assets that Cavalry sold SST are expressly defined in the agreement as follows:

(a) One (1) CAV-15 MKII cores and cavities;

3

(b) One (1) CAV-15 MKI cores and cavities;

(c) One (1) CAV-15 mold base;

(d) One (1) CAV-15 linear vibration welding resin base fixtures;

(e) all of Seller's CAV-15 drilling fixtures; all CAV-15 specific hand tools all CAV-15 specific nuts, bolts, screws, roll pins: all CAV-15 front and rear pivot; take down pins; all CAV-15 serial number tags;

(f) all Licenses for the above-described assets to the extent that they are assignable, including those set forth on Schedule 4.1;

(g) all records required to be kept on the above-described assets pursuant to parts 447, 478, and, 479 of C.F.R. title 27.

12.     The Cavalry-SST APA does not expressly contain any intellectual property, design prints, or CAD/CAM files. *See id.*

13.     Around this time, former Cavalry Arms operations manager, Christian Capello, started Cavalry Manufacturing, LLC ("**Cavalry Mfg.**").

14.      On or about June 18, 2010, Cavalry Mfg. entered into an agreement of sale (the "**Cavalry IP Agreement**") which is attached as Exhibit 2 to the Declaration of Shawn Nealon in Support of his Motion for Summary Judgment, on file herein. Under the Cavalry IP Agreement, Cavalry sold all of the tangible assets Cavalry had at the time, including:

> "All of the intangible property of [Cavalry], including but not limited to [Cavalry's]... **intellectual property rights, know-how, trade secrets, confidential information, software**, business and financial records, supplier and distribution lists and marketing material, price lists, catalogs and marketing material, price lists, technical information, trade information, consulting plans, and every other item of intangible personal property owned, licensed, leased, or held through any other means or rights by [Cavalry] and used in [Cavalry]'s business including, without limitation, … The

names "Calvary Arms," "Cavalry Arms" and "Cavalry Manufacturing."

*See id.*, at Article 1.1 (emphasis added).

15.     In or around June 2010, I began working for Cavalry Mfg. where I essentially did the same work that I had been doing previously at Cavalry. *See* **Exhibit 14.**

**SST'S SALE TO ARMORY**

16.     On or about September 29, 2011, GWACS Armory, LLC ("Armory") vice president, Michel Jones ("**Jones**"), emailed SST inquiring about the Cavalry manufacturing equipment. **Exhibits 7 and 8** are true and correct copies of emails between Jones and I dated May 29, 2011.

17.     In these email chains I provided Jones with a 21 page "Product History and Overview" of the CAV-15. **Exhibit 8** at KEA002050-2071. In these emails I told Jones what SST was selling, the price, the production run times on the machinery, the estimated sales revenues, and the profit margins from previous runs. **Exhibit 7**. Jones asked: "Does the IP package include documentation of test data proving specification. I would like to present this to management as well." *Id*. I responded to Jones' question as follows:

> **The IP package includes the mold prints, and all the**
>
> **information I have on actually producing receivers**. . . Cav
>
> Arms never conducted any formal testing of the CAV-15 MKII . . .
>
> If you mean QA procedures, I can tell you how we tested them as
>
> we went through the manufacturing process.

*Id.* (emphasis added).

18.     On or about October 6, 2011, SST entered into a mutual nondisclosure agreement with Armory (the "**First SST NDA**"). **Exhibit 2** is a true and correct copy of the First SST NDA. In the First SST NDA:

5

a.      Section 2 defines "Proprietary Information" as:
[A]ny information disclosed by one Party (the "Discloser") to the
other Party (the "Recipient") (i) that is marked "Proprietary" or (ii)
that relates to the business of the Discloser or the Discloser's
affiliates, including without limitation, trade secrets, know-how,
data, operations, records, finances, assets, technology, software,
research, inventions, future products, customer information, or
business development plans.

b.      Section 6 states that the definition of "Proprietary Information" did **<u>not</u>**

include:

(a) At the time of was already in the possession of the Receiving
Party;
(b) Is independently made available to the Receiving Party by a
third party not bound
directly or indirectly by a non-disclosure obligation to the
Disclosing Party;
(c) Is in the public domain; or
(d) Is independently developed by the Receiving Party without
reference to Proprietary Information received from the Disclosing
Party.

c.      Section 8 provides that the obligations would terminate by either written

notice or after five (5) years.

d.      Section 11 expressly provides for competition stating:
Each party acknowledges that the other party (or its affiliates) may
be in the process of offering or developing products or services
that are competitive with and potentially similar to the products
and services which it offers or intends to offer, and agree that this
Agreement shall not preclude such offerings or development,
irrespective of any competition with or similarity to its products or
services, so long as the other party's actions are in compliance with
the obligations under this Agreement with respect to Proprietary
Information.

e.      Section 14 had a New York choice of law clause.

6

19.     On or about November 22, 2011, SST entered into an asset purchase agreement with Armory (the "**SST-GWACS APA**"). **Exhibit 3** is a true and correct copy of the SST-GWACS APA. In the SST-GWACS APA:

      a.     Schedule 1 was an itemized complete list of all the being sold:
1. Van. Don 300 Press HT Series Model 300HT14-2865 1996 with Pathfinder 4500 Controller;
2. Con Air SC30 Plastic Dryer with hopper — Serial Number 80105;
3. Branson 90 Series Linear Vibration Welder Model VW2 Serial Number 96R523769;
4. Take Down Pin Sets (1,500+);
5. Serial number, tags (1,000+);
6. CAD drawings, design prints to the molds, including any and all intellectual property ("IP") related thereto;
7. Take Down Pins specifications;
8. Miscellaneous tools and equipment to manufacture, market and sell the Lowers.

      b.     Section 3 provided for a purchase price of $120,000;

      c.     Section 6 expressly disclaimed warranties;

      d.     Section 14.2 provided:
This instrument contains and constitutes the entire agreement between the parties herein and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof. There are no agreements, understandings, restrictions, warranties or representations among the parties relating to the subject matter hereof other than those set forth herein. All exhibits and all schedules attached hereto or delivered pursuant hereto are hereby incorporated herein and made a part of this Agreement. This instrument is not intended to have any legal effect whatsoever, or to be a legally binding agreement, or any evidence thereof, until it has been signed by both parties hereto.

      e.     Section 14.3 continued an Oklahoma choice of law clause.

7

20.     Notably, Armory and its attorneys drafted SST-GWACS APA; and upon information and belief, the attorneys that drafted the SST-GWACS APA are the same attorneys who represent Armory in this lawsuit.

21.     **Exhibit 9** is a true and correct copy of an email between Jones and I dated January 9, 2012. In this email I disclosed to Jones my old CAV-15 customer list, which was essentially all the federal firearm license holders that I knew had previously purchased CAV-15 firearms.

22.     **Exhibit 10** is a true and correct copy of an email between Jones and I dated January 13, 2012.   In this email I disclosed to Jones my supplier for take down pins needed to manufacture/assemble CAV-15 firearms.

## END OF WORK WITH CAVALRY MFG.

23.     In or around September 2012, I stopped working for Cavalry Mfg. I then pursued various other opportunities in the firearms industry, such as consulting firearm companies, teaching firearm classes, training security companies, and writing for various firearm magazines.

24.     **Exhibit 11** is a true and correct copy of an email between Jones and I dated September 21, 2012.   In this email I disclosed to Jones photos and information related to all four (4) "generations" of the CAV-15, including without limitation the MKI, MKII, the prototype MKIII, and conceptual MKIV.

25.     **Exhibit 12** is a true and correct copy of an email between Jones and I dated January 27, 2013. In this email I disclosed to Jones and Armory's "engineering" department the enhancements and improvements I believed could be made to the CAV-15, including without limitation: an adjustable buttstock design (also known as a tele stock) option; an "Ergo Grip" design / collaboration; an improved buffer tube system design; and cross-marketing and compatibility ideas.

26.     **Exhibit 13** is a true and correct copy of an email between Jones and I dated February 8, 2013 and **Exhibit 14** is a true and correct copy of my resume that was attached to the

same email.  In this email I disclosed to Jones that I had left Cavalry Mfg., attached my resume, and expressed an interest in working as a non-exclusive sales representative for Armory. *See id.*

<u>**NON-EXCLUSIVE WORK FOR ARMORY**</u>

27.     On or about February 25, 2013, I entered into a "non-exclusive independent contractor sales representative agreement with Armory (the "**Phagan IC Agreement**"). **Exhibit 4** is a true and correct copy of the Phagan IC Agreement. The Phagan IC Agreement was prepared by Armory and contained an Oklahoma choice of law provision. *See id.*

28.     **Exhibit 15** is a true and correct copy of an email between Jones and I dated February 27, 2013 re: Brownells and pricing. In this email I disclosed to Jones sales information relevant to Brownells, including without limitation the historical pricing for the CAV-15 lower receivers, the minimum order quantities, suggestions on approaching Brownells as a customer such how to alleviate concerns/objections, and marketing strategies for the CAV-15.

29.     **Exhibit 16** is a true and correct copy of an email between Jones and I dated March 4, 2013 re: Extreme duty pins. In this email I disclosed to Jones solutions for the pins used to assemble the CAV-15, suppliers for the part, and potential upgrade options for the CAV-15 related to the pins.

30.     **Exhibit 17** is a true and correct copy of an email between Jones and I dated March 26, 2013 re:  Falcon f93 stock. In this email I disclosed to Jones information regarding an adjustable buttstock design (also known as a tele stock) option for the CAV-15, that I had CAD files that would allow for the integration of an adjustable buttstock on the CAV-15, and other design/collaboration contacts for the CAV-15.

31.     **Exhibit 18** is a true and correct copy of an email between Jones and I dated March 27, 2013 re: Magpul p-mags. In this email I disclosed to Jones more design/collaboration contacts for the CAV-15.

32.     **Exhibit 19** is a true and correct copy of an email between Jones and I dated March 27, 2013 re: Armory Brownells Dealer Agreement. In this email I disclosed to Jones an email conversation I had with Brownells about why Brownells passed on purchasing CAV-15 products from Armory.

33.     **Exhibit 20** is a true and correct copy of an email between Jones and I dated April 2, 2013 re: MKI information. In this email I disclosed to Jones the owner's manual I had drafted for the CAV-15 while at Cavalry, so that Armory could re-purpose it for their own use.

34.     **Exhibit 21** is a true and correct copy of an email between Jones and I dated April 11, 2013 re: fliers for dealers and the MKI cores. In this email I disclosed to Jones that I still had MKI molds for sale; and I also disclosed marketing materials that I created for Armory to sell to potential dealers.

35.     **Exhibit 22** is a true and correct copy of an email between Jones and I dated May 9, 2013 re: Latest Drawings. In this email I disclosed to Jones additional enhancement and improvement ideas for the CAV-15, including without limitation: reinforced ribbing near the telestock; reinforcement ribbing and dimensions for the buffer tube; the thickness of the buffer tube; the angle between the receiver and the buffer tube with curves/ radius.

36.     On or about May 9, 2013, SST entered into a second mutual nondisclosure agreement with Armory (the "**Second SST NDA**"). **Exhibit 5** is a true and correct copy of the Second SST NDA. The Second SST NDA contained essentially same terms as the First SST NDA.

37.     **Exhibit 23** is a true and correct copy of an email between Jones and I dated June 20, 2013 re: SLIC Pin Price Quote. In this email I disclosed to Jones more solutions for the pins used to assemble the CAV-15, suppliers for the part, and potential upgrade options for the CAV-15 related to the pins.

38.     **Exhibit 24** is a true and correct copy of an email between Jones and I dated November 5, 2013 re: They're Learning. In this email I disclosed to Jones additional enhancement

and improvement ideas for the CAV-15, including durability improvements that had been made by other polymer receiver manufacturers.

39.     **Exhibit 25** is a true and correct copy of an email between Jones and I dated February 18, 2015 re: New Polymer Receivers. In this email I disclosed to Jones other manufacturers who were making polymer receivers for semi-automatic rifles.

### WORK AT KE ARMS, LLC

40.     In or around April 2015, I began working for KE Arms, LLC ("KEA"). At this time, KEA manufactured an aluminum alloy semi-automatic rifle called the KE-15. The lower receivers on the KE-15 were either forged or billet, and the billet version had a flared magazine well.

41.     On June 15, 2015, KEA entered into a mutual nondisclosure agreement with Armory (the "**KEA NDA**"). **Exhibit 6** is a true and correct copy of the KEA NDA. To my knowledge, KEA: (a) did not receive any "proprietary information," as defined in the KEA NDA, from Armory related to the CAV-15; and (b) did not breach any express or implied term of the KEA NDA.

42.     **Exhibit 26** is a true and correct copy of an email between Jones and I dated June 17, 2015 re: Mold Cad. In this email I disclosed to Jones that I did not have CAD files for the CAV-15 MKII mold that Armory had purchased several years previously. *Id.* I also noted that I had already given them the CAD files and prints I had for the MKII itself. *Id.*

43.     **Exhibit 27** is a true and correct copy of an email between Jones and I dated June 6, 2016 re: Proposal.  In this email I disclosed to Jones more information regarding costs and pricing relevant to the CAV-15, including without limitation: the viable retail price point for the market; retail price point for just the lower receiver; manufacturing processes; total parts costs for building a complete rifle without the receiver; marketing strategies, and sales strategies.

44.     **Exhibit 28** is a true and correct copy of an email between Jones and I dated June 29, 2016 re: DropBox file re CAV15_MKII. In this email I disclosed CAD files for the CAV-15 that KEA had purchased from Nealon.

45.     On or about October 6, 2016, First SST NDA expired. *See* **Exhibit 2.**

46.     On or about February 25, 2016, Nealon, through his new entity Cavalry Medical, LLC ("Cavalry Medical"), sold KEA two (2) boxes of assorted "Blue prints" and "one thumb drive of assorted CAD/CAM files" (the "**Nealon Files**"). *See* **Exhibit 30**. Cavalry Medical's sale to KEA outlined in a letter and between Cavalry Medical and KEA. *Id.*

47.     On April 11, 2018, I texted Jones that he should get Karl Kasarda of InRange TV under NDA and provided Kasarda's e-mail address. **Exhibit 32** is a true and correct copy of text messages between me and Shel Jones dated April 11, 2018 through December 21, 2018. I am informed and believe that Armory never obtained an NDA with InRange TV nor Karl Kasarda.

48.     On or about May 9, 2018, the Second SST NDA expired. *See* **Exhibit 5**.

49.     **Exhibit 31** is a true and correct copy of an email between Jones and I dated May 23, 2018 re: Variance Request. In this email Jones and I discussed a marking variance so that KEA could manufacture aluminum lower receivers for Armory.

50.     On June 29, 2018, Jones disclosed the following to me via text message:
- That Armory planned to shut down CAV-15 MKII production and roll out a new model;

- That Armoy's inventory of CAV-15 MKIIs was very low;

- That Armory had produced about 6000 units total since they had purchased their molds;

- That Armory had sold over 3000 receivers after the InRange WWSD videos were released;

- That Armory had another 9000-unit order lined up; and

- That Armory was seeking an investor for the new mold, requiring $500,000.00 with an $850,000.00 return and 8% equity.

*See* **Exhibit 32** at Armory 0197-0198.

51.     On June 29, 2018, I wrote the following public relations statement for Armory:
We are thankful for InRange TV's WWSD project reinvigorating
interest in the product and allowing us to sell all out our MKII
product line. This year the CAV-15 MKII turns 15 years old and
the mold is due for some serious maintenance and the product like
has been in need of a feature update for some time The MKIV will
incorporate a number of features we've wanted to add incorporate
since acquiring the CAV-15 in 2012. Some of these were
recommended by Russell Phagan aka SinistralRifleman.com who
has been involved with the CAV-15 product line since 2001, others
our engineers have included to improve manufacturing and meet
the needs of the modern firearms market[;]

To which Jones replied with "I like what you are suggesting and will use it[;]" *Id.* at Armory 0198-0199. Jones later slightly edited this text statement I provided him and publicly disclosed the same statement on Armory's website, GWACSArmory.com. **Exhibit 54** is a true and correct screen shot of Armory's statement on its website.

52.     On September 5, 2018, I texted Jones and explained that even if Armory got a new investor, the product being off the market for 6 months would be rough.  **Exhibit 32** at Armory 0199-0200. Jones acknowledged this. *Id.*

53.     On September 7, 2018, I texted Jones for Jud Gudgel's contact information to set up a call to discuss the InRange project, which Shel provided me. *Id.* at Armory 0200.

54.     On September 10, 2018, I informed Jones that Mike Kenney of KEA was interested in investing in their MKIII. *Id.* at Armory 0200.

55.     On December 21, 2018, I had the following text conversation with Jones:
- **Phagan**: "Heard anything else from Jud about moving forward with new molds?"

- **Jones**: "I have not I have not spoke [sic] with him much lately[.]"

- **Phagan**: "Some people have gotten messages that new receivers will be available first quarter 2019…. but I'm not holding my breath[.]"

*Id.* at Armory 0201.
## DEVELOPMENT WORK FOR THE KP-15

56.     In 2019, KEA started to develop and design a new version of its KE-15 aluminum rifle called the KP-15. The KP-15 would have the same parts of its KE-15, but instead of an aluminum allow lower receiver, the KP-15 would have a monolithic polymer lower receiver.

57.     The initial problem KEA faced with the KP-15 was that the project was going to require a substantial capital investment. Specifically, the project required expensive manufacturing equipment, molds, and tooling, all of which KEA could not afford to purchase outright.

58.     To resolve this obstacle, one of KEA's members formed a separate Arizona entity, Tool and Design Group, LLC ("TDG"), which could raise the capital necessary for the equipment. TDG agreed to obtain the capital needed to purchase the manufacturing equipment, molds, and tooling; and in exchange, KEA agreed to lease back TDG's equipment at a cost-per-unit price.

59.     KEA started its development and design of the KP-15 by importing CAM files that it was using for its KE-15 aluminum lower receiver into a program called Mastercam (the "CAM File"). The CAM File itself illustrates the development and design iterations of the KP-15 starting from the CAM File. **Exhibit 33** is a true and correct copy of screenshots from the KE-15 CAM File used to develop the KP-15.

60.     For example, the images captured from the CAM File show: the KE-15 billet flared magwell design with added reinforcements to the fire control area (fig. 8); the pistol grip integration onto the KE-15 billet flared magwell de-sign (figs. 7 and 5); the A-1 Length buttstock integration into the pistol grip and KE-15 billet flared magwell design (figs. 4 and 6); the formation of the internal features and structure of the KP-15 (fig. 11); the formation of the internal structural ribbing inside the grip, stock, and buffer tube (figs. 9 and 10); and The completed rough draft design of the KP-15 (figs. 12-15). *See id.*

61.     On or about January 9, 2020, the rough part design shown in the CAM File was saved and exported to an outside polymer mold designer named Randy Sperry, of Sperry Design Services ("Sperry"), who, at the time, worked for a mold-design company called Moldworx. I am

informed and believe that Sperry converted the CAM File into a new file-type which he could more easily work with in a program called Solidworks (the "Sperry File").

62.    KEA, Sperry, and Moldworx collaborated for several months, converting the design in the Sperry File, which was originally an aluminum lower receiver part (the KE-15), into a moldable polymer lower receiver part (the KP-15). The conversion process from aluminum to polymer was a challenging process since it required changes to the overall geometry of the aluminum part.

63.    For example, specific changes and analysis had to conducted to accommodate the molten polymer material and its flow through the mold (also known as moldflow analysis) and to essentially prevent the polymer part from catching on the mold tooling itself upon release (also known as mold-release). After several months of work, and through the expertise of Sperry and Moldworx, KEA was finally able to conform the Sperry File to a workable plastic mold end-design.

64.    KEA also relied on expert input from Scherertech who provided additional moldflow analysis, Branson Ultrasonics who helped design the parts to be capable of being vibration welded, and Molded Devices Inc. who helped ensure the mold would fit and function in a mold-press machine.

## PUBLIC DISCLOSURES OF THE CAV-15

65.    **Exhibit 34** at KEA001750-1756 is a true and correct copy of Cavalry Arms website as of February 12, 2004 and linked information. This publicly disclosed and described the following information regarding the CAV-15:

a.    The injection molded polymer lower receiver manufacturing process;

b.    The exact weight of the CAV-15 and the weight advantages to polymer materials versus other materials;

c.    The entire internal geometry of the of the polymer lower receiver;

       d.      The material used in the CAV-15 production being Nylon 6; and

       e.      The material used is similar to that of the Steyr Aug and Glock.

66.    **Exhibit 35** at KEA001757.070-1757.073 is a true and correct copy of an article about the CAV-15 published in the October/November 2004 edition of SWAT magazine. This publicly disclosed and described the following information regarding the CAV-15:

       a.      The injection molded polymer lower receiver manufacturing process;

       b.      The use of vibration welding to bond the two halves together;

       c.      That the polymer lower receivers are made of Nylon-6 glass filled polymer material;

       d.      The use of speed pins with the detents built in; and

       e.      That the stock is A1 length.

67.    **Exhibit 36** is a true and correct copy of the an AR-15.com article regarding a QD Swivel on the CAV-15 on September 13, 2010. This publicly disclosed and described the following information regarding an end user modification of the CAV-15 MKII to incorporate a QD Socket at the pistol grip/stock transition.

68.    **Exhibit 37** is a true and correct copy of the Armory Facebook linking my blog on May 4, 2012. This publicly disclosed and described the following information regarding the CAV-15:

       a.      The durability of the CAV-15 MKII in extreme conditions such as being run over by a vehicle;

       b.      The durability of the CAV-15 MKII at high round counts;

       c.      The reliability of the CAV-15 MKII in sandy/dusty environments; and

       d.      How GWACS Armory holds me out as an expert on the CAV-15.

69.    **Exhibit 38** is a true and correct copy of a Jerking the Trigger Article from GWACS Armory re: the CAV-15 on January 31, 2013. This publicly disclosed and described the following information regarding the CAV-15:

      a.     The use of a buttstock trap door;

      b.     QD Socket integration into the lower; and

      c.     That Armory is "looking for customer input on their current products, products that you would like to see them carry, and their upcoming CAV-15 MKIII."

70.    **Exhibit 39** is a true and correct copy of a Jerking the Trigger Article re: assembling the CAV-15 dated February 19, 2013. This publicly disclosed and described the following information regarding the CAV-15:

      a.     Describing all about how the CAV-15 is made and assembled; and

      b.     Describing trouble shooting common problems with the CAV-15 and resolving them.

71.    **Exhibit 40** is a true and correct copy of the Echo nine three modifications to the CAV-15 dated March 25, 2013. This publicly disclosed and described the following information regarding the CAV-15:

      a.     Adding the QD Swivel modification to an MKII; and

      b.     Adding grip modifications to an MKII.

72.    **Exhibit 41** is a true and correct copy of the Truth about guns article dated May 21, 2013. This publicly disclosed and described the following information regarding the CAV-15:

      a.     Individuals had begun making their own monolithic polymer lowers using 3D printing at home;

      b.     This design incorporated a number of the same features as the CAV-15 MKII;

      c.     How it uses an integral stock, buffer tube, grip, and trigger guard;

      d.     How the fire control area is reinforced; and

      e.     How the selector spring and detent load from the top.

73.      **Exhibit 42** is a true and correct copy of a Guns.com Article re: the Charon Family of 3D-Printable AR-15 polymer lower receivers dated June 3, 2013. This publicly disclosed and described the following information:

a.      How individuals can make their own monolithic polymer lowers using 3D printing at home;

b.      How to incorporate a number of the same apparent features of the CAV-15 MKII;

c.      Use of an integral stock, buffer tube, grip, and trigger guard; and

d.      How to reinforce a fire control area.

74.      **Exhibit 43** is a true and correct copy of Amory's Facebook referencing me as a CAV-15 expert on October 9, 2013. This publicly disclosed and described the following information regarding the CAV-15:

a.      That, according to Armory, I am a "certified GWACS Armory CAV-15 expert."

b.      The polymer design theory vs. aluminum design theory for AR15 receivers.

75.      **Exhibit 44** is a true and correct copy of The Firearms Blog Article re: the American Tactical $50 OMNI Hybrid AR-15 Lower dated November 4, 2013. This publicly disclosed and described the following information:

a.      Development of a polymer lower receiver;

b.      The price of polymer lower receiver; and

c.      A fire control area of a lower receiver that is reinforced the same as the CAV-15 MKII.

76.      **Exhibit 45** is a true and correct copy of The Firearms Blog Article re: Gun Review: ATI Omni Gen2 Hybrid Polymer AR15 Lower dated December 19, 2013. This publicly disclosed and described the following information regarding claimed weaknesses of using polymer in lower receivers at that time.

77.     **Exhibit 46** is a true and correct copy of a Weapons Man Article re: The Latest in 3D Printed polymer Gun Developments dated October 13, 2014. This publicly disclosed and described the following information:

      a.     How to make polymer lower receiver using aluminum AR receivers as a template; and

      b.     How easy it is to make a polymer lower receiver.

78.     **Exhibit 47** is a true and correct copy of a Jerking the Trigger Article re: KE Arms and GWACS Armory Lightweight Collaboration Rifle dated May 15, 2015. This publicly disclosed and described the following information regarding the lightweight AR-15 concept and how to use KEA parts on a CAV-15 MKII.

79.     **Exhibit 48** is a true and correct copy of more collaboration articles re: the CAV-15 dated July 7, 2015. This publicly disclosed and described the following information regarding the CAV-15:

      a.     The lightweight AR-15 concepts;

      b.     How to use KEA parts with CAV-15 MKII; and

      c.     Collaboration with InRangeTV.

80.     **Exhibit 49** is a true and correct copy of lightweight budget build article posted by Armory on its Facebook on July 21, 2015. This publicly disclosed and described the following information regarding the CAV-15:

      a.     How to build a lightweight CAV-15 MKII rifle;

      b.     Enhancements and modifications to the CAV-15 MKII rifle;

      c.     Incorporation of a quick detach socket; and

      d.     Incorporation of a strap slot on a buttstock.

81.     **Exhibit 50** is a true and correct copy of an article describing Armory's CAV-15 and collaborative improvements dated July 22, 2015. This publicly disclosed and described the use of ambidextrous controls on the CAV-15 MKII.

82.     **Exhibit 51** is a true and correct copy of a Jerking the Trigger Article re: Echo Nine Three GWACS Armory CAV-15 MKII Sling Mount Modification dated April 11, 2016. This publicly disclosed and described the following information regarding use of quick-detach swivel on an MKII.

83.     **Exhibit 52** is a true and correct copy of GWACS promoting the Echo Nine Three modifications to the CAV-15 polymer lower receiver dated May 13, 2016. This publicly disclosed and described the following information regarding how the QD Swivel idea for a CAV-15 was developed by Echo Nine Three.

84.     **Exhibit 53** is a true and correct copy of an Echo Nine Article in Guns & Ammo magazine re: modifications and enhancements to the CAV-15 dated May 29, 2018.

85.     **Exhibit 54** is a true and correct copy of Armory's disclosure of the condition of their mold on Facebook on or about July 10, 2018. This publicly disclosed and described the following disclosed the condition of Armory's mold to the public.

86.     **Exhibit 55** is a true and correct copy of an AR15.com Forum discussion re: 3D Printed AR15 made from polymer dated August 30, 2018. This publicly disclosed and described the following information regarding how to 3D print AR-15 polymer lowers with features similar to CAV-15 MKII, and particularly a reinforced fire control area.

87.     **Exhibit 56** is a true and correct copy of a Jerking the Trigger Article re: KE Arms Trigger/Hammer Pins for CAV-15 MKII Receivers dated Nov 19, 2018. This publicly disclosed and described the following information regarding KEA's development of longer trigger/hammer pins for the CAV-15 MKII receivers.

88.     **Exhibit 57** is a true and correct copy of Armory's Facebook disclosing to world that it is closing shop dated January 17, 2019. This publicly disclosed and described the fact that Armory was going "off grid" and vacating their building (*id*. at KEA002877).

89.     **Exhibit 58** is a true and correct copy of a Sinistral Rifleman Article re: Colt Monolithic Polymer Lower from the Vietnam Era dated December 10, 2019. This publicly

disclosed and described the following information regarding how the CAV-15 was based upon the Colt monolithic receiver.

90.     **Exhibit 59** is a true and correct copy of Jeff's Toy Box Article re: building an AR-15 lower receiver using CAD dated December 31, 2019.

91.     **Exhibit 60** is a true and correct copy of a Cavalry Shot Show flier that was distributed at shot show on or about January 2008. This publicly disclosed and described the entire manufacturing process of the CAV-15. To my knowledge approximately 10,000 copies of this document were given out.

92.     **Exhibit 61** is a true and correct copy of photographs of the CAV15 MKI and the mold that were posted on the Cavalry website in or around 2000-2002. This publicly disclosed and described the all the internal features and support structures of the CAV-15; and how parts are installed and work on the CAV-15.

93.     **Exhibit 62** is a true and correct copy photographs of the CAV15 MKII that were posted on the Cavalry website in or around 2008-2010. This publicly disclosed and described:

      a.      All the internal features and support structures of the CAV-15;

      b.      How the mold functioned including serial number tag insert for the CAV-15;

      c.      How the welder functions and joins the halves together for the CAV-15;

      d.      The brand of the welder used to make the CAV-15;

      e.      The location and type of plastic runner in the mold of the CAV-15; and

      f.      The sacrificial material along the weld lines to facilitate part bond on the CAV-15.

94.     **Exhibit 63** is a true and correct copy of the CTRL+Pew Webpage re: File Drop: U-Bolt Vanguard 3D Printable AR15 Lower Receiver dated Nov 15, 2021.

95.      **Exhibit 64** is a true and correct copy of an Armalite/Eagle Arms Polymer lower receiver. Eagle Arms was a subsidiary of Armalite, Inc., which offered a polymer lower receiver

for an AR-15. Cavalry manufactured these for Eagle Arms under variance. Cavalry fully disclosed all of its business know how and design prints to Eagle Arms under this program.

96.     **Exhibit 65** is a true and correct copy of a Sabre defense Polymer 15 lower receiver. These were made by Cavalry under a marking variance by Cavalry for Sabre Defense using the CAV-15 MKII mold. Cavalry fully disclosed all of its business know how and prints to Sabre Defense under this program.

97.     **Exhibit 66** is a true and correct copy of a photograph of a Bisection of GWACS MKII available for sale to the public. This publicly disclosed and described the following information regarding the CAV-15:

    a.     All internal ribbing and support structures;

    b.     The length of the buffer tube;

    c.     The length of the buttstock;

    d.     The integration of the buttstock, buffer tube, pistol grip and trigger guard;

    e.     The fire control area reinforcements and wider hammer pin area;

    f.     The mold ejector pin locations;

    g.     The mold gate location and angle;

    h.     The type of material used;

    i.     The serial number tag size and method of over molding it; and

    j.     The types of pins used to attach the upper.

98.     **Exhibit 67** is a true and correct copy of Cavalry Arms AR-15.com forum threads. This publicly disclosed and described the following information the entire manufacturing process on the forum, such as:

    a.     How the CAV-15 MKII is assembled using vibration welding;

    b.     That the welder vendor is Branson;

    c.     The exact weights of the CAV-15 MKI and CAV-15 MKII;

    d.     The production time for a receiver being 5 minutes start to finish;

  e.  The pins and the use of detents; and

  f.  Mold design including gate location and runner orientation.

 99. **Exhibit 68** is a true and correct copy of transcript portions from the September 20, 2022 Deposition of Jud Gudgel.

 100. **Exhibit 69** is a true and correct copy of Armory's Response to KEA's Interrogatory No. 8.

 101. **Exhibit 70** is a true and correct copy of the Notice of Deposition of Armory.

 102. **Exhibit 71** is a true and correct copy of the December 17, 2021 Deposition of Armory.

 I declare under penalty of perjury that the foregoing is true and correct.

 Executed on this 18th day of July, 2022.

_____
Russell Phagan