**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

GWACS ARMORY, LLC )
)
                    **Plaintiff,** )
)
v. )
)    **Case No.:20-cv-0341-CVE-SH**
KE ARMS, LLC, RUSSELL PHAGAN, )    **BASE FILE**
SINISTRAL SHOOTING )
TECHNOLOGIES, LLC, BROWNELLS, )    Consolidated with:
INC., and SHAWN NEALON, )    Case No. 21-CV-0107-CVE-JFJ
)
                **Defendants.** )
and )
)
KE ARMS, LLC, )
                **Plaintiff,** )
v. )
GWACS ARMORY, LLC, GWACS )
DEFENSE INCORPORATED, JUD )
GUDGEL, RUSSEL ANDERSON, DOES I )
through X, and ROE CORPORATIONS I )
through X, )
                **Defendants.** )

## KE ARMS, LLC'S OPPOSITION TO COUNTERCLAIM DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Counterclaimant KE Arms, LLC, by and through its attorneys of record, Marquis Aurbach, hereby submits this brief in opposition to counterclaim defendant GWACS Armory, LLC's Motion for Summary Judgment (Dkt. 121). This opposition is made and based upon the attached memorandum of points and authorities, the existing exhibits and evidence on the record, the exhibits and evidence attached hereto, and any oral argument permitted by the Court at hearing on this matter.

    / /

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

GWACS Armory, LLC ("Armory") and KE Arms, LLC ("KEA") are competitors selling the most common-owned sporting rifle in America.[1] Armory got into the business after it purchased manufacturing molds and equipment from Sinistral Shooting Technologies, LLC ("SST") in 2011.[2] After Armory's equipment started to wear-out, it publicly disclosed to the world that it was closing down its shop. [3] KEA, on the other hand, never left the marketplace. In 2019, KEA and its employee, defendant Russell Phagan ("Phagan"), started designing a more superior rifle for its competitive shooting customers; and in the process, they spent months collecting customer feedback, working with industry experts, and expended hundreds of thousands of dollars. The end result was the KP-15.

Instead of competing with the KP-15, Armory chose to attack it in every way possible. Armory went so far as to send a cease-and-desist filled with false and disparaging statements to KEA's largest customer, defendant Brownells Inc. ("Brownells").[4] According to Armory, its purpose and motive for sending Brownells this letter was to deter KEA's sales of the KP-15 to Brownells.[5] Unfortunately, Armory's false statements had their desired effect, and KEA lost over $600,000 in sales and about $400,000 in profits.[6] In all, KEA's counterclaims are supported by substantial evidence. Accordingly, Armory's motion for summary judgment must be denied, and

---

[1]  Modern Sporting Rifle, The Firearm Industry Trade Association, available at: https://www.nssf.org/msr/ (Last visited August 8, 2022).
[2] Dkt. 124, at ¶16; Dkt. 124-4.
[3] Dkt. 124-57.
[4] Dkt. 121-1.
[5] Dkt. 121-18, at p. 170:1-21.
[6] Expert Report and Supporting Documents (attached hereto as **Exhibit 5**).

KEA's claims should proceed to trial.

## II.  STATEMENT OF FACTS [7]

1.      KEA admits SOF No. 1.

2.      KEA admits SOF No. 2.

3.      KEA admits SOF No. 3.

4.      KEA admits SOF No. 4.

5.      KEA admits SOF No. 5.

6.      KEA admits SOF No. 6.

7.      SOF No. 7 misrepresents evidence and omits the relevant sections of the agreements that define the scope of "Proprietary Information."[8] Section 6 present in the NDAs expressly excludes information that:

> (a) At the time of was already in the possession of the Receiving Party;
>
> (b) Is independently made available to the Receiving Party by a third party not bound directly or indirectly by a non-disclosure obligation to the Disclosing Party;
>
> (c) Is in the public domain; or
>
> (d) Is independently developed by the Receiving Party without reference to Proprietary Information received from the Disclosing Party.

Section 11 in the NDAs also expressly provide for competition.[9]

---

[7] Pursuant to LCvR56(c), KEA responds to each of Armory's statements of fact in its motion ("SOF") in correspondingly numbered paragraphs, pursuant to LCvR56(c). In addition, KEA provides the factual basis and evidence disputing the corresponding SOF via footnote. KEA also forth its controverting facts ("COF"), in corresponding numbered paragraphs, and states the additional facts the nonmovant contends preclude judgment as a matter of law.
[8] Dkt. 124-3 (First SST NDA); Dkt. 124-6 (Second SST NDA); Dkt. 124-7 (KEA NDA); Dkt. 122, pgs. 6-8 (First Brownells NDA); Dkt. 122 at pgs. 8-12 (Second Brownells NDA).
[9] *Id.*

8.     The information contained in the investment packets was not "Proprietary Information" under the definition in Armory's mutual non-disclosure agreements with each of the defendants.[10] This information was not "Proprietary" because it was either: (a) already in the possession of defendants;[11] (b) independently made available to defendants by third parties not bound directly or indirectly by a non-disclosure obligation to Armory, including defendant Shawn Nealon ("Nealon") and Cavalry Arms Corporation ("Cavalry");[12] (c) already in the public domain;[13] or (d) was independently developed by KEA and other third parties, including Nealon, SST, Phagan, and Cavalry.[14] Further, inventor and original owner of Armory's putative proprietary information has admitted that: "[o]ver the course of Cavalry [Arms Corporation]'s existence, disclosed every piece of information related to the production, manufacture, and design of the CAV-15 and its lower receiver were publicly disclosed."[15] Finally, Armory publicly disclosed on its investment packets on the record,[16] which further evidences that this information is not proprietary under the NDAs.[17]

---

[10] *Id.*

[11] Dkt. 122, at ¶¶3-8 (Brownells directly disputes that any of the information it obtained under the NDA with Armory was proprietary information as defined in the NDA); Dkt. 124, at ¶¶4-9 (Phagan describing his knowledge prior to any NDA); Dkt. 124, Exhibits 7-32 (124-7:124:32) (Phagan's communications with Armory wherein Phagan educates Armory on everything Armory claims to be proprietary); Dkt. 123, at ¶¶3-5(Cavalry's disclosures to Phagan and the public); Dkt. 123, at Exhibit 3 (Cavalry Medical LLC's disclosures of CAD/CAM files and prints to KEA); Dkt. 124, at Exhibits 34-67 (124-34:124-67) (additional public disclosures related to the CAV-15).

[12] *Id.*

[13] Dkt. 124. at ¶¶56-64 (Phagan describes the process of KEA's independent development); *see also* Dkt. 124-33 (Screenshots illustrating KEA's iterative process in developing the KP-15 files in a program called Mastercam).

[14] Dkt. 124, Exhibits 7-32 (124-7:124:32) (Phagan communications with Armory wherein he educates Armory virtually everything they allege to be proprietary);

[15] Dkt. 123, at ¶5.

[16] *See* Dkt. 121-14, Dkt. 121-15.

[17] *C.f., S*ection 6 of the NDAs (Dkt. 124-3 (First SST NDA); Dkt. 124-6 (Second SST NDA); Dkt. 124-7 (KEA NDA); Dkt. 122, pgs. 6-8 (First Brownells NDA); Dkt. 122 at pgs. 8-12 (Second Brownells NDA)).

9.      Brownells did not have knowledge of Armory's purchase of MKII machinery and alleged "intellectual property" from Russell Phagan.[18] Brownells was only generally aware that Armory had purchased a mold and equipment for the MKII.[19]

10.     KEA admits SOF No. 10.

11.     Brownells is one of the distributors of the KP-15 and the exclusive retailer of the WWSD rifle.[20]

12.     In or around 2017, InRange LLC ("InRange") launched its "What Would Stoner Do" project (the "WWSD Project").[21] The WWSD Project was a nod to Eugene Stoner, a pioneering firearm innovator that used modern materials in rifles.[22] In 2017, KEA and Armory were both component manufacturers for InRange's WWSD Project.[23] Then, in 2018, Brownells reached out to InRange to market a fully assembled WWSD-branded AR-15 style rifle to meet customer demand (the "WWSD Rifle").[24] InRange and Brownells reached out to various sub-component manufacturers for the WWSD Rifle, including KEA and Armory.[25] InRange and Brownells did not select Armory's lower receiver for the WWSD Rifle.[26]

---

[18] Exhibit 1, at pgs. 152:8-15 ("Q. . . . [Does Brownells] have any knowledge regarding the purchase of the . . . Mark II machinery and intellectual property that occurred between GWACS and Russell Phagan?  A. No. I wasn't privy to any of that information.").

[19] Dkt. 121-13, at pgs. 2-3.

[20] Exhibit 2 at pg. 192:21-194:4 (Discussing distributors of the KP-15); Exhibit 3 at pg. 315:1-316:2 (Discussing additional distributors of the KP-15).

[21] Dkt. 102-5, at ¶¶4-9 (Declaration of Karl Kasarda of InRange LLC); *see also* Exhibit 4 at pgs. 11:6-13:22 (InRange describing the shift from the WWSD Project to the WWSD Rifle).

[22] *Id.*

[23] *Id.*

[24] *Id*. at ¶¶11-14; *see also* Exhibit 4 at pgs. 11:6-13:22 (InRange describing the shift from the WWSD Project to the WWSD Rifle).

[25] *Id.* at ¶¶15-18; Dkt. 121-13, at p. 48:23-49:15.

[26] *Id.*

13.     Brownells was aware that both KEA and Armory were sub-component manufacturers for the WWSD Project, as well as potential component manufacturers for the WWSD Rifle.[27]

14.     Brownells (not KEA) used photos from InRange's WWSD Project in 2017 to promote the upcoming WWSD Rifle.[28] The photos were labeled as InRange's photos, contained InRange's celebrity endorsement of the WWSD Project, and were posted on Brownells' website.[29]

15.     KEA (not Brownells) briefly used the name "MK3" for their rifle, but later changed the name to "KP-15."[30] The change was made after KEA learned that other companies (not Armory) had already registered a trademark related to "MK3."[31]

16.     Brownells (not KEA) proposed using Armory's molds and equipment for a fee to manufacture a lower receiver for the WWSD Rifle.[32] This proposal was made because, according to Armory, its plastic injection mold had "reached its end of life," which Armory disclosed to the public on its own website in 2018.[33]

---

[27] *Id.*; *see also* Exhibit 4 at pgs 11:6-13:22 (InRange describing the shift from the WWSD Project to the WWSD Rifle).
[28] Exhibit 2 at pg. 151:23-154:5; Dkt. 121-16 (The product photo is labeled: "InRange What Would Stoner Do? 2017") (emphasis added); Dkt 121-17 (This is a photo of InRange promoters Ian McCullum and Karl Kasarda, and the product photo is labeled "InRange WWSD 2017") (emphasis added).
[29] *Id.*
[30] Dkt. 121-21 (Email between KEA and Brownells renaming the model number to KP-15).
[31] Exhibit 2 at pg. 163:24-165:6 (Explaining that KEA changed the MK3 name after it learned that another firearm company, Ruger, held a trademark related to MK3); Exhibit 2 at pg. 167:21-168:4 (Explaining that MK3 name was initially used because the KP-15 was the third generation AR-15 type rifle produced by KEA).
[32] Exhibit 2 at pg. 135:2-11 (Explaining the intention behind use of Armory's equipment); Exhibit 2 at pg. 138:20-139:139:8; Dkt. 121-19, at p. 5; Exhibit 1 at pgs. 68:16-72:5.
[33] Dkt. 124, at ¶85; Dkt. 124-54.

17.     Armory turned down Brownells' proposal to pay Armory for the use of its molds and equipment.[34]

18.     In August 2019, KEA wrote to Brownells, explaining that it was working on designing a monolithic polymer receiver for the 2020 WWSD Rifle, which KEA envisioned to be a modernized, refined, and revised design similar to the CAV-15 MKII design.[35]

19.     On April 7, 2020, Armory sent a detailed cease-and-desist letter containing false and disparaging statements (the "C&D Letter") to KEA.[36] Shortly thereafter, KEA learned that another firearm company, Ruger, held a trademark related to the MK3,[37] and accordingly, KEA wrote to Brownells on April 16, 2020, informing Brownells that KEA was updating the model number of the polymer receiver for the WWSD Rifle from MK3 to KP-15.[38] Notably, KEA's April 16, 2020 email to Brownells does not mention the C&D Letter from Armory.[39] Five days later, on April 21, 2020, Armory copied Brownells on the previous C&D Letter, thereby publishing Armory's C&D Letter, along with its false and disparaging statements about KEA.[40]

20.     KEA admits SOF No. 20.

21.     SOF No. 21 misstates the testimony of Brownells and omits the testimony of Karl Kasarda of InRange. As a result of Armory publishing its C&D Letter, Brownells testified that it

---

[34] *See* Dkt. 121-19, at p. 5; Exhibit 1 at pgs. 68:16-72:5.
[35] Exhibit 2 at pg. 162:22-163:23 (Explaining KEA's reference to the "CAV-15 MKII" reference in an email to Brownells); Dkt. 121-20 (Email from KEA to Brownells).
[36] Dkt. 121-1.
[37] Exhibit 2 at pg. 163:24-165:6 (Explaining that KEA changed the MK3 name after it learned that another firearm company, Ruger, had a trademark related to MK3).
[38] *Id.*; *see also* Dkt. 121-21.
[39] Dkt. 121-1; *see also* Dkt. 121-13, at pgs. 126:11-128:20 (Brownells confirmed that this was the "first time Mr. Anderson wrote to [Phagan] about [Armory]'s claims. . .").
[40] *Id.*

"didn't market the product as much as [they] probably would have otherwise."[41] Brownells further testified that it was no longer "actively going out and promoting [the WWSD Rifle]" in marketing channels.[42] And, "as a result of the letter,"[43] Brownells' primary marketing partner for the WWSD Rifle,[44] curtailed its promotion of the WWSD Rifle.[45]

22.     While Brownells did not take "action" against KEA upon Armory publishing the C&D letter, as a result of the letter (a) Brownells "didn't market the product" as they would have otherwise,[46] (b) Brownells curtained its promotion the KP-15 and WWSD Rifle,[47] and (c) Brownells' primary marketing partner, curtailed its promotion of the WWSD Rifle from.[48]

23.     SOF No. 23 mischaracterizes Brownells deposition testimony and omits the context of the deposition. Specifically, SOF No. 23 omits that, as a result of the letter: (a) Brownells "didn't market the product" as they would have otherwise,[49] (b) Brownells curtailed its promotion of the KP-15 and WWSD Rifle,[50] and (c) Brownells' primary marketing partner, InRange, curtailed its promotion of the WWSD Rifle from approximately May 2020 until August 2020.[51]

---

[41] *Id.* at pg. 128:7-20.
[42] *Id.* (Explaining that Brownells did not promote the product with Recoil and other magazines as they had done previously).
[43] Exhibit 4 at pg. 63:18-64:4.
[44] Exhibit 4 at pg. 14:6-13; *see also* Dkt. 101-5,. at ¶¶21-36.
[45] Exhibit 4 at pgs. 63:18-68:25, 70:1-71:21, and 80:21-86:19.
[46] *Id.* at pg. 128:7-20.
[47] *Id.* (Explaining that Brownells did not promote the product with Recoil and other magazines as they had done previously).
[48] Exhibit 4 at pgs. 14:6-13, 63:18-68:25, 70:1-71:21, and 80:21-86:19; *see also* Dkt. 101-5,. at ¶¶21-36.
[49] *Id.* at pg. 128:7-20 ("Q. Did Brownells cease doing anything on the WWSD project as a result of this email? A. We—I don't know if it was a direct result of this email, but ***we didn't market the product as much as we probably would have otherwise***.") (Emphasis added).
[50] *Id.* (Explaining that Brownells did not promote the product with Recoil and other magazines as they had done previously).
[51] Exhibit 4 at pgs. 14:6-13, 63:18-68:25, 70:1-71:21, and 80:21-86:19; *see also* Dkt. 101-5,. at ¶¶21-36.

24.     KEA admits SOF No. 24.

25.     KEA admits SOF No. 25.

26.     SOF No. 26 mischaracterizes KEA's deposition testimony and omits the context of the deposition. KEA's testimony was that all parties involved in the WWSD Rifle (which includes Brownells, and its marketer InRange), curtailed marketing and advertising of the KP-15 as a result of Armory publishing its C&D Letter.[52]

27.     KEA admits SOF No. 27.

28.     The effects of Armory publishing the C&D Letter were felt both before and after KEA brought action against Armory in Arizona for declaratory relief.[53]

29.     As a result of the letter: (a) Brownells "didn't market the product" as they would have otherwise,[54] (b) Brownells curtailed its promotion of the KP-15 and WWSD Rifle,[55] and (c) Brownells' primary marketing partner, InRange, curtailed its promotion of the WWSD Rifle from approximately May 2020 until August 2020.[56] Moreover, as a result of Armory publishing the C&D Letter, KEA lost revenues of $637,427 between May to December 2020, and lost profits of at least $387,918.[57]

30.     Armory published false, misleading and disparaging statements about KEA to Brownells.[58]

---

[52] Exhibit 3 at pgs. 319:11-322:7, 337:10-343:21, 346:21-349:19.
[53] Exhibit 3 at pgs. 319:11-322:7, 337:10-343:21, 346:21-349:19; Exhibit 4 at pgs. 14:6-13, 63:18-68:25, 70:1-71:21, and 80:21-86:19; *see also* Dkt. 101-5, at ¶¶21-36;
[54] *Id.* at pg. 128:7-20.
[55] *Id.* (Explaining that Brownells did not promote the product with Recoil and other magazines as they had done previously).
[56] Exhibit 4 at pgs. 14:6-13, 63:18-68:25, 70:1-71:21, and 80:21-86:19; *see also* Dkt. 101-5, at ¶¶21-36.
[57] Exhibit 5.
[58] Dkt. 121-1; *see also* Exhibit 3 at pg. 335:12-24.

9

31.     SOF No. 31 mischaracterizes evidence and omits material deposition testimony. Phagan did write a number of SST blog posts wherein he described the SST-Armory sale (which is further described in SOF No. 3),[59] and Phagan does refer to the "CAV-15 MKII mold and IP" in the posts.[60] However, when Phagan was asked what he meant by the term "IP," Phagan explained that he is "not a lawyer" and "[a]ny references to me using 'IP' or 'intellectual property' in this post are as a lay person."[61]

32.     SOF No. 32 omits several material facts, and misrepresents the testimony of Russell Anderson and Jud Gudgel:

a.     First, Armory intended the C&D Letter to be sent to KEA.[62] The letter was sent to Russell Phagan at his "kearms.com" email address and was expressly directed at Phagan's "employer, KE Arms."[63]

b.     Second, the C&D Letter was regarding the development, design and manufacture of a lower receiver.[64] Specifically, Armory's C&D Letter stated that KEA's development was in "direct conflict" with Armory's "MKIII design[;]" and proposed a manufacturing "licensing arrangement" wherein KEA would become the manufacturer for both Armory and KEA.[65]

---

[59] Dkt. 121-22.
[60] *Id.* at p. 1.
[61] Exhibit 2 at pgs. 52:16-53:20.
[62] Dkt. 121-1.
[63] *Id.*
[64] *Id.*
[65] *Id.* (fourth full paragraph).

      c.      Third, Brownells was not involved with the development, design, or manufacture of a lower receiver.[66]

      d.      Fourth, Armory intentionally copied Paul Levy of Brownells on the C&D Letter.[67] Russell Anderson of Armory was specifically instructed to do so by Jud Gudgel of Armory.[68]

      e.      Fifth, the C&D Letter did not pertain to any proposed proceeding against Brownells, nor any circumstances related to Brownells. According to Anderson: Armory did not expect Brownells to "do anything" with the information that Armory was distributing to Brownells; Armory's C&D Letter and subsequent email copying does not even mention Brownells; Armory did not mention anything about potential litigation against Brownells; Armory's letter does not contain any allegations suggesting that Brownells was unlawfully conspiring with KEA to develop and manufacture a receiver; Armory did not allege any violation of Brownells mutual non-disclosure agreement with Armory; and Armory had not done any due diligence nor considered any potential claims against Brownells.[69]

      f.      Finally, Armory's purpose for copying Brownells on the C&D Letter was to persuade Brownells' from purchasing KEA's lower receivers.[70] According to Anderson, Armory knew: that Brownells and KEA were working together; Armory knew that Brownells was working with KEA on the WWSD Rifle; and that Brownells was an existing customer and

---

[66] Exhibit 1 at pgs. 34:23-36:23, 152:16:153:4.
[67] *Id.*
[68] Exhibit 6 at p. 47:19-55:6.
[69] *Id.*
[70] Dkt. 121-18, at p. 170:1-21; Exhibit 6 at p. 47:19-55:6.

distributor of KEA products, including products other than lower receivers.[71] According to Gudgel, Armory was well aware that "Brownells wasn't the one manufacturing" – just the entity selling KEA's lower receivers.[72] Armory never asked Brownells to stop selling KEA's products, but instead, targeted Brownells because it was the buyer of KEA's products.[73]

33.     The evidence shows that the KP-15 was independently developed by KEA using the design of its KE-15 aluminum lower receiver.[74] And the evidence cited by Armory in support of SOF No. 33 does not support its assertion.[75]

a.     First, Phagan did not state that KEA was using the CAV-15 to design the KP-15. Once again, this email was KEA writing to Brownells in 2019, and explaining that it was working on designing a monolithic polymer receiver for the 2020 WWSD Rifle, which KEA envisioned to be a modernized, refined, and revised design similar to the CAV-15 MKII.[76]

b.     Second, Mike Kenney never testified that KEA used the CAV-15 to design the KP-15.[77]  As shown by the deposition transcript, Armory's counsel placed a document in front of Kenney (which Kenney had never seen) and then asked Kenney: "read that box for me, would you, on the right there?"[78] Kenney then read the document produced by counsel, which in no way

---

[71] Exhibit 6 at p. 47:19-55:6.
[72] Dkt. 121-18, at p. 170:1-21.
[73] *Id.*
[74] Dkt. 124, at ¶¶56-64; Dkt. 124-33; Exhibit 2 at pgs. 157:10-162:19; Exhibit 3 at pgs. 41:2-44:17, 236:13-280:17; Dkt. 124-33.
[75] *See* Dkt. 121-20, 121-25, 121-26, 121-27, 121-28.
[76] Exhibit 2 at pg. 162:22-163:23 (Explaining KEA's reference to the "CAV-15 MKII" reference in an email to Brownells); Dkt. 121-20 (Email from KEA to Brownells).
[77] *See* Dkt. 121-25.
[78] *Id.*

speaks to Kenney's knowledge or belief.[79] Armory's mischaracterization of Kenney's deposition transcript does, however, speak to Armory's tactics in this case.[80]

      c.    Third, SST never testified that KEA used the CAV-15 to design the KP-15.[81]  Notably, SST stated the exact opposite: "we never mimicked the gate of the CAV-15 Mark 2. The gate on the KP-15 is 180 degrees rotated from the gate on the Mark 2."[82]  SST also pointed out that the gate location on the MKII is "easy to see" on the product itself.[83]

      d.    Fourth, Jovan Beltran never testified that KEA used the CAV-15 to design the KP-15.[84] Armory attempts to rely on selective-portions of Beltran's deposition wherein he was asked about his modeling of the KP-15 in Mastercam.[85] Armory tellingly omitted the portions of Beltran's deposition testimony where Beltran testifies: that he drew KEA's model for the KP-15 in Mastercam;[86] that he did not use any ribbing designs from the CAV-15 model;[87] that he couldn't use the CAV-15 model;[88] and that he used KEA's "model of the KE Arms wide flange" from the KE-15.[89] Armory also improperly attempts to use Beltran to authenticate a document that was

---

[79] *Id.*

[80] *Id.*

[81] *See* Dkt. 121-26, at pgs. 60:15-61:25.

[82] *Id.*

[83] *Id.*

[84] Dkt. 121-26, at pgs. 60:15-61:25.

[85] Dkt. 121-27.

[86] Exhibit 7 at pgs. 43:5-45:13 ("WITNESS: What model? BY MR. BOGAN: Q. You said that you looked at -- that you looked at a model. A model was provided of a buttstock, right? A. I drew it. It's a model that -- I don't think we had a model for the buttstock. I think it was a physical one that I measured and I then got the basic rough features of it.") (Emphasis added).

[87] Exhibit 7 at 49:2-52:2 ("Q. So you saw the ribbing design in the CAV-15 model that was a CAD file? A. Yes. Q. And you used that model, right? [Objection]. . . THE WITNESS: No.· I couldn't use that model. BY MR. BOGAN: Q. You used that model to do the spacing of the ribbing, though, right? [Objection] . . . THE WITNESS: I don't think I took any dimensions or anything from that model.");

[88] *Id.*

[89] Exhibit 7 at p. 67:1-22 (Explaining how Beltran used the "model of the KE Arms wide flange.")

produced by Armory,[90] despite the fact that Beltran repeatedly testified that he could not identify the document, did not know where it came from, and could not identify whether the file was even associated with the KP-15.[91]

34. SOF No. 34 is false. KEA explained in its deposition that it began working on a polymer lower receiver as soon as Phagan began working for KEA.[92] Phagan began working for KEA in or around April 2015, whereas KEA entered into an NDA with Armory in June 2015.[93]

35. KEA disputes the assertion that Anderson did not know Phagan was working for KEA when he sent his C&D Letter,[94] especially since Anderson used Phagan's KEA email address ending in "@kearms.com" in the C&D Letter itself. KEA does not dispute, however, that Armory made false statements in the C&D Letter.[95] It is material to note that:

    a. Armory falsely stated that KEA was developing a lower receiver in "direct conflict" with Armory's "intellectual property rights";[96] when in reality, Armory had not performed any due diligence or investigation into its intellectual property rights prior to sending the C&D Letter.[97]

    b. Armory falsely stated that Armory had purchased "exclusive" intellectual property rights from Cavalry Arms in 2011;[98] when in truth, Cavalry Arms sold all of its

---

[90] Dkt. 121-28.
[91] Exhibit 7 at pgs. 126:8-132:24 (Beltran was asked about a document produced by Armory, Armory's counsel repeatedly tried to question Beltran about the document, after which Beltran repeatedly stated he could not identify the document, where it came from, or what file it was associated with).
[92] Exhibit 3 at pgs. 30:11-32:15.
[93] Dkt. 124, at ¶¶40-41; *see also* Dkt 121-9.
[94] Dkt. 121-1.
[95] SOF. No. 35.
[96] Dkt. 121-1, at p. 2, ¶1.
[97] Exhibit 6 at pg. 49:4-50:2
[98] Dkt. 121-1, at pg. 2, ¶2.

intellectual property in June 2010 to its former operations manager, Christian Capello, of Cavalry Manufacturing, LLC,[99] Armory's purchase in 2011 was with SST (not Cavalry Arms),[100] and Armory's purchase in 2011 did not contain "exclusive" rights.[101]

        c.    Armory falsely stated that KEA appeared to be attempting to market the design of an MKIII;[102] when in fact, KEA was independently developing its KP-15 using the design of its KE-15 aluminum lower receiver.[103]

## III.   <u>ARGUMENT</u>

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers, interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view disputed facts "in the light most favorable to the party opposing summary judgment." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1211 n.1 (10th Cir. 2013). Thus, the Court must view the facts, resolve all factual disputes, and make all reasonable inferences in KEA's favor. *Brooks v. Colorado Dep't of Corr.,* 12 F.4th 1160, n. 2 (10th Cir. 2021) (citing *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013)). Here, KEA has presented significant evidence disputing each material SOF in Armory's motion. As set forth above, KEA has sufficiently disputed SOF Nos. 7-9, 11-19, 21-23, 26, 28, 29-35. Furthermore, KEA has provided corresponding controverting facts (COF Nos. 7-9, 11-19, 21-23, 26, 28, 29-35) which

---

[99] Dkt. 123, at ¶10.
[100] Dkt. 124, at ¶19; Dkt. 124-4;
[101] *Id.*
[102] Dkt. 121-1, at pg. 2, ¶2.
[103] Dkt. 124, at ¶¶56-64; Dkt. 124-33; Exhibit 2 at pgs. 157:10-162:19; Exhibit 3 at pgs. 41:2-44:17, 236:13-280:17; Dkt. 124-33.

preclude summary judgment as a matter of law. Thus, Armory's motion must be denied.

### B. ARMORY'S EMAIL TO BROWNELLS WAS NOT PRIVILEGED.

The facts show that Armory's April 21, 2020 email to Brownells was not privileged.[104]
Oklahoma recognizes a litigation privilege "under which attorneys, parties, jurors, and witnesses
are immune from defamation liability for statements made in the course of judicial or quasi-judicial
proceedings, so long as the statements are relevant to the proceedings." *Cardtoons, L.C. v. Major
League Baseball Players Ass'n*, 335 F.3d 1161, 1166 (10th Cir. 2003). However, the litigation
privilege does not "give free reign [sic] to attorneys to defame," and the privilege is applicable if
the communication is (1) relevant or has some relation to a proposed proceeding and (2)
circumstances surrounding the communication have some relation to the proposed proceeding."
*Samson Inv. Co. v. Chevaillier*, 988 P.2d 327, 330 (Okla. 1999).

Moreover, the privilege applies only when the communication is "contemplated in good
faith and under serious considerati*on*." *Samson*, 988 P.2d at 330; *Morrow Development Corp. v.
American Bank & Trust Co*., 875 P.2d 417 (Okla.1994); *Green Bay Packaging, Inc. v. Preferred
Packaging, Inc.,* 932 P.2d 1091, 1096 (Okla.1996). In *Morrow*, the Oklahoma Supreme Court held
that an actor's course of conduct is privileged only if its "primary focus" was protection of the
actor's legitimate economic interests rather than interference. 875 P.2d at 417. Similarly, in *Green
Pay Packaging*, the Oklahoma Supreme Court held that the privilege "is not absolute" and it is
"lost when the underlying motive is principally to harm another." 932 P.2d at 1096; *see also
Wohali Outdoors, LLC v. Sheltered Wings, Inc*., No. 13-CV-0773-CVE-PJC, 2014 WL 2589449,
at \*4 (N.D. Okla. June 10, 2014) (unpublished) (quoting *Green Bay Packaging*).

---

[104] SOF Nos. 19, 21-22, 26, 28, 29, 32, and 35; COF Nos. 19, 21-22, 26, 28, 29, 32, and 35.

In this case, the C&D Letter did not pertain to any proposed proceeding against Brownells, nor did it pertain to circumstances related to Brownells.[105] It is evident by the C&D Letter itself that Armory intended it to be sent to KEA and not Brownells.[106] The subject of the C&D Letter was KEA's development, design and manufacture of a lower receiver.[107] Armory's C&D Letter stated that KEA's development was in "direct conflict" with Armory's "MKIII design[;]" and Proposed a manufacturing "licensing arrangement" wherein KEA would become the manufacturer for both Armory and KEA.[108] Notably, however, Brownells was not involved with the development, design, or manufacture of a lower receiver.[109] Thus, there is no evidence to support Armory's allegation that the circumstances in the C&D Letter pertained to Brownells.

Second, Anderson and Gudgel of Armory admitted that the C&D Letter did not pertain to any proposed proceeding against Brownells.[110] According to Anderson: Armory did not expect Brownells to "do anything" with the information that Armory was distributing to Brownells; Armory's C&D Letter and subsequent email to Brownells does not mention Brownells; Armory did not mention anything about potential litigation against Brownells; Armory's letter does not contain any allegations suggesting that Brownells was unlawfully conspiring with KEA to develop and manufacture a receiver; Armory did not allege any violation of Brownells mutual non-disclosure agreement with Armory; and Armory had not done any due diligence nor considered any potential claims against Brownells when Armory copied it on the C&D Letter.[111]

---

[105] COF No. 32(a)-(d); *see also* SOF No. 32.
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.* at COF No. 32(e).
[111] *Id.*

Finally, Armory's communication was not contemplated in good faith, was made without serious consideration, and was done with the underlying motive to harm KEA. *Samson*, 988 P.2d at 330; *Morrow*, 875 P.2d at 417; *Green Bay Packaging*, 932 P.2d at 1096.  Here, Armory's purpose for copying Brownells on the C&D Letter was to persuade Brownells' from purchasing KEA's lower receivers.[112] According to Anderson, Armory performed *no due diligence or investigation* with respect to potential claims against Brownells.[113] Armory copied Brownells on the C&D Letter, despite the fact that Armory knew Brownells was not the manufacturer of the lower receivers at issue.[114] What is worse, Armory's communication with Brownells was intended to propagate materially false statements about KEA.[115] In a word, Armory's email to Brownells was (a) done without serious consideration; and (b) to persuade Brownells' from buying KEA's lower receivers in bad faith.[116]  As such, its communication to Brownells was not privileged under Oklahoma law. *Samson*, 988 P.2d at 330; *Morrow*, 875 P.2d at 417; *Green Bay Packaging*, 932 P.2d at 1096.

### C.   MATERIAL DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT ON KEA'S TORTIOUS INTERFERENCE CLAIM.

It is well-settled in Oklahoma, that "one has a right to prosecute a lawful business without unlawful molestation or unjustified interference from any person, and any malicious interference with that business is an unlawful act and an actionable wrong." *Loven v. Church Mut. Ins. Co.*, 452 P.3d 418, 424 (citing *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1165). The

---

[112] COF No. 32(f).
[113] COF No. 32(e).
[114] *Id.*
[115] COF No. 35 (a)-(c).
[116] COF No. 35.

Oklahoma Supreme Court has stated that the elements of a claim of interference with prospective economic advantage are:

> 1.) the existence of a valid business relation or expectancy;
>
> 2.) knowledge of the relationship or expectance on the part of the interferer;
>
> 3.) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and
>
> 4.) resultant damage to the party whose relationship has been disrupted.

*Id.* at 425. Here, Armory does not dispute its knowledge of KEA's valid business relation and expectancy with Brownells.[117] Armory only disputes (1) whether its interference with KEA's prospective economic relations with Brownells was done in "bad faith"; and (2) whether KEA sustained damages as a result.[118] Thus, KEA will address the disputed elements below.

First, the facts in this case show that Armory's purpose and motive for sending Brownells the C&D Letter was to deter KEA's sales of the KP-15 to Brownells.[119] While Armory may attempt to dispute its true intentions at trial, the evidence showing Armory's blatant attempts to deter KEA's sales with Brownells must be considered by a finder of fact. Indeed, this evidence is precisely the sort of evidence constituting improper interference under Oklahoma law.

The Oklahoma Supreme Court has held that the tort requires a "showing of bad faith," meaning the "interference must be the purpose of the tortfeasor's act, and their motive must include a desire to interfere and disrupt the others' prospective economic business advantage." *Loven*, 452 P.3d. at 426 (citing Restatement (Second) of Tort § 767, at 25-26) (citations omitted). The question

---

[117] SOF. No. 32; COF Nos. 32 and 35.
[118] Dkt. 121, at pg. 16.
[119] COF. Nos. 32 and 34; *see also* SOF. No. 32.

19

of whether a tortfeasor's purpose and motive were improper, however, is for the finder of fact. *See e.g., Green Bay Packaging*, 932 P.2d at 1096. For instance, in *Green Bay Packaging*, an employer sued a former employee for misappropriation of trade secrets and proprietary information, after which the former employee countersued for defamation and interference with business relations. *Id.* at 1095. *Id.* at 1095. The counterclaim alleged that the employer's underlying motive was to put the former employees and their company out of business. *Id.* At trial, the jury was instructed:

> The determination of whether a Party's conduct was or was not improper depends upon your consideration of all the facts and circumstances of the case, and a balancing of the following factors: 1. The nature of the Party's conduct; 2. The Party's motives; 3. The interests of the Party with which another party's conduct interfered; 4. The interests sought to be advanced by a Party; 5. The social interests in protecting the freedom of action of a Party and the contractual interests of the Parties; 6. The proximity or remoteness of a Parties [sic] conduct to the interference claimed by a party; and, 7. The relationship among the Parties and the entity or entities which have a relationship with the Parties.

*Id.* at 1096. The jury found in favor of the former employee, and on review, the Oklahoma Supreme Court upheld the trial court's instruction, holding: "[t]he instruction adequately directed the jury in determining whether [employer's] conduct improperly interfered with [former employee's] business relations or whether [employer] was honestly exercising its privilege to protect its legitimate economic interests." *Id.*

Here, the facts are eerily similar. The evidence shows that Armory's purpose and underlying motive for sending the C&D Letter to Brownells was to harm KEA's sales with Brownells.[120] As set forth above, Armory's purpose for copying Brownells on the C&D Letter was

---

[120] COF Nos. 35 and 32; SOF No. 32.

to persuade Brownells' from purchasing KEA's lower receivers.[121] Not only did Armory sent the letter without any diligence or investigation,[122] Armory also copied Brownells despite the fact that Armory knew Brownells was not the designer or manufacturer of the product at issue.[123] Adding insult to injury, Armory's letter published materially false statements about KEA to Brownells.[124] In sum, Armory is free to argue at trial that it did not send its letter to Brownells in bad faith, but the finder of fact must be permitted to consider the substantial evidence showing otherwise.[125] Since material disputed facts preclude summary judgment of KEA's interference claim, Armory's motion must be denied.

Second, the facts in this case show that KEA was, indeed, damaged by Armory publishing the C&D Letter to Brownells.[126] Lost profit damages are recoverable in interference cases, which may be established by evidence of lost sales and lost accounts resulting from the actions of the tortfeasor. *Green Bay Packaging*, 932 P.2d at 1097.

In this case, as a result of Armory's letter, Brownells testified that it "didn't market [KEA's] product as much as [they] probably would have otherwise."[127] Brownells further testified that it was no longer "actively going out and promoting [the WWSD Rifle]" with its marketing channels.[128] And, "as a result of the letter,"[129] Brownells' primary marketing partner for the

---

121 COF No. 32(f).
122 COF No. 32(e).
123 *Id.*
124 COF No. 35 (a)-(c).
125 COF Nos. 35 and 32; SOF No. 32.
126 COF. Nos. 32 and 34; *see also* SOF. No. 32.
127 COF No. 21, 22, and 23.
128 *Id.*
129 *Id.*

WWSD Rifle,[130] curtailed its promotion of the WWSD Rifle.[131] While Brownells did not take "action" against KEA,[132] the facts show that: (a) Brownells "didn't market the product" as they would have otherwise, (b) Brownells curtailed its promotion of the KP-15 and WWSD Rifle, and (c) Brownells' primary marketing partner, InRange, curtailed its promotion of the WWSD Rifle.[133] As set forth above, these effects were felt both before and after KEA brought action against Armory.[134]

In sum, the facts show that KEA lost revenues of $637,427 and lost profits of approximately $387,918.[135] Since Armory cannot legitimately dispute KEA's lost sales during this period, its motion should be denied.

### D. MATERIAL DISPUTED FACTS PRECLUDE JUDGMENT ON KEA'S BUSINESS DISPARAGEMENT AND DECEPTIVE TRADE PRACTICE CLAIMS.

The elements of a claim for business disparagement are that "(1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to plaintiff." *Choctaw Town Square, LLC v. City of Choctaw, Oklahoma*, 2014 WL 12818169 (W.D. Okla. Dec. 29, 2014). A claim of business disparagement is similar to a defamation claim and privilege to make the disputed communication is a defense to a business disparagement claim. *Id*. at *5. Under Oklahoma's Deceptive Trade Practices Act, OKLA. STAT. tit. 78, § 53, a person "engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person . . . [d]isparages the goods, services, or business of another by

---

[130] *Id.*
[131] *Id.*
[132] SOF. No. 22.
[133] COF No. 29.
[134] COF No. 28.
[135] COF No. 29.

false or misleading representation of fact. . . ."

In this case, Armory argues that its communication to Brownells on April 21, 2020 was not deceptive, sent without malice, privileged, and that KEA did not incur damages as a result.[136] As set forth above, Armory's communication was not privileged; and as set forth below, material disputed facts preclude summary judgment on the remaining elements.

First, the facts show that Armory's statements published to Brownells were false.[137] In its motion, Armory not only concedes this fact,[138] but what is worse, Armory simply ignored the remaining falsities it published.[139] For example, in the C&D Letter, Armory falsely stated that KEA was developing a lower receiver in "direct conflict" with Armory's "intellectual property rights"; when in reality, Armory had not performed any due diligence or investigation into its intellectual property rights prior to sending the C&D Letter.[140]

Another example is Armory's false statement that Armory had purchased "exclusive" intellectual property rights from Cavalry Arms in 2011; when in truth, Cavalry Arms sold all of its intellectual property in June 2010 to its former operations manager, Christian Capello, of Cavalry Manufacturing, LLC, Armory's purchase in 2011 was with SST (not Cavalry Arms), and Armory's purchase in 2011 did not contain "exclusive" rights.[141]   In yet another instance, Armory falsely states that KEA appeared to be attempting to market the design of an MKIII; when in fact, KEA was independently developing its KP-15 using the design of its KE-15 aluminum lower receiver.[142]

---

[136] Dkt. 121, at p. 20.
[137] COF. No. 30.
[138] SOF. No. 35.
[139] *Id.*
[140] COF No. 35(a).
[141] COF No. 35(b).
[142] COF No. 35(c).

Put simply, the facts show that Armory's published statements in the C&D Letter were false.

Second, whether Armory acted with malice is a question for the finder of fact.[143] In Oklahoma "one who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." *Bennett v. McKibben*, 915 P.2d 400, 404 (quoting Restatement of the Law (Second), Torts, § 623A).[144]

Here, Armory conceded that it misrepresented the source of its own intellectual property rights.[145] The facts also show that Armory's purpose and underlying motive for sending the C&D Letter to Brownells was to harm KEA's sales with Brownells.[146] The facts also show that Armory made its false statements without any diligence or investigation,[147] and Armory copied Brownells on the C&D Letter, despite the fact that Armory knew Brownells was not the designer or manufacturer.[148] Thus, material disputed facts preclude summary judgment on the issue of malice, and Armory's motion must be denied.

Finally, the facts show that KEA was, indeed, damaged by Armory publishing the C&D

---

[143] COF. No. 30.
[144] The rule also applies to "the publication of a false statement disparaging another's property rights in land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property." *Bennett,* 915 P.2d at 404. (Quoting Restatement of the Law (Second), Torts, § 624).
[145] SOF No. 32.
[146] COF Nos. 35 and 32; SOF No. 32; COF No. 32(f).
[147] COF No. 32(e).
[148] *Id.*

Letter to Brownells.[149] As set forth above, these effects were felt both before and after KEA brought action against Armory.[150] The facts show that between May 2020 until August 2020,[151] KEA lost revenues of $637,427 and lost profits of approximately $387,918.[152] Accordingly, Armory's motion must be be denied.

### E. KEA'S DAMAGES ARE SUPPORTED BY EVIDENCE.

KEA's damages incurred as a result of Armory's letter to Brownells are supported by substantial evidence. As a set forth above, Brownells' curtailed its marketing of the KP-15, which affected KEA's sales of the KP-15 and KP-15 parts during that period.[153]  As a result, Armory's letter directly impacted sales of the WWSD Rifle and KP-15, thereby damaging KEA.[154]

To be sure, KEA performed a financial analysis its sales data with Brownells both before and after the April 21, 2020 letter has been conducted in this case.[155] The financial analysis was prepared by Mike Rosten, CPA, CFF, CFE, CVA, MAFF, who is qualified to provide expert testimony at trial in this case.[156] This financial analysis considered a wide range of credible data and evidence, including, among other things: Brownells' purchase orders with KEA, sales history with Brownells, unit costs for the KP-15, annual firearm manufacturing and export reports prepared by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"), BAFTE firearm commerce statistical reports for the United States, and the Federal Bureau of

---

[149] COF. Nos. 32 and 34; *see also* SOF. No. 32 (Armory admits that "Brownells was included on the e-mail because they [sic] were selling the KP-15.").
[150] COF No. 28.
[151] COF No. 29.
[152] *Id.*
[153] COF No. 29.
[154] *Id.*; *see also* Dkt. 102-6.
[155] *Id.*
[156] *Id.*

Investigation's ("FBI") National Instant Criminal Background Check System ("NICS") data from 1998-2021.[157] Notably, all of this evidence, data, as well as the anticipated testimony of Mr. Rosten, is presently undisputed by Armory.[158]

In sum, there is substantial (and undisputed) evidence that KEA suffered lost revenues of $637,427.[159] This data clearly (and conservatively) shows that the resultant economic damages sustained by KEA.[160] Since Armory has provided no evidence or financial data that would rebut these damages at trial, there is presently no evidence to even dispute this, which, absent the other material disputed facts set forth above, would warrant summary judgment in KEA's favor under Rule 56(a). Since KEA's damages have extensive, undisputed evidentiary support, Armory's present motion must be denied.

## IV.   <u>CONCLUSION</u>

Armory sent a cease-and-desist filled with false and disparaging statements to KEA's largest customer, Brownells.[161] According to Armory, its purpose and motive for sending Brownells this letter was to deter KEA's sales of the KP-15 to Brownells.[162]  Unfortunately, Armory's false statements had their desired effect, and KEA lost over $600,000 in sales and about $400,000 in profits.[163] As set forth herein, KEA's counterclaims are supported by substantial

/ / /

---

[157] *Id.*
[158] *Id.*
[159] *Id.*
[160] *Id.*
[161] Dkt. 121-1.
[162] Dkt. 121-18, at p. 170:1-21.
[163] **Exhibit 5.**

26

evidence. As such, Armory's motion for summary judgment must be denied, and KEA's claims should proceed to trial.

Dated this 8th day of August, 2022.

Respectfully submitted,

**HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.**

_/s/Robert P. Fitz-Patrick_
Robert P. Fitz-Patrick, OBA #14713
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3706
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
Email:  rfitzpatrick@hallestill.com
**ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFFS**

**-AND-**

**MARQUIS AURBACH**

_/s/ Alexander K. Calaway_
Brian R. Hardy, Esq.
Nevada Bar No. 10068
_Admitted Pro Hac Vice_
Alexander K. Calaway, Esq.
Nevada Bar No. 15188
_Admitted Pro Hac Vice_
10001 Park Run Drive
Las Vegas, Nevada 89145
Tel: 702-382-0711
bhardy@maclaw.com
acalaway@maclaw.com
**ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 8th day of August, 2022. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

James E. Weger, Esq.
Tadd J.P. Bogan, Esq.
JONES, GOTCHER & BOGAN, P.C.
15 East Fifth St, Suite 3800
Tulsa, OK 74103
ATTORNEYS FOR THE PLAINTIFF AND
THIRD- PARTY DEFENDANTS

*/s/ Cally Hatfield*

28