# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
    GWACS ARMORY, LLC, AN     )
 3  OKLAHOMA LIMITED          )
    LIABILITY COMPANY,        )  CASE No. 20-CV-0341-CVE-SH
 4                            )           BASE FILE
          Plaintiff,          )     CONSOLIDATED WITH:
 5                            )  CASE No. 21-CV-0107-CVE-SH
          vs.                 )
 6                            )
    KE ARMS, LLC, RUSSELL     )  Deposition of:
 7  PHAGAN, SINISTRAL         )
    SHOOTING TECHNOLOGIES,    )  PAUL E. LEVY
 8  LLC, BROWNELLS, INC.,     )
    AND SHAWN NEALON,         )
 9                            )
          Defendants,         )
10                            )
    AND                       )
11                            )
    KE ARMS, LLC,             )
12                            )
          Plaintiff,          )
13                            )
    vs.                       )
14                            )
    GWACS ARMORY, LLC, GWACS  )
15  DEFENSE, INCORPORATED,    )
    JUD GUDGEL, RUSSELL       )
16  ANDERSON, DOES I THROUGH  )
    X, AND ROE CORPORATIONS   )
17  I THROUGH X,              )
                              )
18        Defendants.         )
    --------------------------)
19

20      THE DEPOSITION OF PAUL E. LEVY, taken
    before M. Jane Weingart, a Registered Merit
21  Reporter and a Notary Public of the State of
    Iowa, commencing at 10:00 a.m., on the 10th day
22  of January, 2022, at Comfort Inn and Suites,
    1630 W Street South, Grinnell, Iowa.
23

24

25
```

```
 1   have the authority to sign them?
 2       A.   I have the authority to sign.  If I do
 3   see, I read them, and if I see anything that's
 4   out of the normal, out of the typical NDA,
 5   we'll send it to Counsel.
 6       Q.   Do you have in-house counsel at
 7   Brownells?
 8       A.   Not in-house.
 9       Q.   Just local Counsel?
10       A.   Yes.
11                (Exhibit No. 152 was marked for
12                identification by the reporter.)
13   BY MR. WEGER:
14       Q.   I have handed you what we've marked as
15   Exhibit 152 (Indicating).
16                Have you seen this document
17   before, sir?
18       A.   Yes, I believe so.
19       Q.   I need you to turn to Page Six of this
20   notice, please, or amended notice.  I kind of
21   want to walk through these subject matters.
22       A.   Uh-huh.
23       Q.   We'll go back and forth to make sure
24   we cover them all.
25                What can you tell me about
```

1  Brownells' involvement with KEA in the
2  development of their polymer lower that's being
3  used for the WWSD as well as just selling
4  AR-15s through Brownells?
5              MR. HARDY: Objection. Form.
6     A.   So as far as the KE Arms polymer lower
7  receiver, Brownells did not have any input in
8  the design or development.  KE Arms was aware
9  of our desire, as well as InRange, and Karl to
10 develop a What Would Stoner Do Rifle.
11             When that appeared to probably
12 not be happening, KE Arms conveyed that they
13 could, in fact, produce a monolithic polymer
14 lower receiver and approached us with that
15 design, I believe in 2019; and then Russell
16 sent us various iterations to us to see; and
17 then that's eventually what we came to market
18 with the KP-15, and then used that in the What
19 Would Stoner Do Rifle.
20    Q.   Did Mr. Phagan ever tell you that he
21 used the drawings and the CAD drawings from the
22 GWACS lower to build the KE Arms lower?
23             MR. HARDY: Objection. Form.
24    A.   I don't believe he ever conveyed what
25 he did or didn't use when he made that.

```
 1      Q.   So he never mentioned that to you?
 2                MR. HARDY:   Object to form.
 3      A.   I don't believe so.
 4   BY MR. WEGER:
 5      Q.   Do you have any knowledge as to
 6   whether that's, in fact, what happened?
 7      A.   No, I do not.
 8      Q.   Have you ever been to KE Arms'
 9   location?
10      A.   No.
11      Q.   Have you ever asked them where they
12   got the lower, the design for the lower that
13   they're using?
14      A.   No.
15      Q.   And no one has ever told you how they
16   came up with their design?
17      A.   No.
18      Q.   And I take it then that Brownells had
19   no financial investment in KE Arms' design of
20   its lower that you're using in the WWSD
21   project?
22      A.   Correct.  We paid nothing up front nor
23   did we invest in KE Arms in any way.
24      Q.   You had in your catalogs, because I've
25   seen some of them, GWAC's lower, AR-15 lower
```

```
 1   use in it?
 2      A.   Yes.
 3      Q.   Components, I should say.
 4              (Exhibit No. 162 was marked for
 5              identification by the reporter.)
 6   BY MR. WEGER:
 7      Q.   This is where the variance that we've
 8   been discussing was approved by the Federal
 9   government.
10                    Correct?
11      A.   Correct.
12      Q.   Okay.  So you're now writing to Ian
13   and Karl, and you say the:
14              "Variance approved with GWACS.
15   Once they get retooled, we'll be in business."
16                    Talk to me about the retooling.
17   Who told you that GWACS needed to retool and
18   what did they tell you?
19      A.   I believe Shel or Jud at GWACS had
20   told us that was necessary.
21                    I believe Ian and Karl were also
22   under the impression of the retooling.
23                    And I believe GWACS maybe was
24   also public in saying that there was going to
25   be new receivers coming that required some
```

```
 1   retooling.
 2      Q.   Did you have any more definition than
 3   retooling?
 4      A.   I just generally got communicated to
 5   that the old tooling was wearing out and needed
 6   to be fixed.
 7      Q.   Well, you knew that the Mark III was
 8   different than the Mark II?
 9      A.   Correct.
10      Q.   That would require a different mold?
11      A.   Correct.
12      Q.   Right?
13      A.   Yes.
14      Q.   And that the Mark IV was different
15   than the Mark III, which would require a
16   different mold?
17           MR. HARDY:  Objection.  Form.
18   BY MR. WEGER:
19      Q.   Right?
20      A.   Correct, but the What Would Stoner Do
21   per Ian and Karl was specified to be a Mark II,
22   which would have required retooling.
23      Q.   So you knew that there had to be
24   retooling, or was going to be retooling of all
25   three? -- the Mark II, Mark III and the
```

```
 1   Mark IV?
 2        A.   The Mark III would require tooling
 3   from the ground up.
 4                  And then the Mark II required
 5   the tooling to be fixed or retooled.
 6                  (Exhibit No. 163 was marked for
 7             identification by the reporter.)
 8   BY MR. WEGER:
 9        Q.   Okay.  I've handed you Exhibit 163
10   (Indicating).  Per usual, let's start on the
11   back page of KEA 451.
12                  Where did you come up with the
13   idea in September of 2018 to license the MK II
14   mold from GWACS?
15        A.   Is that in this e-mail?  Or that's
16   just a conversation we're referring to?
17        Q.   Well, it's an email from you --
18        A.   Yes.
19        Q.   -- on the last page, sorry.  Are you
20   with me?  I'm on Page KEA 415.
21        A.   I've gotcha.
22        Q.   Okay.  I want to make sure we're on
23   the same page.
24        A.   Gotcha.
25        Q.   All right.  You're discussing here --
```

```
 1    first of all, up above that, it says:
 2                    "Sent from BlueMail."
 3                    What is that reference right
 4    above where it says "September 10th of 2018"?
 5       A.    I don't know what that would be.
 6       Q.    Okay.
 7       A.    So the licensing came about when the,
 8    we understood there was retooling needs.  We
 9    were working with all of the parties to supply
10    parts, but we needed to get that in sync so
11    that we could supply the parts at the same time
12    to produce the rifles.
13                    And it was appearing that the
14    lower receiver was the gating factor to launch
15    the rifle.
16                    And then at that time, since
17    KE Arms was aware triggers were needed for this
18    rifle with the -- I forget the designation of
19    what trigger they were providing -- Russell
20    reached out and said:
21                    "Hey, if we could get the actual
22    tooling, those could be sent here, maybe we
23    could retool those and bring this to market and
24    get it going and fix the Mark II tooling."
25                    So that's when I reached out
```

```
 1   to -- this would have been Jud here -- asking
 2   if we could pay a fee to get that tooling so
 3   that these parts could actually start to be
 4   produced.  That was our concern at that time
 5   was parts not being made.
 6        Q.   Who brought Russell Phagan and KE Arms
 7   in these discussions?  They haven't been on
 8   these emails we've been looking at.
 9        A.   Ian and Karl were working with them
10   when they built the first rifles, and they have
11   specified the KE Arms trigger into that
12   project.
13               So Russell knew that this
14   project was happening via Ian and Karl, and
15   then Russell -- we were obviously in contact
16   then because we had to source the triggers.  We
17   had to purchase the triggers from KE Arms.
18               So we set up KE Arms as a
19   factory around this time, or a vendor of ours;
20   and that's when Russell reached out with this
21   concept.
22        Q.   So Russell reached out to you with the
23   concept of:
24               "Can you get your hands on the
25   mold."
```

```
 1      Q.   Any printed advertising you pay for?
 2      A.   I believe there was the Recoil
 3   advertisements.  I'm not sure how many -- we
 4   really got out of print the last, probably,
 5   last year or two years.  It doesn't just have
 6   much return.  So pretty much everything has
 7   been electronic.
 8      Q.   Okay.  Do you have any personal -- not
 9   personal knowledge, you're here on behalf of
10   Brownells -- do you have any knowledge
11   regarding the purchase of the K- -- or the
12   Mark II machinery and intellectual property
13   that occurred between GWACS and Russell Phagan?
14      A.   No.  I wasn't privy to any of that
15   information.
16      Q.   Have you ever asked anybody at KE Arms
17   whether they have the right to produce the
18   Mark II?
19      A.   I don't think they -- they never made
20   the Mark II.
21      Q.   How about the Mark III?
22      A.   The one that KE Arms came to us with,
23   I never asked them if they had the right to
24   make that, given that's their own design.
25      Q.   Do you know for a fact it's their own
```

```
 1   design?
 2              MR. HARDY:  Object to form.
 3       A.  Given my interpretation of the
 4   appearance of the item and my expertise, yes.
 5              MR. WEGER:  Let's take a short
 6   break.  I'm pretty close to being done.
 7              (A recess was taken.)
 8              (Exhibit No. 178 was marked for
 9         identification by the reporter.)
10   BY MR. WEGER:
11       Q.  Paul, on this email in February of
12   2021, you're writing to Karl and Ian.
13              It says:
14              "Russell got me up to speed on
15   the current WWSD situation.  We're on board
16   with offering the lower here."
17              What is this about?  What are we
18   talking about?
19       A.  Okay.  So what was our situation.  So
20   the rifle itself, so the lower receiver was
21   delayed; then the rifle itself was also delayed
22   due to subcomponents, maybe the hard guard, the
23   carbon fiber hand guard.
24              So in order to get -- one of the
25   benefits -- Ian and Karl, to get their royalty,
```

```
 1                    C E R T I F I C A T E

 2

 3            I, the undersigned, a Registered Merit
      Reporter and a Notary Public of the State of
 4    Iowa, do hereby certify that I acted as the
      shorthand reporter in the foregoing matter at
 5    the time and place indicated herein; that I
      took in shorthand the proceedings had at said
 6    time and place; that said shorthand notes were
      reduced to print under my supervision and
 7    direction by means of computer-aided
      transcription, and that the foregoing pages are
 8    a full and correct transcript of the shorthand
      notes so taken; that said deposition was
 9    submitted to the witness for signature, if
      requested to do so by a party or the witness;
10    that any changes, if any, requested by the
      witness are attached hereto.
11
              I further certify that I am neither
12    attorney nor counsel for, or related to or
      employed by any of the parties in the foregoing
13    matter, and further that I am not a relative or
      employee of any attorney or counsel employed by
14    the parties hereto, or financially interested
      in the action.
15
              IN WITNESS WHEREOF, I have hereunto set
16    my hand and seal this 24th day of January,
      2022.
17
                       M. Jane Weingart
18
                       _____
19                     Registered Merit Reporter
                       Notary Public
20

21

22

23

24

25
```