# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GWACS ARMORY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>KE ARMS, LLC, RUSSELL PHAGAN, SINISTRAL SHOOTING, TECHNOLOGIES, LLC, BROWNELLS, INC., and SHAWN NEALON,<br><br>Defendants.<br><br>and<br><br>KE ARMS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>GWACS ARMORY, LLC, GWACS DEFENSE INCORPORATED, JUD GUDGEL, RUSSELL ANDERSON, DOES I through X, and ROE CORPORATIONS I through X,<br><br>Defendants. | Case Number<br>20-cv-0341-CVE-SH<br>BASE FILE<br><br>Consolidated with:<br>Case No.<br>21-CV-0107-CVE-JFJ |

THE DEPOSITION OF RUSSELL WAYNE PHAGAN, taken on the 26th day of October, 2021, between the hours of 9:20 a.m. and 4:42 p.m., on behalf of the Plaintiff GWACS, pursuant to Federal Rules of Civil Procedure, at the law offices of Hall, Estill, Hardwick, Gable, Golden & Nelson, 320 South Boston Avenue, Suite 200, Tulsa, Oklahoma, before Linda Fisher, CSR-RPR, and Notary Public in and for the State of Oklahoma.

have been some design beforehand. Okay.

(Whereupon, Deposition Exhibit 40 was marked for identification purposes.)

Q. Let me hand you what I've marked as Exhibit 40.

MR. CALAWAY: Do I get a copy?

MR. WEGER: Yes.

MR. CALAWAY: Thanks.

Q. (By Mr. Weger) Can you identify this post, sir?

A. Yes.

Q. Please do so. Who posted this?

A. I did.

Q. Okay. And it's posted in September of 2011; is that right?

A. Yes.

Q. Okay. And talk to me about this. Is this the first post you made about selling the items you had purchased from Cavalry Arms?

A. Yes.

Q. Now, in the first sentence you say, "When Cavalry Arms closed down last year, I took the opportunity to purchase the CAV-15 mold and IP." Your term, right?

A. I am not a lawyer. Any references to me using "IP" or "intellectual property" in this post are as a lay person.

Q. I didn't ask that question, sir. I asked if you used the term "IP."

A. Yes, I did.

Q. Okay. So you purchased IP from Cavalry Arms?

A. In this context, I'm referring to the prints themselves.

Q. Whatever it might be, you're telling the public that you purchased IP, correct, from Cavalry Arms?

A. Yes.

Q. Okay. In the second paragraph you say, "It made no sense for me to move forward on this, so I've decided to sell the mold and IP rights." Your words, correct?

A. Yes.

Q. Third paragraph. "After a series of false-starts with several prospective buyers, I have decided to put the CAV-15 mold and Intellectual Property Rights" -- spelled out -- "...up for sale publicly."

Did I read that right?

A. Yes.

Q. That's what you meant to tell people out in the public because that's what was available for sale by you, correct?

MR. CALAWAY: Object to the form of the question.

anyone involved.

Q. (By Mr. Weger) Were you aware that Brownells requested GWACS to license the molds to them for KE Arms to produce the receiver?

MR. CALAWAY: Object to the form of the question.

A. I am aware of that conversation. I believe "license" is the incorrect phrase. A lease would be the correct phrase for the use of the equipment. The interest in it was that the equipment already existed and could potentially be used.

MR. CALAWAY: Do you want to take a quick break?

MR. WEGER: Sure.

(Whereupon, there was a recess taken.)

(Whereupon, Deposition Exhibit 58 was marked for identification.)

Q. (By Mr. Weger) Ian McCollum and Karl, those are your two friends, right?

A. Yes, that run InRange TV.

Q. That you shoot with and spend a lot of time with, right?

A. Yes.

Q. And they're discussing here with Paul Levy at Brownells the WWSD rifles. And they're asking for a

the end of its service life. That was posted in July of 2018 on their site.

Q. So did you have a discussion with Ian and Karl about the information you knew about the problems with their mold, GWACS' mold?

A. Not in specificity, other than they weren't able to produce per their own revelation on their own website.

Q. Well, what was your "very appealing idea" that Ian is referencing here?

A. What we were talking about at that point is trying to get GWACS to work with us and allow KE Arms to rent the equipment or pay a per unit cost for the use of the equipment to produce the receivers. And any of those dimensional issues that were existing at that time with the mold being worn, were things that KE Arms could have addressed through the use of its own CNC equipment.

(Whereupon, Deposition Exhibit 59 was marked for identification purposes.)

Q. (By Mr. Weger) Let me hand you Exhibit 59. I asked you earlier if you were aware as to whether Brownells had requested GWACS to license their mold to have product produced. Have you seen this email before?

A. Yes.

Q. It does ask to license it, not lease, right?

A. I believe Paul Levy is using an improper term. But yes, licensing would imply that they wanted to make a new one based on the design of GWAC's mold. What they wanted to do was use the actual equipment.

And the whole point to this effort was to produce firearms in a timely manner. The development for a mold of this scale is a minimum of six months. So licensing it wouldn't be what they are talking about.

Q. Well, it's certainly what the president of Brownells, or the director of project management of Brownells is talking about, isn't it? Because he use "licensing" several times in his email.

MR. CALAWAY: Object to the form of the question.

A. Well, you --

Q. (By Mr. Weger) He seems to be arguing with something he didn't write. Were you the partner, "We feel we can work with our partners to clean up the part and have it usable for this project in the short term"?

MR. CALAWAY: Object to the form of the question. You can answer, if you --

A. Perhaps one of them. Have you talked with Brownells about this whole idea that you just said was your idea with Ian about -- about getting the molds and producing them --

ahead.

MR. WEGER: You don't need to coach the witness anymore. He's got a question pending.

MR. CALAWAY: And I was raising an objection.

A. What's not clear to me is, like, which ones are me and which one is Shel? Because it has "R," I guess denoting that that's my text message. And then in bold in the other text that's not bold is Shel responding. Is that what I'm seeing?

Q. (By Mr. Weger) I believe so. Do you remember this text message string?

A. I'm reading through it trying to refresh my memory. The formatting is just kind of weird.

MR. CALAWAY: Is there a pending question?

A. He's asking if I recall or recognize these.

MR. WEGER: There is a question pending.

A. I recall some of these conversations, yes.

Q. (By Mr. Weger) Okay. You texted back and forth with Shel quite often, didn't you?

A. We did during that time frame.

Q. Did you tell -- let's go back to Armory page 0200. I'm interested in the September 12th, 2018, 8:17 p.m.

Did you tell Shel, "Another point to mention to Jud

is Mike is interested in investing in the MKIII"?

A. It appears that I did.

Q. Let's go back to the first part of this. Did you tell Shel that you "need to get Karl under NDA so you can get his input too" and Shel responded, "Yes, please send his email address"?

A. Where am I looking for that?

Q. Bottom of the page Armory-0196.

A. Yes. I did say that.

Q. So you thought it was important that Karl be under an NDA so he could discuss this whole WWSD project, right?

A. No, we --

MR. CALAWAY: Object to the form.

A. -- in this particular chain, we were talking about Mark III receivers. And I knew that GWACS was sensitive to releasing information to people without NDAs. So I told him he should send one to Karl so they can get Karl's input.

You know, what is really interesting in here is the body of text on 198 where I text him a statement that they ultimately posted to their website.

Q. (By Mr. Weger) Would you open your notebook to Tab 31, please. Did you have any involvement with this posting of this ad for KE Arms on their AR-15, KP-15?

A. This is on Brownells' website. It's their product listing.

Q. My question was: Did you have any involvement in preparing this advertising?

A. I sent them the text for this ad.

Q. Is that the CAV-15 Mark II in the picture or is that the KE Arms KP-15 in the picture?

A. That is the CAV-15 Mark II labeled as the What Would Stoner Do Project 2017.

Q. I'm sorry, it's the what? Say it again.

A. It is a CAV-15 Mark II labeled as the What Would Stoner Do Project 2017.

Q. Let's go to Tab Number 32.

A. Yes.

Q. Is that picture in this ad the CAV-15 Mark II or the KE Arms KP-15?

A. It's the KP-15 taken just before SHOT Show 2020.

Q. And the next Tab 33, are those rifles depicted in that ad for KE Arms KP-15, are they CAV-15 Mark IIs, or are they KE Arms KP-15?

MR. CALAWAY: Object to the form of the question.

A. It's a picture of Karl and Ian as this is a celebrity endorsed product with their rifles as part of

the 2017 project which are CAV-15 Mark IIs.

Q. (By Mr. Weger) But you're using that picture to advertise the KE Arms KP-15, right?

A. I'm not using that picture. Brownells is, because it's a celebrity endorsed product.

(Whereupon, Deposition Exhibit 64 was marked for identification.)

Q. Let me hand you Exhibit 64, which is a document produced by the defendants. What is this?

A. It appears to be a Brownells new product submission form.

Q. Okay. So the reference is the GWACS CAV-15 Mark IV. It references the GWACS CAV-15 Mark III. Correct?

A. This isn't a document that I produced.

Q. No, I'm just asking: Have you seen this before?

A. I have not.

Q. Okay.

A. This appears to be something GWACS sent to Brownells.

(Whereupon, Deposition Exhibit 65 was marked for identification.)

Q. I hand you Exhibit 65. Here we are now in August of 2019. And you and Mr. Levy are having

A. No. Their interest is solely in the tooling.

Q. And how much is the total budget for this polymer receiver project that you reference in this email?

A. We had initial estimates of $300,000. I believe it ended up overrunning to 350-ish thousand dollars for things related specifically to it. KE Arms put in another $600,000 in CNC equipment for secondary operations on the KP-15 receivers. But those machines could also be used for other purposes.

Q. So the 350,000, the 300 to 350, whatever the number is, was for what? Developing a mold of the parts? What? What went into that?

A. It was for development of the mold, production of the mold, mold flow analysis, outside engineers, a Branson linear vibration welder, fixtures specific to the Branson linear vibration welder, and a development program from Branson to aid us in our development of the KP-15.

Q. Who produced the mold for you?

A. MoldWorx.

Q. Where are they out of?

A. Gilbert, Arizona.

Q. Did you provide them with either drawings or CAD drawings of the mold you wanted them to make for you?

A. We sent them our renditions of what we wanted the KP-15 to be. And there was a large amount of back and

forth with them because our design was designed as if it was an aluminum part.

We did not have enough experience with our internal design staff to make a plastic part design. So we went back and forth with them several times about adding drafts and radii and other features necessary for a plastic part to be molded.

And we ended up contracting one of the engineers at MoldWorx to finish the KP-15 design, adding all the features to make it moldable, while concurrently designing the mold so that it was easier for him to update the part design and the mold design at the same time.

Q. Who is the engineer at MoldWorx that you contracted with?

A. Rand --

MR. CALAWAY: Object to the form of the question.

Q. (By Mr. Weger) Go ahead.

A. I'm trying to remember his last name. His first name is Randy.

Q. You worked with this guy to engineer on this project and you can't tell me his last name?

A. I don't recall off the top of my head.

Q. Okay. How much did you pay Moldworx for Randy's time?

A. We paid Randy separately from Moldworx for much of the design work. I believe it was around $3500.

Q. So as I understand what you're trying to tell me now is you sent Moldworx drawings or CAD drawings for an aluminum lower and worked with them to develop it into a plastics lower? Is that what you're saying?

A. Not --

MR. CALAWAY: Objection to the form of the question.

A. Not exactly.

Q. (By Mr. Weger) Well, tell me what I -- what's wrong.

A. KE Arms internal design staff, and Mike have experience designing aluminum parts where you can do sharp corners, sharp angles on different things. And part of the design was morphing our billet flared magwell receiver into having a pistol grip similar to the Aztec grips that we sell, and incorporating the A1 length stock into the design.

The features that we designed into it weren't made to actually be released from a mold. For a part to be released from the mold, it has to have a draft angle. If it's a straight 90 degree, it can't release.

And there's radii and different concerns related to release from mold as well, along with the flow of the

plastic going into the mold, and how it will interface with these features. Those are things KE Arms' design staff did not have experience with.

So the part design that we gave to MoldWorx didn't have all those required features in it. So they took our hybrid morphed billet flared magwell design and then adjusted all those subtle details to make the part moldable, and be capable of being made out of plastic.

Q. Who was in the KEI design staff?

A. Mike Kenney. We've had a number of engineers come and go. Mike Kenney and I primarily talked about this project and implemented the design.

Q. Do you consider yourself a design engineer?

A. No.

Q. Is Mike Kenney an engineer?

A. Yes. He has an aerospace degree.

Q. Okay. And give me the names of anybody else you remember that worked on the design staff of KE Arms.

A. Don't recall.

Q. All right. So you sent Moldworx to do the mold. You bought a vibration welder. Is it new or used?

A. Brand new.

Q. How much did that cost?

A. Roughly $180,000 including the fixtures and the design package.

Q. Now, you mentioned a mold floor. What's that?

A. Mold flow analysis.

Q. Flow. Okay.

A. So we worked with, going back, we worked with Branson from the start to design the part to make the part moldable and weldable rather. There's an amount of sacrificial material that has to be designed in between the two halves to be capable of being welded together and how to best execute that.

That thickness of material between the two halves varies depending on the process used. And their experts gave us that input, along with other manufacturing techniques including weld location tabs that we machine off in post-processing.

Q. Who is Branson?

A. Branson Ultrasonics is the vibration welder company.

Q. Where are they located?

A. They have offices around the country, including the Detroit metro area and New York.

Q. Where did you work out of? Which office did you work with?

A. Both. They were in the process of transitioning between facilities. And one in Connecticut. Mold flow analysis is computer simulations that uses data

to analyze how the plastic flows into the mold, at what temperature, hot spots that have problems cooling, where glass fibers can bind up, a number of things like that. It takes about 20 hours to 24 hours to run a simulation of these different materials through.

Q. And how much did you spend on this mold flow analysis?

A. I believe it was around $2,000, $3,000.

Q. Okay. So I've got 180 in the vibration welder. I've got 3,500 in engineering with Randy, whoever he might be. I've got Branson doing a flow analysis for two or three thousand dollars. Where'd the other hundred thousand dollars go?

A. $160,000 into the mold itself.

Q. Okay. That's just the cost of the mold?

A. Mold, texturing, inserts. There's a few different modular inserts we made for it to do different grip textures to do different engraving for the front serial number area.

(Whereupon, Deposition Exhibit 66 was marked for identification.)

Q. I hand you Exhibit 66. This is an email you sent to Paul Levy.

A. Okay.

Q. Is it accurate that you -- I assume when you

say "we," you're talking about KE Arms, right, the project you just talked to me about?

"We are actively working on revising the CAV-15 MKII design to modernize it and refine things from a manufacturing perspective. We are currently 4-6 months out on mold completion."

Did you write Paul Levy in August of 2019 and tell him that?

A. Yes. So you don't dispute that you used the CAV-15 MKII design to build your lower?

MR. CALAWAY: Objection to the form of the question.

A. In this case, I believe I'm referring, in summation, to the concept of a monolithic polymer receiver.

Q. That's not what you said, is it, sir?

A. Well, at this time there was no need to differentiate the two.

Q. Because you hadn't been caught yet, right?

A. It's not -- it's not about --

MR. CALAWAY: Object to the question.

A. It's not about being caught. It's about the colloquial use of a term.

Q. (By Mr. Weger) How did you come up with the pricing on Brownells, price to Brownells of $1219.51?

A. I had to go through and get costs on all the components we didn't make including barrels, bolt groups, carbon fiber free flow tubes, and incorporate our own costs into it, including our trigger, selector, ambidextrous mag catch. We were planning on doing an ambidextrous charging handle at the time. That is the cost of the package.

Q. I guess I need to ask you just under oath: Did you use the designs, the CAD drawings, and the CAD system for the CAV-15 MKII design in any way, shape, or form in creating your lower, the KP-15?

A. No.

(Whereupon, Plaintiffs' Exhibit 67 was marked for identification.)

Q. I hand you Exhibit 67. What is this?

A. This appears to be my new product submission to Brownells.

Q. And what do you call your product?

A. We called it the, simply, the Mark3.

Q. And did you fill out all the information that's reflected on this document?

A. Yes.

Q. Did there come a time you stopped using the MK3 designation?

A. Yes.

Q. Why?

A. We found that Ruger holds a trademark on the term MK3 related to firearms.

Q. Ruger is a pistol maker, though, correct?

A. They make everything in the firearms world. They make AR-15s, they make pistols, they make shotguns.

(Whereupon, Deposition Exhibit 68 was marked for identification purposes.)

Q. I hand you Exhibit 68. Exhibit 68 are some emails back and forth between you and Paul Levy and some other people at Brownells about pricing, right?

A. Yes.

Q. Okay. What is it you finally priced the KP-15 at, please?

A. Stripped? Do you want me to use the exact cents or just round?

Q. Just round.

A. Okay. So the stripped receiver is sold for 110. The mill spec receiver is sold for 200. The receivers with our DMR match trigger, 300. And the receivers with the SLT, the ambi selector, and ambi mag catch for 450.

Q. Okay.

A. And it looks like we reference here that the What Would Stoner Do rifle final pricing was at $1,700.

that made fuel shortages for a while.

Q. Oh, yes. Okay.

A. And it seemed --

Q. I know what you're talking about now. I was still thinking of weapons. Sorry. I was like, what?

A. The firearms --

Q. I'm now with you.

A. The firearms industry is very reactive to political and social circumstances.

Q. Uh-huh.

A. And in this case, it seemed like people were more generally concerned about economic uncertainty. And accordingly, firearm sales declined. Also pretty much every company in the industry ramped up to maximum capacity for over a year. And distributors finally started having product and inventory again.

And just like the toilet paper crisis of last year, once product is on the shelves, people stop buying as actively because they think they can get it whenever they want.

Q. Who came up with the MK3 designation for the KE Arms KP-15?

A. We had a conversation about it with Mike and that it was fortuitous that Mike's initials are Mike Kenney. And this would have been the third type of

receiver that KE Arms produced.
We produced both forged and billet, as I mentioned before. And this was the third derivative AR-15 type receiver that we were going to be producing.
Are we okay to take a break?
MR. WEGER: Sure.
(Whereupon, there was a recess taken.)
(Whereupon, Deposition Exhibit 69 was marked for identification.)
(Whereupon, Deposition Exhibit 70 was marked for identification.)
Q. (By Mr. Weger) All right. Let's go back on the record and go ahead and get started back. I've handed you Exhibit 69, Mr. Phagan. Tell me about this exhibit and the drawings.
A. It looks like an email I sent to Paul Levy and Roy Hill at Brownells on October 9, 2019, with some initial renderings of our KP-15 design.
Q. Who did these drawings that you've transmitted here?
A. I don't recall specifically who.
Q. External or internal?
A. Internal, yeah, internal.
Q. Now, you say, "Not for distribution-MK3 Design in Process." Why is it not for distribution?

Q. And has anything about the email that was sent to both KE Arms and Brownells ceased or stopped your production?

A. There was a period of time where we were debating that we wanted to continue moving forward. But the deposits had already been paid and they were nonrefundable. It did delay our actual production of the tooling.

Q. Why is that?

A. Because it was a question of do we want to keep moving forward and paying on this project, or cancel the whole thing and eat the cost.

Q. So how long did it delay your development? A day? A week?

A. Probably weeks.

Q. Did you stop development? Is that your testimony?

A. It slowed development.

(Whereupon, Deposition Exhibit 82 was marked for identification.)

Q. Here's an email from you to Mr. Levy, Exhibit 82. We are now in October of 2020. Did you tell Mr. Levy in October of 2020 that you were still doing weekly updates?

A. Yeah. This is after we resumed. The period of

time where we stopped or slowed those updates was roughly from April through July of 2020 when we were dealing with GWACS original legal counsel.

And we were waiting because we were hoping to have this issue resolved, you know, before moving into full production.

Q. When was the SHOT Show in 2020?

A. January.

Q. And what was the -- you went to another show that year, didn't you?

A. Not an actual trade show. I went to several shooting competitions that were large events.

Q. Okay. Have you issued any or entered into any variances to produce the KP-15 under anybody else's name?

A. Yes, for Wraith Works.

Q. What are you doing for them?

A. We're making receivers for them with their engraving and texture pattern on the grip.

Q. And how many of those have you sold?

A. I would have to review our records to be exact but I believe it's around 4,000.

Q. Is there anyone else you've entered into a variance with to produce the KP-15?

A. No. No one has been interested with the pending legal situation.

Q. Who has told you they're not interested because of the pending legal situation?

A. ArmaLite/SAC specifically. There's other distributors that are not interested because of it.

If you don't mind, I need to go use the restroom again.

MR. WEGER: Yeah, sure. We're almost done. Actually, why don't we take a five-minute break.

MR. CALAWAY: Yeah.

(Whereupon, there was a recess taken.)

Q. (By Mr. Weger) Back on the record. Sir, if I can refer you back to Exhibit 61, which is an email from Paul Levy to Ian, Karl, and yourself of September 11th, 2018.

Go down to the third paragraph. It starts out, "Jud did state..."

A. Yes.

Q. Okay. You with me?

A. Yes.

Q. Okay. "Jud did state that moving forward with the MKII would be more expedient than MKIII or MKIV. He did want me to pass along that the only difference between the MKII and MKIII is the MKIII has a QD sling swivel insert. What's a -- that's hard to say -- QD sling swivel insert?

CERTIFICATE

STATE OF OKLAHOMA )
COUNTY OF TULSA ) ss.

I, Linda Fisher, a Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public in the State of Oklahoma, do hereby certify that on the 26th day of October, 2021, at the law offices of Hall, Estill, Hardwick, Gable, Golden & Nelson, 320 South Boston Avenue, Suite 200, Tulsa, Oklahoma, pursuant to Federal Rules of Civil Procedure, appeared the above witness, RUSSELL WAYNE PHAGAN, who was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid, and that the deposition by him was reduced to writing by me in stenograph, and thereafter transcribed by me, and is fully and accurately set forth in the preceding pages.

I do further certify that I am not related to nor attorney for any of the said parties, nor otherwise interested in the event of said action.

WITNESS my hand and official seal this 5th day of November, 2021.

NDTCA · Signed Electronic Transcript

______________________________
Linda Fisher, CSR-RPR #866