Exhibit 3

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OKLAHOMA

GWACS ARMORY, LLC,                )
                                  )
                Plaintiff,        )
                                  )
vs.                               )  Case Number
                                  )  20-cv-0341-CVE-SH
KE ARMS, LLC, RUSSELL PHAGAN,     )  BASE FILE
SINISTRAL SHOOTING,               )
TECHNOLOGIES, LLC, BROWNELLS,     )  Consolidated with:
INC., and SHAWN NEALON,           )  Case No.
                                  )  21-CV-0107-CVE-JFJ
                Defendants.       )
                                  )
and                               )
                                  )
KE ARMS, LLC,                     )
                                  )
                Plaintiff,        )
                                  )
vs.                               )
                                  )
GWACS ARMORY, LLC, GWACS          )
DEFENSE INCORPORATED, JUD         )
GUDGEL, RUSSELL ANDERSON, DOES    )
I through X, and ROE              )
CORPORATIONS I through X,         )
                                  )
                Defendants.       )
_____  )
```

          THE DEPOSITION OF MICHAEL ERIC KENNEY,
taken on the 27th day of October, 2021, between the hours
of 8:34 a.m. and 4:54 p.m., on behalf of the Plaintiff
GWACS, pursuant to Federal Rules of Civil Procedure, at
the law offices of Hall, Estill, Hardwick, Gable, Golden &
Nelson, 320 South Boston Avenue, Suite 200, Tulsa,
Oklahoma, before Linda Fisher, CSR-RPR, and Notary Public
in and for the State of Oklahoma.

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

```
1        Q.    Do you know the dealer's name?

2        A.    I'd have to check the record to be specific.

3        Q.    Do you know where that dealer was located?

4        A.    Not off the top of my head.

5        Q.    Do you know what you paid for that weapon?

6        A.    I believe it was $45,000.

7        Q.    Is that a fully automatic weapon?

8        A.    Yes, it is.

9        Q.    Have you shot it?

10       A.    No.

11       Q.    I may have already asked you this.  I apologize

12  if I have.  Did Russell Phagan work for you when you

13  purchased it?

14       A.    Yes, he did.

15       Q.    How did you find out about Colt's polymer lower

16  receiver?

17       A.    They have been in discussions when we -- from

18  almost day one with Russell.  He's been talking polymer

19  since the second I met the kid.

20       Q.    What did -- what did he talk about?

21       A.    Everything.  I mean, pretty much everything.

22  It's kind of a passion for him; so...

23       Q.    Did he tell you about his involvement in

24  developing the CAV-15?

25       A.    The original, yes.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 31

```
 1        Q.   What did he tell you about that?

 2        A.   Like I said, pretty much every detail you can

 3   imagine.  The kid is pretty proud of his work.

 4        Q.   Do you think he's done good work?

 5        A.   He has.

 6        Q.   Did he tell you what went into the process of

 7   making those lowers?

 8        A.   Yes, he did.

 9        Q.   Did he tell you that after he went to work for

10   you?

11        A.   We've started discussions.  He worked for us as

12   a consultant doing marketing for a while, so -- prior.  So

13   we had discussions all along.

14        Q.   When did he start working for you doing

15   marketing?

16        A.   It would have been around 2015.

17        Q.   And so he was a consultant doing marketing

18   around 2015 initially?

19        A.   Correct.

20        Q.   Did you know Mr. Phagan before 2015?

21        A.   I can't remember exactly when we first met when

22   we were introduced.  He was a writer for a number of the

23   publications.  So I mean, I was aware of him.

24        Q.   Is it safe to say any of these discussions that

25   you had with him about these polymers would have been in
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 32

```
 1   2015 or later?
 2        A.   Yeah, I mean, --
 3        Q.   So Russell Phagan, you said, was telling you
 4   about the CAV-15 polymer lowers.  Did he tell you how much
 5   it cost to produce them?
 6        A.   I'm sure we went over a number of the details.
 7        Q.   Did he tell you about the speed and efficiency
 8   of the manufacturing process?
 9        A.   Yes, he did.
10        Q.   Did he want you to manufacture polymer lower
11   receivers at KE Arms?
12        A.   He felt that it would be a great thing going
13   into it, you know, a rush to be able to make lowers faster
14   than you can with the billet process.  And knowing Fostick
15   (phonetic), I would agree with him.
16        Q.   When was that rush?
17        A.   What's that?
18        Q.   When was that rush you just referenced?
19        A.   There have been a number of them since we
20   started.  But the one in particular would be the 2016
21   election.
22        Q.   So 2016 time frame, Mr. Phagan was --
23        A.   Prior to.
24        Q    -- encouraging you to --
25        A.   Well, everybody was getting ready for it.  And
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 41

```
 1         A.    Correct.

 2         Q.    When did you create the polymer variant for the

 3    KE-9?

 4         A.    Started that right after we worked on the

 5    KP-15.

 6         Q.    What are the differences between the KE-9, the

 7    polymer KE-9, and the KP-15?

 8         A.    Materials basically.  They're mirror images.

 9    We always used our design for our competition lowers in

10    the polymer versions and then attached the fixed buttstock

11    to it.

12         Q.    So the KE-9 is essentially the same lower

13    receiver but has a different magazine or magwell, and --

14         A.    Well, the KE-9 if you look at our -- if you

15    look at our -- if you look at the KP-15, the KP-15 is a

16    derivative of our billet competition lower.  So all the

17    features and things in that are morphed into a polymer

18    product.  We did the same thing with the KE-9.  We've had

19    great acceptance for our alloy lowers.  People like the

20    way they feel, the magwell.  It's, you know, been well

21    received.  So when we converted those to the polymer, we

22    kept all the same design features.

23         Q.    So the KE-15, it has a permanently attached

24    buttstock on it?

25         A.    No.  Like I said, we -- as you asked for the
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 42

 1   design, what we did was we morphed our lower into a

 2   standard buttstock.  And we actually used a derivative of

 3   a pistol grip that we liked that had a -- you know, a more

 4   aggressive sweep than the standard.

 5        Q.   On your aluminum lowers, is the pistol grip

 6   integrated into it?

 7        A.   Bolts on.

 8        Q.   Is that what makes it a monolithic lower

 9   receiver is that it's got the pistol grip and the

10   buttstock attached permanently?

11        A.   Depends on your definition of monolithic.  But

12   I guess, I don't know exactly what you're asking.

13        Q.   What do you consider a monolithic lower

14   receiver?

15        A.   Well, I'm saying if you are using it as a --

16   yes, it is a one piece, I guess.  But I don't know if

17   that's a definition of it; but...

18        Q.   Yeah, I just need -- I was just asking yours

19   essentially.

20        A.   Yeah.

21        Q.   That was the definition I was using.  But

22   that's why I asked how you would define it.

23        A.   Okay.

24        Q.   So on your KE-15, the lower receiver does not

25   have a permanently attached pistol grip, right?

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 43

```
 1        A.   Correct.

 2        Q.   And it does not have a permanently attached

 3   buttstock, right?

 4        A.   Right.

 5        Q.   So the KP-15, which is the polymer, it has the

 6   permanently attached pistol grip?

 7        A.   Correct.

 8        Q.   And it has the permanently attached buttstock?

 9        A.   Correct.

10        Q.   So on the design that you were talking about

11   that you used, your original design, --

12        A.   Uh-huh.

13        Q.   -- what -- describe for us what the lower

14   receiver consists of.

15        A.   The -- in the -- which design?

16        Q.   In the KE-15.

17        A.   In the KE-15?  It's -- I mean, design features,

18   it's pretty much every AR has an identical variant.  It's

19   kind of tough to get around how an AR functions and works,

20   you know, when you're talking about all the pins and

21   things that have to be there.

22        So those all have to kind of go in first.  And the

23   rest of it is all, you know, whether -- you know, the

24   function is identical.  So there's not a lot you can do.

25   In our competition, we flared the magwells.  You know, we
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 44

```
 1   did some other stuff with the function, functionality, but
 2   everything is identical; so...
 3          Q.   Is the trigger guard in the lower receiver on
 4   the KE-15?
 5          A.   In our competition version, yes.
 6          Q.   And is that a winter trigger guard on the
 7   competition version?
 8          A.   They call it that.  I mean, the winter trigger
 9   guard was actually a dipped guard that went onto -- it was
10   a removable component.  We integrated it in.  And a lot of
11   people have done stylistic things but ours is the only way
12   we like it; so...
13          Q.   So your trigger guard is not removable on the
14   KE-15?
15          A.   On the competition version, correct.  I just
16   want to be clear, because we have different models of
17   lowers, we've got.
18          Q.   Yeah.  No, I appreciate that.  When did you
19   come out with a competition version of the KE-15?
20          A.   '15, '16.
21          Q.   Did Russell Phagan work on that project with
22   you?
23          A.   Yes.
24          Q.   Did he have input on what kind of trigger guard
25   you put on it?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY      October 27, 2021

Page 236

1         A.   You asked that question earlier, and I said I
2    was pretty sure we sold out of everything, but I'd have to
3    check the records.  I know we don't have any in our
4    inventory.
5         Q.   Sure.  Did you still have some in 2018, though?
6         A.   I don't believe so.  But I would have to check
7    the records.
8         Q.   But you believe that the records should reflect
9    a high demand for the polymer lower receiver before the
10   2016 election?
11        A.   It was a high demand for anything firearms
12   related.
13        Q.   Who all was involved in the development of the
14   KP-15?  You talked about your team, obviously, of what
15   I'll call the Tool Design Group team.  And then, of
16   course, Russell, and you at KE Arms.  But who was involved
17   with the development of the KP-15 in its early stages?
18        A.   Russell and I.
19        Q.   And then what role did Russell play in that?
20        A.   As a competitive shooter, giving feedback on,
21   you know, what people that shoot firearms want to see in a
22   rifle.
23        Q.   So Russell, as a competitive shooter, was
24   telling you here's what -- are you a shooter?
25        A.   I'm not a competitive shooter, no.

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 237

```
 1        Q.   Okay.  So Russell is telling you here's what us
 2   competitive shooters want?
 3        A.   Yes.
 4        Q.   And what was that that they want?
 5        A.   Well, we had already geared our billet lower to
 6   that.  So they want something that the mag can easily be,
 7   you know, put in and out.  They wanted, you know,
 8   obviously, lightweight was a plus.
 9        And they don't just, you know, -- I, you know, I'm
10   trying to think of all the different things but off the
11   top of my head those are the first two.
12        Q.   Okay.  Did he tell you what the problems were
13   with the existing polymer lowers on the market?
14        A.   All polymer lowers on the market?
15        Q.   Yeah.
16        A.   I'm sure we discussed it.
17        Q.   Yeah.  Did he tell you what he saw as the
18   problems with the existing polymer lowers on the market,
19   and not just the CAV-15 but any others as well?
20        A.   Oh, yeah, I'm sure we discussed all that.
21        Q.   Did he tell you what he thought were the
22   problems with the CAV-15?
23        A.   Yeah.  I'm sure he did.  Like I said, you're
24   talking about seven-year-old conversations; so...
25        Q.   Yeah.  But they happened frequently, right?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 238

1    That's what it sounds like.

2        A.    Yeah.

3        Q.    So you and Russell were involved initially.

4    And did anybody else become involved in KE Arms after

5    that?

6              MR. CALAWAY:  Object to the form.

7        A.    Not on the design side, no.  I handle that.

8        Q.    (By Mr. Bogan) So you and -- it was exclusively

9    you and Russell on the design side, right?

10       A.    Yes.

11       Q.    And then what about the actual production side?

12   Once you had the design, KE Arms, did you produce, did you

13   -- did KE Arms make the mold?

14       A.    No.

15       Q.    Is KE Arms capable of making the mold?

16       A.    Getting closer but not at that time, no.

17       Q.    What goes in to making one of these molds?

18       A.    Obviously, a ton of engineering design work.  I

19   mean, figuring out everything from gating to pooling, you

20   know, for the initial start-up of figuring out what size

21   tool die and block it needs to go into, and the tonnages

22   of the press.  Gating, flows, I mean, there's, you know, a

23   million different things that go into it.

24       Q.    Had you ever operated an injection mold for --

25   mold?  Let me start that --

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 239

```
 1        A.   Have I ever pushed the button?
 2        Q.   What do you call that?  Is it just an injection
 3   mold machine?  I mean, what do you call that?
 4        A.   Yeah, injection mold machine.
 5        Q.   Have you ever operated an injection mold
 6   machine?
 7        A.   Not personally.
 8        Q.   Have you ever set one up?
 9        A.   Not personally.
10        Q.   Have you ever taken molds in and out of the
11   machine?
12        A.   Not personally.
13        Q.   Had Mr. Phagan ever operated an injection mold
14   machine?
15        A.   I've seen videos of him doing it, so I'm
16   assuming.
17        Q.   So yes?
18        A.   Yeah.
19        Q.   Had Mr. Phagan ever taken molds in and out of
20   the injection mold machine, to your knowledge?
21        A.   I'm assuming he has, but I can't speak for him.
22        Q.   So out of the two of you on the production
23   side, Mr. Phagan really is the only one who has ever done
24   it, right?
25        A.   Oh, actually, run a mold, a press, yes.  But
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 240

```
 1   I've been around molds and presses, and I understand the
 2   concept, so, you know...
 3        Q.   I've been around guns but that doesn't make me
 4   a good shooter.  I'm just kidding.  So what else on the
 5   production side?  It was you and Russell obviously on the
 6   production side as well in the beginning, right?
 7        A.   Correct.
 8        Q.   Anybody else?
 9        A.   Well, we would have been talking with MDI and
10   Moldworx.
11        Q.   Do you know who owns MDI?
12        A.   A bank.
13        Q.   Is that after some financial issues; or...
14        A.   It's my understanding but I'm not at liberty to
15   disclose their current situation.
16        Q.   How do you know it?
17        A.   Actually KE Arms does.
18        Q.   Did you sign a non-disclosure with MDI?
19        A.   I don't know.
20             MR. CALAWAY:  I don't think you're
21   prepared.
22        A.   I'm not prepared to answer questions on MDI,
23   so...
24        Q.   (By Mr. Bogan)  Do you own any MDI?
25        A.   No, I do not.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 241

```
 1        Q.   Does your wife?

 2        A.   No, she does not.

 3        Q.   Do you know the previous owners of MDI prior to

 4   the banks taking over?

 5        A.   No, I do not.

 6        Q.   So your relationship with MDI is strictly as a

 7   customer, right?

 8        A.   Correct.

 9        Q.   What about Moldworx?  Do you know who owns

10   Moldworx?

11        A.   Recently sold, and I honestly don't know who --

12   I'm sure I heard it but another company bought it.

13        Q.   Do you know who owned it before?

14        A.   Jim, and I don't know the structure of the

15   company.  I have no idea of the investors, or who owned it

16   or whatever.  He just told me he was the owner when I met

17   him.

18        Q.   Okay.  And KE Arms does not have any ownership

19   in that company?

20        A.   We do not.

21        Q.   You're strictly a customer?

22        A.   Strictly a customer.

23        Q.   So you and Russell then brought MDI and

24   Moldworx into the product design or, sorry, production

25   side of the KP-15?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 242

```
 1        A.   Well, mold and product design and then
 2   production.
 3        Q.   Was anybody else involved at that stage?  I
 4   understand later, you know, more people were involved but
 5   was anyone involved at that stage?
 6        A.   At the stage we brought them in?
 7        Q.   Yeah, when you met with MDI and Moldworx.
 8        A.   Well, we met them to help finalize the design
 9   so they could be moldable.  I don't know if you say at
10   that stage, in this development stage, we brought in
11   somebody to do mold flow analysis.  And then they pretty
12   much ran with the rest of it.
13        Q.   Who did the mold flow analysis?
14        A.   I'm hell on names but it's either Ray or Randy.
15        Q.   Would that be Randy Sperry?
16        A.   Yeah.
17        Q.   He actually worked for Moldworx, right?
18        A.   No.
19        Q.   He's got his own company now, I believe, but...
20        A.   No, this -- the mold flow analysis was separate
21   of MDI -- or separate of MDI and separate of Moldworx.
22        Q.   Would you say that Brownells was involved in
23   the development and design of the KP-15?
24        A.   No.
25        Q.   So Brownells' involvement was strictly as part
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 243

1   of the WWSD Project and as a distributor, correct?

2        A.    Distributor, as a distributor.

3        Q.    Well, Brownells was part of the WWSD Project,

4   right?

5        A.    Correct.  But I'm saying that they were a

6   distributor for us.  There's no --

7        Q.    How much have you paid Brownells for

8   advertising of the KP-15?

9        A.    Nothing.

10       Q.    How much have you paid Brownells for

11  advertising of the WWSD Project?

12       A.    Nothing.

13       Q.    Would you agree with the statement that

14  Brownells is a partner in the WWSD Project?

15       A.    It depends on how you define "partner," but

16  their -- their interaction is more with InRange than us as

17  far as the WWSD Project would be concerned.

18       Q.    Did you know that Brownells is really what made

19  the WWSD Project commercially viable?

20            MR. CALAWAY:  Object to the form.

21       A.    Is that your belief?

22       Q.    (By Mr. Bogan)  That is my belief.  Is that

23  your belief?

24       A.    There's a number of different distributors, and

25  that's an Ian and Karl project, so it would be best to

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 244

 1    speak to them about it.

 2         Q.    I will.  I was just wondering what you thought

 3    about that because I believe you've seen where Brownells

 4    actually reached out to Ian and Karl and wanted to join

 5    this team and this effort.  You saw that, right?

 6         A.    I don't know who reached out to who initially.

 7         Q.    Okay.  Let's go to Exhibit 88.  If you go to

 8    the back of that exhibit, there's an email from April 9th,

 9    2018, from Paul Levy to Ian.  Do you see that?

10         A.    Yes, I do.

11         Q.    Paul says, "Would InRange TV be comfortable

12    with Brownells pursuing this project."

13         A.    Oh, sorry.  Last page?

14         Q.    Yes, yes, I'm sorry.

15         A.    I was in the middle of it.  I was going to --

16         Q.    Yeah.  KEA 00493.  Sorry.  I should have waited

17    for you to get there.

18         A.    No, I apologize.  I have the last page, where

19    it's "quite informative," or...

20         Q.    Yeah, the second paragraph said, "Would InRange

21    TV be comfortable with Brownells pursuing this project."

22    Do you see that?

23         A.    Oh, I see that.

24         Q.    And he says he doesn't want "to straight up

25    lift the concept."  Do you see that, the very last

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 245

 1  sentence?

 2       A.    Okay.

 3       Q.    Does that give you any indication of who

 4  pursued who in relation to the WWSD Project between

 5  Brownells and InRange?

 6       A.    Not knowing the context of their conversations

 7  between InRange and Brownells, I don't know how they

 8  initially started it, but...

 9       Q.    Who did the rough design work?  And by "rough

10  design work," I mean, not engineered drawings.  I'm sure

11  this was probably drawn on a napkin or something at some

12  point in time as most great inventions are.  Who did the

13  rough design work for the KP-15?

14       A.    I mean, literally the rough design work was

15  taking one of our billet lowers and putting a fixed

16  buttstock on it.  I mean, it was that simple.  We had the

17  preexisting design so we didn't have to do a bar napkin

18  sketch.

19       Q.    What was the preexisting design you referenced?

20       A.    Our billet lowers.

21       Q.    Oh.  On your billet lower receiver, when the

22  hammer pin is inside of the weapon, is it recessed or is

23  it flush?

24       A.    It's flush.

25       Q.    Is the hammer pin on --

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 246

```
 1        A.   Both.  Depending on whether you have captured
 2   hammer pins and springs, or some that are exterior with
 3   screws and a number of different pins.
 4        Q.   And I believe you testified -- maybe it was
 5   Russell testified -- that the section of the lower where
 6   the hammer pin goes in is thicker than on an aluminum
 7   receiver because -- to give it more strength.  Did Russell
 8   say that?  Or you didn't say it?
 9        A.   He hasn't said it to them, no.
10             MR. CALAWAY:  Object to the form.  I don't
11   think you were here for Russell's.
12        Q.   (By Mr. Bogan)  Yeah.
13        A.   Yeah, sorry.  I'm catching up.
14        Q.   That -- that was my bad.  Would you agree with
15   that statement that the area where the hammer pin is
16   located is thicker on the KP-15 than it is on the KE-15?
17        A.   Yes, it is.  Yeah.
18        Q.   So that would have required some sort of design
19   modification beyond just changing an aluminum to polymer,
20   right?
21        A.   Correct.
22        Q.   Are you aware that the CAV-15 also has a larger
23   area where the hammer pin is for the same reason?
24             MR. CALAWAY:  Object to the form.
25        A.   Yes.  So does the Colt.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 247

1         Q.    (By Mr. Bogan)  But you -- I didn't ask about
2     the Colt.  I'm talking about the CAV-15.  You're aware
3     that it's thicker at that location, correct?
4         A.    Yeah.
5         Q.    And when you did this design of the KP-15, you
6     didn't own the Colt yet, right?
7         A.    I had seen the Colt.  I had seen the CAV and I
8     had seen everything related to it.
9         Q.    You had seen the Colt in person?
10        A.    In photos.
11        Q.    And when did you see the Colt in photos?  And I
12    say that because I thought you said the photos you saw of
13    the Colt were when you were talking about buying it.
14        A.    Oh, I would have to look at the exact timing,
15    but...
16        Q.    Did you have discussions with Russell about
17    making that part of the lower thicker for -- to make it
18    stronger?
19        A.    We had had a number of discussions with
20    actually the team of development of what we were going to
21    do as far as all kinds of structures all over the rifle
22    itself.
23        Q.    The team on development; is that the team we
24    talked about earlier?
25        A.    Yeah, Moldworx and MDI.  Once we made a

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 248

```
 1   decision, we were -- we moved forward on developing a new
 2   product, so...
 3        Q.   But I guess my point is, and I don't know
 4   plastics like you do, so just correct me if I'm wrong.
 5        A.   Right.
 6        Q.   But it's not necessarily intuitive to know that
 7   that section has to be thicker, is it?
 8        A.   I don't know if I would call it intuitive.  But
 9   I mean, I guess I know what you're driving at.
10        Q.   Well, what I'm getting at is how did you come
11   to the decision or the conclusion to make that particular
12   section thicker?
13        A.   We made a -- we made a number of areas thicker.
14   We made a number of ribs.  We added a bunch of different
15   things because polymer works and acts differently than
16   aluminum.
17        Q.   Right.  So I guess my question is:  How did the
18   decision get made that this area needs to be thicker to be
19   reinforced than your aluminum lower?
20        A.   I don't remember the specific directions.
21        Q.   But you didn't have that experience before
22   development of the KP-15, right?
23             MR. CALAWAY:  Object to the form.
24        A.   I guess I don't -- I mean, like I said, if
25   you're saying the -- did the --
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

```
 1              MR. CALAWAY:  I don't think there -- but
 2    answer if you can.  I'm not --
 3         A.   I guess I can't answer the question.
 4         Q.   (By Mr. Bogan)  Well, so it's not -- I think we
 5    both agree it's not intuitive to know that you have to
 6    make it thicker because it's made out of plastic
 7    necessarily, right?
 8         A.   I mean, it would be intuitive that you would
 9    have to reinforce certain areas around the polymer lower.
10         Q.   Right.  So how did you select that area is my
11    question.
12         A.   I honestly don't remember exactly how we
13    decided to do that.  I mean, I do know there was a lot of
14    people prior to any of this having problems with the
15    firearms in that area; so...
16         Q.   Who would that be?
17         A.   End users, they had problems with it on the
18    Mark I.  You know, it's ironic enough, Colt, you know, saw
19    the same problem with the same answer.  So, and there's --
20    I guess to say is it intuitive, other people have come up
21    with the same solution.
22         Q.   Well, you know, Colt came up with the same
23    solution.  How do you know that Colt came up with that
24    solution?
25         A.   Because they put it in the firearm.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 250

```
 1        Q.   How do you know that Colt didn't just make that
 2   area thicker because they made it thicker?  How do you
 3   know that was for support?
 4              MR. CALAWAY:  Object to the form.
 5        A.   I don't know what anybody did.  Are you
 6   asking--
 7        Q.   (By Mr. Bogan)  I don't know, sir.  You said
 8   Colt did it, right?
 9        A.   Yeah.
10        Q.   And they did it to make it stronger.
11        A.   Right.
12        Q.   That was your testimony, not mine.  I'm asking
13   you --
14        A.   I would assume through testing.
15        Q.   Okay.  So you don't know why Colt made that
16   area thicker?
17        A.   I would assume through -- you asked me why they
18   would do it.  I would say I assume through testing.
19        Q.   Okay.
20        A.   And to control the stresses of the hammer.
21        Q.   And but you don't remember if Russell ever had
22   any discussions with you about that or the need for that?
23        A.   Like I said, not specifically.  But I don't
24   think it's a big point.  I do know that -- well, --
25        Q.   Yeah, and that's fine.  You don't have to think
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 251

 1    any of this is a big point or not a big point.  I'm just
 2    trying to gather what information you had.  And also in
 3    addition to that, what information Mr. Phagan provided to
 4    you.  And so that would be, to me, an area that he would
 5    be helpful.  I mean, the guy has been in this business for
 6    a long time.
 7         A.   Right.
 8         Q.   He helped create the CAV-15.  No offense to Mr.
 9    Nealon.  He developed it, obviously, first and Mr. Phagan
10    helped him, and made other iterations of it.
11         A.   Yeah.
12         Q.   So I would think that Mr. Phagan would be a
13    great source of information on that.
14         A.   Like I said, driving in this particular point
15    on it, there's a number of areas that we strengthened and
16    reinforced the parts of who drove a particular design
17    element at a particular time.  Off the top of my head, I
18    don't remember.
19         Q.   Yeah.  Did Mr. Phagan talk to you at all about
20    the length of the hammer pin being longer than the
21    standard hammer pin so that it would sit flush because
22    people didn't like the recessed hammer pin?
23              MR. CALAWAY:  Object to the form.
24         Q.   (By Mr. Bogan)  Did you have that discussion
25    with him?

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

```
 1        A.   Yeah.  We actually manufactured longer hammer
 2   pins prior to even doing this.  I think we're the only
 3   people that ever did.
 4        Q.   Why did you manufacture longer hammer pins?
 5        A.   It was a customer demand for it.
 6        Q.   Who was the customer?
 7        A.   CAV Arm's owners.
 8        Q.   So you made a longer hammer pin for CAV Arms
 9   owners?
10        A.   Correct.
11        Q.   And that was so it would sit flush, right?
12        A.   Correct.
13        Q.   And who told you that that was a need?
14        A.   Russell.
15        Q.   When did Russell tell you that?
16        A.   Prior to us making them.  I don't know exactly
17   when we did it.  We -- we make a lot of products.
18        Q.   After he worked for you?
19        A.   Yes.
20        Q.   So Russell told you after he went to work for
21   you, Hey, CAV-15 owners are unsure about this.  So let's
22   make longer hammer pins that we can sell for the CAV-15 so
23   they can still get their hammer pins flush and no problem.
24   Right?
25        A.   Correct.  I think we captured hammer opinions
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 253

1   for them, too.

2       Q.   Did Russell ever tell you that Pivot Pin made

3   the pins for the CAV-15?

4       A.   I'm sure at some point.  But I've been aware of

5   Pivot Pin for years.

6       Q.   Right.  Did you know that Pivot Pin made the

7   pins for the CAV-15 before Russell told you that?

8       A.   I don't know that I knew that.  But I knew they

9   made a lot of pins for the firearms industry.

10      Q.   Did Russell tell you that GWACS Armory

11  outsourced their buttstock, or their buttplates?

12      A.   I don't know that he told us that.  But I

13  believe they asked us to make them for them once.

14      Q.   And when they asked that, was that after you

15  signed the NDA with Armory?

16      A.   I honestly don't know.

17      Q.   Well, did they tell you anything, or ask you to

18  do anything for them before you signed the NDA in 2015,

19  and "they" being Armory?

20      A.   I don't know.

21      Q.   So now getting further down the stages, who did

22  the actual production design work?

23      A.   I guess Mold -- Moldworx.  And towards the end,

24  I think, it was Randy.  I get the two names mixed up.  But

25  their inside engineer, we hired him personally to finish

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 254

 1    up some of this stuff, because Jim just wanted to get it
 2    wrapped up.
 3        Q.   Okay.  So Moldworx did the actual production
 4    design.  I think we talked about that earlier.
 5        A.   Right.
 6        Q.   And then Randy, what -- what was it that Randy
 7    did there at the end you're talking about?
 8        A.   He was finalizing drafts, and, you know,
 9    release angles, and, you know, all the stuff that I know
10    about but don't know about.
11        Q.   Did Russell have any conversations with you
12    about release angles?  I just recently learned of that
13    term; so...
14        A.   I mean, obviously, we all know that you have to
15    have a release angle for a mold.  So whether it's a
16    plastic injection mold, rotor mold, whatever, but each one
17    is specific to itself.  So we left that up to the expert.
18        Q.   How much did you pay Randy for that design
19    work?
20        A.   Part of it was originally in the mold
21    development program with MDI.  I think that's why we broke
22    it out because we were feeling like they were going over.
23    So we paid them, I believe $3,000.
24        Q.   Okay.  Russell said 3,500, so that sounds
25    roughly --

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 255

```
 1        A.   Yeah.

 2        Q.   -- roughly right.

 3        A.   Jim was kind of feeling like I've done what I

 4   said I would do so we just agreed to pay Randy.

 5        Q.   And you said MDI was going over budget?

 6        A.   Moldworx.

 7        Q.   Huh?

 8        A.   Moldworx.

 9        Q.   Oh, I'm sorry.  I thought you said MDI.

10        A.   If I misspoke, I apologize.

11        Q.   One of us did.  All good.  We got it fixed.

12   Okay.  So you thought Moldworx was going over?

13        A.   I would say that was what Jim was feeling, you

14   know, that it was better for us just to finalize this

15   stuff Randy and have them knock it out, get it done.

16        Q.   And Jim was the owner of Moldworx?

17        A.   Correct.  One of the times.

18        Q.   Yeah.  What do you mean that Jim thought you

19   were going over?  I mean, did -- I thought, when you said

20   it I thought, I just assumed from a budget perspective,

21   you had gone over budget.  But I take it since Jim was

22   saying, "finish up with Randy," what do you mean by he was

23   going over?

24        A.   The time that he felt it was allowed to put the

25   program together budget wise.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 256

```
 1        Q.   So --
 2        A.   And we were kind of at the point where it's
 3   like we're spending a lot of money on this.  How do we
 4   just get this wrapped up.
 5        Q.   Got you.
 6        A.   And he's like, you know what, pay Randy
 7   directly to get the thing finished up --
 8        Q.   Got you.
 9        A.   -- and we'll -- we'll start cutting -- cutting
10   a mold.
11        Q.   Got you.  So Moldworx was taking too long,
12   essentially?
13        A.   Yeah.
14        Q.   And Jim said, "Have Randy just finish it up."
15        A.   Well, and as you remember, this would have been
16   pretty close to the start, so, you know, we were like,
17   Let's get this thing going.
18        Q.   I'm sorry, pretty close to the start of -- you
19   said --
20        A.   Us wanting to get into production.
21        Q.   Oh, okay.
22        A.   So it was, like, you know, --
23        Q.   Yeah.
24        A.   -- this dragging on and it was one of those
25   things Randy has got a lot to do at work so if he could go
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 257

```
 1  knock this out on the weekend, then, or whatever the time

 2  frame was -- I don't want to specifically say the weekend

 3  or being two days or --

 4        Q.    Sure.  Sure.

 5        A.    -- whatever.  But if he was one that put some

 6  of his personal time in it, it would speed up the process.

 7        Q.    And Jim was okay with that?

 8        A.    He was the one that suggested it, if I remember

 9  correctly.

10        Q.    I think if Randy was busy at work, he'd want

11  him busy at work, but I guess not.

12        A.    Everybody has got his life after work.

13        Q.    And some of that is working after work.  Right?

14  I bet you you probably don't -- that's probably all you do

15  is work, right?

16        A.    24/7.

17        Q.    I can imagine, seven companies and all you've

18  got going on, I bet you work a lot.

19        Mr. Phagan had testified yesterday -- and I'm

20  paraphrasing, I'm not -- and I'm -- I may -- I'm not going

21  to take any liberties, but I'm going to try to explain it

22  the best I can.  I'm sure counsel will object if I go

23  astray.

24        But I believe Mr. Phagan testified that a mold

25  design was given to MoldWorx.  And I think he meant like,
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 258

1   you know, kind of a rough design or maybe an early concept

2   or something like that.  Do you know what he would have

3   been talking about there?

4          A.   No.  If he said that, he would have been

5   incorrect.

6          Q.   Okay.  What was Russell Phagan's role in the

7   KP-15 project?

8          A.   To help with the development of it as we've

9   been speaking about all day.

10         Q.   Did he have any specific role as far as, you

11  know, I believe we talked earlier about sales and

12  marketing is not necessarily your strong suit.

13         A.   Right.

14         Q.   And I believe it is Mr. Phagan's, is that

15  right?

16         A.   Correct.

17         Q.   So one of Mr. Phagan's roles was going to be

18  sales and marketing, right?

19         A.   Correct.

20         Q.   Mr. Phagan brought InRange to you, correct?

21         A.   I'm sorry?

22         Q.   Mr. Phagan brought InRange to you, correct?

23         A.   Yeah.  Not just on this, but he introduced me

24  to InRange pretty much after we met.

25         Q.   I believe I've seen somewhere where it really

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 259

```
 1   appeared that Mr. Phagan was really the biggest driver
 2   behind this project.
 3         A.    Oh --
 4         Q.    would you agree with that statement?
 5               MR. CALAWAY:  Object to the form.
 6         A.    -- I think we're all, you know, had reason to
 7   push the project.  I don't know, I mean, obviously, he
 8   grew up with the thing; so...
 9         Q.    (By Mr. Bogan)  Right.  Would you say that Mr.
10   Phagan spent more time on the KP-15 project than you did,
11   just time?  Obviously, you put up the money.
12         A.    I think we both spent a lot of time with it but
13   obviously I'm spread thin between a lot of different
14   organizations.  So, you know, in the automotive industry,
15   it would have been the one who was running the project
16   kind of thing.
17         Q.    Project lead?
18         A.    Yeah.
19         Q.    I guess I could have asked that a lot easier
20   and just said, Is he the project lead instead of the guy
21   driving it.  But I didn't get there.  I apologize.
22         A.    Fair enough.
23         Q.    It took me a little longer.  I think I asked
24   you this, and I apologize if I did, but did you have an
25   NDA with Moldworx?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 260

```
 1        A.   No.
 2        Q.   What about with Mr. Sperry?
 3        A.   No.
 4        Q.   Can Mr. Sperry use your prints or CAD files?
 5        A.   I guess he could.  He's not under an NDA.
 6        Q.   What about Mr. -- what about Moldworx?
 7        A.   I -- like I said, we're not holding any of them
 8   under an NDA; so...
 9        Q.   Okay.  And I thought you testified earlier,
10   it's all pretty public knowledge, nothing is really unique
11   or special it.  Probably "special" is not the right word.
12        A.   We never tried to protect it.
13        Q.   Yeah.  Because you don't think it's
14   protectable, right, I think is what you said?
15        A.   Uh-huh.
16        Q.   Have you produced your CAD files and prints for
17   the KP-15 in this lawsuit?
18        A.   No, we have not.
19        Q.   Why not?
20        A.   I don't know that we were asked for them.
21             MR. CALAWAY:  for the record, I don't think
22   we have.  If that's a -- that's a question you're trying
23   to catch him on, we have not provided those.
24             MR. BOGAN:  I'm not trying to catch him.  I
25   just asked if he had produced them.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 261

```
 1              MR. CALAWAY:  Yeah.

 2       A.   I didn't know that we had been asked for them.

 3       Q.   (By Mr. Bogan) Could you get us a copy of

 4  those, please?

 5       A.   Yeah.

 6       Q.   And I know that you said the prints were large.

 7  And I know counsel and I talked about that, so we can just

 8  add that tot he --

 9              MR. CALAWAY:  And can he -- which prints,

10  which CAD files are you asking for?  Are they the ones

11  that you asked for last week?

12              MR. BOGAN:  Well, that's what I was just

13  referring to there was last week we had already discussed

14  the other prints and CAD files --

15              MR. CALAWAY:  Yeah, we're blowing those up

16  as we speak so we can give them to you again.

17              MR. BOGAN:  Again?

18              MR. CALAWAY:  They are the same ones that

19  they had sent to them in 2016 that you should already

20  have.

21              MR. BOGAN:  Yeah.  We just need everything

22  that was on that, whatever he sold them in 2016.

23              MR. CALAWAY:  Yeah.

24       A.   That's why it's confusing, because we sent that

25  to them before.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY   October 27, 2021

Page 262

1      Q.   (By Mr. Bogan)  Yeah, we just -- in litigation,
2  we have to ask for them or receive them because we don't
3  know.  So I mean, I understand that you're representing to
4  me that the only thing that was on that file was what was
5  sent in 2016.
6      A.   Right.
7      Q.   But we have to verify that for ourselves.  And
8  I don't believe we received the prints that you talked
9  about which you said were actually maybe not usable but
10 more usable than the files that you couldn't open.
11     So -- so I don't believe the prints were sent to us.
12 We didn't receive -- I don't believe we received hundreds
13 of pages of prints.
14          MR. CALAWAY:  So for the record, we're
15 going to provide -- there's a box of stuff --
16          MR. BOGAN:  Uh-huh.
17          MR. CALAWAY:  -- that was requested in your
18 -- I think it was Thursday or Wednesday that you asked for
19 them.  We are going to provide the entire box.
20     But I think I explained this to you in our meet and
21 confer, a lot of those prints -- there's, like, hundreds
22 of prints -- we're going to provide those to you in
23 digital form so we can get them to you --
24          MR. BOGAN:  Okay.
25          MR. CALAWAY:  -- rather than produce a box

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 263

```
 1   of old papers that were stored in Nealon's garage.
 2                   MR. BOGAN:  Yeah.
 3        A.   They will have to be scanned in, and we don't
 4   have a scanner big enough.
 5                   MR. BOGAN:  Yeah, no, that's fine.  And
 6   that's what I was trying to -- I was trying to be clear.
 7                   MR. CALAWAY:  Is that what you're asking
 8   for?
 9                   MR. BOGAN:  Well, I'm requesting the prints
10   and CAD files for the KP-15 separate.
11                   MR. CALAWAY:  Oh.
12        A.   He wants our new design.
13                   MR. BOGAN:  That's what I was trying --
14   yeah, the new design.  Because I mean, he just said it's
15   not special, and it's out there.  It's not protected or
16   protectable; so...
17                   MR. CALAWAY:  I mean, we can go off the
18   record for this if we want to continue to talk about
19   discovery and stuff.
20                   MR. BOGAN:  Oh, I -- no, I think we're
21   good.  I was just trying to -- I was just asking you to
22   provide it.
23                   MR. CALAWAY:  Okay.  Send your request.
24                   MR. BOGAN:  Do you want me to send a
25   specific request?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 264

```
 1              MR. CALAWAY:  Yeah, absolutely, if that's
 2   what you're asking for.
 3              MR. BOGAN:  Okay.
 4              MR. CALAWAY:  Last week what you asked for
 5   was, like I said, this separate box of stuff --
 6              MR. BOGAN:  I understand.
 7              MR. CALAWAY:  -- which I told you at a meet
 8   and confer, we would provide.  If you're asking for a
 9   separate box of CAD files and prints, let's, by all means,
10   talk about it.
11              MR. BOGAN:  Yeah, no, yeah, certainly.  I
12   mean, we can talk about it if you have any issues with it
13   for sure.
14      Q.   (By Mr. Bogan)  Which -- do you know what brand
15   of vibration welder you purchased?
16      A.   Branson.
17      Q.   Branson?  How did you select Branson?
18      A.   I believe the number one manufacturer of
19   vibratory welders.  And they're U.S. based.
20      Q.   Do you know what kind of vibration welder GWACS
21   owns?
22      A.   For the bill of sale I just recently saw, I
23   don't -- it wasn't specified.
24      Q.   So you don't know.
25      A.   I -- I think the discussions, like I said, was
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

 1   it might have been a Branson.

 2        Q.   How does one go about figuring out that the

 3   Branson is the number one vibration welder?  Is that just

 4   an industry knowledge thing?

 5        A.   Well, actually, we talked with -- I'm pretty

 6   sure, and I'm sorry if I'm looking their way.  But I'm

 7   pretty sure we were led that direction also by MDI.  But I

 8   would have to --

 9        Q.   Did Mr. Phagan have any input in which welder

10   you selected?

11        A.   At that point we were more talking with

12   Moldworx and MDI for their advice.

13        Q.   Did you have any discussions with Russell

14   Phagan prior to July 15th of 2020 when this lawsuit was

15   filed and when Armory filed its claims?  Did you have any

16   discussions with Mr. Phagan about whether or not the

17   CAV-15 was protectable -- from an intellectual property

18   standpoint -- I'm talking about the design?

19        A.   Prior to you guys filing a lawsuit?

20        Q.   Yes.

21        A.   Yes.

22        Q.   What did Mr. Phagan tell you about whether or

23   not the design of the CAV-15 was protectable?

24        A.   I think it's both our feeling that it's not.

25        Q.   So he told you prior to development of the

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 266

```
 1   KP-15, and after he went to work for you, he did not
 2   believe the CAV-15 was protectable, correct?
 3        A.   Correct.
 4        Q.   Did you have any discussion regarding that same
 5   topic with Brownells?
 6        A.   No.
 7        Q.   Did you have any discussions with Mr. Nealon
 8   about the same topic?
 9        A.   Not really.  Nealon and I haven't talked that
10   much.
11        Q.   You say "not really"?
12        A.   I mean, since then I've talked with him and his
13   believe is it's not.
14        Q.   Sure.
15        A.   But you know, I think that anybody that saw how
16   that was handled and how it was put in public domain
17   couldn't try to assert that there was.
18        Q.   Who put it in the public domain, to your
19   knowledge?
20        A.   Nealon, CAV Arms, GWACS, and specifically Shel,
21   and --
22        Q.   Are you missing anybody?
23        A.   I -- I mean, off the top of my head, I mean, --
24        Q.   How about your friend Mr. Phagan over there?
25        A.   Oh, yeah, sure.  Yeah.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 267

1        Q.   Did he put it in the public domain?

2        A.   Oh, yeah, sure, yeah.  When I say that, he

3   would have been working with CAV and, you know, so -- you

4   know, and wrote it.

5        And for that matter, InRange and a million other

6   people that have written about it or posted pictures or

7   3D, printed them or -- I mean, I don't have every example

8   off the top of my head.  But there's a pretty extensive

9   group of people that have been posting this on the

10  internet for the last decade.

11       Q.   What did Brownells say to you when they found

12  out or when they received, I guess I should say, about the

13  cease and desist demand?

14       A.   We told them that we had already worked with

15  legal counsel on it, and that we would get back with them

16  when we found out how it was going to proceed.  They did

17  seem concerned, though.

18       Q.   They did not?

19       A.   They did.

20       Q.   They did.  Did anybody express specific

21  concerns to you?

22       A.   No.  I just think at the onset without us

23  knowing exactly what our legal position was and that was

24  one of the reasons we kind of backed off all the marketing

25  and advertising on it.  And as we moved forward in

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 268

1  discussions with our legal counsel, we felt that there was

2  no issue.

3       Q.   And you already had legal counsel when

4  Brownells received that demand, correct?

5       A.   Correct.

6       Q.   If you will turn to Exhibit 62 for me, please.

7  This is an email from Russell Phagan at KEArms.com to Paul

8  Levy at Brownells as well as Ian McCollum and Karl

9  Kasarda.  Do you see that?

10      A.   Am I starting on the front page?

11      Q.   Yeah, the very top.

12      A.   Correct.

13      Q.   And it's dated September 11, 2018, correct?

14      A.   Correct.

15      Q.   Now, isn't that the same date that we saw

16  earlier where Mr. Levy was asking Mr. Phagan if it was

17  okay to tell Armory that KE Arms was their partner?

18      A.   I'll take your word for it.  I mean, --

19      Q.   You don't have to.  You can.  But you don't

20  have to.  Let's look.  Let's make sure.  Let's go to

21  Exhibit 60, just a couple --

22      A.   It looks like it's the same thing.

23      Q.   I guess I should have made it a lot easier and

24  told you to look at the next page because it's the same

25  email.

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 269

 1        A.   All right.

 2        Q.   So this is the same email chain but here's

 3   another email that we hadn't seen yet.

 4        A.   Right.

 5        Q.   And this is from Russell to Paul.  And he's

 6   copied Ian and Paul on it.  And it says that he agrees,

 7   "he" being Russell, "he" being KE Arms "agree that seeing

 8   the quote from GWACS makes the most sense.  Hopefully it

 9   is reasonable and they can deliver in a reasonable time

10   period.  If not we can talk about other options."

11        Do you know what other options he was referring to?

12        A.   Us moving forward with manufacturing our own

13   lower.

14        Q.   The KP-15?

15        A.   Yeah.

16        Q.   Okay.  And the research he was going to do in

17   that direction, should it be needed, was to research what

18   it was going to take for you guys to develop it, right?

19             MR. CALAWAY:  Object to the form.

20        A.   I -- I would gather by this time we probably

21   knew the "bigger than a breadbox, smaller than a house"

22   what it would take to do it.

23        Q.   (By Mr. Bogan)  Do you know what research he

24   was going to do?

25        A.   I would imagine finding out if KE Arms was

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 270

 1  willing to invest in moving forward.

 2      Q.   And then if you look at the second paragraph,

 3  it says, "KE Arms is here to help with any part of the

 4  project we can."  Do you see that?

 5      A.   Yeah.

 6      Q.   It says, "This could include:"  and he says,

 7  "Manufacturing the aluminum buttplates GWACS currently

 8  outsources."  Do you see that?

 9      A.   Yeah.

10      Q.   Was it public knowledge that GWACS outsourced

11  it's buttplates?

12      A.   I don't know.

13      Q.   Did you see that in any of the posts in all

14  these public documents you talked about, did you see that

15  in any of those?

16      A.   I can't say that I have.

17      Q.   The next thing says, "Manufacturing dedicated

18  hammer pins that are the full width of the CAV-15 MKII

19  receiver (this area is wider than mil-spec and while

20  mil-spec works, the pin being recessed is a constant

21  source of concern with retail customers in my customer

22  service experience)."  Do you see that?

23      A.   Yeah.

24      Q.   And then in the next paragraph he says, "There

25  are also better takedown and are pivot pin options

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 271

1  available now that would be well suited for this project."
2  Do you see that?
3       A.    Yeah.
4       Q.    And he provides you with pivot -- provides,
5  sorry, KE Arms provides Paul levy with Pivotpins.com, --
6       A.    Correct.
7       Q.    -- and the pins that he's suggesting, right?
8       A.    Yes.
9       Q.    Are you aware that those are the pins that
10 GWACS Armory used in the CAV-15?
11      A.    Yeah, they're commercially available to anybody
12 that wants to buy them.
13      Q.    Right.  Now, was it public knowledge that GWACS
14 Armory bought pivot pins from Pivotpins.com versus
15 manufacturing themselves?
16      A.    I would have known it from looking at it.
17      Q.    You would have known it.
18      A.    Yeah.
19      Q.    You would have known that they got it from
20 Pivot Pin?
21      A.    They're the source but maybe I have more
22 information than the average guy.  But yeah, that's --
23 it's the same thing that's in the HK MP5s.  It's a pretty
24 common pin in the firearms industry.
25      Q.    And are they longer than the normal pins?

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 272

```
 1        A.   You can order them just about any length you
 2   want or diameter.
 3        Q.   Okay.  What about the ones that were sold with
 4   it?
 5        A.   I -- I'm not a pivot pin expert on that.  But I
 6   mean, I know that there were pivot pins that were longer
 7   available from a couple of other manufacturers.
 8        Q.   Did you make any pivot pins for the CAV-15?
 9        A.   We did not make the pivot pins, no.
10        Q.   Do you make the pivot pins now?
11        A.   We do not.
12        Q.   Who makes the pivot pins now?
13        A.   Pivot Point, I believe.
14        Q.   Pivotpins.com, which that's their website,
15   right?  Pivot -- I think it's called pivotpoint when you
16   look at --
17        A.   If you say that.  I've never been there; so...
18        Q.   I think when you go to their website, it
19   actually says Pivot Point, but their web address is
20   Pivotpins.com.  Right?
21        A.   Sure.
22        Q.   And they're the same length, diameter,
23   everything as the CAV-15 pins?
24        A.   Yeah, I believe it goes all the way back to CAV
25   Arms.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 273

```
 1        Q.   Yeah, but it's the same pins today, right?
 2        A.   As ours?  I would have to check.  I think ours
 3   is a specific dimension too.  But I've never set one
 4   beside the other.
 5        Q.   Do you know where you got that dimension?
 6        A.   After we finished the design, we measured the
 7   distance across and ordered the pin.
 8        Q.   And so in that ground up, start from scratch
 9   development, the pins for the CAV 15 and the pins for the
10   KE Arms, they shouldn't be the same length, right?
11        A.   I don't know if they are or not.
12        Q.   Because the lowers are actually wider than
13   mil-spec, right?
14        A.   Correct.
15        Q.   So you would, I assume, be surprised if we put
16   them right next to each other and they were the same size?
17        A.   I honestly can't tell you if they are or not.
18        Q.   Now, who decided which -- who decided to go
19   with pivot pins for the KP-15, Mr. Phagan?
20        A.   We looked at a couple of different options.
21   There's pins that have little drop downs.  We looked at
22   some captures, the Colt in the front has a very
23   rudimentary cross bolt and nut.  So we looked at a couple
24   of different things, but we settled on that.
25        Q.   Did Mr. Phagan tell you that Armory got their
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 274

1   pins from pivot point or pivotpins.com?

2              MR. CALAWAY:  Object to the form.

3        A.   I would have already known that.  I worked on a

4   couple of MP-5 projects.  We were actually trying to put

5   an AR lower on an MP5, and we looked at a bunch of

6   different points for that.  It's not a secret that pivot

7   point, pivot.com makes pins.  And like I said, I --

8        Q.   (By Mr. Bogan)  Well, I'm -- that was probably

9   a poorly-worded question.  I meant how did you know that

10  Armory used the same ones?

11             MR. CALAWAY:  Object to the form.

12       Q.   (By Mr. Bogan)  Or did you?

13       A.   I mean, they were in the CAV.  I mean, they're

14  -- I saw them, seen --

15       Q.   Well, I guess what I was trying to figure out

16  is if Mr. Phagan gave you the same information that you

17  guys, you, KE Arms, gave to Brownells, which was where we

18  order our pins from.  And by "we," I mean our client -- my

19  client.

20             MR. CALAWAY:  Object to the form.

21       Q.   (By Mr. Bogan)  Did he give you the same

22  information that you gave to Brownells?

23       A.   He wouldn't have given me any information I

24  didn't already know, if he did.

25       Q.   (By Mr. Bogan)  And where did you -- I guess my

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 275

1  question, then, is:  Where did you learn that GWACS Armory

2  ordered their pins from Pivot Pin?

3               MR. CALAWAY:  Object to the form.  And

4  asked and answered.

5       Q.   (By Mr. Bogan)  Where did you learn that?

6       A.   I guess right here.  I mean, the pivot pin is a

7  standard.  I don't --

8       Q.   But it's not a standard pin, though, right?  It

9  may be -- it may not be a custom pin, but it's not a

10  standard pin for an AR-15 lower, right?

11               MR. CALAWAY:  Object to the form.

12       A.   It's used in other firearms.  And it's used in

13  other AR lowers.  I believe CNNG even used that pin prior

14  to one of their models.

15       Q.   (By Mr. Bogan)  Sir, I'm not trying to claim

16  exclusivity as to the pin.  Okay?

17       A.   All right.

18       Q.   I'm just wondering what Mr. Phagan told you

19  because you understand your company was under an NDA when

20  he disclosed this information to Brownells.  You

21  understand that, right?

22       A.   Right.  But that information was already in

23  public domain.

24       Q.   Where?

25       A.   In every CAV Arms lower that was sold.

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 276

```
 1        Q.   So every Cavalry Arms lower that was sold --
 2        A.   That --
 3        Q.   -- publicly disclosed that the pins were
 4   purchased from Pivot Pin; is that what your testimony
 5   under oath is today?
 6             MR. CALAWAY:  Object to the form.  Answer,
 7   if you can.
 8        A.   I guess I can't answer that question.
 9        Q.   (By Mr. Bogan)  Okay.  Well, you just testified
10   under oath that everybody knew, and that it came with
11   every --
12        A.   No.
13        Q.   (By Mr. Bogan) -- CAV-15 lower ever purchased.
14             MR. CALAWAY:  Let him finish his question.
15        A.   Okay.
16        Q.   (By Mr. Bogan)  So are you testifying today
17   that customers were informed that Pivot Pin was the
18   manufacturer of the pins that were used in the CAV-15?
19        A.   No, I am not.
20        Q.   Okay.  How was that public knowledge?
21        A.   If you're in the firearms industry and you see
22   a pin that was manufactured by Pivot Pin, you would know
23   what it was and where it came from?
24        Q.   Why?
25        A.   Because you had the knowledge of who
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 277

1  manufactured the pin.

2      Q.   How do you know that?

3      A.   If I see a can of Coke sitting on the table,

4  and I know what Coca-Cola is, I can assume that it was

5  manufactured by Coca-Cola Company.  I had that knowledge

6  as somebody in the industry.

7      Q.   Okay.  So Pivot Point puts a marking on their

8  pins that allows you to look at it, and know who --

9      A.   It's a very distinctive --

10     Q.   -- manufactured it?

11     A.   It's a very distinctive pin that's used across

12  the firearms industry.

13     Q.   Okay.  Is there a reason that you, being KEA,

14  had to tell Brownells where Cavalry -- or where GWACS

15  Armory purchased their pivot pins if it was such common

16  knowledge in the firearms industry?

17     A.   I don't know.

18          MR. CALAWAY:  Object to the form.  Answer

19  it.

20     A.   I don't know.  I didn't send this email.

21     Q.   (By Mr. Bogan)  What marking is on the pivot

22  pin that makes you know that?

23     A.   The pin itself.

24     Q.   The appearance of the pin?

25     A.   Correct.

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 278

```
 1      Q.   And so Mr. Levy is the director of product
 2 management for the largest firearms manufacturer or
 3 distributor in the world, right?
 4      A.   Correct.
 5      Q.   And he had to tell him that information because
 6 he couldn't tell from looking at it; is that your
 7 testimony?
 8           MR. CALAWAY:  Object to the form.
 9      A.   I don't know what -- I honestly don't know what
10 Paul knows or doesn't know.  He may have known exactly
11 where it comes from.
12      Q.   (By Mr. Bogan)  Well, he does now, right,
13 because Mr. Phagan told him.  Right?
14           MR. CALAWAY:  Object to the form.  That's a
15 statement.
16      Q.   (By Mr. Bogan)  Right?  He knows now because
17 Mr. Phagan told him as an employee of KE Arms, right?
18      A.   I don't know when he knew it to be exact.
19           MR. CALAWAY:  Can we take a break or -- how
20 much longer have you got?
21           MR. BOGAN:  We don't have a whole lot of
22 time if he's got to catch a flight.
23           MR. CALAWAY:  I do need to take a quick
24 break.
25           MR. BOGAN:  That's fine.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 279

```
 1          (Whereupon, there was a recess taken.)
 2          Q.   (By Mr. Bogan)  Okay.  We're back on the
 3     record.  You understand you're still under oath?
 4          A.   Yes, sir.
 5          Q.   All right.  Can you tell me what the
 6     nonfunctional features of the KEA polymer lower, which is
 7     the KP-15, what are the nonfunctional features that it
 8     shares with the CAV-15 MKII?
 9          A.   None.
10          Q.   What are the functional features it shares with
11     the CAV-15 MKII?
12          A.   None that aren't shared with every AR.
13          Q.   And is that the same for the MKIII which has
14     not been produced, but you've seen design work for?
15          A.   I don't think I've seen the design work.  I saw
16     a picture of it, but...
17          Q.   Tell me about your decision, and I think we
18     touched on this earlier, so I can probably be brief.  But
19     your decision to use the Mark MK3 you said was Mike Kenney
20     the third iteration.
21          A.   Yeah.
22          Q.   You decided to change that.  And when did you
23     make that decision to change from the MKIII to the KP-15?
24          A.   After our legal counsel made us aware that it's
25     owned by Ruger.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 280

1      Q.   Do you know the date on which that decision was
2  made?
3      A.   I don't specifically.  But as soon as we found
4  out it was a Ruger trademark, we switched from it.
5      Q.   Was that before or after you received the cease
6  and desist demand from GWACS Armory?
7      A.   I honestly don't know.
8      Q.   Earlier we were just talking about when Mr.
9  Phagan had told Mr. Levy that he was going to do some
10 research on September 11th, 2018, about making the KP-15.
11 You say you thought you probably had costs and things like
12 that at that time, right?
13     A.   I think from reading this email, he was
14 basically just trying to say, Hey, we're here to help in
15 any way we can to try and get this project moving forward.
16     Q.   I understand.
17     A.   And I think at the beginning he stated that it
18 would be great if these guys could produce it first.
19     Q.   I'm just going to thumb through these exhibits
20 real fast.  But I think the next document I want to ask
21 you about is already an exhibit and I don't want to
22 duplicate it.
23          MR. CALAWAY:  What are you looking for?
24 Maybe I can help you.
25          MR. BOGAN:  It's an email.  It's 8/15/19

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 315

```
 1        Q.   Have you provided documentation of those
 2   transactions?
 3        A.   I don't think it was requested.
 4        Q.   Okay.  Well, I'm going to request that you
 5   provide documentation of the sales direct to consumers.
 6        A.   I think we actually, just to clarify, I think
 7   we have shown all sales related to KP-15s.
 8        Q.   Okay.  I'm glad Mr. Nealon is still out,
 9   because let's run through some confidential documents real
10   quick.
11        You produced in discovery some spreadsheets that
12   were specific to customers is what I'm going to call them.
13   And that would be RSR Group.
14        A.   Uh-huh.
15        Q.   A company called WraithWorks.  I'm sorry,
16   Second Amendment.  And I thought there was WraithWorks.
17             MR. CALAWAY:  Do you need specific Bates
18   numbers?  It will help you speed things up if you're
19   looking for a specific document.
20        Q.   (By Mr. Bogan)  So when I looked at your
21   production of the documents related to your sales, I
22   received a bunch of documents for RSR Group.  Who is that?
23   Do you know?  Is that a --
24        A.   A large distributor of firearms.
25        Q.   And then I received Second Amendment Wholesale.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY      October 27, 2021

Page 316

```
 1   Are you familiar with them?

 2        A.   Another distributor.

 3        Q.   And then I received a large number of purchase

 4   orders from Brownells.  I received sale by item summary.

 5   It doesn't appear to be Bates numbered and I think that's

 6   probably because it's on an Excel spreadsheet and it came

 7   through funny.

 8             MR. CALAWAY:  Yes, we Bates stamped these

 9   separately and then reference them.

10        Q.   (By Mr. Bogan)  There is a cost summary.  And

11   then there is a sales by month summary.

12        I don't see any documents that evidence your sale of

13   KP-15 lowers to any individuals, only through these

14   entities.  Do you believe that you have provided

15   documentation beyond that that shows sales directly?

16             MR. CALAWAY:  Answer if you know the

17   answer.

18        A.   I mean, could I -- could I see those documents

19   for a second?

20        Q.   (By Mr. Bogan)  Yeah.  If you'd like.  So these

21   are the Brownells purchase orders.  I don't know if you

22   want to look through all those.

23        A.   No.

24        Q.   We're kind of crunched on time.

25        A.   The summary.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 319

1   project down.  We stopped advertising, we stopped

2   marketing.

3        Q.   (By Mr. Bogan)  Okay.  How long?

4        A.   A couple of months.  We were actually -- we put

5   these gentlemen in negotiations for quite some time.  We

6   felt that we would be able to get back to it after that.

7        Q.   What months were those?

8             MR. CALAWAY:  Object to the form.

9        A.   Yeah.  I'd have to look at the exact dates;

10  but...

11       Q.   (By Mr. Bogan)  Okay.  So you sued these

12  gentlemen in April of 2020, right?

13       A.   Correct.

14       Q.   And you said that your reputation had been

15  damaged and that you had suffered damages --

16       A.   Correct.

17       Q.   -- with Brownells?

18       A.   Correct.

19       Q.   How did you stop advertising and suffered

20  damages in those -- let's call it a week from the time

21  that they, Brownells, received the cease and desist email

22  and you sued them?

23       A.    We actually slowed down our whole marketing

24  campaign for months after that.

25       Q.   Yeah.  After you sued them?

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 320

```
 1        A.   Yes.
 2        Q.   Yeah.  So how were you damaged from slowing
 3   down your marketing after -- when you had already sued
 4   them?  You sued them saying you've been damaged.  But how
 5   were you damaged if you hadn't slowed your marketing down
 6   yet because it was only a matter of days after Brownells
 7   got the email?
 8        A.   We were launching a new product.  Our customers
 9   were going along with the build cycle and how it was being
10   developed.
11        Q.   Uh-huh.
12        A.   As we were doing that, we were taking
13   pre-sales.  We stopped all of that.  And we have a damage
14   expert that's come in and reviewed all of that.  And I
15   think you have all that information.
16        Q.   Yeah.  Yeah.  I understand that.  But I want to
17   know what your basis is.  Because I don't know if your
18   damage expert realizes that within days of that email
19   being sent to Brownells, you sued these people.
20             MR. CALAWAY:  Object to the form.
21        Q.   (By Mr. Bogan)  So I don't know what your
22   expert has.  And of course, your expert is paid by you,
23   and is looking at it from your point of view -- if he --
24             MR. CALAWAY:  Object to the form.
25        Q.   (By Mr. Bogan)  If he didn't say what you
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 321

1   wanted him to say, I can promise you you would have

2   another expert.  So I'm wanting to know what your

3   knowledge and your basis is for the allegations that you

4   put in a lawsuit against these gentlemen.

5              MR. CALAWAY:  Object to the form.

6        A.   I'm not a damage expert.  That's why we hired

7   one.

8        Q.   (By Mr. Bogan)  I would agree with that because

9   you certainly did not suffer damages from lack of

10  advertising in a matter of a week after Brownells received

11  it, right?

12             MR. CALAWAY:  Object to the form.  If you

13  understand it.

14       A.   Is that a question?

15       Q.   (By Mr. Bogan)  Yeah.

16       A.   It feels more like a statement to me.  Like I

17  said, you can check the damage report.

18       Q.   I don't care what the damage report says, sir.

19  I'm asking you.  You have sued these people.  And in fact,

20  in your counterclaims, do you know the number you put on

21  that?

22       A.   In the millions, I would imagine.

23       Q.   $2.5 million in revenue you claim you lost.  Do

24  you know what that number is now?

25       A.   Approximately 400,000.

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 322

```
 1          Q.   Quite a big difference, isn't it?
 2                    MR. CALAWAY:  Object to the form.
 3          A.   We limited it to just the Brownells' exposure.
 4          Q.   (By Mr. Bogan)  Because that's the only
 5     exposure you've alleged, right?
 6          A.   I don't think it's the only exposure we
 7     alleged.  But it's the focus of this.
 8          Q.   How much revenue have you generated from the
 9     KP-15?
10          A.   Approximately $3 million.
11          Q.   How much revenue did you generate in 2018?
12          A.   Less than $3 million.
13          Q.   Less than $2 million?
14          A.   How than $2 million.
15          Q.   About 2019?
16          A.   Less than $2 million.
17          Q.   Because '19 was a pretty rough year, wasn't it?
18          A.   Everything after Trump got elected was pretty
19     rough in the firearms industry.
20          Q.   And then in 2020, you did four million, right?
21          A.   The paper says that's what we did.
22          Q.   And three million of that was the KP-15.
23          A.   No, the KP-15 sales are to date; it includes
24     both years.
25          Q.   How much of that was in 2020?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 335

```
 1   allowed to do that.  We even gave more time for that to
 2   happen.  It was fine.  But you filed that claim and you
 3   added this claim, right?
 4        A.   I think -- yes, if you're stating that.
 5        Q.   So it says here that "Anderson, on behalf of
 6   all the counterdefendants made false, defamatory and
 7   disparaging statements regarding KEA when he falsely
 8   informed the potential customers/distributors..." plural,
 9   you've only got one, right, Brownells?  We can get through
10   that pretty quick.
11        A.   Yes.
12        Q.   Okay.  "...that KEA had breached the NDA and
13   that KEA's receiver violated GWACS' intellectual property
14   rights.  These false, misleading and disparaging statement
15   injured KEA's business reputation among KEA's potential
16   customers, distributors," plural again.  But correct that
17   and say it's just Brownells, right?
18        A.   That's who they notified but them doing that
19   would jeopardize our relationship with our other
20   distributors as well.
21        Q.   Okay.  But they didn't provide false or
22   misleading information to anybody according to you other
23   than Brownells, right?
24        A.   Correct.
25        Q.   Okay.  And you said that they made --
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 337

```
 1   in any companies.  Would you consider yourself an Investor

 2   in Tool Design Group?

 3             MR. CALAWAY:  Object to the form.

 4        A.   I did not say that I did not invest in any

 5   other companies.  I said I limited how I invested in other

 6   companies.

 7        Q.   (By Mr. Bogan)  I believe you said you own what

 8   you invest in.

 9        A.   And I own a third of this.

10        Q.   Tell me what damaged your reputation.  I

11   understand that advertising curtailment is the basis for

12   your damages.  But what happened to your reputation?  Tell

13   us about that.  Tell the jury how your reputation with

14   Brownells was damaged.

15             MR. CALAWAY:  Object to the form.

16        A.   Well, they -- going to one of our larger

17   distributors, and making a claim as they did is not

18   something that they would lightly.  We were very concerned

19   with losing all of our business, not just business related

20   to KP-15 as Brownells is the largest distributor across

21   our entire platform.  And the fact that they had done

22   this, we were concerned that they might would go out and

23   publicly make these statements as well.

24        Q.   But they didn't, to your knowledge, publicly

25   make these statements, right?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 338

```
 1                MR. CALAWAY:  Object to the form of the
 2    question.
 3          A.   I don't know what they have or haven't done.
 4          Q.   (By Mr. Bogan)  Okay.  Well, my question is:
 5    How was your reputation and/or relationship with Brownells
 6    damaged?  We all agree that you've done more business with
 7    Brownells now than you did before, right?
 8          A.   We worked through this for sure.
 9          Q.   So there's -- there's been no damage to your
10    reputation that they caused you to suffer a monetary loss,
11    right?
12          A.   There was.  We have been able to repair that.
13          Q.   What was the monetary loss from the damage to
14    your reputation?
15                MR. CALAWAY:  The expert says it's
16    approximately $400,000.
17          Q.   (By Mr. Bogan)  That's your advertising
18    curtailment.  Who made the decision to curtail
19    advertising?
20          A.   I did.
21          Q.   Okay.  Not Brownells?
22                MR. CALAWAY:  Object to the form.
23          Q.   (By Mr. Bogan)  So you -- you made the decision
24    to curtail advertisement.  Brownells took no adverse
25    action against you as a result of this, right?
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 339

1        A.    Not long-term.

2        Q.    What was the short-term adverse consequences?

3        A.    We all stopped marketing and advertising this.

4   We all stopped.

5        Q.    I'm not asking you that.  I'm saying what was

6   the damage to your reputation?  Not your advertising.  I'm

7   talking about the damage to your reputation with

8   Brownells.  You haven't suffered any losses from it, have

9   you?

10             MR. CALAWAY:  Object to the form.  And

11   asked and answered.

12       Q.    (By Mr. Bogan)  So -- so none?  Your answer is

13   none?

14       A.    You can answer the question.  I already

15   answered it.

16       Q.    Well, is that your answer?  Is that your

17   answer?

18             MR. CALAWAY:  Object.

19       Q.    (By Mr. Bogan)  I mean, I'm trying to get done

20   here.  But we're not going to get done if you can't give

21   me a straight answer.  And you're saying short term it was

22   damaged, long term you've been able to repair it.  I want

23   to know what your short term damages were.

24             MR. CALAWAY:  I object to the form.

25       Q.    (By Mr. Bogan)  You've sued these people for

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 340

```
 1   hundreds of thousands of dollars.
 2            MR. CALAWAY:  He's told -- and asked and
 3   answered.  Object to the form.
 4        Q.  (By Mr. Bogan)  Okay.  Would you like to tell
 5   it again so, hopefully, you can make your flight, sir?
 6   How was your reputation damaged with Brownells as a result
 7   of the April 21st, 2020, --
 8        A.  Everything that we were doing with Brownells
 9   was put on hold.
10        Q.  For how long?
11        A.  We would have to go back and look at the
12   records.  But we had it -- we have given this information
13   over to our damage expert so he could quantify that.
14        Q.  I understand what your damage expert is saying,
15   sir.  I'm asking you as a representative of KEA how your
16   reputation with Brownells was damaged.  From what I've
17   seen, your business with Brownells has only increased
18   since that day.
19        A.  No.
20            MR. CALAWAY:  Object to the form.
21        A.  It plateaued, and then increased from that day.
22        Q.  (By Mr. Bogan)  You did not have a product on
23   the date the email was received by Brownells, correct?
24   You did not have a product to sell?
25            MR. CALAWAY:  Object to the form.
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 341

```
 1        Q.   (By Mr. Bogan)  Correct?

 2        A.   We were taking pre-orders.

 3        Q.   And what were you doing to advertise the

 4   product that you stopped doing before April 21st and after

 5   April 21st?  What did you stop doing?

 6                  MR. CALAWAY:  Object to the form.

 7        A.   We stopped doing daily to weekly updates to the

 8   customer base.

 9        Q.   (By Mr. Bogan)  Okay.  So you reduced your

10   customer updates.  How were you updating customers?

11        A.   Through social media, through posts, through --

12   I mean, numerous ways.

13        Q.   Okay.  How long did you stop those updates?

14        A.   I would have to go back and get that actual

15   information, but weeks.

16        Q.   Did you go to zero?

17        A.   Yes.

18        Q.   For weeks?

19        A.   Yes.

20        Q.   Not months, weeks?

21                  MR. CALAWAY:  Object to the form.

22        Q.   (By Mr. Bogan)  You know, your expert gave me a

23   range to like December.  So that's problematic.

24        A.   No.

25        Q.   So weeks you stopped your advertising which was
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 342

1    updating customers on the progress of the project?

2        A.    Actually, we stopped a number of things.  We

3    stopped development on other products, we stopped the --

4    for, like I said, I would have to go look at all of it.

5    But we stopped --

6        Q.    Well, I've asked you to be here today to talk

7    your damages.  Okay?  So I need you to be able to tell me.

8        A.    We stopped contacting other manufacturers for

9    variances, that we knew this would be problematic with.

10   There's, you know, a lot of different things that were

11   curtailed during this time.

12        We have had experiences with other distributors that

13   would have taken this product on.  We actually have --

14       Q.    Well, now, that's a result of the lawsuit,

15   right?  Not the email.  I'm talking about the email.

16            MR. CALAWAY:  Object to the form.  You're

17   arguing with him on his answers.  He's answering your

18   questions.

19            MR. BOGAN:  Well, I'm asking -- I'm trying

20   to ask him to clarify --

21            MR. CALAWAY:  If you want to --

22            MR. BOGAN:  Counsel, I'm trying to get

23   through this.  Please stop.

24       Q.    (By Mr. Bogan)  I'm asking you what your

25   damages were from the email.  You said other people you

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 343

```
 1   could have contacted for a variance, you didn't.  That's
 2   because of the lawsuit --
 3        A.   No.
 4        Q.   -- that you already had filed by that point.
 5   Right?
 6             MR. CALAWAY:  Object to the form.
 7        Q.   (By Mr. Bogan)  Is that -- there was -- you had
 8   already filed a lawsuit by that point when those decisions
 9   were made on the variance, correct?
10             MR. CALAWAY:  Object to the form.
11        A.   What has -- the lawsuit was filed based off of
12   their actions.  Their actions, because we knew there was
13   an issue out there, curtailed us being able to go out and
14   sell and market it.
15        Q.   (By Mr. Bogan)  That was your decision not to
16   sell and market it, because they had made a demand on you,
17   though, right?
18             MR. CALAWAY:  Object to the form.
19        A.   Because of their actions, we knew that we would
20   not be able to effectively market and advertise this if
21   there was a problem over this.
22        Q.   (By Mr. Bogan)  Okay.  But at that point all
23   they had done was send an email to Brownells.  So all this
24   speculation of what could have happened is irrelevant.
25        A.   Which is why we've limited our damages to what
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 346

 1  million in revenue.

 2       And he's telling me that that is based on an expert

 3  report which isn't responsive, and is not evidence.  He's

 4  telling me that it is based on the decision not to seek

 5  variances with other companies before your product even

 6  existed, and you didn't get a variance until a year later.

 7             MR. CALAWAY:  What are you doing here, Man?

 8  You're just yelling.

 9             MR. BOGAN:  I'm going over what he said.

10             MR. CALAWAY:  All you're doing is

11  testifying.  If you have a question, ask my client so he

12  can answer the question.

13             MR. BOGAN:  That's what I'm asking him.

14  And that's what -- you asked me --

15             MR. CALAWAY:  I didn't hear a question

16  there.  I heard a --

17             MR. BOGAN:  It was a response to you,

18  Counsel.  So if you would like to stop talking and object

19  to form, I will continue.

20             MR. CALAWAY:  Okay.

21       Q.   (By Mr. Bogan)  So let's go back to your

22  damages resulting from the April 21st, 2021, email.  How

23  were you damaged by that?  How did that impact variances

24  with other companies other than Brownells, the email that

25  was sent to Brownells?  How did that impact variances with

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 347

```
 1   other companies?
 2        A.   We discussed with other companies having a
 3   variance.  We told them the situation that we were in
 4   based off of this email.  And we know from prior working
 5   with them that they would not enter into a variance on a
 6   project that had a cloud over it.  And in some cases, they
 7   told us as such, and said come back and see us when this
 8   is finalized.
 9        Q.   Okay.
10        A.   We're still sitting here today, a year and a
11   half later.  It hasn't been finalized.  The gun rush is
12   over.  And potentially tens of thousands of lowers that
13   could have been sold to those guys haven't been sold.
14        Q.   Okay.  Thank you.  So you told them, these
15   potential customers, about the dispute with GWACS?
16                  MR. CALAWAY:  Object to the form.
17        Q.   (By Mr. Bogan)  Right?  That was your testimony
18   just now.  You said "we told them."
19        A.   No, no.  I said because of this we have prior
20   experience with these types of issues.
21        Q.   So when we read this transcript, it's not going
22   to say, "We told them about the dispute -- about the issue
23   with GWACS"?
24        A.   I'm clarifying what I'm saying.  We -- from
25   previous experiences understand that some of our customers
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 348

```
 1   would not get involved with this project while there was a
 2   cloud hanging over it.
 3       Q.   So --
 4       A.   Since then, we've discussed it with them and
 5   clarified that, yes.
 6       Q.   So you made the decision to change that because
 7   you were in a lawsuit that you filed against them to seek
 8   a declaratory judgment over who had rights or did not have
 9   rights to the intellectual property asserted?  Correct?
10                MR. CALAWAY:  Object to the form.
11       A.   I would have to hear the question again.  I --
12   what did you say?
13       Q.   (By Mr. Bogan)  You are saying that because you
14   filed a lawsuit against GWACS Armory to seek a declaratory
15   judgment as to who owned what intellectual property
16   rights, you are saying that is what caused you not to seek
17   variances, or is because they sent a single email --
18       A.   What I'm saying is --
19       Q.   -- to a single customer or distributor?
20                MR. CALAWAY:  Object to the form.
21       A.   Because they made a false accusation and false
22   claims.  And they disparaged our company, our initial suit
23   to them was for them disparaging our company because we
24   knew that there was going to be legal discussions over
25   this whether it was the negotiations we entered into
```

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY    October 27, 2021

Page 349

1  initially in good faith or whether it was a lawsuit

2  long-term.  We knew that existing customers would not

3  enter into variances.

4          Q.   (By Mr. Bogan)  Okay.  But the reason there was

5  a lawsuit at the time of this allegation was because you

6  filed it, correct?

7          A.   Because they had damaged our company.

8          Q.   But they sent an email to Brownells, right?

9          A.   Correct.

10         Q.   Okay.  So you're the one who filed the lawsuit

11 which put the cloud over your company.  Am I wrong?

12         A.   You're wrong.

13         Q.   Okay.

14         A.   Your client was the one that attacked our

15 company.

16         Q.   To a single distributor, Brownells, who was

17 involved in the WWSD Project, and knew that we owned the

18 CAV-15, MKII, right?

19         A.   They don't know that.

20              MR. CALAWAY:  Object to the form.

21         Q.   (By Mr. Bogan)  Okay.  What other losses have

22 you suffered as a result of deceptive trade practices by

23 -- are there any other damages you've suffered as a result

24 of alleged deceptive trade practices, whether it be to

25 your reputation or otherwise, by GWACS Armory, Russ

GWACS ARMORY, LLC v. KE ARMS, LLC, et. al.
MICHAEL KENNEY     October 27, 2021

Page 356

1                        CERTIFICATE

2    STATE OF OKLAHOMA         )

3    COUNTY OF TULSA           )   ss.

4              I, Linda Fisher, a Certified Shorthand

5    Reporter, Registered Professional Reporter, and Notary

6    Public in the State of Oklahoma, do hereby certify that on

7    the 27th day of October, 2021, at the law offices of Hall,

8    Estill, Hardwick, Gable, Golden & Nelson, 320 South Boston

9    Avenue, Suite 200, Tulsa, Oklahoma, pursuant to Federal

10   Rules of Civil Procedure, appeared the above witness,

11   MICHAEL ERIC KENNEY, who was by me first duly sworn to

12   testify the truth, the whole truth, and nothing but the

13   truth in the case aforesaid, and that the deposition by

14   him was reduced to writing by me in stenograph, and

15   thereafter transcribed by me, and is fully and accurately

16   set forth in the preceding pages.

17             I do further certify that I am not related to

18   nor attorney for any of the said parties, nor otherwise

19   interested in the event of said action.

20             WITNESS my hand and official seal this 8th day

21   of November, 2021.

22

23

24

25                        Linda Fisher, CSR-RPR #866