# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

GWACS ARMORY, LLC, )
)
Plaintiff, )
)
v. ) Case No.
) 20-cv-0341-CVE-SH
KE ARMS, LLC, RUSSELL PHAGAN, ) BASE FILE
SINISTRAL SHOOTING )
TECHNOLOGIES, LLC, BROWNELLS, ) Consolidated with:
INC., and SHAWN NEALON, ) Case No.
) 21-CV-0107-CVE-JFJ
Defendants. )
)
and )
)
KE ARMS, LLC, )
)
Plaintiff, )
)
v. )
)
GWACS ARMORY, LLC, GWACS )
DEFENSE INCORPORATED, JUD )
GUDGEL, RUSSELL ANDERSON, DOES )
I through X, and ROE )
CORPORATIONS I through X, )
)
Defendants. )
______________________________)

DEPOSITION OF KARL KASARDA

Volume 1
Pages 1 - 105

Phoenix, Arizona

April 7, 2022

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

A. Correct.
Q. How long have you and Mr. Phagan been friends?
A. 2006 or so, I believe.
Q. If you'll go to your declaration at paragraph 7.
09:01:25 A. Uh-huh.
Q. It said that InRange's WWSD build in 2017 did not promote a complete rifle. Instead, customers interested in the WWSD project purchased or recommended AR-15 parts from manufacturers directly and then built or modified their existing AR-15 rifle with the parts.
09:01:44 Do you see that?
A. Yes, I do.
Q. Did I read that correctly?
A. Yes, you did.
09:01:49 Q. Tell me about that.
You're saying that the 2017 WWSD build wasn't -- wasn't a complete build. Did that change later?
MR. CALAWAY: Object to the form of the question. Go ahead. Now you can answer.
09:02:06 THE WITNESS: The 2017 build, in quotes, was not designed to be a commercial product. It was a DIY concept. And so there were a number of divergent parts and components to make that DIY project the way we envisioned it.
09:02:21 So in terms of it being a complete rifle,

what is intended by that statement is it was not intended to be sold or marketed as a complete thing. It was a DIY project for my audience.

BY MR. BOGAN:

09:02:31 Q. And at what time did that change?

A. We -- when Brownells contacted me with the idea that it would be possible to make it a commercial project around, I believe -- let me reference that in here, in 2018, April.

09:02:47 Q. And on the WWSD build in 2017, what was the lower receiver for that project?

A. At that time it was the GWACS model with the polymer lower.

Q. How are you aware of the GWACS monolithic polymer
09:03:04 lower?

A. The GWACS was made from the same mold that was made from the Cav Arms that was the precursor to that.

Q. And InRange selected that lower for the project; correct?

09:03:12 A. Yes. I had familiarity with the Cav Arms product and therefore this product, because it was the same thing.

Q. Are there other polymer lower receivers on the market that are comparable to the GWACS CAV-15?

A. In 2017 there were not any monolithic ones. There
09:03:28 were other polymer lowers in the market that were not

comparable, no.

Q. And what was your role in the WWSD project as it developed into a complete build?

A. Okay. When it developed into a complete build was working with the new selection of the components that would be possible to pull together in collaboration with Brownells to make it a complete rifle.

Q. And did those components change when it -- after Brownells contacted you in 2018, did you stick with the same components that you were giving for the DIY project or did those change?

A. A number of components changed. One example would be the charging handle.

Q. What else changed?

A. Well, the -- let me think here. At one point later on, the barrel manufacturing producers changed. There's two -- two different barrel producers. And, of course, the polymer lower is now the KP-15.

Q. On the barrel, was that Faxon Arms --

A. Yes. Now it is Faxon and Ballistic Advantage.

Q. And Faxon is F-a-x-o-n; correct?

A. Correct.

Q. Was -- what was your role after you guys started working on the project that would be a complete build? What was InRange's role?

A. InRange's role was to ensure that the components that were put together to make the complete rifle fit the vision of the goals originally designed in 2017. So when things had to change, we wanted to make sure that those components fit the vision.

09:05:08

Q. And who did the marketing for this project?

A. The marketing for this has been entirely under InRange TV.

Q. Brownells did not do marketing?

09:05:17

A. Excuse me. They may have put some things on their website and such, But when it comes to the video reach to the consumer, it's been through InRange.

Q. What about Russell Phagan, did he do any video advertising?

09:05:27

A. I don't know how to answer that. That would be a question for him.

Q. Were you in any videos with Russell Phagan that were not part of InRange on the CAV-15?

A. I don't recall that being the case.

09:05:39

Q. Were you in any videos with Russell Phagan discussing the KP-15?

A. We have done videos about the KP-15 on InRange TV. I don't recall doing them anywhere else.

Q. Did InRange handle the social media marketing for the WWSD project?

09:05:53

financial interest in it.

I will say that when it comes to the "What Would Stoner Do" project, in InRange has been very consistent with its marketing and to its audience about our financial stake in it. I always talk to my audience about InRange being supported by only two venues, One of which is the direct viewer support and proceeds or -- excuse me. What's the word?

Q. Royalties?

A. Royalties. Thank you. From Brownells. That's always been disclosed to the audience.

Q. Paragraph 31 of your declaration says, After InRange was notified of Armory's letter, InRange initially ceased its promotion of the WWSD rifle to review the veracity of Armory's statements.

Do you see that?

A. I do.

Q. Who notified you of Armory's letter?

A. There was a general conversation between all parties involved. I cannot remember the first person to mention it.

Q. When you say "all parties involved," who are those people?

A. The people that I can remember would be Brownells and KE Arms.

       Q. So there was a conversation between InRange, Brownells, and KE Arms about the cease and desist letter?

A. About the issue that is now facing the project as a result of the letter.

09:58:04 Q. GWACS Armory never sent you a copy of the cease and desist email; correct?

A. I do not recall receiving one.

Q. And what did InRange do to review the veracity of Armory's statements?

09:58:22 MR. CALAWAY: Object to the form.

THE WITNESS: Can you clarify that further?

BY MR. BOGAN:

Q. Yeah.

Paragraph 31 you said, InRange initially

09:58:29 ceased its promotion of the WWSD rifle to review the veracity of Armory's statements.

A. Yeah. So that would have been part of the general conversation about what the claims were within it.

Q. What did InRange do to review the veracity of

09:58:42 those statements?

A. That would have been the conversation that I mentioned earlier amongst all three parties.

Q. So all you did to review the veracity of Armory's statements was have the conversation with KE Arms and

09:58:52 Brownells?

A. Yes, that I can recall.

Q. How many conversations did you have with Brownells about the letter, the cease and desist letter?

A. I do not know. I just know that, of course, as you can imagine, that this was threatening the project as a whole, and it was a very charged moment, emotionally speaking, so I don't recall how many calls.

Q. Did KE Arms inform you that it had sued GWACS Armory before May of 2020?

MR. CALAWAY: Object to the form.

THE WITNESS: I am aware of that happening, but I do not know when I was told or how I found out about it.

BY MR. BOGAN:

Q. And you said that you curtailed marketing from May of 2020 until about August of 2020; right?

A. Yeah. I would say there's even a cooling effect to this day at the moment, but it's not as significant. We've had to move forward, because there was no option but to move forward.

Q. But that started in May of 2020?

A. Around there.

Q. At that time did you know -- when you started this curtailment in May, did you know that KE Arms had filed a lawsuit against GWACS Armory?

A. I do not remember that being the case in May. What I remember was the discussion in general about the threat to the project as a result of the letter and as a -- and that's what caused that decision on my part.

10:00:06 Q. And that decision that you're referring to is to produce less videos than you were previously?

A. To not promote a project that may not come to fruition.

Q. But you did continue to promote it; correct?

10:00:14 A. There had to be a need to. People were asking -- the audience -- this has generated a lot of hype since 2017 when it was originally a DIY project. And then when it became commercially marketed and SHOT 2020, there was a lot of interest. Actually, significant interest.

10:00:28 This -- this concept is a little bit unique to the AR-15 industry. It generated a lot interest and consternation at the same time.

So the audience -- I don't know if you've ever been a content creator, but they always demand 10:00:39 something right now. It's very hard to keep them fed. So there had to be some information coming to them, yes. So what it did is, it turned into essentially a trickle versus a flood.

Q. But it's not your testimony today that you 10:00:58 completely stopped marketing?

A. Did not completely stop, no.
Q. When you curtailed the marketing in May of 2020 through August of 2020, did you have a product to sell?
MR. CALAWAY: Object to the form.
10:01:20 THE WITNESS: There was the continued effort to make this a commercially viable product, yes.
BY MR. BOGAN:
Q. But it was not a commercially --
A. I do not remember when it -- I'm sorry. I didn't
10:01:28 mean to cut you off.
Q. It was not a commercially viable product at that time; correct?
A. I do not remember when it was -- when we actually hit the Brownells' shelves. That would be a question --
10:01:35 I'd have to go back and look.
However, if I recall -- and I don't remember when we started -- Brownells was taking pre-sales and interest, so that would have diminished that as well.
Q. And what's the basis for that opinion?
10:01:53 A. The marketing efforts on InRange are what generated interest in the product. There's a -- this has been wholly an InRange project, meaning the "What Would Stoner Do" project since 2017, and all of the interest generated in it initially started completely grassroots and
10:02:10 organically through my social media and video content. So

the pre-sales on Brownells, unless someone were to accidentally find by clicking on it, probably were brought there by my work.

Q. And what happened to pre-sales when you were doing less marketing between May and August of 2020?

A. That would have to be a question for Brownells as they would be the ones to have that data, but I would have to imagine it had an effect. Because due to other video content I've done, not only about this but other projects -- in fact, even GWACS, when the 2017 project was -- hit its peak, it is my understanding -- I think I referenced this earlier -- that GWACS had, like, a -- essentially a couple-year inventory of lowers in stock. And the 2017 DIY project actually blew out that inventory, which is why there was none left on the market.

So while I don't know the exact numbers, for example, of how many lowers were sold for GWACS because I never asked them, nor did they tell me, the reality is it blew out the inventory. That has been a common trend with work with InRange where I make sure that the -- I've heard people's inventory being depleted or being hit very hard when videos come out or launch.

So as a result of that, it is a pretty safe assumption that not marketing the pre-sales had a diminishing effect.

A. The general cooling effect was. I can't speak to these specific dates.

Q. I'm sorry. Say that again.

A. I cannot speak to these specific dates; right? Because there are other things that can occur within things that would cause something like this to happen. I mean, manufacturing has its delays of its own accord as well.

So as for this particular email, I do not know if this email is referencing that. I don't believe it is.

Q. But you think there was a cooling effect from that as well; right?

MR. CALAWAY: Object to the form of the question.

THE WITNESS: No. I would not allow a -- I would not -- here's how I would answer that. When it comes to manufacturing and the difficulties and challenges that come with manufacturing anything, that's something that I would be more interested in actually sharing with my audience versus a cooling effect, because my audience tends to be technical, and being able to share with them those kind of difficulties actually helps versus hurts marketing and general consumer interest.

BY MR. BOGAN:

Q. Were there any other factors that you believe

could have been a cooling effect on the WWSD project other than the cease and desist letter that Armory sent to Brownells and KE Arms?

MR. CALAWAY: Object to the form.

10:05:39 THE WITNESS: I believe that there could have been delays in getting a thing to market as a result of manufacturing difficulties and things that occur with manufacturing.

But would I use the term cooling effect? No.

10:05:49 The reason I use the word cooling effect is because that letter and subsequent actions were a diminishing -- not only -- frankly, was a demoralizing element to the people that were involved in the project, of which we were excited about, but also the possibility of not being able to bring 10:06:04 it to market.

The only thing that ever happened in the production of this WWSD 2020 that truly jeopardized this actually coming to market was this. There were always challenges, like a barrel or a part or things like that, 10:06:18 which are part of manufacturing a product, but none of them would have made it impossible to come to market.

BY MR. BOGAN:

Q. So looking at Exhibit 173, Russell's telling Paul that they're getting social media messages, though, asking 10:06:31 when they can expect to get those pre-orders; correct?

making a trademark for Brutality Matches, which are a competition that I run. InRange itself, InRange -- the logo for InRange, which is iconography, and WWSD.

Q. So you hired Mr. Calaway's firm to get a trademark for you for WWSD?

A. Yes.

Q. Did they do any other intellectual property work for you -- have they done any other intellectual property work for you other than the trademarks?

A. No. And the reason I hired them, to add something to that, is technically that's something you can sort of pursue yourself, but I am not good with that sort of thing, so I needed help.

Q. And how did you know them? How did you get referred to their firm?

A. That would have been through Russell, who's familiar with working with them and said they were good guys.

Q. Through Russell Phagan?

A. Yes.

Q. What did Brownells tell you that it was going to do to review the veracity of the statements in the cease and desist letter?

MR. CALAWAY: Object to the form.

THE WITNESS: I can -- I don't recall them

telling me what they were going to do, but I do remember having a concern that they might decide to pull out of the project.

BY MR. BOGAN:

10:24:07 Q. And what would have happened if Brownells pulled out of the project?

A. I would have had to put out a video canceling the "What Would Stoner Do" project as a commercial endeavor.

Q. Did that happen?

10:24:19 A. No. They didn't pull out.

Q. Do you know if Brownells canceled any orders for KP-15 lowers?

A. I do not know about their workings with KE besides "What Would Stoner Do." Excuse me.

10:24:32 Q. Was Brownells upset on that call that you had with Brownells and KE Arms where you were discussing the cease and desist letter?

A. "Upset" is not the word I would use. I mean, this is all business; right? Upset is a different thing. But I would say there was definitely concern.

10:24:46

Q. And how did Brownells express their concern?

A. I think that Brownells is a large company that is essentially used to just marketing non-controversial things, although it is firearms, which is controversial in its own accord, depending on who you are. But legal

10:25:02

controversy like this tends to have, as I said earlier, a chilling or cooling effect on corporate type entities, and Brownells is that. So that was their concern. Like -- I'm sorry. Go ahead.

10:25:13 Q. So what did Brownells say? How did Brownells express that concern?

A. In general, they didn't know that they wanted to be related to a project, whether or not -- they didn't know if they could continue pursuing a project that had this

10:25:26 type of controversy around it or -- and/or whether or not a legal case was frivolous or not didn't make them want to be involved with it -- or may not make them want to be involved with it.

Q. And who from Brownells expressed that?

10:25:37 A. That would have been -- my conversations are entirely with Paul.

Q. So Paul Levy told you that that Brownells was concerned about pursuing this project further?

A. He is my primary contact, and he would have been

10:25:47 relaying Brownells' general feelings.

MR. BOGAN: I'll pass the witness.

EXAMINATION

BY MR. CALAWAY:

10:25:52 Q. Okay. We'll stick on that subject for a second.

You said that Brownells was concerned about the WWSD project after the cease and desist letter?

A. Uh-huh.

Q. I mean, what -- why do you think they were concerned?

10:26:12

What was the -- you had conversations with that, and I want to understand what those conversations were like.

MR. BOGAN: Object to form.

10:26:20 THE WITNESS: As I recall, Brownells being a large corporation that's used to dealing with non-controversial type issues or products, a cease and desist letter coming in, whether or not it has veracity or not, is something that makes corporations tend to act -- 10:26:37 squirrelly would be the word I would use. And as a result, whether or not there's veracity or not, legal gets involved, probably things get concerned, marketing gets concerned as we saw a chilling effect. And as a result, Brownells was like, do we want to do this anymore?

10:26:49 BY MR. CALAWAY:

Q. And what would have happened if Brownells had pulled out of the project?

MR. BOGAN: Object to form.

THE WITNESS: It would have been the end of 10:26:58 the "What Would Stoner Do" 2020 project. The only way it

was commercially viable was due to their ability to aggregate multiple manufacturers.

BY MR. CALAWAY:

Q. Okay. I want to understand why they were crucial.

10:27:08 MR. BOGAN: Object to the form.

THE WITNESS: Brownells is a very large retailer of firearms products across the spectrum. And the "What Would Stoner Do" project, whether it's the 2017 or the 2020, is an aggregation of multiple divergent 10:27:21 manufacturers. For example, obviously, we're here talking about the KP-15, but the KP-15 is only one component.

There's, like, a JP capture spring from JP Enterprises. There's an ambidextrous bolt release. There's an ambidextrous magazine release. There's a barrel 10:27:36 that's a pencil barrel that has to meet specific specifications. There's a carbon fiber float tube. All of these things are from different manufacturers or many different manufacturers. And trying to get manufacturers to work together in the firearms industry is nigh 10:27:51 impossible, and Brownells was going to be the glue.

BY MR. CALAWAY:

Q. Understood.

You also mentioned earlier -- I don't want to mischaracterize your testimony, but you said something 10:27:58 about Brownells being concerned regardless of whether a

lawsuit was frivolous or not. Did I characterize that correctly?

MR. BOGAN: Object to form.

THE WITNESS: I said that, yes.

10:28:10 BY MR. CALAWAY:

Q. What do you mean if the -- if it was frivolous or not? What do you mean by that?

MR. BOGAN: Object to form.

THE WITNESS: What I mean by that is the 10:28:16 veracity of the claims have no bearing on the cooling effect that a corporation might have when they see something like that come across their counter. I mean, it has the effect on a lot of people.

If you suddenly open your mail and have a 10:28:27 letter in it that has a legal threatening nature of it, whether or not it's true or not, is going to have concern. And when you're dealing with corporations that normally don't have to deal with those types of concerns, they would -- there's a very good likelihood that they might 10:28:40 back off from a project.

BY MR. CALAWAY:

Q. You also mentioned that you looked into the veracity.

I think in Exhibit 194 you reference 10:28:50 reviewing the veracity of the statements. Was that review

including whether or not GWACS' assertions were frivolous?

MR. BOGAN: Object to form.

THE WITNESS: That would have been in the conversation I said of all the parties involved and the general concerns or points that were made in the letter, yes.

BY MR. CALAWAY:

Q. Did you think at the time that GWACS' claims were frivolous?

MR. BOGAN: Object to form.

THE WITNESS: Yes, I did.

BY MR. CALAWAY:

Q. Why?

A. Because the claims generally being made, whether it was -- I'm having a hard time remembering all of it now because it's over a duration of time. Many of the claims, as I understand it, are things that are standard elements of an AR-15 product regardless of it being a monolithic polymer lower or not.

Q. And what are those standard elements?

MR. BOGAN: Object to form.

THE WITNESS: Some of the standard elements have already been mentioned here today. But like, for example, an A1 buttstock length, which is a length of pole, which is the -- where the shoulder meets the shooter and

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 20th day of April, 2022.

Cindy Mahoney

CINDY MAHONEY, RPR, RMR NO. 50680