**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **GWACS ARMORY, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.4:20-cv-0341-CVE-SH** |
| **KE ARMS, LLC, RUSSELL PHAGAN,** | ) | **BASE FILE** |
| **SINISTRAL SHOOTING** | ) | |
| **TECHNOLOGIES, LLC, BROWNELLS,** | ) | Consolidated with: |
| **INC., and SHAWN NEALON,** | ) | Case No. 21-CV-0107-CVE-JFJ |
| | ) | |
| **Defendants.** | ) | |
| **and** | ) | |
| | ) | |
| **KE ARMS, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **GWACS ARMORY, LLC, GWACS** | ) | |
| **DEFENSE INCORPORATED, JUD** | ) | |
| **GUDGEL, RUSSEL ANDERSON, DOES I** | ) | |
| **through X, and ROE CORPORATIONS I** | ) | |
| **through X,** | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION FOR SPOLIATION SANCTIONS**

Defendants KE Arms, LLC, Russell Phagan, Sinistral Shooting Technologies, LLC, Brownell's Inc., and Shawn Nealon ("Defendants"), by and through their attorneys of record, Marquis Aurbach, hereby move spoliation sanctions against GWACS Armory LLC ("Armory") pursuant to Fed. R. Civ. P. 37. As further described in the LCvR37-1 Certification in Support of Motion for Spoliation Sanctions below, the undersigned has made multiple attempts to resolve this dispute in good faith with Armory's counsel prior to filing this motion. This motion is made and based upon the attached memorandum of points and authorities, any oral argument permitted by

1

the Court at hearing on this matter.

## CERTIFICATION OF COUNSEL PURSUANT TO LCvR37-1

Alexander K. Calaway, Esq. certifies and declares as follows:

1.      I am counsel of record for Defendants in this matter and make this certification pursuant to LCvR37-1. I have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.

2.      On July 20, 2022, I contacted Armory's counsel, notifying them of the withheld information at issue in this motion; and further requesting to meet and confer as to: (1) why Armory had failed to disclose the communications in discovery, and (2) whether there were additional communications that had been concealed in discovery.[1] Unfortunately, Armory's counsel never responded to this request.[2]

3.      On October 18, 2022, the I wrote to Armory's counsel again, notifying them that Armory had withheld *additional* information in discovery, and requested to meet and confer again regarding the issue.[3] As of the date of this filing, however, Armory's counsel has still not responded to this request.[4]

---

Declaration of Alexander K. Calaway, Esq. in Support of Defendants' Motions for: (A) Leave to Supplement Their Pending Motion for Summary Judgment Briefing; and (B) Spoliation Sanctions (hereinafter "**Calaway Decl**.") at **Exhibit 6** (filed contemporaneously with this motion).

[2] *Id.* at ¶8.

[3] *Id.*

[4] *Id.*

4.      Since Armory has ignored our attempts to confer on the issue, Armory's position as to why it concealed evidence in discovery is still unclear.[5] But as set forth above, Defendants have, in good faith, made sincere attempts to meet and confer to resolve differences before filing this motion, in accordance with LCvR37-1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 23rd of November 2022.

*/s/ Alexander K. Calaway*

Alexander K. Calaway

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

In any trade secret case, it is axiomatic that a litigant must preserve all evidence, especially evidence of trade secret disclosure.  This is because a "trade secret" is only a trade secret if (a) the person claiming the trade secret "has taken reasonable measures to keep such information secret" and (b) the information is not "readily ascertainable" through other proper sources. 18 U.S.C. § 1839(3). Thus, once information is made public, it simply ceases to be a trade secret.[6] In this trade secret case, Armory concealed critical emails wherein it disclosed the same information it alleges

---

[5] Calaway Decl. at ¶¶8-9.

[6] This is well-established principle in trade secret law. *See e.g., Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222 (S.D. N.Y. 2021) (New York law and DTSA); *See e.g., Public Systems, Inc. v. Towry*, 587 So. 2d 969, 973, 21 U.S.P.Q.2d 1220 (Ala. 1991) (Alabama law); *see e.g., Mobile Medical Intern. Corp. v. U.S.,* 95 Fed. Cl. 706, 737-38 (2010) (construing Vermont version of UTSA); *see e.g., W.L. Gore & Associates, Inc. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883 (D. Ariz. 2012) (Arizona law); *Instant Technology, LLC v. DeFazio*, 40 F. Supp. 3d 989, 38 I.E.R. Cas. (BNA) 427 (N.D. Ill. 2014) (applying Illinois law).

to be secret to third-parties. Due to Armory's spoliation of this case-dispositive evidence, Defendants respectfully request that Armory's trade secret and breach of contract claims be dismissed, or in the alternative, that other appropriate sanctions be rendered.

In dispositive briefing, Armory vehemently argued that its alleged trade secrets and proprietary information were "not publicly known."[7] Armory's theory is that it "never publicly disclosed" this information, and instead, took "reasonable measures to keep such information secret" by entering into non-disclosure agreements with defendants KEA and Brownells.[8] Prior to these motions, however, Armory conveniently withheld communications that establish its disclosure of the same "secret" information to third-parties. Immediately after Defendants discovered the evidence had been suppressed by Armory, the undersigned counsel requested to meet and confer regarding the issue pursuant to LCvR37-1. Tellingly, Armory's counsel flat-out ignored the undersigned's requests.

In sum, Armory has flagrantly disregarded its duty to disclose in this case by electing instead to conceal the most significant evidence. The extent of Armory's disregard is stunning and there simply is no excuse for Armory to have withheld evidence that exonerates Defendants. Armory's sole claims turn on its disclosure allegedly "confidential" information to Defendants that was "not publicly known."[9] Armory's suppression of critical evidence that establishes the opposite is undeniably prejudicial to Defendants. Instead of being able to simply point to Armory's own

---

[7] Dkt. 143, at pgs. 2, 15.

[8] Dkt. 143-5, at ¶¶11-13; Dkt. 143, at pgs. 10, 18 (quoting 18 U.S.C. § 1839).

[9] Dkt. 143, at pg. 2.

disclosures, Defendants now must attempt to rebut Armory's eleventh-hour argument that its trade secrets were not publicly known.[10] As a result of Armory's abuse of the litigation process, the Court should dismiss Armory's claims as a sanction. In the alternative, Armory should not be permitted to offer evidence that its trade secrets and proprietary information trade secrets were not publicly known, and this Court should instruct the jury to infer or presume instruction that Armory's trade secrets and proprietary information trade secrets were publicly known.

## II.    PROCEDURAL BACKGROUND

1.    Armory's claims in this action arise out of its alleged "trade secrets" and "proprietary information" related to a firearm known as the CAV-15.[11] Armory has further alleged that it took "reasonable measures" to keep this information secret.[12] Accordingly, in discovery, defendant KE Arms, LLC ("KEA") requested that Armory produce its internal communications concerning the CAV-15 (the "Discovery Requests").[13]

2.    On December 27, 2021, Armory lodged a boilerplate objection that the Discovery Requests were somehow "overly broad" and "unduly burdensome[.]"[14]

---

[10] Dkt. 143, at pg. 2.

[11] Dkt. 2, at ¶¶ 53-57, 59-67.

[12] *Id.* at ¶61.

[13] Declaration of Alexander K. Calaway, Esq. in Support of Defendants' Motions for: (A) Leave to Supplement Their Pending Motion for Summary Judgment Briefing; and (B) Spoliation Sanctions (hereinafter "**Calaway Decl.**") at **Exhibit 1** (KEA's Second Request for Production of Documents at Response Nos. 60-63, 65-68, 70, 74, 81-85).

[14] Calaway Decl. at **Exhibit 2** (Responses the KEA's Discovery Requests, at Response Nos. 60-63, 65-68, 70, 74, 81-85).

3.      On January 3, 2022, KEA counsel requested Armory withdraw its objections and Armory substantively respond to the Discovery Requests.[15] After several discovery conferences, Armory finally agreed to substantively respond to amended Discovery Requests that narrowed the scope of to only those communications specifically concerning Armory's alleged "trade secrets" and "proprietary information."[16]

4.      On February 20, 2022, KEA served the amended Discovery Requests.[17] Armory responded, without objection, to the Amended Discovery Requests on March 1, 2022 (hereinafter the "Discovery Responses").[18]   While Armory's Discovery Responses did include communications between Armory's vice president, Michel "Shel" Jones ("Jones"),[19] Armory had only cherry-picked Mr. Jones' communications while concealing others.[20] For example, as set forth below, Armory withheld communications with at least nine (9) individuals,[21] wherein Mr. Jones freely shared information that Armory now claims to be "trade secret" and "proprietary information" in this case.[22]

---

[15] Calaway Decl. at **Exhibit 3** (Letter dated January 3, 2022).

[16] *Id.* at **Exhibit 4** (KEA's Amended Second Request for Production of Documents, at Request Nos. 60-63, 65-68, 70, 74, 81-85).

[17] *Id.*

[18] *Id.* at **Exhibit 5** (Armory's Responses to KEA's Discovery Requests, at Response Nos. 60-63, 65-68, 70, 74, 81-85).

[19] Phagan Decl. at **Exhibits 1-9**; *see also* McBride Decl. at **Exhibit 1.**

[20] *Id.*

[21] *Id.*

[22] *See id.*; *c.f.,* Dkt. 2, at ¶¶ 53-57, 59-67.

6

5.      On June 6, 2022, discovery closed in this matter,[23] and on July 18, 2022, defendants filed their dispositive motions and motions in limine.[24] Armory opposed the dispositive motions[25] and defendants filed replies in support of their motions.[26]

6.      On July 19, 2022, Defendants were first apprised that Armory had withheld evidence of communications in discovery pertaining to the CAV-15.[27] Defendants obtained this information through Armory's former customer, Kenneth King ("King"), who reached out to KEA online. *See id.*

7.      The next day, on July 20, 2022, the undersigned contacted Armory's counsel, notifying them of the withheld information, and requesting to meet and confer as to (1) why Armory had failed to disclose the communications in discovery, and (2) whether there were additional communications that had been concealed in discovery.[28] Unfortunately, Armory's counsel never responded to the undersigned's requests.[29]

8.      In early October 2022, after dispositive motions had already been fully briefed, defendants were apprised of *additional* communications withheld by Armory in discovery.[30] Once

---

[23] *See* Dkt. 101.

[24] Dkt. 117, 118, 119, and 120. The Court extended the deadlines for filing dispositive motions and motions in limine to July 18, 2022. Dkt. 115.

[25] Dkt. 141, 142, and 143.

[26] Dkt. 159, 160, 161, and 162.

[27] Phagan Decl. at **Exhibit 1**.

[28] Calaway Decl. at **Exhibit 6**.

[29] *Id.* at ¶8.

[30] Phagan Decl. at **Exhibits 1-9**; *see also* McBride Decl. at **Exhibit 1.**

again, instead of receiving this evidence from Armory in discovery, Defendants received it from nine (9) third-parties who had direct communications with Armory.[31]

9.      Accordingly, on October 18, 2022, the undersigned wrote to Armory's counsel, notifying them again that Armory had withheld information in discovery and requested to meet and confer regarding the undisclosed evidence withheld by Armory.[32] As of the date of this filing, however, Armory's counsel has still not responded to requests to meet and confer.[33]

10.     Since Armory has rebuffed all attempts to confer on the issue, it is still unclear why Armory chose to conceal the evidence as Armory's counsel.[34] Regardless of Armory's intent, the withheld communications are material to the pending dispositive motions as they evidence Armory's own disclosure of information it alleges to be "proprietary and not publicly known."[35]

III.    **FACTUAL BACKGROUND**

A.      **THE CHARACTER OF EVIDENCE CONCEALED IN DISCOVERY BY ARMORY.**

The known information that Armory withheld in discovery relate to disclosures made by Mr. Jones (Armory's vice president of sales) to third-parties.[36] Not only was this information specifically requested by KEA in discovery,[37] the information is highly material to Armory's

---

[31] Calaway Decl. at **Exhibit 7.**

[32] *Id.*

[33] *Id.*

[34] Calaway Decl. at ¶¶8-9.

[35] Dkt. 143, at pg. 2.

[36] Phagan Decl. at **Exhibits 1-9**; McBride Decl. at **Exhibit 1**.

[37] Calaway Decl. at **Exhibit 4**.

claims in this case.

Further, Armory did not identify these third-parties as potential witnesses, which made it impossible for Defendants to completely evaluate or identify these public disclosures of Armory's alleged trade secret and proprietary information. Unfortunately, the information set forth below is only the information Defendants obtained through third-parties that *voluntarily* came forward with their communications with Armory.[38] Thus, at this point, it is impossible to determine how many other public disclosures were made by Armory and its agents related to the CAV-15.

## 1.     Kenneth King

On or about July 15, 2018, Kenneth King ("King") requested an internal photo of Armory's MKII lower receiver from Armory.[39] On the same day, Armory responded to King by sending an internal photo of the MKII, which shows: the internal rib structures and dimensions of the MKII with a ruler showing dimensional authentication; the design and location of the mold runner (i.e., where the molten plastic flows into the mold); the mold gate location and angle; the location of the mold ejector pints as shown by the rounded circles on the inside of the plastic product; and other internal details pertaining to the MKII.[40]

In this case, Armory claims this same information to be proprietary and trade secret,[41] yet Armory never disclosed these emails in discovery nor did it identify King as a witness in

---

[38] Phagan Decl. at **Exhibits 1-9**; McBride Decl. at **Exhibit 1**.

[39] Phagan Decl. at **Exhibit 1.**

[40] *Id.*

[41] Dkt. 143, at pgs. 19-23.

discovery.[42] Further, on May 14, 2018, King emailed Amory the following:

> That is absolutely what I was looking for. Thank you very much! Have you guys thought about making a second generation lower? I know InRange's What Would Stoner Do project has really pushed the popularity of your receivers.. [sic] While they're pretty good as is there are definitely some small things I would change. The biggest one being the grip reach to the safety and magazine release. I know it was made like that to give more support to the stock meeting area at the back of the FCG cavity but you could push the grip forward a bit if you made that whole area just wider/thicker out to the sides. You could even incorporate this modification into having QD socket or other sling mounting points. Thanks again! – Kenneth [43]

To which Armory replied as follows: "***We are and I have passed this on to our engineer for consideration!***"[44] In this case, Armory asserts that Armory's vice president, Michel "Shel" Jones, "had the idea of adding a QD sling attachment and ran that idea by Phagan."[45] Once again, Armory withheld this email in discovery.

### 2.   Timothy McBride

On or about August 23, 2012, Timothy McBride ("McBride") emailed Armory inquiring about a potential dealer relationship with Armory.[46] On January 15, 2013, Armory replied to McBride attaching their dealer agreement, as well as Armory's "***technical notes***" and sales "***pricing***" for the CAV-15.[47] In this case, Armory alleges that this pricing information was

---

[42] Calaway Decl. at **Exhibit 4**.

[43] Phagan Decl. at **Exhibit 1.**

[44] *Id*. (emphasis added).

[45] Dkt. 143, at pg. 7, 15 (Armory's Statement of Additional Material Fact No. 5).

[46] McBride Decl. at **Exhibit 1**; *see also* Phagan Decl. at **Exhibit 2.**

[47] *Id.* (emphasis added).

proprietary or trade secret information disclosed to KEA and Brownells under non-disclosure agreements.[48] This witness also received copies of the CAV-15 CAD files,[49] which Armory claims contains "proprietary information."[50] Conveniently, Armory never disclosed these emails in discovery nor did it identify McBride as a witness in discovery.

### 3. <u>Angus Anderson</u>

On June 17, 2017, Angus Anderson ("Anderson") emailed Armory inquiring about whether he could customize the length of pull (LOP) on a CAV-15 MKII buttstock.[51] On June 22, 2017, Armory's vice president, Michel "Shel" Jones, replied to Anderson as follows: "***Cool attached is a picture of the inside with a ruler. Please don't post this on any public site. I am providing you this so you can succeed with the chop. There is 3 inches of buffer stop you only need half of that for 5.56.***"[52]

In this email, Armory further disclosed pictures showing the internal measurements of the CAV-15 lower, how the lower receivers are constructed, the exact material measurement needed in the buffer tube to support 5.56mm ammunition (1.5 inches), and an internal "firewall" exact measurement. *Id.* Notably, these are the same design features of the CAV-15 that Armory claims, in this case, to "derive[] economic value from not being generally known[.]"[53] But again, Armory

---

[48] *See* Dkt. 143, at pg. 9 (Armory's Statement of Additional Material Fact No. 16).

[49] McBride Decl. at ¶10.

[50] Dkt. 143, at pgs. 3, 12 (Armory's Response to Defendants' Undisputed Facts No. 3).

[51] Phagan Decl. at **Exhibit 3**.

[52] *Id.* (emphasis added).

[53] Dkt. 143, at pg. 19.

never disclosed its emails with Anderson nor did it identify him as a potential witness in discovery.

### 4.    MKO Firearms LLC

On February 9, 2018, MKO Firearms LLC ("MKO") emailed Armory asking for technical details regarding the pistol grip on the CAV-15 polymer lower.[54] Specifically, the customer asked for the wall thickness or CAD drawings showing the cavity inside the pistol grip part.[55] On February 15, 2108, Armory's vice president, Michel "Shel" Jones, voluntarily responded as follows: "***0.135 inch thickness on the pistol grip and most other areas. Here is a picture of whats [sic] inside***." [56] Here again, Armory's attached a picture disclosing the internal measurements of the CAV-15 lower; the internal rib structures and dimensions of the MKII; the design and location of the mold runner (i.e., where the molten plastic flows into the mold); the mold gate location and angle; the location of the mold ejector pints as shown by the rounded circles on the inside of the plastic product; and other internal details pertaining to the MKII.[57] Despite the fact that Armory claims this same information to be proprietary and trade secret in this case,[58] it concealed these emails with MKO in discovery, and failed to identify MKO as a potential witness.

### 5.    Mark Blankenau

On May 13, 2018, Mark Blankenau ("Blankenau") contacted Armory asking: "***I recently purchased a lower receiver from you . . . I would like to reduce the gap, and I will do that better***

---

[54] Phagan Decl. at **Exhibit 4.**

[55] *Id.*

[56] *Id.* (emphasis added).

[57] *Id.*

[58] Dkt. 143, at pgs. 19-23.

*if I know what the lower is made of. Can you tell me what polymer is used?"*[59] Once again, Armory's vice president, Michel "Shel" Jones, obliged without reservation, disclosing precisely what the CAV-15 polymer lower receiver is made of: "*Nylon 6 with 20% glass fill*."[60]  Yet, according to Armory, one of its trade secrets is the type of polymer that the CAV-15 was made of, and specifically, the same "Nylon 6" glass material. [61]

### 6.      Greg Bowling

On March 23, 2021, Greg Bowling ("Bowling") emailed Armory requesting to replace his defective CAV-15 lower receiver.[62] Approximately a year later, on February 14, 2022, Armory's vice president, Michel "Shel" Jones, responded, freely disclosing that Armory has depleted its inventory. But according to Armory, "the number of CAV-15 MKII CAV-15 lowers it had sold and that they were essentially out of inventory. . . was proprietary and not publicly known."[63] Nevertheless, Armory never disclosed its emails with Bowling nor identify him as a potential witness in discovery.

### 7.      Mike F. Di

On or about May 16, 2012, Armory's vice president, Michel "Shel" Jones, did a podcast interview with Mike F. Di of the "80sPodcastChannel" which was later posted publicly on

---

[59] Phagan Decl. at **Exhibit 5** (emphasis added).

[60] *Id.* (emphasis added).

[61] Dkt. 143, at pg. 23.

[62] Phagan Decl. at **Exhibit 6.**

[63] Dkt. 143, at pg. 2.

YouTube.[64] In this interview, Armory freely discloses and discusses the manufacturing processes of the CAV-15, as well as Armory's plans to make a telestock/adjustable buttstock model of the CAV-15.[65] This is the same information which Armory claims to be part of the "exclusive rights to the CAV-15 IP" it purchased from Phagan.[66] However, Armory never disclosed this podcast nor did it identify Mike F. Di as a potential witness in discovery.

### 8.   Nathaniel Hall

On September 6, 2017, Nathaniel Hall ("Hall") contacted Armory and asked: "***Any future plans for upgrades? Like an adjustible length of pull or built in QD sockets***?"[67] Armory's vice president, Michel "Shel" Jones, disclosed that Armory hoped to "***launch a next generation lower that will have adjustability in length and multiple QD sockets***."[68] As noted above, Armory never publicly disclosed its alleged idea of using a "QD sling attachment" outside of the "2015 & 2018 Investment Packets" disclosed to KEA and Brownells under NDA.[69] But of course, Hall, and his emails clearly establishing the opposite, were withheld in discovery by Armory.

### 9.   Nate Henry

On March 29, 2018, Nate Henry ("Henry") contacted Armory and asked about the

---

[64] Phagan Decl. at **Exhibit 7.**

[65] *Id.*

[66] Dkt. at pg. 7 (Armory's Statement of Additional Material Facts No. 2).

[67] Phagan Decl. at **Exhibit 8.**

[68] *Id.* (emphasis added).

[69] Dkt. 143, at pg. 7, 15 (Armory's Statement of Additional Material Fact No. 5).

manufacturing temperature limit for the polymer of the CAV-15.[70] After obtaining the technical information from Armory's engineering department, Armory VP, Shel Jones, responded: "*425 degrees is the high temp and starts to impact the lower*."[71] Once again, the manufacturing process of the CAV-15 was information Armory alleges to be part of the "exclusive rights to the CAV-15 IP" it purchased from Phagan.[72] Here again, Armory has not disclosed its communications with Henry nor did it identify him as a potential witness in discovery.

## IV.   <u>LEGAL ARGUMENT</u>

### A.   THE STANDARD FOR SPOLIATION

Spoliation is the "intentional destruction, mutilation, alteration, or **concealment** of evidence[.]" Black's Law Dictionary (11th ed. 2019) (emphasis added). The Court's analysis of claims spoliation sanctions based on "**concealment** or **destruction** of evidence" are the same. *Gates Rubber Co. v. Bando Chem. Indus., Ltd*., 167 F.R.D. 90 (D. Colo. 1996). "[A]ny distinctions between Rule 37 and the inherent powers of the court are distinctions without differences." *Id.* The Tenth Circuit has stated: "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co*., 470 F.3d 985, 989 (10th Cir. 2006)). The party seeking sanctions for spoliation need not show that the other party acted in bad faith. *103 Investors I, L.P*., 470 F.3d at 989.

---

[70] Phagan Decl. at **Exhibit 9.**

[71] *Id.*

[72] Dkt. 143, at pg. 7 (Armory's Statement of Additional Material Facts No. 2).

"Sanctions for spoliation serve three distinct remedial purposes: punishment, accuracy, and compensation." *United States ex rel. Koch v. Koch Ind., Inc*., 197 F.R.D. 488, 490 (N.D.Okla.1999). "Sanctions for spoliation may also be designed to promote accurate fact finding by the court or jury." *Id.* This is because "[a]side perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence.... [W]hen critical documents go missing, judges and litigants alike descend into a world of *ad hocery* and half measures-and our civil justice system suffers." *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 258 (Fed.Cl.2007). Sanctioning spoliation "especially important in today's environment when so much information is being compiled and stored electronically." *U.S. ex rel. Baker v. Cmty. Health Sys., Inc*., No. CIV. 05-279 WJ/ACT, 2012 WL 12294413, at *2 (D.N.M. Aug. 31, 2012), objections overruled, No. CIV. 05-279 WJ/ACT, 2012 WL 5387069 (D.N.M. Oct. 3, 2012).

**B.     THE STANDARD FOR DETERMINING SPOLIATION SANCTIONS**

The Court has both express powers, under Federal Rules of Civil Procedure 37, and its own inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." Fed. R. Civ. P. 37; *Chambers v. NASCO*, 501 U.S. 32 (1991). "Among those inherent powers is the ability to fashion an appropriate sanction." *Chambers*, 501 U.S. at 43. District courts have "substantial weaponry" in their arsenal to shape the appropriate relief for a party's spoliation of evidence. *See Turner v. Pub. Serv. Co. of Colo*., 563 F.3d 1136, 1149 (10th Cir. 2009).

Among the options, a court may strike witnesses (*103 Inv'rs I, L.P.* 470 F.3d at 988); issue an adverse inference (*Henning v. Union Pac. R.R. Co*., 530 F.3d 1206, 1219–20 (10th Cir. 2008)); impose costs for creating a substitute for spoliated data (*Koch Ind.*, 197 F.R.D. at 490–91); exclude

16

evidence (*Jordan F. Miller Corp. v. Mid–Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998) (unpublished)); or, in extreme circumstances, dismiss a party's claims (*id.*). In this Circuit, "an adverse presumption that follows the destruction or spoliation of evidence arises only in cases of willful destruction [or] suppression." *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 864 (10th Cir.2005) (citation and internal quotation marks omitted) (alteration in original). Ultimately, the severity of a sanction depends on at least two factors: "(1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Patten v. Target Corp.*, 2009 WL 1279331, *3 (D.Colo.2009) (unpublished opinion) (quoting *Kokins v. Teleflex, Inc.,* 2007 WL 4322322, *2 (D.Colo.2007) (J. Miller).

### C. THE SEVERE PREJUDICE TO DEFENDANTS WARRANT DISMISSAL OF ARMORY'S TRADE SECRET AND CONTRACT CLAIMS.

Courts are empowered to impose severe sanctions against a litigant who despoils relevant evidence upon a showing that the conduct prejudiced the opposing party. *See e.g., Philips Elecs. N. Am. Corp. v. BC Tech.,* 773 F. Supp. 2d 1149 (D. Utah 2011). In the context of trade secrets, courts find the requisite prejudice when the conduct precludes the opposing party from discovering the full scope of the alleged trade secrets, which impedes their ability to obtain evidence relevant to the claims and defenses at issue. *Id.*

For example, in *Philips Electronics North America Corp. v. BC Technical*, the district court sanctioned a despoiling party by striking the striking the party's answer, dismissing its counterclaims, and entering default judgment as to liability in movant's favor. *Id.* at 1155. The court found that the despoiling party had deleted ESI containing the "allegedly confidential, proprietary and trade secret documents." *Id.* at 1198. The court's dismissal of the plaintiffs' claim was appropriate, since the despoiler "not only had the responsibility to preserve information

17

relevant to this litigation on the five laptops, but that it also had control over those laptops and the information stored on them." *Id.* at 1203. The court reasoned that, due to the severe prejudice caused by the despoiler, only a dismissal of claims related to the missing ESI would suffice (*id.* at 1214; indeed, "[i]mposition of a lesser sanction would only reward [the despoiler] for its misconduct in [the] litigation." *Id.* (quoting *Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc.*, 593 F.Supp. 1443 (C.D.Cal.1984)).

Similar results have also been reached by other courts. For instance, the *Krumwiede* case involved trade secrets under the Illinois Trade Secret Act. *See Krumwiede v. Brighton Assocs.*, 2006 WL 1308629 (N.D.Ill.2006). Like this case, the destroyed evidence directly related to existence of trade secrets. *Id.* at *10. And like here, there was a conscious and deliberate attempt to destroy and cover up conduct. *Id.* The *Krumwiede* court found the moving party had been prejudiced by the spoliation, and thus, entered default judgment against the despoiler, along with an award of costs and fees. *Id.*

In this case, the prejudice sustained by Defendants is immeasurable as a result of Armory's suppression of evidence. Armory's entire claim is predicated on the allegation that its trade secrets and proprietary information were "not public known."[73] As set forth above, the suppressed evidence show that Armory publicly disclosed, and even discussed, its alleged trade secrets openly with third-parties. To date, there are at least eight (8) third-parties who have come forward with similar emails which were suppressed by Armory in discovery.[74] But Defendants only obtained

---

[73] Dkt. 143, at pgs. 2, 15-16.

[74] Phagan Decl. at **Exhibits 1-9**; McBride Decl. at **Exhibit 1.**

18

this information because these third-parties *voluntarily* came forward with the information. In determining the appropriate sanction for plaintiff's spoliation of evidence, the Court should consider the extensiveness of discovery in this case. Armory contacted, and in many instances deposed, each of the witnesses disclosed by Defendants in discovery. But because Armory concealed these documents and witnesses in discovery, it is was impossible for Defendants to evaluate or discover Armory's public disclosures. Now, given the stage of the litigation, the prejudice to Defendants cannot be remedied without severe sanctions.

Further, Armory cannot legitimately dispute the importance of the evidence nor is there any excuse for withholding the information. That is, perhaps, why Armory's counsel never responded to repeated requests to meet and confer – indeed, this silence speaks volumes. In any event, "[i]f a party fails to produce from within its control evidence that is relevant and material, the fair inference is that the evidence would have weighed against the party who held it back." *Computer Assocs. Int'l, Inc. v. American Fundware, Inc*., 133 F.R.D. 166, 170 (D. Colo. 1990); *see also Aramburu v. The Boeing Co*., 112 F.3d 1398, 1407 (10th Cir.1997). In sum, there can be no dispute that Defendants have been prejudiced in proving its claims, counterclaims, and defenses by Armory's suppression of critical ESI. As such, "[n]othing less than default judgment on the issue of liability will suffice to both punish [Armory] and deter others similarly tempted. *Id*.at 170. The strictest of sanctions are required to protect Defendants' status as innocent parties, safeguard the integrity of the litigation process, and deter misconduct by others.

### D.   ARMORY'S CULPABILITY IS EVIDENCED BY ITS EXCLUSIVE CONTROL AND RESPONSIBILITY OF THE SUPPRESSED ESI.

Bad faith, or culpability, "may not mean evil intent, but may simply signify responsibility and control." *Phillip M. Adams & Associates, L.L.C*., 621 F.Supp.2d at 1193. Under the federal

19

rules, in addition to this Court's discovery orders, Armory and its counsel were expected to take the necessary steps to ensure that relevant records—including ESI—were preserved when this litigation was reasonably anticipated or began, and that those records were collected, reviewed, and produced to Defendants during the discovery process. Here, it cannot be disputed that Armory enjoyed control over the ESI and chose not to disclose it. Indeed, Armory owned the email addresses used to communicate with these third-parties, as evidenced by the use of the "@gwacsarmory.com" domain handle.[75] While Defendants need not show that Armory acted in bad faith (*103 Investors I, L.P.*, 470 F.3d at 989), Armory's ability to exercise full control over this ESI, coupled with its decision to suppress such information, is sufficient to establish that Armory acted with bad faith in the spoliation of the evidence. *See e.g., Philips Elecs. N. Am. Corp.*, 773 F. Supp. 2d at 1207 (holding the same).

Similarly, Armory may not attempt to shift culpability to its counsel, nor employee, Shel Jones. Culpability may arise through responsibility and control of an actor or situation. *See Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F.Supp.2d 1173, 1193 (D.Utah 2009). "Since a [company] is only a legal entity, it cannot act or have a mental state by itself." *Magnum Foods v. Continental Casualty Co.*, 36 F.3d 1491, 1499 (10th Cir.1994) (citation omitted) Thus, the practical reality is that companies, such as Armory, "can only act through their [officers, employees, and agents]." *Keys Youth Servs. v. City of Olathe*, 248 F.3d 1267, 1271 n. 3 (10th Cir.2001); *see also Magnum*, 36 F.3d at 1499. And in any event, Shel Jones, the individual who evidently had custody of this evidence, was not a low-level employee. Rather, Jones was a vice

---

[75] Phagan Decl. at **Exhibits 1-9**.

president of Armory, charged with managing and directing certain operations of Armory. Thus, to argue that Armory cannot be culpable or that Jones employees acted independently is simply not credible.

## E.    LESSER SANCTIONS ARE NOT APPROPRIATE GIVEN THE STAGE OF THIS LITIGATION.

As illuded to above, the Court should further consider late stage of this litigation in determining the appropriate sanction for plaintiff's spoliation of evidence. Armory concealed documents and witnesses in discovery, rendering it impossible for Defendants to evaluate or discover Armory's public disclosures of trade secrets. For example, in *Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, the district court opted for lesser sanctions because "the degree of prejudice and the appropriate sanction cannot be determined until the close of discovery." 621 F. Supp. 2d at 1195. Conversely here, due to the types of claims involved in this action and the circumstances of the case, this case is distinguishable from *Phillip M. Adams.*  In that case, the parties were still fairly early in litigation; whereas, in this case, the parties have been litigating for well-over two years, discovery has closed, dispositive motions have been filed, and trial is set for next month. The late stage of litigation warrants severe sanctions against Armory.

## V.    IF THE COURT DECLINES TO IMPOSE TERMINATING SANCTIONS, DEFENDANTS ALTERNATIVELY REQUEST EVIDENTIARY SANCTIONS.

If this Court decides not to dismiss the failure trade secret and NDA claims, Defendants request that the Court render other appropriate sanctions against Armory for the spoliation of the evidence critical to this lawsuit. Included in this Court's inherent powers is "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. Within this discretion lies the power to exclude testimony of witnesses whose use at trial would unfairly

21

prejudice an opposing party." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).

For example, in *103 Invs. I, L.P. v. Square D Co.,* the district court below struck the testimony of a witness, because suppressed evidence prejudiced defendant from factually defending against certain claims. 470 F.3d at 989. In this case, the Court may strike evidently false testimony of Armory's Rule 30(b)(6) designee, Jud Gudgel, that it "never publicly disclosed" its alleged trade secrets and proprietary information.[76] The Tenth Circuit has held that bad faith is required in order to allow an adverse inference. *Aramburu,* 112 F.3d at 1407. The facts surrounding Armory's destruction of evidence certainly satisfies the bad faith requirement and Defendants should be entitled to an adverse instruction and comment on the same. However, bad faith is not required for other sanctions, including exclusion of evidence or exclusion of witness testimony. *See Jordan F. Miller Corp.,* 1998 WL 68879 at *4.

Further, an appropriate sanction for Armory's actions would include precluding any witness from testifying that Armory never publicly disclosed its alleged trade secrets and proprietary information. While Armory attempts to present testimony that it took reasonable steps to maintain its trade secrets' secrecy, this Court may preclude such testimony given the circumstances and clear evidence to the contrary. *See e.g.,* Yi *Min Ren v. Prof. Steam-Cleaning, Inc.,* 706 N.Y.S 2d 169, 169-70 (N.Y App. Div. 2000) ("Where a critical item of evidence is lost, either intentionally or negligently, the party responsible should be precluded from offering evidence as to its condition."); *see e.g., Bridgestone/Firestone North American, LLC v. Campbell,* 574 S.E.2d 923, 928 (Ga. App. 2002) (The

---

[76] Dkt. 143-5, at ¶¶11-13.

exclusion of inspection notes or other examination materials and testimony of any witness based on destroyed evidence was properly excluded as a sanction for spoliation.); *Tandycrafts, Inc. v. Bublitz* No. 3:97-CV-1074-T, 2002 WL 324290 (N.D. Tex Feb. 27, 2002) (defendant spoliator was permitted only to cross examine plaintiffs witnesses and was not permitted to produce any evidence of its own).

Alternatively, or in addition to excluding testimony, this Court may presume or instruct the jury to infer that the communications would have been adverse to Armory. Independent evidence already corroborates those presumptions or inferences. *See, e.g., In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 385–87 (9th Cir. 2010) (affirming an adverse "inference that the spoliated evidence would demonstrate" Oracle's CEO Larry Ellison had "knowledge of any material facts that Plaintiffs could otherwise establish."). Similarly, this Court may presume or instruct the jury to infer suppressed communications would have shown the trade secrets and proprietary information were publicly disclosed. Independent evidence also corroborates such a presumption or inference.

In sum, if the Court were to decline to enter terminating sanctions, then this Court should presume the spoliated evidence would have been unfavorable Armory. Accordingly, Defendants request that the Court impose evidentiary sanctions that addressing the public disclosure of Armory's alleged trade secrets and proprietary information.

**VI.    CONCLUSION**

For the foregoing reasons, Defendants respectfully request that Armory's trade secret and NDA contract claims be dismissed, or, in the alternative, that the Court strike any testimony from Armory that it "never publicly disclosed" its alleged trade secrets and proprietary information, permit Defendants to comment on Armory's failure to preserve the evidence, and allow them an

23

adverse instruction. Defendants also requests such further relief as the Court deems just and proper

and for its fees and costs incurred herein.

      Dated this 23rd day of November, 2022.

                                Respectfully submitted,

                                **HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.**

                                */s/Robert P. Fitz-Patrick*
                                Robert P. Fitz-Patrick, OBA #14713
                                320 South Boston Avenue, Suite 200
                                Tulsa, OK  74103-3706
                                Telephone: (918) 594-0400
                                Facsimile: (918) 594-0505
                                Email:  rfitzpatrick@hallestill.com
                                **ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFFS**

                                **-AND-**
                                **MARQUIS AURBACH**

                                */s/ Alexander K. Calaway*
                                Brian R. Hardy, Esq.
                                Nevada Bar No. 10068
                                *Admitted Pro Hac Vice*
                                Alexander K. Calaway, Esq.
                                Nevada Bar No. 15188
                                *Admitted Pro Hac Vice*
                                10001 Park Run Drive
                                Las Vegas, Nevada 89145
                                Tel: 702-382-0711
                                bhardy@maclaw.com
                                acalaway@maclaw.com
                                **ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFF**

24

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 23rd day of November, 2022. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

James E. Weger, Esq.
Tadd J.P. Bogan, Esq.
JONES, GOTCHER & BOGAN, P.C.
15 East Fifth St, Suite 3800
Tulsa, OK 74103
ATTORNEYS FOR THE PLAINTIFF AND
THIRD- PARTY DEFENDANTS

*/s/ Cally Hatfield*

25