IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GWACS ARMORY, LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| KE ARMS, LLC; RUSSELL PHAGAN; SINISTRAL SHOOTING TECHNOLOGIES, LLC; BROWNELLS, INC.; and SHAWN NEALON, | ) |
| Defendants, | ) |
| and | ) Case No. 20-cv-00341-CVE-SH |
| KE ARMS, LLC, | ) Base File |
| Plaintiff, | ) |
| v. | ) |
| GWACS ARMORY, LLC; GWACS DEFENSE INCORPORATED; JUD GUDGEL; RUSSELL ANDERSON; DOES I through X; and ROE CORPORATIONS I THROUGH X, | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Before the Court is Plaintiff GWACS Armory, LLC's ("Armory's") motion for a protective order, gag order, and sanctions against Defendants' out-of-state counsel. Armory claims Defendants have publicly disclosed confidential information in violation of a prior protective order and are otherwise attempting to prejudice Armory in the eyes of the public. Armory, however, fails to point to a single piece of evidence that was properly designated as confidential and, itself, publishes a deposition it asserts should not

be disseminated. The Court further finds that the extraordinary relief of a gag order is not appropriate in this case.

## Background

The ownership and use of intellectual property for the CAV-15 monolithic polymer receiver for AR-15 assault rifles is at the center of this dispute. Among other things, Armory alleges that KE Arms, LLC ("KEA") has breached a non-disclosure agreement, misappropriated trade secrets, and misappropriated its intellectual property rights by developing and marketing a lower that is based on Armory's protected designs. (ECF No. 2.) Armory also has claims against Brownells, Inc. ("Brownells") and other defendants. (*Id.*) KEA, meanwhile, asserts that it has done nothing wrong and alleges that Armory committed various torts by informing KEA's customer, Brownells, of its claims before the lawsuit was filed. (ECF No. 49.)

Non-party Karl Kasarda ("Kasarda") has previously filed a declaration in this litigation as the owner and manager of InRange, LLC ("InRange"), another non-party. (ECF No. 102-5 at 2 ¶ 1.) According to Kasarda, InRange is "an online video program dedicated to the study of firearms, shooting, gun culture, and history." (*Id.*) While a non-party, InRange allegedly has a pecuniary interest in the outcome of the case. According to Kasarda's declaration, in 2018, Brownells and InRange entered into an agreement where Brownells would be the exclusive retailer, and InRange the primary marketer, of a fully assembled AR-15 rifle for a project called "What Would Stoner Do" ("WWSD"). (ECF No. 102-5 ¶¶ 4, 13-14.) According to Kasarda, InRange will receive 5 percent of the retail purchase price for each firearm using the "WWSD" designation. (*Id.* ¶ 14; ECF No. 134-2 at 21:5-25.) KEA is manufacturing the polymer lower for this rifle (ECF No. 102-5 ¶¶ 19-

20), and it appears this lower is the one Armory claims misuses its designs.  Armory deposed Kasarda on April 7, 2022.  (ECF No. 134-2.)

Non-party Reed Oppenheimer ("Oppenheimer") is one of Armory's investors.  At his May 27, 2022, deposition, Oppenheimer testified he was funding the instant litigation, because he was an Armory investor, felt it was the right thing to do, and had "a lot of confidence in Jud [Gudgel]."  (ECF No. 134-6 at 17:10-15, 78:14-20.)  Oppenheimer further testified he did not attend any of the business or annual meetings for Armory and described his involvement with Armory as "remote, passive, and obscure."  (*Id.* at 27:1-9.)  When asked whether he would provide additional investment to Armory "in order to conduct research and development of the CAV-15," Oppenheimer replied "probably not" because he did not like AR-15s.  (*Id.* at 65:25-66:7.)  Similarly, when asked whether he intended to continue to invest in Armory, Oppenheimer replied "no," because he did not like "the AR-15 business, semi-automatic weapons."  (*Id.* at 75:4-12.)  Likewise, in response to whether he would have been interested in investing further in the AR-15 in April of 2015, Oppenheimer stated "no" and agreed this was because he had a "personal distaste for the AR-15 market."  (*Id.* at 76:12-18.)  Oppenheimer then clarified he was specifically not interested in "the AR-15 and military style weapons to civilians."  (*Id.* at 76:24-77:2.)

On July 24, 2022, InRange posted a YouTube video titled "WWSD - GWACS Armory Sucks" (the "InRange Video") in which Kasarda explains his involvement in the WWSD project and expresses his opinion on several related topics, including the merits of Armory's claims in the instant lawsuit.  *WWSD – GWACS Armory Sucks*, YouTube, https://www.youtube.com/watch?v=p_sDdUmN6tM (last visited Dec. 6, 2022).  Kasarda discusses Oppenheimer's deposition testimony in the final few minutes of the

3

video, stating that Oppenheimer made "pretty flagrant anti-AR-15 and military-style firearms comments" during the deposition, including that he "was no longer interested in manufacturing or being associated with the manufacture of any AR-15 product or military-style firearms but was willing to continue to fund the lawsuit against KE, et al." *Id.* at 30:17-30:36. Kasarda then presents the following question: "If [Armory is] suing about the supposed property rights of the CAV Arms slash now GWACS Mark II lower in relation to the completely new designed KP-15 . . . what is it they're trying to acquire if it isn't to manufacture more or a new monolithic polymer lower if the person investing in them flat out says that he is against AR-15s and military-style firearms in the civilian hands?" *Id.* at 30:51-31:23. Kasarda offers his "interpretation" of the answer to this question by suggesting the instant lawsuit could be the result of one of the following: (1) a realization that Armory is a failure; (2) a legitimate effort "to diminish the amount of AR-15s available on the market as some form of activism in a very weird backhanded way"; or (3) a genuine belief that "they own the A1 length of pull, trap door buttstocks, QD swivels, and . . . [the] What Would Stoner Do . . . project." (*Id.* at 31:27-32:26.) Kasarda ultimately concludes that no matter the reason for the litigation, Armory has "done immense harm to no benefit to [InRange], to the industry, or to . . . the consumer." (*Id.* at 32:30-32:36.)

David Lane ("Lane") holds himself out as "the Web Editor for RECOILWeb.com, the digital side of RECOIL Magazine." http://davidlane.biz/ (last visited Dec. 6, 2022). On July 29, 2022, Lane published an article on RECOILweb.com (the "Recoil Article"), discussing the instant lawsuit and his opinion on the merits of Armory's claims. David Lane, *KE Arms, Brownells, And Others Sued By Anti-AR-15 Investor*, RECOIL Magazine (July 29, 2022), https://www.recoilweb.com/ke-arms-brownells-and-others-sued-by-anti-ar-15-investor-175976.html (last visited Dec. 6, 2022). Lane also explores

Oppenheimer's involvement in the instant lawsuit, his contributions to federally registered political committees, and the Reed Jules Oppenheimer Foundation's annual returns. *Id.* Based on statements Oppenheimer made in his deposition, Lane characterizes Oppenheimer as someone who is "flagrantly against the AR-15 in the hands of civilian ownership." *Id.* As "Supporting Documentation" for his article, Lane provides several links, including to the InRange video and "Russell Phagan Declaration To The Courts." *Id.* The latter appears to be a link to the Declaration of Russell Phagan in Support of Defendants' Motion for Summary Judgment (ECF No. 124).

On August 1, 2022, Armory filed the instant motion. (ECF No. 134.) Armory asserts that, "[n]otwithstanding the Court's entry of a Stipulated Protective Order," Defendants—"in apparent concert with" Karsada—published the InRange Video. (*Id.* at 2-3.) The InRange Video, Armory asserts, is misleading; includes references to Oppenheimer's deposition testimony; and includes the Russell Phagan Declaration (ECF No. 124), which Armory claims itself contains "information subject to the Stipulated Protective Order" (ECF No. 60). (ECF No. 134 at 3.)

Armory asserts Defendants have violated the Stipulated Protective Order, the Oklahoma Rules of Professional Conduct, and this Court's local rules for the conduct of attorneys. (*Id.* at 13.) For relief, Armory requests the Court enter "a protective order and 'gag order' prohibiting the parties from disseminating information and evidence related to this case, prohibiting public harassment and oppression of Armory and/or Oppenheimer, and prohibiting the use of evidence and information in this case for any purpose other than this litigation." (*Id.* at 14.) Armory also asks for "appropriate sanctions" against Defendants' out-of-state counsel. (*Id.*)

5

**Analysis**

**I.     Amory Has Provided No Evidence of a Violation of the Stipulated Protective Order**

Despite its repeated, generalized statements of protective-order violations, Amory has offered no evidence that any protected information has been misused or disclosed. For example, Amory complains that the InRange Video and RECOIL Article link to the Russell Phagan Declaration (ECF No. 124), which it says includes information subject to the protective order. (ECF No. 134 at 3.) Amory then goes on to cite drawings attached to the Declaration and the transcript of Amory's 30(b)(6) deposition. (*Id.* (citing ECF No. 124-33 & 124-71).) Amory also complains that Defendants' counsel provided Kasarda with a copy of Oppenheimer's deposition transcript. (*Id.* at 8-9.)

As relevant to the instant motion, the Stipulated Protective Order applies to "information produced or disclosed" during this case when it is "designated with the procedures set forth" in the Order. (ECF No. 60 § 1(a).) The Order then goes on to provide methods by which a party may designate information as confidential and subject to its non-disclosure provisions. (*Id.* § 2(a)-(e).) So, for example, a party supplying a document may mark the pages of a document containing confidential information with one of the following legends: CONFIDENTIAL, CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER, HIGHLY CONFIDENTIAL, or HIGHLY CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER.[1]  (*Id.* § 2(a).)  Once such information has been designated confidential, it may not be used by any person, other than the "Supplying Party," for any

---

[1] For depositions, the process is a little more involved, but the end result should be that any transcript containing confidential information will bear one of the following conspicuous legends: CONTAINS CONFIDENTIAL INFORMATION or CONTAINS HIGHLY CONFIDENTIAL INFORMATION.  (ECF No. 60 § 2(c).)

purpose other than conducting the above-captioned litigation "and in no event shall such information be used for any business, competitive, personal, private, public or other purpose." (*Id.* § 3.) Even for use in the litigation, the dissemination of the confidential information is proscribed by the terms of the Order. (*Id.* §§ 4-5.)

Despite its bold assertions of a violation, Armory does not point to a single disseminated page marked "CONFIDENTIAL"—either in the Russell Phagan Declaration, the Armory deposition transcript, or the Oppenheimer deposition transcript. Indeed, Armory itself has published portions of the Oppenheimer deposition transcript by publicly filing them with its motion. (ECF No. 134-6.) Armory does not explain why it did not take advantage of the provisions of the Stipulated Protective Order or seek revisions to that order if its protections were not sufficient.[2] Armory further has taken no effort to ask the Court to seal the Russell Phagan Declaration, which has remained publicly available since July.

There is, simply, nothing about the Stipulated Protective Order that restricts the dissemination or use of the non-confidential material Armory cites.

---

[2] In its brief, Armory generally cites the ability of a "person from whom discovery is sought" to move for a protective order "to protect a party or person from annoyance, embarrassment, [or] oppression . . . ." Fed. R. Civ. P. 26(c)(1). (ECF No. 134 at 10.) However, the relief Armory is seeking does not appear to be the entry of a new protective order, e.g., "requiring that . . . confidential . . . information not be revealed or be revealed only in a specified way . . . ." Fed. R. Civ. P. 26(c)(1)(G). Nor, is Armory seeking an order otherwise altering the manner of discovery or allocating its expense. *See, e.g.,* Fed. R. Civ. P. 26(c)(1). Instead, as discussed below, the meat of Armory's request is for a gag order. To the extent Armory is seeking any relief from discovery under Rule 26, such motion is denied for the failure to show good cause.

## II. Armory Has Not Shown a Sanctionable Violation of the Rules Governing Attorney Conduct

Armory next appears to invoke the Court's inherent power to sanction attorney conduct, citing LGnR 4-6 and Oklahoma Rules of Professional Conduct 3.6 and 8.4, Okla. Stat. tit. 5, app. 3-A. (ECF No. 134 at 8-9.) Oklahoma Rule 3.6 generally prohibits a lawyer from making an extrajudicial statement he expects to be publicly disseminated and that will have an imminent and materially prejudicial effect on the fact-finding process in a jury trial. Oklahoma Rule 8.4 defines professional misconduct by a lawyer as including violating the Rules of Professional Misconduct; engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; or engaging in conduct prejudicial to the administration of justice. Local General Rule 4-6 similarly discusses the standards of practice for attorneys in this court.

Yet, Armory does not point to <u>any</u> statements made by opposing counsel or any evidence of actions taken by them. At most, Armory alleges that Defendants' counsel "admitted that they provided Kasarda with Oppenheimer's deposition transcript 'because he asked for it'" (ECF No. 134 at 9)—an allegation Defendants' counsel denies as "patently false" (ECF No. 155 at 9).[3] Again, this relates to a transcript that Armory has not designated as confidential and has been publicly filed of record.

Armory has offered the Court no evidence indicating sanctions are warranted against Defendants' counsel.

---

[3] Defendants' counsel states they did provide "excerpts of the [Oppenheimer] deposition to their clients (the Defendants)," just not to third parties. (ECF No. 155 at 9.)

8

### III.   Armory is Not Entitled to a Gag Order

The relief Armory really seeks is a gag order. Armory asks the Court to prohibit the parties from disseminating any information about the case (confidential or not); to order the public in general not to harass or oppress Armory or Oppenheimer; and to prohibit the use of any evidence from this case for any purpose other the prosecution of this case. (ECF No. 134 at 14.) Armory asserts such extraordinary relief is justified, because Defendants have engaged in a "smear campaign" to harass and oppress Armory and/or Oppenheimer, to prejudice Armory's ability to have a fair trial, and to seek their own "public justice." (*Id.* at 3.) Specifically, Armory contends that Defendants acted "in apparent concert" with Kasarda in publishing the InRange Video, which also resulted in the publication of the Recoil Article. (*Id.* at 2-3.) According to Armory, the InRange Video misrepresents the facts and mischaracterizes Armory's claims, misleading the public (including potential jurors) about the case. (*Id.* at 3, 5.) As evidence of the InRange Video's ability to taint the potential jury pool and prejudice a fair trial, Armory points to one disparaging voicemail from an anonymous caller in Oklahoma it received the day after InRange posted the video. (*Id.* at 6.) Armory also generally points to the InRange Video's comments "about Oppenheimer, his charitable foundation, boycotting any business he is a part of, . . . Armory, and Armory's lawyers." (*Id.* at 6-7.)

An order prohibiting extrajudicial commentary regarding a pending case imposes a prior restraint on the rights guaranteed by the First and Fourteenth Amendments. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976) (citing freedom of the press). In the Tenth Circuit, "[a] party seeking to impose a gag order on any trial participant must show there is a 'reasonable likelihood' that media attention or extrajudicial commentary will prejudice a fair trial." *Pfahler v. Swimm*, No. 07-cv-01885-MJW-KLM, 2008 WL

9

323244, at *1 (D. Colo. Feb. 4, 2008) (quoting *U.S. v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969)). Stated differently, the moving party must demonstrate "a 'reasonable likelihood' of prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial." *Tijerina*, 412 F.2d at 666. In determining whether a reasonable likelihood of prejudice exists, and whether an order restraining speech is justified, the court should consider: "(a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1976).[4] Taking each factor in turn, the Court concludes Armory has not satisfied its burden of proof for the imposition of a gag order on trial participants, much less other non-parties.

### A. Pretrial Publicity

There is no evidence this matter has been publicized by any local news sources. The only media attention Armory identifies is the InRange Video and the Recoil Article, which the Court finds insubstantial. *See, e.g., Slivka v. YMCA*, 390 F. Supp. 3d 1283, 1286 (D. Col. 2019) (finding "the extent of pretrial news coverage" was "insubstantial" where "three media sources ha[d] published articles related to the lawsuit"). Armory correctly notes the InRange Video and Recoil Article are accessible "to millions of people"

---

[4] Armory's citations to *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), are inapposite. Unlike the gag order Armory requests, a protective order pursuant to Rule 26(c) "prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times*, 467 U.S. at 34. Thus, a protective order can be issued if: (1) the order "is limited to the context of pretrial civil discovery"; (2) the order "does not restrict the dissemination of the information if gained from other sources"; and (3) there is a "showing of good cause as required by Rule 26(c)." *Id.* at 37. This is <u>exactly</u> the sort of order Armory already obtained in the Stipulated Protective Order. As noted above, Armory has failed to demonstrate that an additional protective order is needed.

(ECF No. 134 at 11), as is anything posted publicly on the internet. Nonetheless, Armory fails to show the InRange Video or Recoil Article reached members of the potential jury pool, let alone irreparably tainted them. "[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n,* 427 U.S. at 554.

Although originally published on YouTube, Armory states the InRange Video was subsequently shared on Facebook, Reddit, and other platforms. (ECF No. 134 at 3-4.) Armory asserts InRange has 426,000 YouTube subscribers, 40,134 Facebook followers, and approximately 3,800 Reddit members. (*Id.* at 4.) Armory states the InRange Video was viewed 92,203 times, received 1,050 comments, and received nearly 7,500 likes within a week of publication.[5] (*Id.*) As to the Recoil Article, Armory states Recoil has 517,302 followers on its "Facebook page alone." (*Id.* at 7.) Significantly, there is no evidence connecting InRange's or Recoil's social media participants with the potential jury pool in this case.[6] For example, Armory presents no evidence on the number of InRange's 426,000 YouTube subscribers or Recoil's 517,302 Facebook followers, if any, who either are registered voters in one of the counties that make up this district or are licensed drivers in Tulsa County. Likewise, there is no evidence that any of the YouTube users who made disparaging comments about Oppenheimer, Armory, and/or Armory's

---

[5] The most current data indicates the InRange video has been viewed 124,000 times, has 1,125 comments, and has 9,000 likes.
*See* https://www.youtube.com/watch?v=p_sDdUmN6tM (last visited Dec. 6, 2022).

[6] This district draws prospective jurors from a list of approximately 617,000 registered voters in Craig, Creek, Delaware, Nowata, Mayes, Osage, Ottawa, Pawnee, Rogers, Tulsa, and Washington Counties, with supplementation from the driver license list of Tulsa County. *See* LCvR47-1(e); https://oklahoma.gov/content/dam/ok/en/elections/voter-registration-statistics/2022-vr-statistics/vrstats-county-jan15-2022.pdf (last visited Dec. 6, 2022).

counsel are part of the jury pool, and in any event, the total number of commenters (whether 1,050 or 1,125) is insignificant. Because the pretrial publicity is insubstantial and Armory has failed to connect the scope of the speech at issue with the potential jury pool, the pretrial publicity factor weighs against the imposition of a gag order on the trial participants in this case.

### B. Other Available Measures to Mitigate the Effects of Unrestrained Pretrial Publicity

The Court concludes there are protective measures short of prior restraint available to address Armory's concerns and guarantee a fair trial. These measures "include such possibilities as a change of venue, trial postponement, a searching voir dire, emphatic jury instructions, and sequestration of jurors." *U.S. v. Walker*, 890 F. Supp. 954, 957 (D. Kan. 1995). Armory fails to address whether any of these measures are appropriate in this case, and the undersigned makes no finding as to what the Court may find appropriate once voir dire has occurred. For purposes of this order, it is sufficient that Armory fails to explain why these measures—if warranted—would be inadequate to address any adverse trial publicity. *See, e.g., U.S. v. McVeigh*, 955 F. Supp 1281, 1282-83 (D. Colo. 1997) (declining to delay case, finding "extensive voir dire" of potential jurors sufficient to ensure that a "fair minded jury" could be empaneled even in a case with "prodigious amounts" of pretrial publicity covering "every possible aspect" of the case); *see also Pfahler*, 2008 WL 323244, at *2 ("[A]t the time of trial, the potential jury pool will have to go through extensive voir dire conducted by this court, in particular, in the area of pretrial publicity that will assure that a fair trial and impartial jury will be selected to hear this case.").

### C. Effectiveness

Regarding the effectiveness of a gag order in preventing the alleged danger, the Court notes the information Armory seeks to restrain was first publicized on July 24, 2022, and the trial date in this case is March 20, 2023. (ECF No. 175.) As Justice Kennedy once stated:

> A statement which reaches the attention of the venire on the eve of *voir dire* might require a continuance or cause difficulties in securing an impartial jury, and at the very least could complicate the jury selection process . . . . exposure to the same statement six months prior to trial would not result in prejudice, the content fading from memory long before the trial date.

*Gentile v. State Bar,* 501 U.S. 1030, 1044 (1991) (Kennedy, J., op.). Here, the InRange Video and Recoil Article will be over six months old by the time of trial. Moreover, it appears interest in the InRange video has waned over time. Since the initial interest spike during the first week of publication over four months ago, the InRange video has only been viewed an additional 31,797 times, liked an additional 1,500 times, and commented on 75 more times. *See, e.g., Skilling v. U.S.,* 561 U.S. 358, 383 (2010) (explaining that "unlike cases in which trial swiftly followed a widely reported crime, . . . over four years elapsed between Enron's bankruptcy and Skilling's trial," media attention had "diminished somewhat" over those years, and juror prejudice could not be presumed). In any event,

> the information that [Armory] seeks to restrain has, by its own admission, already been publicized. Although not wide-reaching, such information is still in the public arena, and the Court cannot suppress access to such information.

*Slivka,* 309 F. Supp. at 1287. Thus, the effectiveness factor also weighs against the imposition of a gag order on the trial participants in this case.

13

In sum, all the relevant factors weigh against the imposition of a gag order. Armory has failed to prove a reasonable likelihood that media attention or extrajudicial commentary will prejudice a fair trial.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Protective Order and Order Prohibiting Extrajudicial Statements and Pretrial Public Communication and Dissemination of Information (ECF No. 134) is DENIED.

ORDERED this 9th day of December, 2022.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT