## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

GWACS ARMORY, LLC,                    )
                                      )
      Plaintiff,                 )
                                      )
v.                                    )     **Case No. 20-CV-0341-CVE-SH**
                                      )     <u>**BASE** **FILE**</u>
KE ARMS, LLC, RUSSELL                 )     **Consolidated with:**
PHAGAN, SINISTRAL SHOOTING            )     **Case No. 21-CV-0107-CVE-SH**
TECHNOLOGIES, INC.,                   )
BROWNELLS, INC., and                  )
SHAWN NEALON,                         )
                                      )
      Defendants,                )
                                      )
and                                   )
                                      )
KE ARMS, LLC,                         )
                                      )
      Plaintiff,                 )
                                      )
v.                                    )
                                      )
GWACS ARMORY, LLC, GWACS              )
DEFENSE INCORPORATED,                 )
JUD GUDGEL, RUSSELL ANDERSON,         )
DOES I through X, and ROE             )
CORPORATIONS I through X,             )
                                      )
      Defendants.                )

## <u>OPINION AND ORDER</u>

Now before the Court are the following motions: Plaintiff's Motion for Order Dismissing

Claims against Defendant Shawn Nealon with Prejudice (Dkt. # 113); Defendant KE Arms, LLC's

Motion for Summary Judgment (Dkt. # 117); Defendant Brownells Inc.'s Motion for Summary

Judgment (Dkt. # 118); Defendant Shawn Nealon's Motion for Summary Judgment (Dkt. # 119);

Defendants Russell Phagan and Sinistral Shooting Technologies, LLC's Motion for Summary

Judgment (Dkt. # 120); Counterclaim Defendant's Motion for Summary Judgment & Brief in Support (Dkt. # 121); and Defendants' Motion for Spoliation Sanctions (Dkt. # 177).  Plaintiff GWACS Armory, LLC (GWACS) argues that its communications with defendants KE Arms, LLC (KEA) and Brownells, Inc. (Brownells) were privileged, and GWACS seeks summary judgment on KEA's counterclaims.  Dkt. # 121.  GWACS also seeks leave to dismiss its claims against Shawn Nealon with prejudice to refiling.  Dkt. # 113.  Each defendant seeks summary judgment on GWACS' claims against them.  Dkt. ## 117, 118, 119, 120.  Defendants argue that GWACS did not disclose  to defendants any information pursuant to non-disclosure agreements (NDAs) that was proprietary or confidential, and defendants request summary judgment on GWACS' breach of contract claims.  Defendants also argue that GWACS does not possess any intellectual property or trade secrets, and they assert that they cannot be held liable for misappropriation of intellectual property or trade secrets.

## I.

In the early 2000s, Shawn Nealon formed a company called Cavalry Arms Corporation (Cavalry), and Cavalry's main product was a semi-automatic rifle called the CAV-15.  Dkt. # 123, at 2.  The CAV-15 rifle was designed by Nealon and other employees of Cavalry, including Russell Phagan, and Phagan subsequently became the vice president of Cavalry.  Id.  One of the key features of the CAV-15 rifle was the lower receiver, which was made with a polymer instead of steel or aluminum, and this made the CAV-15 somewhat lighter than other similar rifles.  Id.  Another feature of the lower receiver was that it was monolothic, meaning that the stock, grip, and magazine were a single piece.  Id.  Much of the information related to the design and manufacturing of the CAV-15 was published on Cavalry's website or otherwise disclosed to customers, because

customers expressed concern about the use of a polymer in manufacturing components for a rifle. Id.  At some point, the information was no longer available on the websites on which the material was published, and certain documents or pictures were privately kept by Phagan.  Dkt. # 143-4, at 9-15.

The CAV-15 lower polymer receiver was later renamed the MKI, and Cavalry developed an improved version marketed as the MKII.  Dkt. # 123, at 2.  Cavalry later produced a prototype for a lower polymer receiver known as the MKIII, but Cavalry never manufactured or produced the MKIII for distribution.  Id.  Cavalry did not obtain a patent, trademark, or copyright for the MKI, MKII, or MKIII.  In 2010, Cavalry stopped manufacturing the MKI, MKII, and MKIII receivers, surrendered its federal firearms license, and began to sell off its assets.  Id. at 3.  On March 3, 2010, Cavalry and Sinistral Shooting Technologies, Inc. (SST) entered an asset purchase agreement for the sale of the following assets:

(a) One (1) CAV-15 MKII cores and cavities;

(b) One (1) CAV-15 MKI cores and cavities;

(c) One (1) CAV-15 mold base;

(d) One (1) CAV-15 linear vibration welding resin base fixtures;

(e) all of Seller's CAV-15 drilling fixtures; all CAV-15 specific hand tools; all CAV-15 specific nuts, bolts, screws, roll pins; all CAV-15 front and rear pivot; take down pins; all CAV-15 serial number tags;

(f) all licenses for the above described assets to the extent that they are assignable, including those set forth on Schedule 4.1;

(g) all records required to be kept on the above described assets pursuant to parts 447, 478, and 479 of C.F.R. title 27.

Dkt. # 123, at 14-15.  SST was owned by Phagan at the time of the transaction, and Phagan states that he is currently the controlling member of SST.  Dkt.# 124, at 2.  Cavalry agreed that it had "title" to the assets being sold, but Cavalry made no representation that it possessed any protected or exclusive intellectual property rights to the assets.  Id. at 16-17.  Phagan testified in his deposition that Nealon also gave him "armors, tools, and other ancillary items related to firearms production along with the prints to the mold and a CD of CAD[1] files," but the CAD files were not expressly part of the sale.  Dkt. # 143-2, at 2.  SST and GWACS subsequently entered an asset purchase agreement for the sale of the following assets:

1. Van Don 300 Press HT Series Model 300 HT 14-2865 1996 with Pathfinder 4500 Controller;

2. Con Air SC30 Plastic Dryer with hopper – Serial Number 80105;

3. Branson 90 Series Linear Vibration Welder Model VW2 Serial Number 96R523769;

4. Take Down Pin Sets (1,500+);

5. Serial number tags (1,000+);

6. CAD drawings, design prints to the molds, including any and all intellectual property ("IP") related thereto;

7. Take Down Pins specifications;

8. Miscellaneous tools and equipment to manufacture, market and sell the Lowers.

---

[1]     The parties use the acronym "CAD" when referring to certain designs or drawings of firearm components.  The parties do not define this term but the Court assumes that the parties are referring to designs or drawings made using "computer-aided design."  For consistency with the summary judgment record, the Court will also use the acronym "CAD" in this Opinion and Order.  In some instances, the parties refer to "CAM files," which appears to be a reference to "computer-aided manufacturing."

Dkt. # 124-4, at 10.  Nealon was aware of this transaction and sent GWACS a letter congratulating it on the purchase on the letterhead of a trade name for his new entity, Cavalry Medical LLC (Cavalry Medical).  Dkt. # 123, at 64.

In February 2013, Phagan began working for GWACS as a sales representative, and the scope of his work was governed by a non-exclusive independent contractor sales representative agreement (Dkt. # 124-5).  Phagan later worked for a competitor of GWACS, KEA, while KEA was marketing a lower receiver known as the KE-15.  Dkt. # 124, at 11.  The KE-15 was either forged or billet, with the billet version having a flared magazine.  Id.  On June 15, 2015, KEA entered a mutual NDA with GWACS to allow the parties to "evaluate the feasibility of [a] business relationship," and they anticipated exchanging trade secrets or proprietary information as part of this process.  Dkt. # 124-7, at 2.  The agreement defined "proprietary information" as information disclosed by one party to another:

> (i) that is marked "Proprietary" or (ii) that relates to the business of the Discloser or the Discloser's affiliates, including without limitation, trade secrets, know-how, data, operations, records, finances, assets, technology, software, research, inventions, future products, customer information, or business development plans.

Id.  Any proprietary information exchanged pursuant to the agreement could not be disclosed to third-parties for five years after the effective date of the agreement.  Id.  Even if one party marked information as proprietary, the agreement states that proprietary information does not include information which:

> (a)  At the time of disclosure was already in the possession of the Receiving Party;
> (b)  Is independently made available to the Receiving Party by a third party not bound directly or indirectly by a non-disclosure obligation to the Disclosing Party;
> (c)  Is in the public domain; or
> (d)  Is independently developed by the Receiving Party without reference to Proprietary Information received from the Disclosing Party.

Id. at 3.  The NDA also recognizes that the parties may offer competing products on the marketplace, and competition was not prohibited as long as the parties complied with their obligations under the agreement.  Id.  Brownells entered two NDAs with GWACS.  The first NDA was executed in May 2013, and the second NDA was executed in January 2016.  Dkt. # 122, at 5-8; Dkt. # 122, at 9-12. SST entered NDAs with GWACS, the first of which was executed in October 2011 and the second of which was executed in February 2013.  Dkt. # 124, at 6. 9.  The NDAs were signed by Phagan on behalf of SST.  Dkt. # 124-3, at 3; Dkt. # 124-6, at 3.

Nealon claims that, in 2016, he found a box containing a thumb drive and various firearms "blue prints" at his house, but he did not know the contents of the thumb drive and he lacked the software to open it.  Dkt. # 123, at 4.  Nealon states that he did not believe that the thumb drive contained any information that could be considered protected intellectual property, because he had publicly shared anything that might have been treated as proprietary information on the internet or directly to firearms enthusiasts or firearms businesses.  Id.  On February 25, 2016, Calvary Medical sold two boxes of blueprints and a thumb drive containing "assorted CAD/CAM files" to KEA.  Id.

KEA claims that it began developing an improved version of the KE-15 aluminum rifle, and the new rifle would include a monolithic polymer lower receiver instead of an aluminum receiver. Dkt. # 124, at 14.  Phagan states that KEA used the CAM files for the KE-15 to develop the new lower receiver, known as the KP-15, and Phagan states that KEA also consulted outside experts to convert the KE-15 aluminum receiver into the KP-15 polymer receiver. Id. at 14-15; Dkt. # 124-33. GWACS asserts that KEA used the CAV-15 design files to create the new receiver, and GWACS further asserts that KEA's witnesses have falsely claimed to have developed the new receiver from scratch.  Dkt. # 143, at 5; Dkt. # 143-14, at 17-20.  GWACS also claims that KEA used information

produced by GWACS pursuant to the parties' NDA to develop the new receiver.  In particular, GWACS sent an investment packet to KEA disclosing that GWACS was seeking financing to begin production of a new version of the MK-III and MK IV, and GWACS claimed that it had improved its manufacturing techniques to reduce production costs. Dkt. # 143-11.  GWACS also claims that its new models would have features that were not otherwise available on the marketplace, such as an adjustable butt stock and an integrated single point sling mount. Id. at 5-6.  On July 10, 2018, GWACS made a public disclosure that it was unable to manufacture any of its CAV-15 products and it was "virtually sold out" of MK II receivers, and it announced that it was finalizing the design of the MK III that incorporated features recommended by "Russell Phagan aka SinistralRifleman.com." Dkt. # 124-54.

In 2017, Karl Kasarda, the owner of InRange LLC (InRange), began designing a new rifle for the What Would Stoner Do (WWSD) project, using products from various firearms manufacturers to assemble a complete rifle. Dkt. # 102-5, at 1-2.  GWACS initially supplied the lower polymer receiver and KEA supplied the trigger and safety selector. Id. at 2.  Brownells initiated discussions around April 2018 with InRange about marketing and distributing the WWSD rifle, and a key issue for production of the rifle was whether the suppliers could meet the demand for the necessary parts. Id. at 4.  After GWACS had publicly disclosed on its website that it was unable to produce more MK II receivers, Brownells offered to lease or rent GWACS' MK II molds to produce the receivers for the WWSD rifle, but GWACS told Brownells that "having the molds get out of their facility is a non-starter." Dkt. # 142-2, at 5-7; Dkt. # 143-25, at 1.  GWACS proposed to Brownells that it could provide a price for retooling the existing MK II molds, and Brownells forwarded this proposal to Phagan. Dkt. # 143-26.  However, the evidence provided by

the parties does not show that any agreement was reached concerning use of or retooling GWACS's MK II molds. KEA designed a new lower polymer receiver and provided pricing information to Brownells in 2019, and KEA claims that the new receiver, known as the KP-15, was essentially the same as KEA's existing KE-15, but was made out of a polymer instead of aluminum. Dkt. # 124, at 14; Dkt. # 143-27.

On April 7, 2020, Russell Anderson, GWACS' sales and marketing director, sent a cease and desist letter to KEA alleging that KEA was "attempting to develop a GWACS CAV-15 M III in direct conflict with our intellectual property rights." Dkt. # 122, at 15. Anderson stated that GWACS purchased all molds, equipment, and intellectual property from Cavalry for the MK II and MK III and that GWACS owns the exclusive rights to these materials, and Anderson claimed that GWACS shared this information with KEA pursuant to an NDA in 2015. Id. Anderson demanded that KEA cease and desist the manufacture and marketing of its product that allegedly bore a likeness to the MKII and MKIII that was the exclusive intellectual property of GWACS, but Anderson stated that GWACS would be willing to discuss a licensing arrangement with KEA. Id. Anderson concluded by threatening that GWACS would be forced to take legal action if the parties could not quickly work out a licensing agreement. Id. GWACS did not receive a response from KEA, and it re-sent the e-mail to KEA and copied Paul Levy of Brownells on the e-mail. Dkt. # 121-1.

On July 15, 2020, GWACS filed this case alleging breach of contract claims against KEA, SST, and Brownells (first, eighth, and ninth causes of action). GWACS also alleges claims for misappropriation of trade secrets and intellectual property against KEA, Phagan, and Nealon (second and sixth causes of action); and a claim of breach of the implied covenant of good faith and fair

dealing against KEA, Phagan, SST, and Brownells (seventh cause of action).  KEA filed counterclaims against GWACS and other related entities and persons for breach of the implied covenant of good faith and fair dealing (second claim), interference with prospective economic advantage (third claim), business disparagement (fourth claim), and deceptive trade practices and unfair competition (fifth claim). Dkt. # 49.  KEA also seeks a declaratory judgment (first claim) that it complied with the NDA when it developed its lower polymer receiver.  Id. at 11-12.  KEA filed its own lawsuit against GWACS and other defendants in the United States District Court for the District of Arizona, and the parties filed competing motions to transfer or stay the cases.  This Court granted GWACS's motion to stay this case pending a decision by the Arizona court as to whether it would exercise jurisdiction over KEA's claims.  Dkt. # 32.  The Arizona court applied Arizona law and determined that KEA's tort claims against GWACS were barred by the absolute privilege applicable to statements made pursuant to private litigation.  Dkt. # 34-1, at 11-14.  The Arizona court also declined to exercise jurisdiction over KEA's declaratory judgment claim, and transferred KEA's remaining claim for breach of the covenant of good faith and fair dealing to this Court for further proceedings.  GWACS has filed a stipulation of dismissal as to its claims for trademark infringement (third claim), trade dress infringement (fourth claim), and copyright infringement (fifth claim). Dkt. # 81.  KEA has filed a stipulation of dismissal as to its counterclaims against GWACS Defense Incorporated, Jud Gudgel, and Anderson, but its counterclaims against GWACS remain pending.  Dkt. # 99.  The Court denied GWACS' motion to dismiss KEA's counterclaims for interference with prospective economic advantage, business disparagement, and deceptive trade practices and unfair competition, and the Court also denied GWACS' request to dismiss without prejudice its claims against Nealon.  Dkt. # 112.

Each party has filed a motion for summary judgment, and GWACS has filed a motion to dismiss its claims against Nealon with prejudice. Based on the dismissal of claims and Court rulings, GWACS' remaining claims are its breach of contract claims against KEA, SST, and Brownells (first, eighth, and ninth causes of action), misappropriation of trade secrets against KEA, Phagan, and Nealon (second cause of action), misappropriation of intellectual property against KEA, Phagan, and Nealon (sixth cause of action), and breach of the implied covenant of good faith and fair dealing against all defendants (seventh cause of action). GWACS has renewed its motion to dismiss its claims against Nealon, and GWACS seeks leave to dismiss its claims against Nealon with prejudice to refiling. Dkt. # 113. Defendants have filed motions for summary judgment as to all of the claims asserted against them, and defendants have also filed a motion to sanction GWACS for failing to disclose evidence of its voluntary disclosure of alleged proprietary information or trade secrets to third parties. Dkt. # 177.

## II.

Defendants argue that GWACS intentionally failed to produce discovery materials concerning GWACS' voluntary disclosure of materials to third-parties that it now claims are proprietary information or trade secrets. Dkt. # 177, at 3-4. Defendants request that the Court sanction GWACS and dismiss GWACS' claims for misappropriation of trade secrets and breach of contract. Id. at 4. GWACS responds that defendants did not actually request the evidence that they now claim was not produced in pretrial discovery, and the alleged proprietary information or trade secrets contained in the new evidence is not the same proprietary information or trade secrets that is the subject of GWACS' claims. Dkt. # 182. GWACS further argues that the defendants were not

10

prejudiced by the untimely disclosure of the new evidence and sanctions are not appropriate for the failure to produce the evidence in pretrial discovery.

The evidence at issue concerns the communications of GWACS' vice president of sales, Michel "Shel" Jones with third parties who requested information about GWACS' products. KEA made a request for production of "all of your communications in Native Format with Shel Jones concerning the CAV-15 during the relevant period." Dkt. # 178-2. GWACS refused to provide any discovery in response to this request on the ground that the request was "overly broad" and "unduly burdensome." Id. at 5. Defense counsel asked GWACS to withdraw its objections to numerous discovery requests, and GWACS subsequently agreed to provide some documents responsive to KEA's discovery requests. Dkt. # 178-5, at 4. The discovery cutoff was June 6, 2022 and the parties filed their dispositive motions on July 18, 2022. On July 19, 2022, KEA was contacted by a former customer of GWACS, Kenneth King, who was asking for information about CAV-15 receiver, and King produced a photograph of the internal workings of the lower receiver that had been provided to him by Jones. Dkt. # 178-6, at 2; Dkt. # 179-1. Defense counsel immediately sent a letter to GWACS' counsel seeking an explanation why GWACS failed to disclose Jones' communications with King, and defense counsel asked GWACS to identify any other similar communications relating to the CAV-15 receiver. Dkt. # 178-6. GWACS failed to respond to the letter, and defendants subsequently learned of eight additional persons who communicated with Jones about technical issues or specifications of the CAV-15 receiver.

There is a general rule that the bad faith or intentional destruction of evidence relevant to an issue at trial gives rise to an inference that the evidence would have been unfavorable to the party responsible for its destruction. Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997).

11

Sanctions for spoliation of evidence are appropriate when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." Burlington Northern and Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007).   "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." Turner v. Public Service Co. of Colorado, 563 F.3d 1136, 1150 (10th Cir. 2009).   District courts have broad discretion when crafting an appropriate sanction for spoliation of evidence, and the sanctions can include striking a witness, the exclusion of evidence, an adverse jury instruction, on "in extreme circumstances," the dismissal of claims.   Helget v. City of Hays, Kansas, 844 F.3d 1216, 1226 (10th Cir. 2017).

Defendants have not raised a true spoliation claim and this is a garden-variety discovery dispute that the parties should have resolved without resort to a motion for sanctions.   Defendants argue that GWACS failed to produce evidence of third-party communications with Jones, but defendants have not accused GWACS of destroying evidence.   The Court agrees with defendants that the withheld information was requested in discovery, and GWACS' claim that defendants failed to request the evidence is meritless.   Defendants expressly requested that GWACS "[p]roduce all of your communications in Native Format with Shel Jones concerning the Cav-15 during the relevant time period." Dkt. # 178-2, at 5.   Jones' communications with customers concerning design and pricing information about the CAV-15 certainly fell within the scope of this discovery request, and GWACS' boilerplate objection that the request was "overly broad" was insufficient to preserve any objection to this discovery request.   Grubaugh v. CSAA General Ins. Co., 2018 WL 445108 (N.D. Okla. Jan 16, 2018) (boilerplate objections that discovery requests are "vague" or "overly

12

broad" do not constitute a response to a discovery request, and the party intending to assert such a request must contact opposing counsel in an effort to narrow the discovery request); Howard v. Segway, Inc., 2013 WL 869955 (N.D. Okla. Mar. 7, 2013) (boilerplate objections to discovery requests can constitute waiver of the responding party's right to object).   In this case, defendants received the information it requested in discovery from third-parties, and the evidence shows that GWACS' counsel consistently refused to meet with defense counsel after it came to light that GWACS withheld relevant evidence in discovery.  The Court finds that it is a sufficient sanction that the Court will consider the evidence provided in defendants' supplemental filings and declarations (Dkt. ## 178, 179, 180, 187, 188) when ruling on the pending motions, and defendants may use this evidence if the case proceeds to trial.  However, the Court declines to impose the sanctions requested by defendants, such as dismissal of claims or an adverse inference against GWACS, and defendants' motion for spoliation sanctions (Dkt. # 177) is denied.

### III.

All defendants seeks summary judgment on GWACS' claims against them.  KEA argues that GWACS does not actually possess any intellectual property or trade secrets, and GWACS' claims of misappropriation of intellectual property or trade secrets are meritless.  KEA also argues that it did not breach the parties' NDA, because GWACS did not disclose anything that would qualify as proprietary information as that term is defined in the NDA.  GWACS argues that it is entitled to summary judgment on KEA's counterclaims on the basis that GWACS' cease and desist letter was made pursuant to a litigation privilege, and KEA's counterclaims are barred as a matter of Oklahoma law.  GWACS also argues that KEA has not come forward with evidence that it suffered any harm as a result of Brownells' receipt of the cease and desist letter.

13

**A.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**B.**

Before reaching the parties' motions for summary judgment, the Court will consider GWACS' request for leave to dismiss its claims against Nealon with prejudice. Dkt. # 113. GWACS states that it deposed Nealon, and it believes that "Nealon had likely unintentionally disclosed [p]laintiff's trade secrets and intellectual property . . . when he sold the same to Phagan and KEA." Id. at 2. GWACS contacted defense counsel and offered to dismiss its claims against Nealon with prejudice, but GWACS states that the parties were unable to come to an agreement on the issue. Id. at 3. Nealon argues that GWACS should be permitted to dismiss its claims against him only if GWACS dismisses the claims with prejudice and he receives an award of attorney fees. Dkt. # 127, at 2. In the alternative, he argues that the Court should defer a ruling on GWACS' motion to dismiss until the Court rules on Nealon's motion for summary judgment. Id.

GWACS previously sought leave to dismiss its claims against Nealon without prejudice and without any other conditions. The Court denied GWACS' motion (Dkt. # 84) primarily because GWACS offered only a vague explanation for seeking leave to dismiss its claims against Nealon. Dkt. # 112, at 14. It also appeared that Nealon was likely to file a motion for summary judgment, and that GWACS was seeking to avoid a ruling on a dispositive motion. Id. at 15. The Court did not give significant weight to Nealon's argument that he had incurred attorney fees due to the filing of GWACS' claims, because there was evidence suggesting that Nealon was not personally responsible for attorney fees or costs associated with this litigation. Id. at 13. The Court denied GWACS' motion with leave to refile a motion to dismiss with prejudice its claims against Nealon. Id. at 15.

15

Under Fed. R. Civ. P. 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Unless a defendant can show "legal" prejudice from granting a plaintiff's request for voluntary dismissal, such requests should ordinarily be granted. Ohlander v. Larson, 114 F.3d 1531, 1537 (10th Cir. 1997). The Tenth Circuit has identified four non-exclusive factors that should be considered in reviewing a request for voluntary dismissal: "the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for dismissal; and the present stage of the litigation." Cnty. of Santa Fe v. Pub. Serv. Co. of N.M., 311 F.3d 1031, 1048 (10th Cir. 2002). However, "[t]his list of factors 'is by no means exclusive,' and factors that are 'unique to the context of the case' must also be considered." Id. (quoting Ohlander, 114 F.3d at 1537). To ensure that "substantial justice is accorded to both parties," the Court must consider the "equities not only facing the defendant, but also those facing the plaintiff." Brown v. Baeke, 413 F.3d 1121, 1124 (10th Cir. 2005).

GWACS has appropriately sought to dismiss its claims against Nealon with prejudice to refiling, and the Court does not find that any other conditions are required to afford substantial justice to GWACS and Nealon. The Court previously analyzed the relevant factors concerning GWACS' request for dismissal in a prior opinion and order (Dkt. # 112), and the parties are not arguing that there has been any substantial change in circumstances that would warrant reconsideration of any of the factors. Nealon argues that attorney fees are a necessary condition for dismissal of GWACS' claims against him, but he has not come forward with any evidence that he has actually incurred attorney fees to defend against GWACS' claims. Nealon will not be prejudiced if GWACS is permitted to dismiss its claims against him with prejudice, and this will

16

effectively terminate the litigation as to Nealon.  Nealon's motion for summary judgment (Dkt. # 119) is moot in light of the Court's decision to grant plaintiff's motion to dismiss (Dkt. # 113).

**C.**

Defendants seek summary judgment on all of GWACS' claims.  KEA, Phagan, and Brownells argue that GWACS did not actually produce any proprietary information pursuant to an NDA, and plaintiff cannot meet its burden to show that any defendant violated an NDA.  KEA and Phagan assert that GWACS did not disclose to them any materials that could be considered intellectual property or trade secrets, and they are entitled to summary judgment on GWACS' claims for misappropriation of intellectual property or trade secrets.  Finally, defendants argue that the parties had an ordinary commercial relationship, and Oklahoma law does not recognize a claim for breach of implied covenant of good faith and fair dealing absent a special relationship between the parties.

**<u>Intellectual Property and Trade Secrets</u>**

Before considering the parties' arguments as to specific claims, the Court will review the various contracts to determine what intellectual property, if any, GWACS possesses, and if any of the materials produced to defendants pursuant to an NDA could qualify as a trade secret under state or federal law.  On May 3, 2010, Cavalry sold certain assets to SST to the "extent that [Cavalry] holds legal or equitable title, if any, to the assets" defined in the contract.  Dkt. # 124-2, at 5.  The "assets" sold to SST included:

(a) One (1) CAV-15 MKII cores and cavities;

(b) One (1) CAV-15 MKI cores and cavities;

(c) One (1) CAV-15 mold base;

(d) One (1) CAV-15 linear vibration welding resin base fixtures;

(e) all of Seller's CAV-15 drilling fixtures; all CAV-15 specific hand tools; all CAV-15 specific nuts, bolts, screws, roll pins; all CAV-15 front and rear pivot; take down pins; all CAV-15 serial number tags;

(f) all Licenses for the above described assets to the extent that they are assignable, including those set forth on Schedule 4.1;

(g) all records required to be kept on the above described assets pursuant to parts 447, 478, and 479 of C.F.R. title 27.

Id. at 8-9.  There was no representation in the asset purchase agreement that Cavalry possessed any patents, trademarks, copyrights or any other type of legally exclusive intellectual property rights to the assets being sold to SST.  In a separate agreement, Cavalry sold its remaining assets, including all of its intangible property, to Cavalry Manufacturing, LLC.  Dkt. # 123, at 38-51.

On November 22, 2011, SST entered an asset purchase agreement with GWACS for sale of the following assets:

1. Van Don 300 Press HT Series Model 300HT 14-2865 1996 Pathfinder 4500 Controller;

2. Con Air SC30 Plastic Dryer with hopper – Serial Number 80105;

3. Branson 90 Series Linear Vibration Welder Model VW2 Serial Number 96R523769;

4. Take Down Pin Sets (1,500+);

5. Serial Number tags (1,0000+);

6. CAD drawings, design prints to the molds, including any and all intellectual property ("IP") related thereto;

7. Take Down Pins specification;

8. Miscellaneous tools and equipment to manufacture, market and sell the Lowers.

18

Dkt. # 124-4, at 10.   Although the asset purchase agreement states that GWACS purchased "intellectual property," the agreement does not state that SST was representing that it had any exclusive or protected rights to the drawings, prints, molds, or other property sold to GWACS.   The agreement states that SST agreed to "assign and deliver to Purchaser . . . all of Seller's rights, title and interest" in the assets being sold, and SST represented that it had "sole and exclusive, good and merchantable title to the Assets" being sold.   Id. at 2.   GWACS argues that the agreement with SST did not include all assets being sold to GWACS, because Phagan was worried that the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) would investigate him for creating the CAV-15 without a valid federal firearms license.   Dkt. # 143, at 4.   Phagan testified in his deposition that the wording of the asset purchase agreement was changed to avoid potential liability to the ATF, but these changes had no effect on what was being sold to GWACS or the intent of the parties as stated in the written agreement.   Dkt. # 143-4, at 2-4.

In 2016, Nealon claims that he found several boxes containing a thumb drive and blue prints of firearms at his home.   Dkt. # 123, at 4.   He states that he did not know the precise contents of the thumb drive, because he did not have the software to open it.   Id.   Nealon claims that it is unlikely that the thumb drive contained any confidential or proprietary materials, because he had freely shared materials relating to the CAV-15 receiver at trade shows, forums, and on the internet.   Id. at 4.   Nealon believed that he had made such extensive public disclosures concerning the CAV-15 receiver that the materials he found in 2016 could not be considered "protectable intellectual property."   Id.   Cavalry Medical sold KEA two boxes of blue prints and the thumb drive.   Id. at 64. GWACS believes that Nealon had retained a copy of the CAV-15 files that it purchased from SST, and GWACS suggests that these files were included in the material that Nealon sold to KEA.   Dkt.

# 143, at 6.  However, GWACS cites no evidence to support its belief that Nealon that retained a copy of the CAV-15 files that were sold to GWACS, and GWACS's speculation on this matter cannot be used to support a genuine dispute as to a material fact.

GWACS repeatedly claims that defendants misappropriated its "intellectual property," but GWACS must establish it disclosed information to defendants that was actually "intellectual property" as that term is commonly understood.  The Court will separately consider whether any defendant breached an NDA by using proprietary information disclosed pursuant to an NDA to develop a competing product, and the Court will initially focus on whether GWACS possesses any legally protected intellectual property.  GWACS purchased certain assets from SST and these assets included design files or drawings relating to the CAV-15.  However, GWACS could purchase rights to the assets only as good as the rights possessed by SST, and SST did not have any patents or other type of exclusive intellectual property rights to the property being sold.  Nealon admits that he freely shared information about the manufacture and design of the CAV-15 with customers and on the Internet, and the agreement between Cavalry and SST does not suggest that either of those parties believed that SST was purchasing any property that was protected by a patent or that was considered "intellectual property' under state or federal law.   GWACS complains that Phagan and SST may have committed fraud by falsely representing that SST had exclusive rights to certain property before GWACS and SST entered an asset purchase agreement in November 2011.  This has nothing to do with the existence of intellectual property rights now or at the time the asset purchase agreement was executed, and there is no evidence suggesting that Phagan represented that SST was selling GWACS a patent or other protected intellectual property rights.  The  Court will not refer to the CAV-15 receiver in any of its forms, or materials related to the CAV-15 receiver, as intellectual

property.  Information about GWACS's financial condition is also not intellectual property, although

this information may be protected as a trade secret or as proprietary information disclosed pursuant

to an NDA.  Due to GWACS' failure to identify any intellectual property in its possession, KEA and

Phagan are entitled to summary judgment on plaintiff's claim for misappropriation of intellectual

property (sixth cause of action).

 GWACS also asserts a claim against KEA and Phagan for misappropriation of trade secrets,

and the Court will consider what, if any, information relating to the CAV-15 or GWACS' financial

status qualifies as a trade secret under state or federal law.  The Defend Trade Secrets Act, 18 U.S.C.

§1831 et seq. (DTSA), defines a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or
> engineering information, including patters, plans, compilations, program devices,
> formulas, designs, prototypes, methods, techniques, processes, procedures, programs,
> or codes, whether tangible or intangible, and whether or how stored, compiled, or
> memorialized physically, electronically, graphically, photographically, or in writing
> if --
>
> > (A) the owner thereof has taken reasonable measures to keep such
> > information secret; and
>
> > (B) the information derives independent economic value, actual or potential,
> > from not being generally known to, and not being readily ascertainable
> > through proper means by, another person who can obtain economic value
> > from the disclosure or use of the information.

18 U.S.C. § 1839(3).  Oklahoma has adopted the Uniform Trade Secrets Act (UTSA), which defines

a "trade secret" as :

> information, including a formula, pattern, compilation, program, device, method,
> technique or process, that:
>
> a.  derives independent economic value, actual or potential, from not being generally
> known to, and not being readily ascertainable by proper means by other persons who
> can obtain economic value from its disclosure or use, and

b.  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

OKLA. STAT. tit. 78, § 86(3).  Oklahoma courts consider the factors from the Restatement of Torts,

§ 757, Comment B to assist courts in determining whether information is a trade secret, and these

factors are:

> (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

MTG Guarnieri Mfg., Inc. v. Clouatre, 239 P.3d 202, 210 (Okla. Civ. App. 2010).

The Court initially notes that the CAV-15 receiver in any of its forms is not patented and is a publicly available product, and there is no evidence that GWACS was in the process of obtaining a patent for any aspect of the production or design of existing models of the CAV-15 receiver.  The Supreme Court has explained that trade secret laws are primarily intended to prevent industrial espionage, and the "public at large remain[s] free to discover and exploit the trade secret through reverse engineering of products in the public domain or by independent creation."  Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 155 (1989).  Under the DTSA, the acquisition of a trade secret by "improper means" does not include reverse engineering or independent derivation, which is expressly permitted by the statute.  18 U.S.C. § 1839(6)(B).  Defendants have produced evidence showing that GWACS provided its customers photographs of the interior of the CAV-15 receiver, extensive information as to ways to modify the receiver, product specification and measurements, and the composition of the polymer.  Dkt. # 187-1, at 7, 37-46, 48-50, 54.  Jones also posted a video on YouTube and disclosed to customers features of the proposed MK III and MK

IV receivers.  Id. at 60, 63, 66.  The evidence shows that GWACS generally failed to maintain secrecy over the design, composition, and features of the MK I and MK II that were available for purchase by the general public.  Jones freely disclosed photographs, design specifications, and information about the composition of these products with anyone who requested this information, and it appears that GWACS had no policy of maintaining secrecy over this information.  This information was also not subject to a patent or any other type of intellectual property protection, and defendants were free to reverse engineer products that were available for purchase in the public marketplace.  However, the Court finds that there is a genuine dispute as to whether information about the design, manufacture, or features of the MK III and MK IV were trade secrets. There is no evidence suggesting that defendants were aware of GWACS' disclosures of features of the MK III or MK IV, and defendants learned of the features of these products pursuant to investment packet that was disclosed to defendants subject to an NDA. A reasonable jury could find that information related to the manufacture and design of the MK III and MK IV qualifies as a trade secret under state or federal law.

As to GWACS's financial information, the Court finds that there is a genuine dispute as to a material fact concerning GWACS' efforts to maintain the secrecy of its financial condition and pricing of its new products.  GWACS made general public announcements that it was essentially out of stock of its existing lower polymer receivers, but this is not the same as a public declaration concerning GWACS' financial condition.  Defendants have not produced evidence suggesting that GWACS publicly disclosed that it was seeking investors, the amount of the investment that GWACS was seeking, or that the pricing for the proposed MK III and MK IV were generally known to the public.  See Dkt. # 143-11.  GWACS took the step of requiring KEA and SST to execute an NDA

before reviewing this information and the information was not available to the public, and this tends to show that GWACS intended to maintain secrecy over its financial information. GWACS argues that KEA relied upon information relating to GWACS' financial condition, specifically GWACS' inability to produce and manufacture new products, when making the decision to develop a competing product. Dkt. # 143, at 8-9, 12-13. The Court will separately consider whether GWACS has come forward with evidence as to the elements of a claim for misappropriation of trade secrets, but GWACS has adequately shown that its financial information may constitute a trade secret.

**Misappropriation of Trade Secrets (Second Cause of Action)**

GWACS asserts claims for misappropriation of trade secrets under federal and state law. GWACS' second cause of action alleges that KEA and Phagan violated 18 U.S.C. § 1831, and GWACS asserts a civil claim pursuant to 18 U.S.C. § 1836. GWACS also seeks relief under the UTSA, which has been adopted by Oklahoma. Under 18 U.S.C. § 1831, it is a violation of federal criminal law to intentionally or knowingly steal, receive, or possess a trade secret for the benefit of a foreign government or agent. Federal law also provides a civil remedy for the owner of a trade secret that is misappropriated if the trade secret is used or intended for use in interstate commerce. 18 U.S.C. § 1836. The elements of a claim under § 1836 are virtually identical to the elements of a claim under the UTSA, and there is no need for the Court to separately consider whether GWACS may proceed with a misappropriation of trade secrets claim under state and federal law. Assessment Technologies Institute, LLC v. Parkes, 588 F. Supp. 3d 1178, 1211 (D. Kan. 2022) (elements of claims under the DTSA and UTSA are "almost identical). Under either statute, a plaintiff must come forward with evidence establishing "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or

disclosing the trade secret knew or should have known the trade secret was acquired by improper means." Id.

The Court has already considered whether any information acquired by KEA pursuant to an NDA could be considered a trade secret, and the Court has determined that there is a genuine dispute as to whether information about the design and manufacture of the MK III and MK IV and financial information disclosed by GWACS could qualify as trade secrets.  GWACS must also show that KEA improperly used or acquired the trade secrets and knew or should have known that the use or acquisition of the information was improper.  The parties' briefing focuses heavily on the existence of a trade secret, but the circumstances giving rise to GWACS' misappropriation of trade secrets claim are sufficient to satisfy the remaining elements of this claim as to KEA.[2]  KEA received information about GWACS' financial condition pursuant to an NDA, and KEA was aware that financial information identified as proprietary by GWACS fell within the scope of the NDA.  The evidence shows that KEA developed a competing product after it learned that GWACS was currently unable to produce more of its existing products or fully develop the MK III and MK IV for production and distribution.  Viewing the evidence in a light most favorable to GWACS, a reasonable jury could find that KEA chose to develop a competing product after learning that GWACS' lower polymer receivers would essentially be leaving the marketplace.  This could reasonably support a finding that KEA misappropriated information it received pursuant to the NDA and that it acted with the necessary intent.  To be clear, GWACS may not proceed with a

---

[2]     GWACS alleges a misappropriation of trade secrets claim against GWACS and Phagan, but the parties focus heavily on KEA's alleged acquisition and misuse of trade secrets.  As will be explained below, the same information that qualifies as trade secrets also meets the definition of proprietary information under the NDA, and Court will analyze Phagan's conduct in greater detail in relation to GWACS' breach of contract claim.  See infra at 31-32.

misappropriation of trade secrets claim as to alleged misappropriation of the design, production, or features of the MK I or MK II receivers, and this claim is limited to financial information that was disclosed pursuant to an NDA and information related to design, manufacture, and composition of the MK III and MK IV receivers.

**Breach of Contract**

Defendants argue that they did not use any "proprietary information" in violation of the NDA, because the NDA does not prohibit them from using information disclosed pursuant to the NDA if the information was already in their possession or was publicly available. Dkt. # 117, at 16-17. Defendants also argue that GWACS' interpretation of the term "proprietary information" is "so overly broad, vague, and generic that it would be impossible for KEA to even compete in the marketplace," and the NDA does not prevent KEA from independently developing and marketing its own products. Id. at 17. Under Oklahoma law, "[a] breach of contract is a material failure of performance of a duty arising under or imposed by agreement." Lewis v. Farmers Ins. Co., 681 P.2d 67, 69 (Okla. 1983). The three elements of a breach of contract claim are "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." Digital Design Grp., Inc. v. Info. Builders, Inc., 24 P.3d 834, 843 (Okla. 2001). In this case, the parties do not dispute that the NDA was a binding contract and, for the purpose of summary judgment, defendants have not raised an issue as to GWACS' damages. The issue before the Court on defendants' motions for summary judgment is whether any defendant breached an NDA by misusing proprietary information.

The parties entered an NDA for the purpose of "engag[ing] in discussions concerning the establishment of a business relationship between them," and they anticipated that confidential or

proprietary information would be exchanged during this process.  Dkt. # 124-7, at 2.  The NDA defines "proprietary information" as:

> any information disclosed by one Party (the "Discloser") to the other Party (the "Recipient") (i) that is marked "Proprietary" or (ii) that relates to the business of the Discloser or the Discloser's affiliates, including without limitation, trade secrets, know-how, data, operations, records, finances, assets, technology, software, research, inventions, future products, customer information, or business development plans.

Id.  However, the NDA provides certain exceptions to this definition:

> Limitation on Obligations.  "Proprietary Information" shall not include information which:
>
> (a) At the time of disclosure was already in the possession of the Receiving Party;
>
> (b)  Is independently made available to the Receiving Party by a third party not bound directly or indirectly by a non-disclosure obligation to the Disclosing Party;
>
> (c)  Is in the public domain; or
>
> (d)   Is independently developed by the Receiving Party without reference to Proprietary Information received from the Disclosing Party.

Dkt. # 124-7, at 3.

The Court will initially consider what information disclosed by GWACS pursuant to the NDA can be considered "proprietary" for the purpose of a breach of contract claim.  In response to a discovery request, GWACS stated that the "proprietary information disclosed to defendants included:

> financial information of Armory [GWACS]; that Armory was seeking investors for continued manufacturing and development; total CAV-15 MKII lower sales volume; CAV-15-15 MK II sales following In Range videos; its intent to use Marks MKIII and MKIV for future CAV-15 models; financial projections for future CAV-15 production and sales; drawings/renderings of the CAV-15; the MKIII CAD renderings and functionality improvements to include several features that were included in the KEA polymer receiver; and the MKIV adjustable stock CAD renderings and functionality.

Dkt. # 124-69, at 8 (bracket added).  In connection with GWACS' claims of misappropriation of trade secrets and intellectual property, the Court has reviewed what information was disclosed pursuant to the NDA and what information could qualify as intellectual property or trade secrets. The definition of "proprietary information" differs in some respects from the statutory definition of "trade secrets," but these differences are not material for analysis of GWACS' breach of contract claim.  GWACS' financial information may reasonably qualify as proprietary information, because defendants have not shown that GWACS' financial condition or its proposal for investments were public knowledge.  Information about the design or functionality of existing versions of the CAV-15 receiver, such as the MK I or MK II does not constitute proprietary information, because the product was available to the public  without any type of intellectual property protection.  Any person could replicate or reverse engineer these products, and design information about the MK I and MK II falls under "public domain" exception to the definition of "proprietary information" in the NDA.  As to information relating to the proposed MK III and MK IV receivers, these products were not publicly available and the Court has determined that there is a genuine dispute as to whether KEA relied on GWACS' disclosures under the NDA to develop a new lower polymer receiver.  The Court finds that the same information that qualifies as a trade secret should also be treated as "proprietary information" for plaintiff's breach of contract claim.

Defendants argue that GWACS conceded in pretrial discovery that no proprietary information or trade secrets were disclosed to defendants or that GWACS was actually harmed by defendants' conduct.  Dkt. # 118, at 9, 11-12.  Defendants requested a deposition of GWACS' corporate representative pursuant to Fed. R. Civ. P. 30(b)(6), and the notice of deposition directed GWACS to produce a person knowledgeable with the proprietary information and trade secrets that

were allegedly disclosed to defendants.  Dkt. # 124-70.  Defendants claim that GWACS' corporate representative, Gudgel, was unable to provide anything other than vague and unsubstantiated testimony in response to questions concerning the specific proprietary or trade secrets that were allegedly exploited by defendants.  Defendants take the position that Gudgel's deposition testimony is binding upon GWACS and Gudgel's failure to provide adequate responses to defendants' inquiries require the Court to enter judgment in their favor as a matter of law.  Dkt. # 118.  There is no dispute that defendants served notice to take the deposition of GWACS' corporate representative, and the notice of deposition stated that GWACS's corporate representative should be prepared to provide information concerning the "'proprietary information' you claim KEA used, disclosed, and/or exploited." Dkt. # 124-70, at 3.  Gudgel's responses to defense counsel's questions on this issue lacked specificity, and defendants could reasonably have sought clarification on the information that defendants allegedly exploited and the basis for GWACS' damages.  However, the Court finds that defendants' argument concerning Gudgel's deposition testimony does not provide a basis for the Court to enter judgment against GWACS.  As with other issues in this case, this is a straightforward discovery dispute that should have been resolved by the parties or by means of a motion to compel, and the remedy for Gudgel's unsatisfactory deposition testimony would have been a supplemental deposition.

GWACS have alleged a breach of contract claim against KEA, Phagan, SST, and Brownells, and a key issue is whether each of these defendants actually received proprietary information pursuant to an NDA with GWACS.  This analysis differs somewhat as to each defendant.  The mere disclosure of an investment packet to each defendant or a defendant's knowledge of the design features of GWACS' existing products will not be enough to show that a defendant violated the

NDA.  Instead, GWACS must identify specific information that was disclosed to each defendant and establish that the information was proprietary under the NDA.

Brownells argues that it did not receive any proprietary information from GWACS after it executed an NDA, because the information that GWACS provided to Brownells was not confidential or proprietary and was not protected by the NDA.  Dkt. # 118, at 13-15; Dkt. # 160, at 8-9.  The parties do not dispute that GWACS notified Brownells that it was seeking investors to finance the purchase of new molds and equipment and that GWACS sought a letter of intent from Brownells as to the number of MK III receivers it would purchase from GWACS.  Dkt. # 145-2, at 3.  GWACS argues that it did not publicly disclose that it was unable to produce receivers for the WWSD project.  However, GWACS posted on its website that it had "virtually sold out" of MK II receivers and it was unable to produce more due to the condition of its molds.  Dkt. # 124-54.  Brownells received an investment packet from GWACS, but Brownells did not forward the packet to anyone outside of the company.  Dkt. # 145-1, at 19.  Brownells and KEA made a proposal to GWACS to use its existing molds for the MK II receiver after GWACS announced on its website that it had problems with its molds.  Dkt. # 142-2, at 5-7.  GWACS has not shown that Brownells or KEA relied on proprietary information when making this proposal, as GWACS had already publicly disclosed that it could not manufacture any more MK I or MK II receivers.  GWACS also argues that Brownells knew that KEA was using the MK II design as a starting point for a new lower polymer receiver.  Dkt. # 145, at 9; Dkt. # 145-1, at 14-15.  The Court has determined that the design of the MK II was not a trade secret or proprietary information, and this does not show that Brownells' communications with KEA violated an NDA with GWACS.  GWACS has not met its burden to come forward with

evidence showing that Brownells breached the NDA by misusing proprietary information, and Brownells' motion for summary judgment (Dkt. # 118) is granted.

Phagan is the owner of SST and he sold to GWACS information related to the design and production of the CAV-15 receiver in 2011. SST and GWACS entered an NDA in 2013, and the NDA included the same definition of "proprietary information" that has been discussed elsewhere in this Opinion and Order. Dkt. # 124-6. The parties dispute whether Phagan saw photographs of GWACS' proposed MK III receiver in April 2018, but Phagan did suggest to GWACS that it should ask Kasarda and InRange to enter an NDA in connection with development of GWACS new products. Dkt. # 143-16, at 1. GWACS never entered an NDA with Kasarda or InRange, and Phagan had discussions with InRange and Brownells about developing a new lower polymer receiver. Dkt. # 143-22; Dkt. # 143-23, at 7-9. On September 10, 2018, Phagan told GWACS that KEA's president, Michael Kenney, was interested in investing in the MK III, although Kenney claims that this was a misunderstanding on Phagan's part. Dkt. # 143-13, at 5-6; Dkt. # 143-16, at 5. Phagan had discussions with Brownells and Kasarda about the development of a receiver similar to the MK II for use in the WWSD rifle, and Phagan mentioned possible modifications to the existing MK II design. Dkt. # 143-25; Dkt. # 143-26. None of this evidence tends to show that Phagan violated an NDA or that he personally profited from the alleged violations of the NDA, and GWACS wholly fails to tie this evidence to SST. The evidence is undisputed that SST purchased information about the CAV-15 receiver from Cavalry and that SST later sold this information to GWACS, and the evidence also establishes that Phagan was personally knowledgeable about the design of the CAV-15 receivers and firearms in general. The NDA prevented Phagan from misusing proprietary information produced pursuant to the NDA, but the NDA did not prohibit Phagan from

relying on his own knowledge of firearms. There is also no evidence that Phagan created, manufactured, or distributed a competing product on his own behalf or through SST, and he was acting as an agent for KEA for the development of a new lower polymer receiver that would be distributed by Brownells or for use in the WWSD rifle. GWACS' claims against Phagan seem more in the nature of an alleged violation of a non-compete agreement based on his former employment with GWACS, but GWACS has not shown that Phagan or SST violated an NDA with plaintiff. For the same reasons, GWACS has not established that Phagan misappropriated a trade secret. The Court finds that Phagan and SST are entitled to summary judgment as to GWACS' breach of contract claim, and Phagan is granted summary judgment as to GWACS' misappropriation of trade secrets claim.

The Court reaches a different conclusion as to KEA, as there is a genuine dispute as to whether KEA misused information produced pursuant to an NDA. KEA entered an NDA with GWACS and received an investment packet from GWACS, and the investment packet disclosed GWACS' financial condition and features of the proposed MK III and MK IV receivers. KEA developed a competing product and the new product bore a substantial similarity to KEA's products. KEA was also aware that GWACS was unable to produce any more of the MK I or MK II receivers, and KEA also knew that GWACS would not be able to produce its proposed MK III and MK IV receivers. This evidence would permit a reasonable jury to find that KEA violated the NDA, and KEA's motion for summary judgment is denied as to plaintiff's breach of contract claim.

**Breach of Covenant of Good Faith and Fair Dealing**

Defendants argue that there is no special relationship between the parties that would support a claim for breach of the covenant of good faith and fair dealing as a matter of Oklahoma law.

GWACS responds that KEA and Brownells acted in bad faith by developing a competing product using proprietary information obtained by using false pretenses, and defendants' actions breached the implied covenant of good faith and fair dealing. Dkt. # 145, at 14-15.

Oklahoma recognizes a common law duty for parties entering a contract that "neither party . . . will act to injure the parties' reasonable expectations nor impair the rights or interests of the other to receive the benefits flowing from their contractual relationship." First Nat'l Bank and Trust Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993). "In ordinary commercial contracts, a breach of that duty merely results in damages for breach of contract, not independent tort liability." Warrenfeltz v. Hogan Assessment Systems, Inc., 2018 WL 1546559 (N.D. Okla. Mar. 29, 2018) (quoting Wathor v. Mut. Assurance Adm'rs Inc., 87 P.3d 559, 561 (Okla. 2004). Absent a special relationship between the parties, Oklahoma law does not recognize a tort claim arising out of a breach of contract, because imposing "tort liability . . . for every breach of contract would only serve to chill commercial transactions." Rodgers v. Tecumseh Bank, 756 P.2d 1223, 1227 (Okla. 1988). "The 'special relationship' that gives rise to tort liability for bad faith is marked by (1) a disparity in bargaining power where the weaker party has no choice of terms, also called an adhesion contract, and (2) the elimination of risk." Embry v. Innovative Aftermarket Systems, L.P., 247 P.3d 1158, 1160 (Okla. 2010). Oklahoma courts have created a narrow exception to this rule in cases in which there was "gross recklessness or wanton negligence on behalf of a party." Beshara v. Southern Nat'l Bank, 928 P.2d 280, 288 (Okla. 1996).

GWACS has not shown that its claim for breach of the covenant of good faith and fair dealing is cognizable under Oklahoma law. This is an ordinary commercial contract between parties of relatively equal bargaining power, and GWACS has made no argument that there was a special

relationship between the parties.  Brownells is a distributor of firearms and firearm parts, and GWACS' arguments primarily concern the alleged misconduct of KEA.  Although Brownells entered an NDA with GWACS, GWACS has not shown that Brownells actually received or misused any proprietary information produced by GWACS pursuant to the NDA, and GWACS allegations of "collusion" between KEA and Brownells are speculative.  GWACS has also produced no evidence suggesting that it had a special relationship with SST or Phagan.  GWACS purchased assets from SST and had an ongoing business relationship with Phagan, but GWACS has cited no authority that its relationship with SST or Phagan could be treated as "special" as a matter of Oklahoma law.  The lack of a special relationship between GWACS and any of the defendants is a sufficient basis to dispose of GWACS' claim for breach of the implied covenant and fair dealing. Construing GWACS' arguments broadly, GWACS could be arguing that defendants acted with gross recklessness or wanton negligence, and this could be an attempt to fit GWACS' claim within the narrow exception identified in <u>Beshara</u>.  However, the Court finds that the parties are engaged in an ordinary commercial disagreement, and GWACS has not shown that any of the defendants recklessly or intentionally violated the terms of the NDA by developing a competing product. Summary judgment is granted in favor of defendants as to GWACS' claim for breach of the implied covenant of good faith and fair dealing (seventh cause of action).[3]

---

[3]     The Court's finding concerning the legal viability of GWACS' claim for breach of the implied covenant of good faith and fair dealing also applies to KEA's counterclaim seeking relief on the same basis.  GWACS raises this specific argument in its motion for summary judgment on KEA's counterclaim for breach of the covenant of good faith and fair dealing, and GWACS' motion for summary judgment is granted as to this claim.

**D.**

GWACS argues that its cease and desist letter was sent to KEA and Brownells pursuant to a litigation privilege, and it seeks summary judgment on KEA's counterclaims of breach of the implied covenant of good faith and fair dealing, interference with prospective economic advantage, business disparagement, and deceptive trade practices based on this privilege.[4] Dkt. # 121, at 13-15. GWACS also argues that KEA has failed to establish that there is a genuine dispute that GWACS intentionally interfered with KEA's business or that KEA actually suffered damages as a result of GWACS' conduct.

**Litigation Privilege**

Oklahoma recognizes a litigation privilege "under which attorneys, parties, jurors, and witnesses are immune from defamation liability for statements made in the course of judicial or quasi-judicial proceedings, so long as the statements are relevant to the proceedings." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 335 F.3d 1161, 1166 (10th Cir. 2003). The privilege has been extended to statements made in anticipation of litigation. Id. The litigation privilege does not "give free reign [sic] to attorneys to defame," and the privilege is applicable if the communication is (1) relevant or has some relation to a proposed proceeding and (2) circumstances surrounding the communication have some relation to the proposed proceeding." Samson Inv. Co. v. Chevaillier, 988 P.2d 327, 330 (Okla. 1999). The privilege applies whether the challenged communication is true or false as long as the author or speaker of the statement had a good faith belief in the truth of the statement. Cardtoons, 335 F.3d at 1166 (citing Kirschstein v. Haynes, 788

---

[4]     As to KEA's counterclaim for breach of the implied covenant of good faith and dealing, the Court's finding that there is no special relationship between GWACS and KEA, which bars the counterclaim for the same reasons stated in relation to GWACS' claim on the same legal basis against KEA.

P.2d 941 (Okla. 1990)).  The issue of whether a communication is privileged is a matter of law to be determined by the court.  Id. at 329.

The Court finds that there is a genuine dispute as to whether GWACS' cease and desist letter was sent to KEA and Brownells in good faith and not merely to unlawfully interfere with the distribution of a competing product.  GWACS has presented no evidence that it undertook any kind of investigation to understand its own intellectual property rights before sending the letter and, even at this stage of the case, GWACS has loosely used the term "intellectual property" to describe information that was already available to the public or that could lawfully be reverse engineered. The cease and desist letter is based on a fundamental misunderstanding that GWACS's purchase of equipment and designs from SST in 2011 gave it exclusive rights to the CAV-15 and related designs. Dkt. # 121-1, at 2.  Instead, GWACS' rights to the property that it purchased from SST were only as good as the rights held by SST, which did not include a patent or any other type of protected intellectual property rights.  GWACS knew or should have known the limitations of its intellectual property rights to the CAV-15 designs, and GWACS's continued overrepresentation of its intellectual property rights gives rise to a dispute of material fact as to whether its cease and desist letter was sent in good faith.  The Court has already noted there is a genuine dispute as to whether KEA used materials produced by GWACS pursuant to an NDA to develop its new lower polymer receiver, and this may independently provide a basis for GWACS to argue to the jury that it had a good faith basis to send the cease and desist letter to KEA.  However, this argument does permit the Court to enter summary judgment based on the existence of a litigation privilege.  The cease and desist letter merely states that KEA and Brownells were attempting to distribute a product that bore a likeness to the MKII and MKIII.  Dkt. # 121-2, at 2.  KEA argues that there is no evidence that

36

GWACS undertook any kind of investigation that KEA's product was actually designed or produced using materials disclosed pursuant to the NDA, or that Brownells had any reason to be aware of the NDA between KEA and GWACS. While the litigation privilege may broadly protect parties making statements in anticipation of litigation, KEA has produced sufficient evidence calling into question whether the statements contained in the cease and desist letter were made in good faith and the Court cannot conclusively resolve the issue of litigation privilege at this stage of the case. GWACS' motion for summary judgment is denied to the extent that GWACS argues that KEA's counterclaims are barred by a litigation privilege.

**Intentional Interference with Prospective Economic Advantage,**
**Business Disparagement, and Deceptive Trade Practices**

GWACS argues that KEA cannot show that it was damaged by Brownell's receipt of the cease and desist letter, because there is no evidence that this harmed KEA's relationship with Brownells.[5] The Oklahoma Supreme Court has stated that the elements of a claim of interference with prospective economic advantage are:

1.) interference with a business or contractual right;

2.) malice or wrongful interference that it is neither justified, privileged, nor excusable; and

3.) damage proximately sustained as a result of the interference.

---

[5]  GWACS also argues that its actions were privileged and therefore were not malicious or wrongful, but the Court has already determined that there is a genuine dispute as to a material fact concerning the existence of a litigation privilege. This dispute is primarily based on evidence calling into question whether GWACS could have had a good faith belief that it had protected intellectual property or that KEA was marketing a competing product using GWACS' proprietary information. This same evidence also gives rise to a dispute as to whether GWACS' actions were privileged for the purpose of its torts claims, and the Court will focus on GWACS' argument that KEA was not damaged by GWACS' actions.

Loven v. Church Mut. Ins. Co., 452 P.3d 418, 424 (Okla. 2019).  The elements of a claim for business disparagement are that "(1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to plaintiff." Choctaw Town Square, LLC v. City of Choctaw, Oklahoma, 2014 WL 12818169 (W.D. Okla. Dec. 29, 2014).  A claim of business disparagement is similar to a defamation claim and privilege to make the disputed communication is a defense to a business disparagement claim.  Id. at *5.  Under Oklahoma's Deceptive Trade Practices Act, OKLA. STAT. tit. 78, § 53, a person "engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person . . . [d]isparages the goods, services, or business of another by false or misleading representation of fact . . . ."  The plaintiff alleging a claim of business disparagement or deceptive trade practices must establish that it suffered damages as an essential element of these claims if it is not seeking injunctive relief. OKLA. STAT. tit. 78, § 54; Choctaw Town Square, LLC v. City of Choctaw, Oklahoma, 2014 WL 12818169, *8 (W.D. Okla. Dec. 29, 2014).

KEA claims that it was damaged by GWACS' conduct, because Brownells "didn't market the product" as it might have otherwise if GWACS had not sent the cease and desist letter.  Dkt. # 142, at 9.  The evidence shows that KEA's assertion that it was harmed as a result of GWACS's conduct is speculative at best.  Paul Levy, the director of product management of Brownells, testified in his deposition that Brownells "didn't market the product as much as we probably would have otherwise," but he also stated that the WWSD rifle had not actually been received for distribution by Brownells.  Dkt. # 121-13, at 27.  Levy states that Brownells had already issued purchase orders to KEA for receivers for the WWSD rifle, but KEA could not fill the order until the receivers were actually produced.  Id. at 28.  Levy has no personal knowledge if the cease and desist

letter had any effect on KEA's ability to timely manufacture and deliver the receivers for the WWSD rifle. Id. KEA has the burden to come forward with evidence showing that plaintiff's actions proximately caused an injury to KEA and that KEA suffered damages as a result of plaintiff's conduct. KEA has produced evidence suggesting that Brownells may have curtailed marketing efforts for WWSD rifle, but Brownells did not even contemplate terminating its relationship with KEA or take any action to cancel the WWSD project. Mike Kenney, the owner of KEA, admitted that KEA was in agreement with Brownells to cease marketing the WWSD rifle, and the cease and desist letter sent by GWACS did not result in any long-term damage to KEA's relationship with Brownells. Dkt. # 121-12, at 21-22. KEA asserts that Brownells and InRange limited marketing efforts between May and August 2020 due to the cease and desist letter, but the evidence is undisputed that the WWSD rifle was not commercially viable or available for purchase during that time period. Dkt. # 142-4, at 11. The evidence shows that the cease and desist letter that GWACS sent had minimal or no effect on the marketing of the WWSD rifle, and KEA's speculative assertion for monetary damages is not sufficient to survive a motion for summary judgment.[6] Summary judgment should be granted in favor of GWACS on KEA's counterclaims of intentional interference with prospective economic advantage, business disparagement, and deceptive trade practices.

**IV.**

---

[6]     The Court notes that KEA retained an expert to calculate its potential damages on its counterclaims against GWACS. Dkt. # 142-5. However, the expert plainly states that he assumed that KEA would prevail on its counterclaims and that the Court would find that GWACS' conduct proximately caused an injury to KEA. Id. at 8. The Court has found that the evidence is insufficient to support such a finding, and the existence of expert opinions as to the amount of damages does not create a genuine dispute to a material fact that precludes summary judgment in favor of GWACS.

This case is currently set for pretrial conference on March 1, 2023 and for jury trial on March 20, 2023. The Court has ruled on all pending motions and the claims remaining for adjudication are GWACS' claims of breach of contract and misappropriation of trade secrets against KEA and KEA's counterclaim against GWACS for declaratory relief. The Court has reviewed the docket sheet and notes that the parties had an unsuccessful settlement conference. Dkt. # 164. The Court will continue the pretrial conference and jury trial by 30 days to allow the parties to review this Opinion and Order, participate in another settlement conference, and prepare for trial.

**IT IS THEREFORE ORDERED** that Defendant Brownells Inc.'s Motion for Summary Judgment (Dkt. # 118) and Defendants Russell Phagan and Sinistral Shooting Technologies, LLC's Motion for Summary Judgment (Dkt. # 120) are **granted**. Brownells, Inc., Russell Phagan, and Sinistral Shooting Technologies, Inc. are terminated as a parties.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Order Dismissing Claims against Defendant Shawn Nealon with Prejudice (Dkt. # 113) is **granted**, and GWACS claims against Nealon are **dismissed with prejudice**. Nealon is terminated as a party.

**IT IS FURTHER ORDERED** that Defendant KE Arms, LLC's Motion for Summary Judgment (Dkt. # 117) is **granted in part** and **denied in part**: the motion is granted as to GWACS claims for misappropriation of intellectual property (sixth cause of action) and breach of the implied covenant of good faith and fair dealing (seventh cause of action); the motion is denied as to GWACS's claims of breach of contract (first cause of action) and misappropriation of trade secrets (second cause of action).

**IT IS FURTHER ORDERED** that Counterclaim Defendant's Motion for Summary Judgment & Brief in Support (Dkt. # 121) is **granted in part** and **denied in part**: the motion is

40

granted as to KEA's counterclaims of breach of the implied covenant of good faith and fair dealing (second claim), interference with prospective economic advantage (third claim), business disparagement (fourth claim), and deceptive trade practices and unfair competition (fifth claim); the motion is denied as to KEA's counterclaim for declaratory relief (first claim).

      **IT IS FURTHER ORDERED** that Defendants' Motion for Spoliation Sanctions (Dkt. # 177) is **denied**.

      **IT IS FURTHER ORDERED** that Defendant Shawn Nealon's Motion for Summary Judgment (Dkt. # 119) is **moot**.

      **IT IS FURTHER ORDERED** that the pretrial conference set for March 1, 2023 and the jury trial set for March 20, 2023 are **stricken** so that the parties have an opportunity to finalize a proposed pretrial order reflecting these rulings.   Final joint proposed pretrial order to be submitted (not filed) no later than March 31, 2023.  The pretrial conference is reset for **April 5, 2023 at 10:00 a.m**, and the jury trial is reset for **April 17, 2023 at 9:15 a.m.**

      **IT IS FURTHER ORDERED** that this matter is set for an additional settlement conference before Magistrate Judge Christine Little on **March 3, 2023 at 9:30 a.m.**  Settlement conference statements to be submitted to Judge Little (not filed) no later than **March 1, 2023**.

      **DATED** this 23rd day of February, 2023.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE