```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OKLAHOMA

GWACS ARMORY, LLC,                  )
                                    )
             Plaintiff,             )
                                    )
vs.                                 )  Case Number
                                    )  20-cv-0341-CVE-SH
KE ARMS, LLC, RUSSELL PHAGAN,       )  BASE FILE
SINISTRAL SHOOTING,                 )
TECHNOLOGIES, LLC, BROWNELLS,       )  Consolidated with:
INC., and SHAWN NEALON,             )  Case No.
                                    )  21-CV-0107-CVE-JFJ
             Defendants.            )
                                    )
and                                 )
                                    )
KE ARMS, LLC,                       )
                                    )
             Plaintiff,             )
                                    )
vs.                                 )
                                    )
GWACS ARMORY, LLC, GWACS            )
DEFENSE INCORPORATED, JUD           )
GUDGEL, RUSSELL ANDERSON, DOES      )
I through X, and ROE                )
CORPORATIONS I through X,           )
                                    )
             Defendants.            )
_____
```

        THE DEPOSITION OF RUSSELL WAYNE PHAGAN,
taken on the 26th day of October, 2021, between the hours
of 9:20 a.m. and 4:42 p.m., on behalf of the Plaintiff
GWACS, pursuant to Federal Rules of Civil Procedure, at
the law offices of Hall, Estill, Hardwick, Gable, Golden &
Nelson, 320 South Boston Avenue, Suite 200, Tulsa,
Oklahoma, before Linda Fisher, CSR-RPR, and Notary Public
in and for the State of Oklahoma.

 1   building when the company was raided on February 27, 2008.

 2        Q.   Were you aware that Mr. Nealon pled guilty to a

 3   felony?

 4        A.   Yes.

 5        Q.   Were you aware that as a result, he had to

 6   surrender his FFL license?

 7        A.   Yes.

 8        Q.   Is that how it came to be that you traded in

 9   your stock at Cavalry Arms for the items that were

10   transferred to you?

11        A.   Yes.

12        Q.   Mr. Nealon told me yesterday he didn't give you

13   any CAD files.  Where did you get those?

14             MR. CALAWAY:  Object to the question, to

15   the form.  Continue.

16        A.   Nealon did not give me CAD files or prints as

17   part of the sale.  After the sale was completed at a later

18   date, he gave me armors, tools, and other ancillary items

19   related to firearms production along with the prints to

20   the mold and a CD of CAD files.

21        I do not personally know what was on that CD.  I did

22   not have any engineering  software capable of opening

23   those files.

24        Q.   So he gave you -- all right.  Let's go back.

25   When did you actually buy the initial tools and mold from

1   physically when you signed it?

2        A.    I don't recall.  I believe we executed it at a

3   Chase Bank because we could use the notary service there.

4        Q.    I was going to ask, who is Drew C. Edson?

5        A.    If I recall correctly, it was a notary public

6   at our local bank we did business at.

7        Q.    And you're sure an attorney drafted this?

8        A.    To the best of my knowledge.  I did not have

9   any direct interactions with an attorney myself related to

10  this document.

11       Q.    Did you understand this document when you read

12  it?

13       A.    The best of my ability, yes.

14       Q.    Okay.  I believe what you're telling us is that

15  you initially signed this agreement with Mr. Nealon but

16  subsequent to that, he transferred additional assets to

17  you.  Is that what you're telling me?

18            MR. CALAWAY:  Object to the form of the

19  question.

20       A.    Define "assets," please.

21       Q.    (By Mr. Weger)  Drawings, a CD, the other items

22  that you mentioned to me that Mr. Nealon gave to you at a

23  later, a later time.

24       A.    I don't know that I would call them "assets,"

25  because he didn't assign any value to them.

1      Q.   But that's not my question.

2      A.   But, yes, he did transfer a CD, prints, armors,

3   tools, and other minor equipment related to the assembly

4   of AR-15s at that time.

5      Q.   When did he do that after May of 2010?

6      A.   Sometime before his sales agreement was

7   finalized to Christian Cappello/Cavalry Manufacturing,

8   LLC.

9      Q.   What do you know about that agreement?

10      A.   I know that Nealon felt pressured to conclude

11   the sale of the rest of his assets because it seemed like

12   he would be going to prison for one to two years.  And he

13   had a very narrow window of time to conduct that

14   transaction.

15      Q.   Was this before or after Mr. Cappello was

16   indicted?

17      A.   Before.

18      Q.   Okay.  So you buy the assets on Exhibit 5 and

19   then sometime between then and when Mr. Nealon sold the

20   rest of the assets of GWACS -- I'm sorry, not GWACS -- of

21   Cavalry Arms to Mr. Cappello, he gave you a CD, right?

22      A.   Correct.

23      Q.   He gave you prints to a mold?

24      A.   Yes.

25      Q.   And were those the prints to the mold that you

1    had purchased under Exhibit 5?

2          A.    Yes.

3          Q.    Same mold or a different one?

4          A.    Same mold.

5          Q.    Was there just one mold?

6          A.    There was one mold base, two sets of cores and

7    cavities.

8          Q.    Okay.  And did you get both of those?

9          A.    Yes.

10         Q.    Okay.  What else did he give you?  You said

11   something about armors?

12         A.    Armorer's tools, action blocks, wrenches,

13   things related to the specific assembly of AR-15

14   receivers.

15         Q.    Okay.  Now, did Cavalry Arms ever sell any

16   polymer lowers to an AR-15?

17         A.    Cavalry Arms Corporation?

18         Q.    Yeah.

19         A.    Yes.

20         Q.    Okay.  How many?

21         A.    Around 11,000 over the course of ten years.

22         Q.    Okay.  And your idea was that you were going to

23   take this equipment and the molds, and the prints, and the

24   CD and everything else that you purchased from Nealon and

25   set yourself up in business to do just that.  And that's

1    than A1 length.  And it would have a series of stackable

2    spacers to make it different lengths.

3        The grip angle and trigger guard undercut were

4    changed.  A lot of mostly cosmetic and shooter interface

5    enhancements.  There was nothing substantive changed about

6    the function of the gun, it was things about how the

7    shooter held the gun, how they shouldered it and how it

8    looked.

9        Q.   Okay.  Was the CD that you received from Mr.

10   Nealon after you signed your contract with him, and he

11   gave you the blueprints and the CD, did that have the CAV

12   Mark II or the CAV Mark III, or both, on it?

13       A.   I'm unaware of what was on the CD.  I did not

14   have the software to be able to open it.  And I don't

15   recall ever looking at it myself.

16       Q.   What did Mr. Nealon tell you was on it?

17       A.   I believe he said it was some of the part

18   files.  And he gave those to me in the interest of being

19   able to check the part dimensions at different points or

20   make sure that the mold was holding consistent with

21   dimensions of the actual parts.

22       Q.   And do you need the CAD file to manufacture the

23   mold?

24              MR. CALAWAY:  Object to the form of the

25   question.

1    have been some design beforehand.  Okay.

2         (Whereupon, Deposition Exhibit 40 was marked for

3    identification purposes.)

4         Q.   Let me hand you what I've marked as Exhibit 40.

5              MR. CALAWAY:  Do I get a copy?

6              MR. WEGER:  Yes.

7              MR. CALAWAY:  Thanks.

8         Q.   (By Mr. Weger)  Can you identify this post,

9    sir?

10        A.   Yes.

11        Q.   Please do so.  Who posted this?

12        A.   I did.

13        Q.   Okay.  And it's posted in September of 2011; is

14   that right?

15        A.   Yes.

16        Q.   Okay.  And talk to me about this.  Is this the

17   first post you made about selling the items you had

18   purchased from Cavalry Arms?

19        A.   Yes.

20        Q.   Now, in the first sentence you say, "When

21   Cavalry Arms closed down last year, I took the opportunity

22   to purchase the CAV-15 mold and IP."  Your term, right?

23        A.   I am not a lawyer.  Any references to me using

24   "IP" or "intellectual property" in this post are as a lay

25   person.

1       Q.   I didn't ask that question, sir.  I asked if

2   you used the term "IP."

3       A.   Yes, I did.

4       Q.   Okay.  So you purchased IP from Cavalry Arms?

5       A.   In this context, I'm referring to the prints

6   themselves.

7       Q.   Whatever it might be, you're telling the public

8   that you purchased IP, correct, from Cavalry Arms?

9       A.   Yes.

10      Q.   Okay.  In the second paragraph you say, "It

11  made no sense for me to move forward on this, so I've

12  decided to sell the mold and IP rights."  Your words,

13  correct?

14      A.   Yes.

15      Q.   Third paragraph.  "After a series of

16  false-starts with several prospective buyers, I have

17  decided to put the CAV-15 mold and Intellectual Property

18  Rights" -- spelled out -- "...up for sale publicly."

19      Did I read that right?

20      A.   Yes.

21      Q.   That's what you meant to tell people out in the

22  public because that's what was available for sale by you,

23  correct?

24          MR. CALAWAY:  Object to the form of the

25  question.

1      Q.   (By Mr. Weger)  Correct?

2           MR. CALAWAY:  I'm sorry.  Object to the

3  form.

4      A.   What I was trying to relay to the public was

5  that there was the data to continue manufacturing of the

6  product and that I had the prints to the mold.

7      Q.   (By Mr. Weger)  You go on to say, "Be prepared

8  to invest between $60,000-$150,000, (depending on existing

9  production facilities owned by the buyer) to get the

10  operation up-and-running."  Where did you get that

11  estimate?

12      A.   I knew what the press, the welder, and the

13  ancillary equipment were going to be sold for if Christian

14  sold them.  So it ultimately depended on what equipment

15  the company purchasing already had.

16      I know that a mold replacement for the CAV-15 Mark

17  II at that time would have cost somewhere between 120 to

18  $150,000.  So I depreciated the mold and all the other

19  tools and bits and pieces that I personally owned down to

20  $60,000.

21      Q.   Okay.  Now, do you have any idea how much

22  Christian purchased the other equipment from Cavalry Arms?

23      A.   It was a lump sum purchase of $300,000 for

24  everything that Cavalry Arms Corporation owned.

25      Q.   Okay.  And how was that paid out, to your

```
 1        A.   Yes.

 2        Q.   Okay.  Is that your signature on KEA 185?

 3        A.   This page says KA40.  Sorry.  185.

 4        Q.   Is that your signature?

 5        A.   Yes.

 6        Q.   Okay.  Now, at the time of this sale, who all

 7   owned an interest in Sinistral Shooting Technologies, LLC?

 8        A.   Only me.

 9        Q.   Okay.  You're a hundred percent owner?

10        A.   Yes.

11        Q.   I didn't ask you earlier:  Are you married?

12        A.   No.

13        Q.   Do you have kids?

14        A.   No.

15        Q.   Have you ever been married?

16        A.   No.

17        Q.   Okay.  Let's go over a couple of pages to the

18   bill of sale, KEA40.  Is that your signature on the bill

19   of sale?

20        A.   Yes.

21        Q.   Okay.  Now, through our earlier discussions,

22   I'm aware that Mr. Nealon sold the equipment to Christian,

23   and he sold the mold and the other items to you

24   separately, right?

25        A.   Correct.
```

1      Q.   But here you're selling all of it to GWACS,

2  correct?

3      A.   Yes.  Correct.

4      Q.   Talk to me about the agreement between you and

5  Christian and/or Cavalry Manufacturing.  How did you get

6  title to the equipment in order to sell or sign the bill

7  of sale which is KEA 39 and 40 of Exhibit 6?

8      A.   Cappello did not want to the deal with GWACS

9  directly.  He did not want to be tied to any agreements

10  with them.  And in the interest of selling his equipment,

11  he agreed to sell it to me, and then I, in turn, would

12  sell it to them basically with terms that would allow me

13  to immediately pay him upon receipt of the payment from

14  GWACS.

15      Q.   Okay.  So is this a written document?

16      A.   I don't recall.  This -- this was a very fluid

17  situation to make this happen in a window of time and get

18  the equipment out of the building before the lease was up.

19      Q.   Do you have a bill of sale from Christian or

20  his company to you?

21      A.   Not in my possession.  And I don't recall if

22  there ever was one.

23      Q.   Okay.  And how much did you buy the equipment

24  from the Christian for?

25      A.   $60,000.

1      Q.   So it was the same amount that you were turning

2  around and flipping it to GWACS Armory for; is that

3  correct?

4      A.   Correct.

5      Q.   And when you got paid, did you get paid by

6  GWACS Armory?

7      A.   Yes.  They did an initial $3,000 of earnest

8  money to not sell it to anyone else while we were working

9  out the details.  Their first payment after the deal was

10  negotiated, I believe, was $57,000.  I might have these

11  mixed up.

12      And then there was another payment later for

13  $60,000.  The first shipment of the equipment, the press,

14  the welder, the dryer, coincided with the payment, the

15  first payment.  So I immediately gave that money to

16  Christian and shipped out that equipment to GWACS.

17      Q.   Okay.

18      A.   The later -- I later received the other half of

19  the payment and that's when I shipped out the mold and the

20  mold base.

21      Q.   Tell me about the conversations between you and

22  Christian on the sale of the equipment that he had

23  purchased from Cavalry Arms.

24      A.   He didn't want it in his building anymore.  It

25  was taking up space without the power to run it.

 1          And he did want to help me sell the CAV-15 mold and

 2     tooling, understanding that these other pieces of

 3     equipment were very useful.  And in the case of the

 4     welder, critical for its manufacture if someone didn't

 5     already have that welder.

 6          So he was holding onto it as long as he could in the

 7     interest of allowing me to get the mold sold, so I could

 8     then, in turn, on top of that $60,000, pay him back for

 9     all the other money he had loaned me as I was trying to

10     get my own manufacturing operations up and running

11     throughout 2010.

12          Q.   So the $60,000 part of the sales price to GWACS

13     Armory that you received, how much of that did you pay

14     Christian?

15          A.   I think it was around 35, or $40,000 by the

16     time it was all done.

17          Q.   Was that a hundred cents on the dollar of what

18     he had fronted for you?

19          A.   Yes.

20          Q.   Okay.  So that put the two of you square,

21     correct?

22          A.   Yes.

23          Q.   And you kept the rest?

24          A.   I paid off my credit card bills and other debts

25     I had accrued.

1   start.

2        The first one is from you to Shel Jones, dated

3   Thursday, September 29th, correct?

4        A.   Yes.

5        Q.   Okay.  And did you write the subsequent email

6   that starts out, "Shel, I spoke with Christian today"?

7                 MR. CALAWAY:  What page are you on?

8                 MR. WEGER:  Armory 10 and 11.  This is the

9   first email.  As usual, it goes backwards to frontwards.

10                MR. CALAWAY:  Right.

11       A.   Okay.

12       Q.   (By Mr. Weger)  I want to -- interested in the

13  second paragraph where you, first of all, you talked about

14  -- talking to Christian.

15       A.   Uh-huh.

16       Q.   And that Christian is having some issues about

17  signing a non-compete, right?

18       A.   Yes.

19       Q.   All right.  And you wrote, "He expressed some

20  reservations regarding a non-compete from himself or

21  Cavalry Manufacturing when he is only selling the

22  production equipment (that could be used for any injection

23  molding), not any intellectual property or CAV-15 specific

24  tooling.  The CAV-15 tooling and design is only owned by

25  my company, Sinistral Shooting Technologies, and as I

1    stated I have no problem signing a non-compete for polymer

2    AR-15 lower receivers."

3           Did you say that?

4           A.   Yes.

5           Q.   You go on to say:  "For what it's worth, I

6    don't believe he has any intention on making a polymer

7    AR-15 lower receiver, nor do I think he would have any

8    better luck getting an FFL than I did as he is also a

9    former employee of Cavalry Arms Corp.  I hope you can

10   reach an agreement with him soon."

11          Did I read all that right?

12          A.   Yes.  So the sum and substance of this is GWACS

13   Armory wanted you and Christian to sign noncompetes for

14   manufacturing any kind of AR-15; isn't that true?

15                MR. CALAWAY:  Object to the form of the

16   question.

17          A.   They never actually gave me one to sign.

18          Q.   (By Mr. Weger)  I didn't ask you that, sir.  I

19   asked you they wanted you to sign a non-compete for making

20   AR-15s, both you and Christian, correct?

21          A.   They were interested in that, yes.

22          Q.   And you indicated back to them that Christian

23   didn't want to sign one but that you would, correct?

24          A.   Yes.  Uh-huh.

25          Q.   All right.  Now, let's go to Armory 008,

1   please.  Take a second to review this email from Russ

2   Jones to you.  Tell me when you've had a chance to review

3   it.

4        A.   Okay.

5        Q.   All right.  Now, Mr. Jones writes to you on

6   September 28th of 2011, that, (As read):  "GWACS Armory

7   has made a decision to move forward with the procurement

8   of the CAV MKII molds, including, but not limited to the

9   exclusive rights to all the IP which includes the molds,

10  business process and know-how, marketing information,

11  fixtures, CAD drawings, design prints and molds, takedown

12  pins designs and CAD drawings, customer database and all

13  other business process to manufacture, market and sell the

14  lowers.  Purchase price $60,000."

15       Is that the offer that Mr. Russell made to you?

16       A.   You mean Shel?

17       Q.   Yeah, Shel Jones.  I apologize, yes.  Mr.

18  Jones.

19       A.   Yes.

20       Q.   Okay.  (As read):  "We would like to include in

21  the sale document that you both would come to Tulsa for

22  three days to transfer operational knowledge of how the

23  machines and the processes work.  We will require a

24  non-compete agreement executed by you and Cavalry

25  Manufacturing specific to the included items of the sell.

1          "Could you look at this list and add anything I

2     might be missing?  I need to get a detailed list to our

3     attorney to get the documents drawn.  Our attorney is

4     putting together a LOI to go with the $3,000 deposit.  We

5     need legal names and basic details above as well as

6     mailing address for the check."

7          Did I read all that right?

8          A.   Yes.

9          Q.   Okay.  Now, let's go to Armory 07.  And it

10    actually starts on 06, I believe.

11         You respond to Mr. Jones where you say, "I wanted to

12    clarify some things on the list.  CAV-15 Mark II molds

13    including, but not limited to the exclusive rights to all

14    the IP which includes the molds, business process and

15    know-how.  No problem with the above."

16         Right?  Is that your response?

17         A.   Yes.  And what seems to be a consistent theme

18    here is, I'm asserting relevant to the molds and your

19    clients are expanding that definition to include the part

20    design itself.

21         Q.   The next item that was in Mr. Jones' offer was,

22    "Fixtures and equipment for drilling operations, Serial

23    number tags (1,000+), takedown pin sets (1,500 +)."

24         Your response was "No problem to the above."

25    Correct?

1      A.   Yes.

2      Q.   Okay.  The next item in his offer was, "CAD

3  drawings, design prints to the molds."  And your response

4  was:  "I will provide any and all CAD drawings that are

5  available."  Correct?

6      A.   Yeah, "CAD/drawings that are available," yes.

7      Q.   Okay.  "Takedown pin designs and CAD drawings,

8  et cetera."

9      Your response was, "I can provide you with the

10  vendor CAV Arms purchased them from.  I do not have prints

11  for the pins themselves.  They are a standard 1/4"

12  diameter retainer pin, that was made to CAV Arms

13  length/finish specifications."

14      A.   Yes.

15      Q.   Next item is "Customer Database.  As we

16  discussed on the phone I can provide a list of vendors

17  that sold CAV-15 lowers."

18      A.   Yes.

19      Q.   The next item is:  "All other business process

20  to manufacture, market and sell the lowers."

21      Your response was:  "What else are you looking for

22  with this statement?"

23      And the last one is:  "We will require a non-compete

24  agreement executed by you and Cavalry Manufacturing

25  specific to the included items of the sell."

1          A.   Over the course of CAV Arm's existence, every

2     piece of information related to the production,

3     manufacture, and design of that receiver was publicly

4     disclosed.

5          (Whereupon, Deposition Exhibit Number 45 was marked

6     for identification purposes.)

7          Q.   I hand you Exhibit 45.   Did you write this,

8     sir?

9               MR. CALAWAY:   Object to the form of the

10     question.   He can identify it.

11          Q.   (By Mr. Weger)   Are you SinistralRifleman?

12          A.   Yes, that is one of my internet aliases.   Yes,

13     this appears to be an article off of my blog.

14          Q.   Did you say in the second paragraph of Exhibit

15     45, "The CAV-15 Mark II mold and IP was recently sold to

16     GWACS Armory of Tulsa, OK"?

17          A.   Yes, the IP to the mold.

18          Q.   "With the CAV-15 MK IIs coming back into the

19     market, I thought it would be a good time to repost some

20     of my old experiences with the CAV-15."   Right?

21          A.   Yes.

22          Q.   That's what you said.

23               MR. CALAWAY:   Object to the form of the

24     question.   I think there was more to that sentence.   You

25     were reading from the -- you were -- my objection is you

 1   were reading from the document but you didn't read it

 2   correctly so I just wanted to clarify.  We can do it.  You

 3   can try it again.

 4                  MR. WEGER:  I think I did.  But I'll read

 5   it again.

 6        Q.   (By Mr. Weger)  "The MKII mold and IP was

 7   recently sold to GWACS Armory of Tulsa, OK.  With CAV-15

 8   MKIIs coming back into the market, I thought it would be a

 9   good time to repost some of my old experiences with the

10   CAV-15 Mark II."  Did I read that right?

11        A.   Yes.

12        Q.   Now, so we've -- and we're in the fall of 2011.

13   You get contacted by GWACS.  You agree to sell them what

14   you had purchased from Cavalry Arms and what Christian had

15   purchased from Cavalry Arms at least as to the mold and

16   the equipment for 120,000, correct?

17        A.   Yes.

18        Q.   All right.  So after it closes, and when does

19   it close?  When do you get the checks?

20        A.   I got one in November of 2011, if I recall

21   correctly.  I can't remember if the second one was in

22   December of 2011 or January of 2012.

23        Q.   Okay.  So after -- let's just start with

24   January 1, 2012.  Take me forward.  What did you do, Mr.

25   Phagan work wise?

1    aluminum that's pressed at high pressure into its rough

2    outer shape.  There are very little machining operations

3    performed around the outer surface of the receiver.

4         Most machining operations are done on the internal

5    components of the receiver to make it capable of accepting

6    fire controlled parts in a magazine.  A billet receiver

7    starts off as a complete, solid, rectangular block of

8    aluminum.  And every surface is touched by the machine to

9    machine those features into it.

10        Q.   Is there one preference over the other?

11        A.   Forged is cheaper.  Billet is more expensive

12   but cosmetically more appealing, and allows you to put

13   different features into the parts such as the flared

14   magazine well for faster reloading.

15                  MR. CALAWAY:  Is now a good time?

16                  MR. WEGER:  Yeah.  Do you want to take

17   another break?

18        (whereupon, there was a recess taken.)

19        (whereupon, Deposition Exhibit 46 was marked for

20   identification purposes.)

21        Q.   (By Mr. Weger)  This is Exhibit 46.  Take a

22   second sir and review Exhibit 46 which is made up of

23   documents KEA 96 through 100.

24        A.   Okay.

25        Q.   Did you sign the letter of intent that's

1   referenced in this email?

2        A.   This one isn't signed but I recall signing some

3   letter of intent.

4        Q.   Okay.  I'm interested in the transaction terms.

5   And let's go to that, please.  It's on KEA 98.

6        This letter of intent states that, "The offer being

7   presented by GWACS is to purchase and the procurement of

8   the CAV MK II molds, including, but not limited to the

9   exclusive rights to all the intellectual property which

10  includes the molds, business process and know-how,

11  marketing information, fixtures and equipment for drilling

12  operations," and then he lists a bunch of the equipment

13  that was sold.

14       He goes on to say, (As read):  "CAD drawings, design

15  prints to the molds, takedown pins specifications and

16  designs with any CAD drawings that exist, the customer

17  database and all other business processes to manufacture,

18  market and sell the lowers, (hereinafter referred to as

19  the "Assets")."

20       Now, what I'm interested in, sir, if we go to KEA

21  97, you respond to the letter of intent with four items,

22  don't you, the top of the page?

23       A.   Yes.

24       Q.   You say, "Christian has decided to sell me the

25  Van Dorn press and the Branson linear vibration welder to

1   simplify the sale.  Please modify the letter of intent

2   accordingly."  Did I read that right?

3        A.   Yes.

4        Q.   "Christian says he will be available for

5   consulting to help you get it running.  2) Please strike

6   'expectations' under point 3 line 7."

7        And that has to do with the acquisition paragraph,

8   right?  Then it goes on to say, Number 3, "The letter of

9   intent states that the sale cannot be discussed with any

10  3rd parties; I believe it is in both our best interests to

11  be able to discuss it with Christian/Cavalry Manufacturing

12  relating to the technical nature of equipment/production."

13       And Number 4, "Please send over the nondisclosure

14  agreement," which we just looked at, didn't we?

15       A.   Yes.

16       Q.   You didn't say anything to Mr. Jones with

17  regard to the letter of intent about paragraph 1 in the

18  transaction terms in your comments; did you, sir?

19       A.   No, I wouldn't believe that I needed to.  We

20  had already defined what IP was in previous emails.

21       And I mean, the way this is phrased, "procurement of

22  the CAV-15 Mark II molds including, but not limited to,

23  exclusive rights to all the intellectual property, which

24  includes the molds.  Again, it's "to the molds" is present

25  throughout all this language because that's what I

1    believed I was selling him.

2         Q.   It's in my outline.  I don't remember if I

3    asked you this.  And if I did, I apologize.  Did you ever

4    tell anyone at GWACS Armory that the ATF made either you

5    or Mr. Nealon destroy any CAD files?

6         A.   Absolutely not.  That's not how ATF stuff

7    works.  As long as you don't actually produce receivers

8    and don't have actual firearms inventory intent for sale,

9    it's nothing they can regulate.  The information is not

10   regulated by the ATF itself.

11        Q.   I just asked if you said that to them.

12        A.   No.

13        Q.   Is the answer no?

14        A.   No.  Never said that.

15        Q.   Let's go to Exhibit 27 in your notebook,

16   please.

17        A.   Okay.

18        Q.   Does this Nondisclosure Agreement contain your

19   signature on the second or the third page?

20        A.   Yes.

21        Q.   And this is again between your company,

22   Sinistral Shooting Technologies, LLC, and GWACS Armory,

23   correct?

24        A.   Correct.

25        Q.   Why was this one signed in 2013?

1    phone calls and emails.  And I didn't want to have any

2    misunderstandings that he was in any way directing or

3    controlling my business.

4         Q.   (By Mr. Weger)  Okay.  So from December of 2010

5    until when?  When is the next time you communicated with

6    Mr. Nealon on a regular basis?

7         A.   Probably not until 2015 or 2016.

8         Q.   Okay.  And what was the occasion for that?

9         A.   I knew that he manufactured medical kits.  And

10   KE Arms wanted medical kits for use on the range and

11   around the shop.

12        Q.   So did you buy medical kits from --

13        A.   Bought or traded.

14        Q.   -- Mr. Nealon?  Did you have anything to do

15   with the purchase by KE Arms of the information from Mr.

16   Nealon?

17        A.   Yes.

18        Q.   Tell me about that.  What was your involvement?

19        A.   I believe Nealon let me know that he had a

20   number of prints and designs for sale.  I knew that he had

21   run Accumatch in the past.

22        And this time frame in 2016 is when KE Arms was

23   developing its Glock pistol product line including slides,

24   compensators, magazine wells, et cetera.  And he mentioned

25   that some of these prints he had were from the Accumatch

1    era, and they might be of use for us in our pistol product

2    development.

3         Q.   So you were the go-between to negotiate that

4    deal?

5         A.   It was basically me and Mike.

6         Q.   Okay.  Did Mr. Nealon come to the offices of KE

7    Arms?

8         A.   Yes.

9         Q.   And were you present in that meeting?

10        A.   Yes.  Tell me about that.  Who was there?

11             MR. CALAWAY:  Object to the form.

12        A.   It was me, Shawn Nealon, Mike Kenney was there

13   for part of it, Tom Cornelius, who was one of our other

14   sales reps, and had worked on pistol product lines at

15   Swords International was also present.

16        Q.   (By Mr. Weger)  Did that have anything to do

17   with an AR-15 polymer lower?

18        A.   It wasn't specifically discussed at that time,

19   no.  It was -- it may have been discussed in the sense

20   that it was one of many things in this information packet

21   but it didn't really have any relevance to us then.

22        (whereupon, Deposition Exhibit 52 was marked for

23   identification.)

24        Q.   I hand you Exhibit 52.  Now, this is back in

25   October of 2011 when you first -- you remember I asked you

1    identification.)

2        Q.    I hand you Exhibit 55.  Here's an email from

3    you in June of 2016 to Shel Jones.  What are you sharing

4    on this CAV-15 Dropbox?

5        A.    So earlier in 2016, February, KE Arms had

6    purchased prints and CAD files from Nealon that I had

7    never received as part of any of my dealings with him

8    earlier.  In June of 2016, Shel Jones and I had been

9    communicating about rifle sales, particularly, a

10   lightweight low-cost rifle going into the 2016 election

11   cycle.

12       Election cycles are historically high sales time

13   periods where being able to put out a cost effective high

14   volume product is a benefit.  So earlier in June, I had

15   been communicating with Shel related to working together

16   on a low-cost lightweight rifle project.

17       He had mentioned they were having problems with

18   their mold.  At that point I spoke with Mike Kenney about

19   the files we had purchased from Nealon and that we had

20   found that there was the complete data for the CAV-15 Mark

21   II in there.

22       And I received permission from Mike Kenney to send

23   that to Shel Jones at that time.  Shel Jones was thankful

24   when I sent that, and that they were finally able to

25   really take a look at refurbishing and repairing the mold.

1      Q.   So that should have been sent to GWACS with the

2   previous exhibits, right, when you sent him the CAD files?

3              MR. CALAWAY:  Object to the form.

4      A.   It wasn't things that I possessed in 2011.

5      Q.   (By Mr. Weger)  But it was things you were

6   supposed to have possessed from Mr. Nealon, he just didn't

7   give them to you?

8              MR. CALAWAY:  Object to the form.

9      A.   No.  That wasn't part of my sales agreement

10   from --

11              MR. CALAWAY:  Object to the form.  Now

12   answer.

13      A.   Okay.  That was not part of my sales contract

14   with Nealon in 2010.  The sales contract with Nealon in

15   2010 lists hard assets only, not CAD files, not

16   blueprints.

17      Q.   (By Mr. Weger)  So now you're telling the court

18   and jury that in 2016 when Nealon with your help sells

19   that CAD file to KE Arms, it had the complete Mark II-15

20   drawings on the CAD?

21              MR. CALAWAY:  Object to the form.  Go

22   ahead.

23      A.   To the best of my understanding.  I don't have

24   CAD software myself.  I can only go based upon what the

25   files were labeled.

1     Q.   (By Mr. Weger)  So you never looked at the CAD
2  files?
3     A.   I don't have the capability of looking at the
4  CAD files.
5     Q.   Did anybody at Cavalry tell you that the
6  complete Mark-15 CAD files were on that disk?
7     A.   No.  I'm relying solely on the naming of the
8  file tree and nomenclature.  There were also huge
9  three-foot by four-foot drafting prints of the CAV-15 Mark
10  II that were part of this that I took to a local graphics
11  company/reproduction company with Mike's permission, had
12  them copied, and we Fed Ex'd GWACS copies of those prints.
13     Q.   Have you used -- has KE Arms used that CAD file
14  in developing its KP lower?
15     A.   No.
16     Q.   Did they use the prints that you sent to GWACS
17  to develop their KP lower?
18     A.   No.
19     Q.   Did you tell KE Arms that that -- you had sold
20  that to GWACS?
21          MR. CALAWAY:  Object to the form.
22     A.   I told KE Arms that I had sold GWACS Armory the
23  molds and tooling and equipment necessary to produce
24  CAV-15 Mark IIs.
25     Q.   (By Mr. Weger)  And all associated IP, right?

1      A.    Yes.  To this day on GWACS' website, they link

2   to my blog article with a photo of Nealon standing in

3   front of prints on the wall behind him.  They have

4   absolutely publicly disclosed dimensions and relative

5   internal features of the CAV-15 Mark II.

6      Q.    (By Mr. Weger)  Okay.  Now, back to my

7   question.  Has GWACS ever disclosed to the public, to your

8   knowledge, the CAD files or the drawings?

9      A.    The drawings, yes.

10      Q.    And that's because they were on the wall behind

11   you in a picture?

12      A.    Behind Nealon in a picture.

13      Q.    Okay.

14      A.    AR-15s are known dimensions.  You can calculate

15   the point of origin from the front takedown pin to all the

16   other locations because AR-15s are in the public domain.

17   The distances between all these features are well-known to

18   the public to the point people produce these at home on

19   their own machines.

20      Q.    Isn't it true that every time that you worked

21   with GWACS on a CAV-15 project, they required you to sign

22   a nondisclosure?

23           MR. CALAWAY:  Object to the form.

24      A.    No, my NDA expired by the time we were still

25   working together in 2015.

1    anybody you wanted to?

2         A.    I reject the concept that they had any

3    confidential information.

4         Q.    So the answer to my question is yes; is that

5    what you're going to tell the jury?

6         A.    Rephrase your question.

7         Q.    You're --

8              MR. CALAWAY:    I'm going to object.  You're

9    arguing.

10              MR. WEGER:    No, no.  I'm trying to get a

11    straight answer.

12         Q.    (By Mr. Weger)  Your position is they didn't

13    have any confidential information.  If that's the case,

14    why were you signing NDAs?

15              MR. CALAWAY:    Object to the form of the

16    question.

17         A.    I signed NDAs relative to sales and pricing

18    data when I became a sales rep.  I signed NDAs relative to

19    their investor packet they sent which included their Mark

20    III and their Mark IV.

21         Q.    (By Mr. Weger)  Okay.  Let's go with that.  Do

22    you feel like you were free to disclose that information

23    after your NDA ran out?

24         A.    No.

25         Q.    Okay.

 1          A.    That was not information that was in the public
 2     sphere or that I publicly possessed.
 3          (whereupon, Deposition Exhibit 56 was marked for
 4     identification.)
 5          Q.    I hand you what I've marked as Exhibit 56.
 6     This is an email from Shel Jones to you.  And you back to
 7     Shel Jones in June of 2015, correct?
 8          A.    Yes.
 9          Q.    And it says, "Shel, signed NDA from Mike and KE
10     Arms attached.  I can just give him the files I already
11     have if that works."  Right?
12          A.    Yes.
13          Q.    So you knew that GWACS wanted a signed NDA
14     from KE Arms before you gave them any files; is that true?
15          A.    Before I gave them their investor packet, yes.
16          Q.    Okay.  Tell me about that.  Why was KE Arms
17     getting an investor packet with GWACS?
18          A.    I had explained the history of the CAV-15
19     receiver to Mike Kenney, and the potential for market
20     growth in that area.  GWACS, I knew, was undercapitalized
21     and they were unable to improve and advance their own
22     tooling.  And given Mike's resources and experience, that
23     perhaps getting him involved would allow them to advance
24     the CAV-15 as a product.
25          Q.    Involved how?

1        A.   Yeah, I remembered it.

2        Q.   S-p --

3        A.   -- e-r-r-y.

4        Q.   And he's the guy that works at Mold, Inc.?

5        A.   MoldWorx.

6        Q.   Moldworx.

7        A.   He no longer works there.  He's independent at

8    this point running Sperry Design Services.

9        Q.   Okay.  And go to your answer to Interrogatory

10   Number 8, please.  We were talking about -- it asks about

11   the purchase of the documents and things from Mr. Nealon

12   in Interrogatory 8.

13       A.   Yes.

14       Q.   Down below you say, and I just want to ask you

15   to clarify what you mean.  You say, "The drive also

16   included files and documents related to the CAV-15 MKI and

17   MKII which were different from what was purchased by SST."

18        How were they different?

19       A.   I don't have them anymore.  So I can't really

20   compare them.  I just know that there was substantially

21   more there than anything I had in 2011 that I transmitted

22   to GWACS.

23       Q.   But you ended up sending that same information

24   to GWACS in 2016, correct?  You forwarded that to --

25       A.   By "same" --