```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OKLAHOMA

GWACS ARMORY, LLC,                   )
                                     )
              Plaintiff,             )
                                     )
vs.                                  )  Case Number
                                     )  20-cv-0341-CVE-SH
KE ARMS, LLC, RUSSELL PHAGAN,        )  BASE FILE
SINISTRAL SHOOTING,                  )
TECHNOLOGIES, LLC, BROWNELLS,        )  Consolidated with:
INC., and SHAWN NEALON,              )  Case No.
                                     )  21-CV-0107-CVE-JFJ
              Defendants.            )
                                     )
and                                  )
                                     )
KE ARMS, LLC,                        )
                                     )
              Plaintiff,             )
                                     )
vs.                                  )
                                     )
GWACS ARMORY, LLC, GWACS             )
DEFENSE INCORPORATED, JUD            )
GUDGEL, RUSSELL ANDERSON, DOES       )
I through X, and ROE                 )
CORPORATIONS I through X,            )
                                     )
              Defendants.            )
_____
```

                    THE DEPOSITION OF SHAWN NEALON,
taken on the 25th day of October, 2021, between the hours
of 9:29 a.m. and 12:46 p.m., on behalf of the Plaintiff
GWACS, pursuant to Federal Rules of Civil Procedure, at
the law offices of Hall, Estill, Hardwick, Gable, Golden &
Nelson, 320 South Boston Avenue, Suite 200, Tulsa,
Oklahoma, before Linda Fisher, CSR-RPR, and Notary Public
in and for the State of Oklahoma.

 1            A.   Everything.  Just my backup of all my

 2     customers, FFL stuff, all that stuff.  It was the off-site

 3     backup in case the business caught fire.

 4            Q.   Right.

 5            A.   But they took that and then from the business,

 6     they took all the firearms, all the papers basically and

 7     anything electronic.  They took any laptops, hard --

 8     computers, thumb drives, CDs, any of that stuff.

 9            Q.   Did you have the design of the CAV-15 on Cad

10     files?

11            A.   Yes.

12            Q.   Did they take those?

13            A.   Yes.

14            Q.   Did you ever get those back?

15            A.   I'm not sure.  I -- I believe so.  They gave

16     back a bunch of just kind of random stuff.  At that point,

17     I couldn't look at most of it so...

18            Q.   Who did you hire to represent you in this

19     matter?

20            A.   Mark Barnes and Marc Victor.

21            Q.   Okay.  They're in Arizona?

22            A.   Mark Barnes is with a K.  And Victor is Marc

23     with a C.  Mark Barnes is out of Washington, D.C.  And

24     then he has an office in Scottsdale, Arizona.  Mark Barnes

25     was based out of I believe it was Chandler, Arizona at

1    and, theoretically, kept going.  But it wasn't -- it

2    wasn't tenable.

3         Q.   What else did they make you surrender?  Did

4    they make you surrender any CAD files as part of your plea

5    deal?

6         A.   No.

7         Q.   Did they ever give you all your CAD files back?

8         A.   I don't know.  Because I wasn't able to

9    actually -- the hard drive came back on some of it.  It

10   wasn't working anymore.

11        So I know that they mirrored all of our hard drives.

12   Because even after they returned our computers, they were

13   still checking our email and whatnot because they were

14   logged in as us.

15        Q.   Okay.  So did Cavalry Manufacturing continue on

16   in business after you pled guilty to the felony?

17        A.   Yes.

18        Q.   What did it do after?

19        A.   Cavalry Manufacturing was a different company

20   but they did everything but receivers.

21        Q.   What did Cavalry Arms do?

22        A.   Change the name.

23        Q.   To what?

24        A.   From Cavalry Arms to Cavalry Industrial

25   Corporation.  And then did a d/b/a as the Tactical Medic.

```
 1          Q.   Now, as part of the plea deal with the ATF,
 2   were you required to sell the machinery that -- for the
 3   molds for the AR-15 lower?
 4          A.   No.
 5          Q.   But you just couldn't manufacture them anymore,
 6   correct?
 7          A.   Not in the traditional sense, no.
 8          Q.   Right.  You could make one side and the other
 9   side but you couldn't join them together?
10          A.   Correct.
11          Q.   What you told me earlier.
12          A.   Correct.
13          Q.   Okay.  As part of the plea deal, were you
14   required to sell anything --
15          A.   No.
16          Q.   -- that Cavalry Arms had done?
17          A.   No.
18          Q.   You just couldn't use it in the traditional
19   sense, to use your term?
20          A.   Correct.
21          Q.   So what did you end up selling and to whom?
22          A.   Before I sold the bulk of the assets to Cavalry
23   Manufacturing, and since we're shooting technologies, I
24   worked out a deal with Russell to get him out of the
25   company.  At the time he was the vice-president, I
```

1    believe, and owned some stock.

2         Q.   Of Cavalry Arms?

3         A.   Correct.  And to get him off of -- out of the

4    company, so that he wouldn't be involved in any of the

5    legal stuff, he traded in his stock.  I gave him

6    physically the mold, I believe the cores and cavities for

7    the Mark 1.

8         There were some hand fixtures for doing the

9    secondary operations, the nests for the vibration welder,

10   not the welder, just the nests; they're the fixtures that

11   go in it.  And I think any screws, takedown pins that were

12   needed for doing the CAV-15.  It was all physical stuff.

13        Q.   Did you give him any CAD files?

14        A.   No.

15        Q.   Where did he get them?

16        A.   I don't know.

17        Q.   Did he steal them?

18        A.   I don't know that he ever had them.

19        Q.   Are you aware that he gave my clients CAD

20   files?

21        A.   No.  Don't believe he did.

22        Q.   Okay.  Is it your testimony under oath that you

23   didn't sell Mr. Phagan any IP?

24        A.   Correct.

25        Q.   Okay.

1  Arms?

2          MR. CALAWAY:  Object to the form of the

3  question.

4      A.   I don't remember.  I was cleaning out my

5  closet, or my garage, and just started calling different

6  people I knew in the industry that might be interested in

7  a box of handguards or prints or whatever.

8      The particular thumb drive of stuff, I actually gave

9  out several of those.  And I can't remember if it was

10  Russell or someone else.  I knew several people at various

11  times that worked at KE Arms.

12      And they got back to me and said they would be

13  interested.  You know, when they asked, Well, what are the

14  files, I said there was a lot of pistol stuff, they said

15  they were interested.

16      Q.   Well, did you sell CAD -- CAM files to KE Arms

17  in 2016?

18      A.   Yeah.

19      Q.   Do you still have a copy of what you sold them?

20      A.   No.

21      Q.   What did you do with it?

22      A.   Sold it to them.

23      Q.   Well, did you sell them the only copy?

24      A.   That I had.

25      Q.   Why didn't you make a copy?

1        A.   Why would I?

2        Q.   Why did you still have this copy?

3        A.   I don't know.

4        Q.   Were you supposed to still have CAD files for

5   manufacture of lowers of AR-15s?

6        A.   Yeah.

7        Q.   Pursuant to your plea with the ATF?

8        A.   Yeah.

9             MR. CALAWAY:  Let him finish the question.

10        A.   Sorry.

11             MR. CALAWAY:  Can you -- can you -- if you

12   want, we can restate the question.  I --

13        Q.   (By Mr. Weger)  Well, my question was, did

14   you--

15             MR. WEGER:  Well, read my question back.

16        (Whereupon, the requested portion was read by the

17   reporter.)

18        A.   Yes.

19        Q.   (By Mr. Weger)  They said it was okay for you

20   to maintain those files?

21        A.   Yes.

22        Q.   Okay.  But you don't think you gave Mr. Phagan

23   a copy of the same files at the time you sold him the

24   items on Exhibit 5?

25        A.   I didn't give him any files when I sold him in

```
 1   that.
 2        Q.   Why not?
 3        A.   He didn't need them.
 4             MR. CALAWAY:  One question at a time.
 5        A.   I'm sorry.  I did not.  Because that wasn't the
 6   deal.
 7        Q.   (By Mr. Weger)  Did you subsequently give him
 8   the CAD file?
 9        A.   Through KE.
10        Q.   So was this done with Mr. Phagan?
11        A.   It was done through Mike -- with Mike Kenney.
12   But Russell worked there.
13        Q.   Okay.  When did Russell go to work at KE Arms?
14        A.   I don't know.  I don't know the date.
15        Q.   Well, this indicates -- it says, "As per the
16   agreement we reached at your facility."
17        So you were at KE Arms' facility in Phoenix,
18   Arizona?
19        A.   Yes.
20        Q.   When did you go there?
21        A.   February 25th.
22        Q.   Okay.  And how many times have you been there?
23        A.   Maybe four.
24        Q.   So on February 25, 2016, was Mr. Phagan still
25   working with GWACS?
```

1    Q.   Were there designs for the CAV-15 on the CD --
2    I'm sorry, on the thumb drive that you gave them?
3    A.   I don't know.  I wasn't able to open the files.
4    I didn't have the proper software to open them.  I also
5    cautioned them that whatever computer they put that thumb
6    drive in, to make sure it wasn't connected to their
7    network, because I had no idea if it was riddled with
8    viruses or whatever.
9    Q.   Okay.  So you sold them a CAD -- CAM file on a
10   thumb drive and you had no idea what was on it?
11              MR. CALAWAY:  Objection.
12   A.   I didn't have a --
13              MR. CALAWAY:  Objection.  Object to the
14   question.  Asked and answered.  Go ahead.
15   A.   Okay.  I no longer owned the computers or any
16   of the stuff that I could really open these files and
17   manipulate them or do anything with.  I didn't currently
18   own any CAD or CAM software.  So last time I had opened
19   the files was, like, shit, 2008, 2006, something like
20   that.  And they were there.
21        Mostly what they were interested in were the stuff
22   that was left over from Accumatch, block pistol barrels,
23   extended pistol barrels with suppressors, muzzle brakes.
24   A lot of the prints and stuff covered a lot of pistol
25   parts.  That was mostly what they were looking at.

```
 1          Q.   Did they look at the files before they paid you
 2   the thousand dollars?
 3          A.   They went through all the paper files.  And as
 4   far as the thumb drive, they -- I told them, Hey, it is
 5   what it is.  It was almost more of a:  These might be
 6   useful for you.  But it was mostly the paper stuff is what
 7   they were really interested in at that time.
 8          Q.   And by that you mean the assorted two boxes of
 9   assorted blueprints --
10          A.   Correct.
11          Q.   -- that are referenced in your letter?
12          A.   Correct.
13          Q.   And these are blueprints for pistol parts?
14          A.   Well, it's all kind of stuff.
15          Q.   Were there any CAV-15 blueprints in there?
16          A.   Some.
17          Q.   How many?
18          A.   Mostly Mark 1.  But I have no idea.  I don't
19   know the exact contents.
20          Q.   Okay.  And did you keep a copy of any of the
21   information that you sold to KE Arms?
22          A.   I don't know.  I very well might have some of
23   the electronic stuff.  I know I still have some of the
24   prints.  I didn't make copies.  I just took the ones I
25   wanted out of it, and they're hanging on my wall.
```

Case 4:20-cv-00341-CVE-SH   Document 203-2 Filed in USDC ND/OK on 04/12/23   Page 11 of 16

Page 87

1    Q.   What did you keep copies of?

2    A.   I think it was mostly CAV-15 stuff.  I mean,

3  that was my baby.  So the other stuff I really didn't care

4  about.

5    Q.   So you pulled the CAV-15 blueprints out of the

6  stuff you sold to KE Arms?

7    A.   Okay.  I'm going to just assume you don't

8  understand how many prints are involved in a mold base or

9  a part print.

10    We're talking, like, 20, 30 pages of stuff.  And I

11  took ones that I thought looked cool.  I have no idea how

12  many.  It's like maybe five or six; it could be more, it

13  could be less.  I don't know.

14    Like I said, they're mostly the ones I thought

15  looked good.  They're mostly part prints.  Because mold

16  based drawings are -- it's a 2D representation of a 3D

17  thing.  And it gets really busy.

18    And unless you know what that is, it just looks like

19  just a bunch of chicken scratch.  But I didn't make copies

20  of anything.  It was all stuff that I already had.  And I

21  just threw it in a box.

22    If they were interested, great.  If not, well, if

23  not, then it would still be in my garage today.  Have you

24  looked to see if you still have anything in your garage?

25    A.   I have all kinds of things in my garage.

1  business, I know nine grand of product probably actually

2  costs them, like, maybe four.  So in reality, they

3  probably got it for actual hard money on their said, maybe

4  four or five grand.

5      Q.   Did you differentiate between the IP you were

6  selling them, the CAD drawings, and the blueprints versus

7  anything else you --

8      A.   I didn't sell them any IP.  I just sold them

9  CAD files, as far as, like, if they're owned or not or any

10  of that stuff.  I mean, I didn't spell out, I mean,

11  obviously, I know how to do that stuff.  This is just

12  basically here's the stuff.

13      Like I said, the CAD/CAM on the thumb drive, a lot

14  of it I couldn't even verify that it was any good.  The

15  paper prints, they're paper prints.  You can physically

16  take them out, look at them, scan them, import them in

17  that way.

18      So and that is really -- that's a tangible thing.

19  The CAD/CAM stuff, like I said, -- and some of it, shit,

20  the CAD/CAM that KE has is so much better than what I was

21  using back at Accumatch.

22      I mean, one of the mills we had at Accumatch

23  literally took punch cards; it was that old.  So I mean,

24  CAD/CAM has advanced just so ridiculously in the past 20

25  years.  The stuff that I did the CAV-15 on, you had to

1   have a specific piece of software called ProEngineer.

2   Pro/Engineer and Pro Manufacturing.  Very expensive.  If

3   you don't pay your monthly licensing, the software deletes

4   itself.  So that's why I couldn't even look at it.

5        Q.   Okay.

6        A.   That, I don't think they're in business

7   anymore, too.  Sorry, a little wordy.

8        Q.   The information that was -- or I'm sorry, not

9   the information, the second page of Exhibit 34, the

10  invoice which you've told me is the stuff that they gave

11  you, that's the $9,000 in KE Arms products, right?

12       A.   Correct.

13       Q.   What was the delay between February of 2016 and

14  November of 2016 when they sent you this invoice?

15       A.   This was the final invoice.  They had given me

16  some stuff right up front.  They were just busy.  Some of

17  the stuff they didn't have.  They were waiting for it to

18  finish being through the process.

19       Like, I think they had barrels but they didn't have

20  complete bolt groups.  It was just different stuff like

21  that.

22       And I didn't need it, just because I was working gun

23  shows with the Tactical Medic.  I knew lots of people that

24  sold AR parts and stuff.

25       And so for me it was a lot easier to sell this stuff

1    had just like bought all my stock and just did it that

2    way, if one of the guns blew up or something, he's still

3    potentially somebody to be sued.

4         Q.   Well, I understand the difference between an

5    asset purchase and a stock purchase.

6         A.   Right.

7         Q.   So you had a company called Cavalry

8    Manufacturing Corp.?

9         A.   No.

10        Q.   What is it?

11        A.   It was an LLC.  I never had any assets in it.

12   It was just --

13        Q.   I'm not asking about that.  I'm just asking

14   about the name of the company that you formed.  You had

15   Cavalry Arms.

16        A.   Correct.

17        Q.   We talked about that.

18        A.   Correct.

19        Q.   And you eventually sold Cavalry Arms to Cavalry

20   Manufacturing?

21        A.   I sold all the assets.

22        Q.   The assets.  Okay.

23        A.   I changed the name from Cavalry Arms to Cavalry

24   Industrial, and then just did a d/b/a as a tactical

25   matter.  So I maintained the existing bank account,

```
 1        A.   Yes.  Or whenever the -- I don't have any of
 2   that stuff in front of me.  Yeah.
 3              MR. CALAWAY:  If you don't know, --
 4        Q.   (By Mr. Weger)  Well, you had the trouble with
 5   the ATF in -- I'm not trying to confuse you.  I actually
 6   want to make sure I understand.
 7        A.   No, I think it was 2010.
 8        Q.   Yeah, you had the trouble with the ATF in 2010.
 9        A.   I got raided in 2008.  It was two years later
10   is when we took the plea and had the sentencing.  It was
11   in 2010.  So it was in 2010.  I can't -- I don't remember
12   if it was right before I took the plea.
13        I mean the plea was already there.  And it was like
14   you have until whenever to sign it or not.
15        Q.   Okay.  Your agreement with Mr. Phagan on the
16   Asset Purchase Agreement with Sinistral was dated May 3,
17   2010, just to give you a time frame.
18        A.   Okay.  So I think it was June.
19        Q.   Okay.
20        A.   I think it was June that I -- I sold what was
21   left to Christian.
22        Q.   Okay.  And you sold him equipment.
23        A.   Correct.  And inventory and, you know, all the
24   customers and stuff like that.
25        Q.   Okay.  And what was -- now, how did you know
```

1   being?

2        A.   The big thing that stood out as far as -- are

3   you talking function or strictly cosmetic stuff?

4        Q.   Either.

5             MR. CALAWAY:  Object to the form.

6        A.   KE-15 looks a lot cleaner.  It's a better

7   looking part.  They obviously spent money on the design.

8   There was a lot of things I wish I would have been able to

9   do when I did it to begin with that we just never did.

10       Q.   Give me an example of what you're talking

11  about.

12            MR. CALAWAY:  Object to the form.

13       A.   You know, CNC machining for trimming it and

14  stuff, just makes a cleaner part.  We were doing it all by

15  hand.  The big thing I noticed that was drastically

16  different that I wouldn't have done, a buffer tube.  They

17  did it differently.

18       Q.   Explain it again what you mean.

19       A.   I didn't -- again, I didn't pick the thing up.

20       Q.   Right.

21       A.   But looking in the hole, I think the CAV-15

22  with the ribs I think was better.  But I -- they did it

23  differently.

24       Q.   And you're talking about --

25       A.   Obviously, it works.  I've seen people shooting