```
 1              IN THE UNITED STATES COURT FOR THE
                  NORTHERN DISTRICT OF OKLAHOMA
 2
                                           )
 3    GWACS ARMORY, LLC, an Oklahoma        )
      limited liability company,            )
 4                                          )
                        Plaintiff,          )   Case No.
 5    v.                                    )   20-CV-0341-CVE-SH
                                            )
 6    KE ARMS, LLC, RUSSEL PHAGAN,          )   Consolidated with
      SINISTRAL SHOOTING TECHNOLOGIES,      )   Case No.
 7    LLC, BROWNELLS, INC. And SHAWN        )   21-CV-0107-CVE-SH
      NEALON,                               )
 8                                          )
                        Defendants,         )
 9    and                                   )
                                            )
10    KE ARMS, LLC,                         )
                                            )
11                      Plaintiff,          )
      v.                                    )
12                                          )
      GWACS ARMORY, LLC, GWACS DEFENSE      )
13    INCORPORATED, JUD GUDGEL, RUSSEL      )
      ANDERSON, DOES I through X, and       )
14    ROE CORPORATIONS I through X,         )
                                            )
15                      Defendants.         )
      _____)
16
17
18            DEPOSITION OF RUSSELL WAYNE PHAGAN
19                    PHOENIX, ARIZONA
                       June 1, 2022
20
21
22
23
      Prepared by:
24    Deborah L. Tucker, RPR
      Certified Reporter
25    Certification No. 50464
```

1      takedown pins, roll pins, and parts kits.

2           Q.   Turn to Exhibit 43 for me, please.

3           A.   Okay.

4           Q.   You there?

5           A.   Yes.

6           Q.   And this is Armory 6, correct?

7           A.   Correct.

8           Q.   Let's start at the back of this e-mail chain.

9           A.   We are on Armory 11?

10          Q.   Yes.

11                    MR. CALAWAY:  43, is that the exhibit?

12                    MR. BOGAN:  Yes.

13     BY MR. BOGAN:

14          Q.   You there?

15          A.   Yeah.

16                    Mr. BOGAN:  Russell, you there?

17                    MR. CALAWAY:  Yes.

18     BY MR. BOGAN:

19          Q.   And this is an e-mail from you to Shel Jones,

20     correct?

21          A.   Yes.

22          Q.   And here it's saying Calvary Manufacturing is

23     only selling the production equipment, right?

24          A.   Correct.

25          Q.   And you didn't own the intellectual property,

```
 1    right?
 2                 MR. CALAWAY:  Object to the form.
 3                 THE WITNESS:  The CAV-15 tooling and design
 4    is only owned by my company is what it states.
 5    BY MR. BOGAN:
 6        Q.   And Armory 8.
 7             Let me ask you, before you move on, is that
 8    a true statement you just read --
 9                 MR. CALAWAY:  Object to the form.
10    BY MR. BOGAN:
11        Q.   -- that the tooling and design is only owned by
12    your company?
13        A.   I own the CAV-15 tooling and the prints to the
14    mold at this time.
15        Q.   So, here -- let's just read it.  The second
16    paragraph says, "He expressed some reservations regarding
17    a noncompete from himself or Calvary Manufacturing, when
18    he is only selling the production equipment.  Open parens,
19    that could be used for any injection molding, close
20    parens, not any intellectual property or CAV-15 specific
21    tooling.  The CAV-15 tooling and design is only owned by
22    my company Sinistral Shooting Technologies; and as I
23    stated I have no problems signing a noncompete for polymer
24    AR15 lower receivers."  Correct?  Did I read that
25    correctly?
```

1    Q.   There's an e-mail from you to Shel Jones on
2    November 10th, 2011, correct?
3    A.   November 10th, 2011, yes.
4    Q.   And this is after on November 9th you had sent an
5    e-mail to Shel saying you're reviewing the documents and
6    you'll have it over to him as soon as possible, correct?
7    That's on the next page if you need to look at it.  That's
8    on KEA 157.
9    A.   Yep, I'm looking.  Okay.
10   Q.   You write back to Shel, correct?
11   A.   Yes.
12   Q.   And you say, in the second paragraph, second
13   sentence, "I had my attorney go through and clean it all
14   up to make it relevant to the sale of the equipment."  Do
15   you see that?
16   A.   Yes.
17   Q.   And what does the next line say?
18   A.   "Some aspects of it were relevant to the sale of
19   a business, and stated" --
20   Q.   Slow down just a little bit.  She's trying to
21   type all this down.
22   A.   "Some aspects of it were relevant to the sale of
23   a business, and stated that I was operational with the
24   equipment prior to the sale -- as I was not and never
25   licensed to run it, those sections caused some legal

1    liability concerns for me.  He also removed the customer
2    database language for this reason; I'm happy to give you a
3    list of companies that bought CAV-15s prior to the sale,
4    but having the customer database language in there could
5    cause issues with the government believing that SST was
6    operational and selling CAV-15s when it was not."
7         Q.   So, some of the revisions to the contract
8    document that you said was sort of open and vague, that
9    was because you had to take certain portions out so that
10   you wouldn't have liability from the ATF, right?
11        A.   Correct.
12        Q.   But that did not change the intent of the
13   agreement, that was just to make sure that you didn't get
14   in trouble, correct?
15             MR. CALAWAY:  Object to the form.
16   BY MR. BOGAN:
17        Q.   Don't look at his writing, please.
18        A.   I'm nearsighted.  I can't read it anyway.
19             Keeping in mind the time frame of this
20   arrangement, there was some shell shock on my part still
21   from having gone head-to-head with the government over the
22   past two and a half years.  So, yes, there were things I
23   was concerned about related to potentially having the ATF
24   think the wrong things about what my business practices
25   were going into the sale.

1        Q.   But that didn't change what you were selling,
2    right?  That was just you being cautious with how you
3    worded it?  And that's fair.
4             MR. CALAWAY:  Object to the form.
5             THE WITNESS:  Correct.
6    BY MR. BOGAN:
7        Q.   Exhibit 45, please.  You there?
8        A.   Yes.
9        Q.   Second paragraph.  Did you write this?
10       A.   It appears to be a blog post on my
11   SinistralRifle.com blog, so, yes.
12       Q.   And the second paragraph that starts with "The
13   CAV-15 MKII mold," what is it?  Read that to me.
14       A.   "The CAV-15 MKII mold and IP was recently sold to
15   GWACS Armory of Tulsa, Oklahoma.  The CAV-15 MKII's coming
16   back into the market.  I thought it be a good time to
17   repost some of my old experiences with CAV-15 MKII."
18       Q.   Turn to Exhibit 50 for me, please.  This is an
19   e-mail dated January 9, 2012 from you to Mr. Jones,
20   correct?
21       A.   50?  The stamp I'm seeing at the bottom is 204.
22       Q.   Yes, sir.
23       A.   Okay.
24       Q.   E-mail from you to Mr. Jones on January 9th,
25   2012, correct?

1          A.    Yes.

2          Q.    This is the customer list you promised, right?

3                MR. CALAWAY:  Object to the form.

4                THE WITNESS:  That appears to be the case.

5     BY MR. BOGAN:

6          Q.    That was part of the sale, correct?

7                MR. CALAWAY:  Object to the form.

8                THE WITNESS:  Well, it wasn't enumerated in

9     the sales contract.

10    BY MR. BOGAN:

11         Q.    Why not?

12               MR. CALAWAY:  Object to the form.

13               THE WITNESS:  Well, as we previously read,

14    there was concern about the wording should the ATF ever

15    review the sales contract.

16    BY MR. BOGAN:

17         Q.    But it was still part of the agreement, it just

18    wasn't enumerated in there because you were concerned

19    about the ATF looking at it, right?

20               MR. CALAWAY:  Object to the form.

21               THE WITNESS:  I believe I provided it

22    because it was a reasonable request and I was trying to

23    help GWACS become a successful business.

24    BY MR. BOGAN:

25         Q.    Sir, you just testified today, minutes ago, that

1    them I lined out some things because of all my previous

2    knowledge and experience and ongoing work with other

3    businesses.

4         Q.   Do you and Christian Capella ever have any

5    conversations about the intellectual property that KE Arms

6    claims Calvary Manufacturing owns?

7         A.   Recently, yes.

8         Q.   When was that?

9         A.   After you contacted him.

10        Q.   Okay.  What did you guys talk about?

11        A.   It's my understanding you offered to pay him as a

12   witness, and that you offered to represent him in a case

13   against Shawn Nealon.

14        Q.   That's what he told you?

15        A.   Yes.

16        Q.   Okay.  He didn't tell you that he asked if I

17   could pay him money and I laughed and said no?

18        A.   Christian is an unusual person.

19        Q.   Yeah.

20        A.   And maybe about half of what he tells me is

21   believable.

22        Q.   Pretty dishonest guy, it sounds like?

23        A.   It's 50/50.

24        Q.   You guys listed Christian Capella as a witness in

25   this case, correct?

```
1                    MR. CALAWAY:  Object to form.
2                    THE WITNESS:  It wouldn't surprise me if we
3    did.  I don't remember doing that, but it wouldn't
4    surprise me.
5    BY MR. BOGAN:
6         Q.   And before I had contacted Christian how long had
7    it been since you had talked to him?
8         A.   Months to possibly a year.
9         Q.   He told me years, so that's consistent with his
10   lack of veracity, I guess.  You sure it was months to a
11   year?
12        A.   I don't remember specifically.  From 2020 forward
13   it feels like it's one long year.
14        Q.   Did Christian Capello say anything to you about
15   using Calvary Manufacturing's intellectual property for
16   the KP-15?
17                   MR. CALAWAY:  Object to the form.
18                   THE WITNESS:  I'm not sure what you mean
19   specifically.
20   BY MR. BOGAN:
21        Q.   Well, obviously, I called Christian Capella,
22   right?
23        A.   Um-hum.
24        Q.   And I asked him about what he thought he owned.
25   And did you know that -- Did he tell you that he told me
```

```
 1    he didn't think he owned it?
 2              MR. CALAWAY:  Object to the form.
 3              THE WITNESS:  I think what he said
 4    specifically to me was that he wanted to own it if there
 5    was any money in it.
 6    BY MR. BOGAN:
 7         Q.   Did he tell you that Mr. Nealon wasn't supposed
 8    to be using the name Calvary Medical, as well?
 9         A.   He didn't say anything to me about that.
10         Q.   What else did you and Christian talk about?
11         A.   He intermittently buys parts from us, telestock
12    plungers and latch hardware, so we had some sales
13    conversation related to that.
14         Q.   Anything else related to the CAV-15?
15         A.   To the CAV-15, no.
16         Q.   Anything else related to the KP-15?
17         A.   I think he told me he thought it was a good
18    looking part.
19         Q.   Did he make any demands upon KE Arms to stop
20    making the part?
21         A.   He has not.
22         Q.   Did he make any demand upon KE Arms to be paid a
23    royalty for the part?
24         A.   He has not.
25         Q.   Did he express any objection to KE Arms making
```

```
 1    other materials were run through it, like polycarbonate,
 2    that produced a clear receiver.  But running materials
 3    like that was kind of risky because it can get stuck in
 4    the mold and result in a full mold tear-down, or
 5    potentially damage the mold if you continue trying to run
 6    it.
 7         Q.   They ran a clear version?
 8         A.   Yeah.  There's a really interesting clear photo
 9    of the CAV-15 Mark 2 on Oleg Volt's website to this day.
10    There was only, I think, seven or ten of them made.  The
11    problem being is if you expose it to any kind of cleaning
12    solvent, it would just melt.
13              And, like I said, dimensionally they weren't
14    really correct.  They shrunk differently.  They didn't
15    really weld right.  But they looked really cool and people
16    liked seeing all the internals.
17         Q.   And where did you say those are located today?
18         A.   On Oleg Volk's photography website.
19         Q.   Can you spell that?
20         A.   Oleg, O-l-e-g, V-o-l-k, dot, net, I believe.  He
21    handled advertising for Calvary Arms Corporation, and a
22    lot of his advertising materials are part of the
23    disclosures that we've made already.
24         Q.   Did you pay Christian Capella the $60,000 for the
25    equipment that was purchased from Calvary Manufacturing?
```

1   Did you pay that before or after you received payment from
2   Armory?
3       A.   After.  He got paid before I did as far as, like,
4   the total sum of $120,000.  We shipped off the press, the
5   welder, the dryer, all the capital equipment.  And that
6   first payment, as soon as I got it, went directly to him.
7   And I didn't get my half of it until, I think, a month or
8   some change later when the mold and the other stuff went
9   to GWACS.
10      Q.   So, Christian Capella got some of those proceeds?
11      A.   Yes.  In fact, after I got my part of those
12  proceeds I immediately had to pay him back.  I can't
13  remember if it was 35 or $40,000 that he had fronted me to
14  keep the commercial property lease going and paying for a
15  $500 an hour ATF attorney and everything else necessary to
16  try to get the business up and running that didn't happen.
17      Q.   Your communications with Mr. Capella, some of
18  those were via e-mail, correct?
19      A.   Related to?
20      Q.   The assets you were selling.
21      A.   I can't recall.  I was working for him at the
22  time, and I have a feeling we had more in-office
23  conversations than anything.
24      Q.   The nondisclosure agreement you said that you had
25  with KE Arms, do you recall that testimony?

1        Q.    And at that point were there any CAD or CAM files
2   that -- drawings that were available that you could have
3   given Armory at that time?
4               MR. BOGAN:  Object to form.
5               THE WITNESS:  I was unsure what existed.
6   The only thing I physically had at that time were
7   blueprints to the mold.
8   BY MR. CALAWAY:
9        Q.    Okay.  And did you give those to Armory?
10       A.    Yes.
11       Q.    Okay.  Did you ever sign a noncompete with
12  Armory?
13       A.    No.
14       Q.    Okay.  Did you sign any NDAs with Armory?
15       A.    Yes.  I signed one in 2011 and another one in
16  2013.  As Sinistral Shooting Technologies I did not sign
17  any NDAs personally with GWACS Armory.
18       Q.    So, both NDAs you signed were with -- were
19  between Sinistral Shooting Technologies and GWACS Armory?
20       A.    Correct.
21       Q.    And you said the first one was signed when?
22       A.    2011.
23       Q.    The second one was signed when?
24       A.    2013.
25       Q.    And were there expiration dates on those NDAs?

1     or if you asked Russell Phagan personally.

2          Q.   How many plastic cups have you manufactured?

3          A.   What's that?

4          Q.   How many plastic cups have you manufactured?

5          A.   Cups?

6          Q.   Yep.

7          A.   I haven't manufactured plastic cups.  I have

8     manufactured a number of plastic products.

9          Q.   Okay.  Well, your counsel asked you about runners

10    on plastic cups, so I just wondered how many you had

11    manufactured before, sir.  And the answer is none?

12         A.   No plastic cups.

13         Q.   And you said that the gating is obvious in any

14    plastic product, right?  Do you remember that?

15         A.   Yes.

16         Q.   And you said that the reason you were talking to

17    Ray Scherer was about -- or Ray Scherer, about those

18    photographs, was about the runner, right?

19              MR. CALAWAY:  Object to the form.

20    BY MR. BOGAN:

21         Q.   Do you remember that?

22         A.   Correct.

23         Q.   So, if it's obvious, why did you need to send Ray

24    Scherer photographs of the runner?

25         A.   I think he was also interested in runner design.

```
1    Runner design's a different subject, because the angle at
2    which the runner comes in, what bend it goes through, what
3    curve it goes through, how big the runner is to allow the
4    fibers to flow through are all design questions.
5         Q.   On the CAV-15 MK2 is what you sent pictures of
6    the runner, right?
7                   MR. CALAWAY:  Object to form.
8                   THE WITNESS:  Pictures that were not secret
9    in any way.
10   BY MR. BOGAN:
11        Q.   I didn't ask you that.
12                  You sent pictures of the MK2 runner so he
13   could use it, right?
14        A.   It was definitely part of something he wanted to
15   consider.  I don't believe we ended up using any runner or
16   gating design that was from the CAV-15 Mark 2.
17        Q.   You testified just now under oath that you didn't
18   have any CAD files that you could send to GWACS Armory.
19   Do you remember that?
20                  MR. CALAWAY:  Object to form.
21                  THE WITNESS:  What was the specific
22   question?
23   BY MR. BOGAN:
24        Q.   You just said -- You just testified for your
25   counsel that you didn't have any CAD files that you could
```