1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
 3    GWACS ARMORY, LLC,                )
                                        )
 4              Plaintiff,              )
                                        )
 5    v.                                )  Case No.
                                        )  20-cv-0341-CVE-SH
 6    KE ARMS, LLC, RUSSELL PHAGAN,     )  BASE FILE
      SINISTRAL SHOOTING                )
 7    TECHNOLOGIES, LLC, BROWNELLS,     )  Consolidated with:
      INC., and SHAWN NEALON,           )  Case No.
 8                                      )  21-CV-0107-CVE-JFJ
                Defendants.             )
 9                                      )
      and                               )
10                                      )
      KE ARMS, LLC,                     )
11                                      )
                Plaintiff,              )
12                                      )
      v.                                )
13                                      )
      GWACS ARMORY, LLC, GWACS          )
14    DEFENSE INCORPORATED, JUD         )
      GUDGEL, RUSSELL ANDERSON, DOES    )
15    I through X, and ROE              )
      CORPORATIONS I through X,         )
16                                      )
                Defendants.             )
17    _____   )
18              DEPOSITION OF KARL KASARDA
19                    Volume 1
                   Pages 1 - 105
20
21              Phoenix, Arizona
22
                April 7, 2022
22
23
                          Prepared by:
24                        CINDY MAHONEY, RPR, RMR
                          Certified Court Reporter
25                        Certificate No. 50680
```



2

```
1                    I N D E X
2   WITNESS                                    PAGE
3     KARL KASARDA
4         EXAMINATION BY MR. BOGAN             4
5         EXAMINATION BY MR. CALAWAY           82
6
7                   EXHIBITS MARKED
8   EXHIBITS              DESCRIPTION          PAGE
9
      Exhibit 194   Declaration of Karl Kasarda in     8
10                  Support of Defendants'/
                    Counterplaintiff's Opposition to
11                  Counterdefendants' Rule 11 Motion
                    for Sanctions
12
13
14                PREVIOUSLY MARKED EXHIBITS
15                   Exhibit 31    Page 17
16                   Exhibit 33    Page 16
17                   Exhibit 58    Page 32
18                   Exhibit 61    Page 39
19                   Exhibit 62    Page 42
20                   Exhibit 88    Page 19
21                   Exhibit 90    Page 44
22                   Exhibit 91    Page 45
23                   Exhibit 167   Page 48
24                   Exhibit 173   Page 69
25
```

3

```
 1              THE DEPOSITION OF KARL KASARDA, VOLUME 1,
 2    commenced at 8:54 a.m. on April 7, 2022, at the law offices
 3    of Osborn Maledon, P.A., 2929 North Central Avenue, Suite
 4    2100, Phoenix, Arizona, before Cindy Mahoney, RPR, RMR,
 5    Arizona Certified Court Reporter No. 50680.
 6
 7                        *     *     *
 8    APPEARANCES:
 9        For the Plaintiff/Third Party Defendants:
              JONES GOTCHER & BOGAN, P.C.
10            By: Tadd J.P. Bogan, Esq.
                  James E. Weger, Esq.
11                15 East Fifth Street
                  Suite 3800
12                Tulsa, Oklahoma 74103
                  918-581-8200
13                Tbogan@jonesgotcher.com
                  Jweger@jonesgotcher.com
14
15        For the Defendants/Counter-Plaintiff:
              MARQUIS AURBACH COFFING
16            By: Alexander K. Calaway, Esq.
                  10001 Park Run Drive
17                Las Vegas, Nevada 89145
                  702-382-0711
18                Acalaway@maclaw.com
19
20    ALSO PRESENT:
21        Jud Gudgel
22        Russell Phagan
23
24
25
```

```
 1                         KARL KASARDA,

 2              the witness herein, being first duly sworn,

 3                was examined and testified as follows:

 4

 5                            EXAMINATION

 6      BY MR. BOGAN:

 7          Q.    Would you please state and spell your name for the

 8      record.

 9          A.    My name is Karl Kasarda, K-a-r-l.  Last name

10      Kasarda, K-a-s-a-r-d-a.

11          Q.    Mr. Kasarda, what's your address?

12          A.    29327 Kittle Place, K-i-t-t-l-e, Marana, Arizona

13      85658.

14          Q.    And how long have you lived there?

15          A.    Oh, my goodness.  17 years now.

16          Q.    Have you ever had your deposition taken before?

17          A.    I have not.

18          Q.    I'll go over some ground rules with you so you'll

19      know the process.

20                Cindy here is taking down everything we say.

21      And so the first thing I ask is that if I'm asking a

22      question, even if you think you know where I'm going with

23      it, please allow me to finish the question before you start

24      to answer so she can get a clean record.  Okay?

25          A.    [Nodded up and down.]
```

1       Q.    And also, we need verbal responses.

2       A.    Yes.

3       Q.    Yeses, noes.

4       A.    Got it.

5       Q.    Because she can't take down nods of heads and

6    uh-huhs and huh-uhs.

7       A.    Understood.

8       Q.    If I do say, is that a yes or is that a no, I'm

9    not being rude.  I'm just trying to make sure we get a good

10   record.  Okay?

11      A.    Okay.

12      Q.    If you need a break, let us know.  We can take

13   breaks, but we just need to make sure that my question is

14   finished or has been answered before we take a break.

15   Okay?  So if I have a pending question, I'd like to get

16   that answered before we take a break.  Okay?

17      A.    That's fine.

18      Q.    And your counsel will be objecting to some of my

19   questions from time to time.  And if he does, you could go

20   ahead and answer them unless he instructs you not to answer

21   it.  Okay?

22      A.    Okay.

23      Q.    Where are you currently employed?

24      A.    I currently work as InRange TV.  I own and operate

25   InRange TV.  It is my primary source of income.

6

1      Q.   Who owns InRange TV?

2      A.   I do.

3      Q.   Do you own it solely?

4      A.   Yes.

5      Q.   Have you ever had a partner in InRange TV?

6      A.   Yes.  For a -- when the InRange TV project

7   started, it was myself and Ian McCollum.  However, he

8   surrendered his rights to InRange TV many years ago.  I

9   don't remember the exact year.  And I am now the sole

10  proprietor.

11     Q.   Does Ian McCollum still work for InRange TV?

12     A.   No, he does not.

13     Q.   When did Ian McCollum stop working for InRange TV?

14     A.   I don't know the exact date.  It was a number of

15  years ago.  I would say 2018 would be my best guess.

16     Q.   And why did Mr. McCollum leave InRange?

17     A.   He no longer had the time to dedicate to the

18  project so he could focus on his personal project of

19  Forgotten Weapons.

20     Q.   Forgotten Weapons?

21     A.   That's his channel, yes.

22     Q.   What did you do to prepare for this deposition

23  today?

24     A.   Not much beyond knowing that I was coming in here

25  and talked to my counsel.

7

1     Q.   Did you talk to Mr. Phagan about your deposition
2  today?
3     A.   We had a group call, knowing that this was going
4  to happen today.
5     Q.   Did you drive in with Mr. Phagan today?
6     A.   I did.  Because it would have been difficult to
7  find the location otherwise.  I carpooled from his
8  location.  I came all the way from Marana.  The traffic
9  today was quite extent.
10    Q.   I can imagine.  I'm sorry to hear that.
11    A.   It was bad.
12    Q.   Did you and Mr. Phagan talk about this deposition
13 today when you were carpooling?
14    A.   Actually, we did not.  We talked about just
15 general life stuff.
16    Q.   Did you have any conversation about Mr. Sperry's
17 deposition yesterday?
18    A.   No.
19    Q.   Who is your attorney?
20    A.   Sitting to my right.
21    Q.   Alex Calaway?
22    A.   Yes.
23    Q.   When did you hire Mr. Calaway?
24    A.   We are in a mutual defense agreement, I think is
25 the proper terminology.

1              MR. CALAWAY:  Also note for the record that

2     we represented Mr. Kasarda on IP issues, my firm did,

3     before this litigation, I believe.

4              THE WITNESS:  That is correct.

5     BY MR. BOGAN:

6        Q.  When did you have counsel for an IP agreement?

7        A.  Was that about a year ago.  I'm not good with

8     dates.

9              MR. CALAWAY:  I don't remember either.

10              THE WITNESS:  A year ago or more.

11     BY MR. BOGAN:

12        Q.  Was it after or before this litigation was filed?

13     Do you know?

14        A.  I don't remember.

15        Q.  Do you remember when this litigation was filed?

16        A.  I do not remember.

17        Q.  Do you remember signing -- or signing a

18     declaration in this case?

19        A.  Yes.  That was a recent thing.

20        Q.  I'm going to hand you what I marked as

21     Exhibit 194.

22              (The document was marked as Exhibit 194 for

23     identification.)

24     BY MR. BOGAN:

25        Q.  Is that the declaration that you signed for this

1    case?

2        A.    Let me get my glasses.  Yes, this is it.

3        Q.    Did your current counsel represent you when you

4    did this declaration?

5        A.    We worked together on this, yes.

6        Q.    Were they your attorneys, though, when you did

7    this?

8                THE WITNESS:  When did we --

9                MR. CALAWAY:  Yes.

10               THE WITNESS:  Yes.

11               MR. CALAWAY:  We were before the -- yeah.

12               THE WITNESS:  Yes.

13   BY MR. BOGAN:

14       Q.    Did you -- when did you enter into a mutual

15   defense agreement that you mentioned?

16       A.    I would like to defer to Alex for that.

17               MR. CALAWAY:  I don't have exact dates, Tadd.

18   I told you I can send it to you.

19               MR. BOGAN:  Was it within the last two weeks?

20               MR. CALAWAY:  No.  It was before that.

21   Again, I can send it to you.

22               MR. BOGAN:  Okay.

23   BY MR. BOGAN:

24       Q.    Did you -- do you remember if you entered into the

25   mutual defense agreement before you signed this

```
 1    declaration?

 2        A.   I do not recall.

 3        Q.   Were you aware that Russell Phagan, through his

 4    company, Sinistral Shooting Technologies, had sold the

 5    CAV-15 to GWACS Armory?

 6        A.   I was aware of the sale of the mold.

 7        Q.   Tell me about that.

 8             What did Mr. Phagan tell you about the sale

 9    of the mold?

10        A.   Just that he was in possession of the mold and had

11    finally found a buyer.

12        Q.   Did he tell you how much he sold it for?

13        A.   No.  I don't recall.  Let me be more accurate.  I

14    don't recall.

15        Q.   Do you recall any discussions with Mr. Phagan

16    about selling IP to the CAV-15?

17        A.   No.  As I recall, it was strictly the mold.

18        Q.   Were you involved in that transaction?

19        A.   I was not.

20        Q.   And what is the basis for your knowledge of the

21    transaction?

22        A.   We had been friends and worked together on

23    projects for years before that, so I was just aware of the

24    general situation.

25        Q.   You and Mr. Phagan are friends?
```

```
 1        A.    Correct.

 2        Q.    How long have you and Mr. Phagan been friends?

 3        A.    2006 or so, I believe.

 4        Q.    If you'll go to your declaration at paragraph 7.

 5        A.    Uh-huh.

 6        Q.    It said that InRange's WWSD build in 2017 did not

 7   promote a complete rifle.  Instead, customers interested in

 8   the WWSD project purchased or recommended AR-15 parts from

 9   manufacturers directly and then built or modified their

10   existing AR-15 rifle with the parts.

11              Do you see that?

12        A.    Yes, I do.

13        Q.    Did I read that correctly?

14        A.    Yes, you did.

15        Q.    Tell me about that.

16              You're saying that the 2017 WWSD build

17   wasn't -- wasn't a complete build.  Did that change later?

18              MR. CALAWAY:  Object to the form of the

19   question.  Go ahead.  Now you can answer.

20              THE WITNESS:  The 2017 build, in quotes, was

21   not designed to be a commercial product.  It was a DIY

22   concept.  And so there were a number of divergent parts and

23   components to make that DIY project the way we envisioned

24   it.

25              So in terms of it being a complete rifle,
```

1   what is intended by that statement is it was not intended

2   to be sold or marketed as a complete thing.  It was a DIY

3   project for my audience.

4   BY MR. BOGAN:

5       Q.   And at what time did that change?

6       A.   We -- when Brownells contacted me with the idea

7   that it would be possible to make it a commercial project

8   around, I believe -- let me reference that in here, in

9   2018, April.

10      Q.   And on the WWSD build in 2017, what was the lower

11  receiver for that project?

12      A.   At that time it was the GWACS model with the

13  polymer lower.

14      Q.   How are you aware of the GWACS monolithic polymer

15  lower?

16      A.   The GWACS was made from the same mold that was

17  made from the Cav Arms that was the precursor to that.

18      Q.   And InRange selected that lower for the project;

19  correct?

20      A.   Yes.  I had familiarity with the Cav Arms product

21  and therefore this product, because it was the same thing.

22      Q.   Are there other polymer lower receivers on the

23  market that are comparable to the GWACS CAV-15?

24      A.   In 2017 there were not any monolithic ones.  There

25  were other polymer lowers in the market that were not

13

1    comparable, no.

2        Q.   And what was your role in the WWSD project as it

3    developed into a complete build?

4        A.   Okay.  When it developed into a complete build was

5    working with the new selection of the components that would

6    be possible to pull together in collaboration with

7    Brownells to make it a complete rifle.

8        Q.   And did those components change when it -- after

9    Brownells contacted you in 2018, did you stick with the

10   same components that you were giving for the DIY project or

11   did those change?

12       A.   A number of components changed.  One example would

13   be the charging handle.

14       Q.   What else changed?

15       A.   Well, the -- let me think here.  At one point

16   later on, the barrel manufacturing producers changed.

17   There's two -- two different barrel producers.  And, of

18   course, the polymer lower is now the KP-15.

19       Q.   On the barrel, was that Faxon Arms --

20       A.   Yes.  Now it is Faxon and Ballistic Advantage.

21       Q.   And Faxon is F-a-x-o-n; correct?

22       A.   Correct.

23       Q.   Was -- what was your role after you guys started

24   working on the project that would be a complete build?

25   What was InRange's role?

1      A.    InRange's role was to ensure that the components
2    that were put together to make the complete rifle fit the
3    vision of the goals originally designed in 2017.  So when
4    things had to change, we wanted to make sure that those
5    components fit the vision.

6      Q.    And who did the marketing for this project?

7      A.    The marketing for this has been entirely under

8    InRange TV.

9      Q.    Brownells did not do marketing?

10     A.    Excuse me.  They may have put some things on their

11   website and such, But when it comes to the video reach to

12   the consumer, it's been through InRange.

13     Q.    What about Russell Phagan, did he do any video

14   advertising?

15     A.    I don't know how to answer that.  That would be a

16   question for him.

17     Q.    Were you in any videos with Russell Phagan that

18   were not part of InRange on the CAV-15?

19     A.    I don't recall that being the case.

20     Q.    Were you in any videos with Russell Phagan

21   discussing the KP-15?

22     A.    We have done videos about the KP-15 on InRange TV.

23   I don't recall doing them anywhere else.

24     Q.    Did InRange handle the social media marketing for

25   the WWSD project?

1        A.    Yes.   Because the WWSD project is an InRange

2    project, and therefore I posted about it not only with

3    video but Facebook and other social media resources.

4        Q.    So did Mr. Phagan do any Facebook posts about the

5    WWSD project?

6        A.    I am not intimately familiar with his wall enough

7    to answer that question properly.

8        Q.    Do you know if KE Arms was doing any advertising

9    for the KP-15 in conjunction with this project?

10        A.    I can't imagine they would not have.  But again, I

11    don't do that for them, so therefore I'm not the right

12    person to answer that question properly.

13        Q.    Did you have a written agreement with anybody that

14    stated that InRange would primarily be handling the

15    marketing?

16              MR. CALAWAY:  Object to the form of the

17    question.  You can answer it.  I'm trying to understand it.

18              THE WITNESS:  I do not understand the

19    question.  I'm sorry.

20    BY MR. BOGAN:

21        Q.    Do you know what a written agreement is?

22        A.    Yes.

23        Q.    Okay.  So do you -- did you have one of those with

24    any entities or individuals that stated that InRange would

25    be doing the marketing for the WWSD project?

1      A.   I would say no, there was not a written one.

2   The -- that would have been assumed, being that it was an

3   InRange project.

4      Q.   Did InRange select the photographs that would be

5   used for -- to advertise the WWSD project?

6      A.   No, not entirely.  Some of Brownells' work, they

7   just picked pictures of their own accord.

8      Q.   Did anybody else post pictures on their own accord

9   for the WWSD project?

10     A.   Considering how broad in scope that is, I can't

11  answer that.

12     Q.   Did Mr. Phagan post any pictures, to your

13  knowledge, about the WWSD project?

14     A.   I do not know.

15     Q.   If you'll turn to the white book for me, please.

16  These are exhibits that we've used in this case.  If you'll

17  turn to tab 33.

18     A.   Yes.

19     Q.   Have you seen this before?

20     A.   I remember this photo.

21     Q.   Okay.  And this is marked as Exhibit 33, which is

22  indicated by the tab.

23     A.   Uh-huh.

24     Q.   Who's in this photograph?

25     A.   That is myself and Ian McCollum.

1      Q.    Can you tell from the photo -- well, what does it

2    say?  The photo says, WWSD 2017; correct?

3      A.    It does.

4      Q.    And do you know what lower receivers are on the

5    rifles that you and Ian are holding in this photo?

6      A.    I -- it being the 2017 project, that would be the

7    GWACS lower.

8      Q.    And this document says, KE Arms, LLC, AR-15,

9    KP-15, "What Would Stoner Do" 2020 rifle.

10          Do you see that?

11     A.    I do.

12     Q.    And they're selling it for $1,699.99; correct?

13     A.    Yes.

14     Q.    So you have a WWSD photograph with rifles, and

15    this is advertisement for a complete build sale; correct?

16     A.    I don't -- this is a page from a website; is that

17    correct?  Is this from Brownells?

18     Q.    Yes.

19     A.    That would be the correct case then, yes.

20     Q.    And so if you'll turn to tab 31 in that book as

21    well, please.

22     A.    Yes.

23     Q.    On Exhibit 31 have you seen that photograph

24    before?

25     A.    I took that photograph.

1        Q.    And what rifle is depicted in that photograph?

2        A.    That is the 2017 DIY build of the "What Would

3    Stoner Do" project.

4        Q.    And that lower receiver is a UX CAV-15; correct?

5        A.    That would be in that photo, yes.

6        Q.    This document is for the sale of a complete rifle

7    through KE Arms; correct?

8        A.    It is for the sale of the 2020 edition, which is

9    referenced at the top, yes.

10        Q.    Were you aware that Brownells was using a rifle

11    depicting the CAV-15 for the sale of the KP-15?

12              MR. CALAWAY:    Object to the form.    Go ahead.

13              THE WITNESS:    I am aware that they marketed

14    some of the legacy content that was part of the "What Would

15    Stoner Do" project as into -- into, excuse me, generating

16    interest.

17    BY MR. BOGAN:

18        Q.    So they used these photographs to generate

19    interest in the project?

20        A.    Yeah.    These were photos that were from the legacy

21    of the project.

22        Q.    And the intent, you said, was to generate

23    interest; correct?

24        A.    Correct.    I mean, the project existed from 2017 --

25    it started in 2017 and, of course, exists until this day,

1    and so therefore it has had many iterations in it.

2                    Another example of something in this picture

3    that's no longer relevant is the barrel.  That is a Faxon

4    14.5-inch barrel, which is not representative of the final

5    product, which is 16-inch, as is referenced in the text.

6        Q.    Okay.  If you'll turn to Exhibit 88, please.

7        A.    Uh-huh.  Okay.

8        Q.    Have you seen these emails before?

9        A.    I must have.  They were written a while ago, I can

10   see, but they were my emails, so yes.

11       Q.    Let's go to the back page of this exhibit.

12       A.    You got it.

13       Q.    And at the bottom it says, KEA000493.  Do you see

14   that at the bottom right-hand corner, it says KEA?

15       A.    I do see that, yes.

16       Q.    That's called a Bates stamp or a Bates number.  If

17   I reference that, that's what I'm referring to.  That's

18   just to make sure that we're looking at the same page.

19   Okay?

20       A.    Understood.

21       Q.    The bottom here is an email from Paul Levy at

22   Brownells, and he's writing to Ian on April 9, 2018.  Do

23   you see that?

24       A.    I do.

25       Q.    Is this the first contact that you -- that InRange

1   received regarding Brownells being involved in the WWSD

2   series?

3       A.    Per my recollection, that sounds correct.

4       Q.    Do you know why Paul reached out to Ian instead of

5   you?

6                MR. CALAWAY:    Object to the form.

7                THE WITNESS:    This is quite common within

8   InRange.    Because of us working together for many years, a

9   lot of people see us as -- see them as one thing.    It's not

10  unusual.

11  BY MR. BOGAN:

12      Q.    And Ian was part of the 2017 project?

13      A.    He was, yes.

14      Q.    But he was not part of the 2020 project?

15      A.    The "What Would Stoner Do" project continued

16  together.    However, he was no longer a direct member of

17  InRange TV.

18      Q.    And if you look up -- or if you look at this

19  email, this is where Brownells is saying they want to --

20  they want to develop this into a complete rifle build;

21  right?

22      A.    Correct.

23      Q.    And Ian writes back and copies you on the email.

24  And looks likes you guys are pretty excited about the

25  opportunity; right?

21

1    A.    Yes, we were.

2    Q.    You asked for a royalty; correct?

3    A.    Correct.

4    Q.    Did you get a royalty?

5    A.    We are currently contracted with Brownells for a

6    five percent royalty off of every complete "What Would

7    Stoner Do" thing, yes.

8    Q.    Do you get a royalty on anything else related to

9    the KP-15?

10    A.    Only the "What Would Stoner Do" branded elements.

11    Q.    So if a KP-15 lower is sold that's branded "What

12    Would Stoner Do" --

13    A.    If it is sold as a complete "What Would Stoner Do"

14    lower, we do.  But not the KP-15 directly.

15    Q.    So you get a royalty off the complete rifles;

16    correct?

17    A.    Yes, that is correct.

18    Q.    And then the complete lowers as well if they're

19    branded "What Would Stoner Do"?

20    A.    Correct.  But not the KP-15 by itself.

21    Q.    And who gets that royalty?

22    A.    That went to InRange, LLC.  And as their

23    association between Ian and myself, since this is a joint

24    project together, that is split.  So I essentially receive

25    2.5 percent, and Ian receives the other 2.5 percent.

1      Q.   Do you know how much InRange has received in

2   royalties from this project?

3      A.   I do not have that number privy to me at the

4   moment.

5      Q.   Would you be able to get me documentation that

6   showed how much InRange's received in royalties?

7      A.   It would be possible to do that, yes.   I just

8   don't have that with me.

9      Q.   And ultimately you, InRange, entered into a

10   written agreement with Brownells for that royalty; correct?

11      A.   That is correct.

12      Q.   Does InRange have any other written agreements

13   with Brownells?

14      A.   No.

15      Q.   At the time that this email was sent, who was

16   going to provide the lower receiver for the rifle?

17      A.   At the time of this -- initiating the project, it

18   would have been GWACS.

19      Q.   And that would have been the GWACS CAV-15;

20   correct?

21      A.   Correct.

22      Q.   If you'll go back to Exhibit 194, your declaration

23   that I gave you earlier.

24      A.   Okay.

25      Q.   If you'll turn to page 3 at paragraph 19 for me,

1    please.

2        A.    Yes.

3        Q.    It says, InRange reached out to KEA in 2019 to see

4    whether it would be able to manufacture a polymer version

5    of its aluminum KE-15 lower receiver for the WWSD rifle.

6                Do you see that?

7        A.    I do.

8        Q.    Did I read that correctly?

9        A.    Yes.

10       Q.    Do you remember when in 2019 InRange reached out?

11       A.    I do not.    But I do remember that it -- I can only

12   remember the order of events, but it was after it became

13   obvious that it was impossible to fulfill this project with

14   GWACS lowers.

15       Q.    And how did that become obvious?

16       A.    Communication with GWACS had become difficult at

17   best.    So at one point, as I understand it, when the 2017

18   project launched, there were at least -- I don't know what

19   the number was, but there was a significant number of

20   legacy Cav Arms GWACS lowers in inventory that were sold as

21   a result of the 2017 DIY project.

22                At that point that -- those resources had run

23   out.    I do not understand the full reality of it, but my

24   understanding is that the mold or something was wrong with

25   the manufacturing processes and that more of them could not

1  be made.

2              As a result of that, there was an issue in

3  which the lower that we had then put -- centered the idea

4  around, the concept around, was no longer viable in the

5  market.  It was off.  It was defunct.

6              Communications with GWACS went dead, as in

7  not getting replies at all, and at that point it was either

8  this project continues with some other way of moving

9  forward or it was dead.

10     Q.    So the center of this project was the GWACS

11 CAV-15; correct?

12              MR. CALAWAY:  I object to the form.

13              THE WITNESS:  I disagree.  There are many

14 components in this that make this the aggregate of its sum

15 of its parts.  However, the polymer -- monolithic polymer

16 lower is, obviously, a very important part thereof.

17              Other elements that are quintessential are

18 the pencil barrel from Faxon, the carbon fiber float tube,

19 all the things which are generally unique in the AR-15

20 market.

21 BY MR. BOGAN:

22     Q.    And is your -- but you're no longer using that

23 Faxon barrel; is that right?

24     A.    We are using Faxon and Ballistic Advantage.

25     Q.    And why are you using both manufacturers for the

1    barrel?

2        A.    Ability to fulfill or facilitate the number of

3    orders as well as some manufacturing issues that came

4    about.

5        Q.    So Faxon wasn't able to fulfill the needs of the

6    project?

7        A.    Not the numbers, yes.

8        Q.    Who told you that the molds were not in a

9    condition that could produce more lowers?

10       A.    If I recall -- and this is vague memory at this

11   point -- before GWACS communications went dead, I remember

12   there were issues with casting or molding, excuse me, more.

13       Q.    And who told you that?

14       A.    I believe that came from GWACS.

15       Q.    And when you say that GWACS stopped responding,

16   who was trying to communicate with GWACS that wasn't

17   receiving responses?

18       A.    Myself and others.    Brownells also had similar

19   issues.

20       Q.    Who were you talking to at GWACS?

21       A.    What's his fricking name?    The guy that worked at

22   the car dealership later.

23       Q.    Shel Jones?

24       A.    Yes.    Shel.    Thank you.

25       Q.    How were you communicating with Shel?

1      A.   Email.

2      Q.   And so --

3      A.   Email and text.  Would have been a combination

4   thereof, both.

5      Q.   And do you know how many emails or texts you sent

6   Shel approximately?

7      A.   I do not.

8      Q.   Do you know how many emails or texts you sent Shel

9   that did not get responded to?

10      A.   I do not.  But it was a significant effort to try

11   and get some sort of response.

12      Q.   Did you sign a nondisclosure agreement with GWACS

13   Armory?

14      A.   No.

15      Q.   Did you receive a copy of an investment packet for

16   GWACS Armory?

17      A.   Can you -- I'm sorry.  Can you explain what that

18   is?

19      Q.   Yeah.

20           There was a packet of information about what

21   GWACS planned to do and money it was trying to raise so

22   that it could get new molds made.  Do you know anything

23   about that?

24      A.   I do not recall that.

25      Q.   So GWACS never sent you a copy of a packet of

1    information --

2        A.   I said I did not recall that.  I don't remember

3    it.

4        Q.   Did GWACS have any conversations with you about

5    their finances?

6        A.   I do not recall talking about finances.  My memory

7    was that the inventory had been depleted and that it was

8    not possible to mold more of the original receivers from

9    the current and existing mold.

10       Q.   So when we're going back to paragraph 19 of

11   Exhibit 194 -- so you reached out to KEA to see if they

12   could do a polymer version of their aluminum well work for

13   the WWSD project; correct?

14       A.   The project at this point was dead without being

15   able to proceed with that component, yes.

16       Q.   Why could you not have selected a different lower?

17       A.   There were no other lowers that were acceptable on

18   the market.

19       Q.   And what was it about KEA's aluminum lower

20   receiver that you thought would be beneficial for the

21   project?

22       A.   Well, there was an existing relationship with KE

23   in terms of knowing the people, which is an important part

24   of being successful in business, as well as I had

25   appreciated their current manufacturing, as well as there

1  were subcomponents of the original 2017 and 2020 project

2  that were already KE related, such as the SLT-1 trigger.

3       Q.    Was it your idea to have the KP-15 look like the

4  CAV-15?

5               MR. CALAWAY:   Object to the form.

6               THE WITNESS:   AR-15s look like AR-15s.

7  BY MR. BOGAN:

8       Q.    Is it your testimony that the CAV-15 lower

9  receiver looks like other lower receivers on the market?

10              MR. CALAWAY:   Object to the form.

11              THE WITNESS:   My testimony is that the

12  current lower receivers of AR-15s look like other AR-15s.

13  If you were to look at the legacy Colt polymer lower

14  receiver, it would look exactly like the GWACS, which looks

15  very much like the current KP-15 because they are all lower

16  receivers of an AR-15 monolithic polymer lower.

17  BY MR. BOGAN:

18       Q.    And how many of those Colts were produced?

19       A.    A small number.   When they designed them

20  originally, they didn't have the tensile strength nor

21  manufacturing capabilities to do them reliably, is my

22  understanding.

23              Which is one of the things that the "What

24  Would Stoner Do" project has been significant in the

25  industry about is that the original design of Eugene Stoner

 1    way back in the '50s and '60s, a lot them were very
 2    visionary ideas that weren't quite capable of being done
 3    yet.
 4              So Colt's attempt at a monolithic polymer
 5    lower back when they did it wasn't quite capable yet.  But
 6    the polymers that now exist and the manufacturing processes
 7    that now exist make it viable when it wasn't then.
 8         Q.    And the GWACS CAV-15 was a viable lower --
 9         A.    [Indiscernible overlapping] it was viable.
10              THE COURT REPORTER:  I'm sorry.  What was the
11    end of the question?
12              MR. BOGAN:  The GWACS -- the polymer lower
13    receiver was a viable lower receiver correct?
14              MR. CALAWAY:  Don't cut him off.  Take a
15    break between things for her so we're not talking over each
16    other.
17              THE WITNESS:  I apologize.  I know we said
18    that earlier.  At 2017, yes, it was viable.
19    BY MR. BOGAN:
20         Q.    Were there any other viable polymer lowers on the
21    market at that time?
22         A.    I was not aware of any that I would have wanted to
23    use for my project.
24         Q.    Does the KE-15 aluminum lower receiver, does it
25    have an attached buttstock?

1     A.   It can.  It is a standard aluminum, so therefore

2  it has a normal buffer system which can allow for a fixed

3  stock or an adjustable.

4     Q.   Is the KE-15 aluminum lower a monolithic lower

5  receiver?

6     A.   The KE-15 is an aluminum receiver, which was what

7  was the basis of a number of the components; for example,

8  the flared mag well for the KP-15.  But the KP-15 is a

9  monolithic polymer lower receiver and is, of course, made

10  from a different material.

11     Q.   So does the KE-15 aluminum lower receiver -- is it

12  a monolithic lower receiver?

13     A.   That is not a relevant question to an aluminum

14  lower receiver.  That doesn't make sense.

15     Q.   Because it's not; right?

16     A.   No.  It is because it is an aluminum component

17  made from a different material.

18     Q.   What makes the CAV-15 a monolithic lower receiver?

19     A.   Well, I mean, I guess you could answer that an

20  aluminum receiver that's been properly milled out is

21  monolithic, as is it in a monolithic block of aluminum.

22  But it doesn't apply in terms of the manufacturing when we

23  come to polymer.

24         The reason we use the word monolithic to

25  polymer is that it is not multiple polymer components or

1  polymer and aluminum combined.  Like, for example,

2  attaching a standard buffer system to a polymer lower would

3  not be a monolithic.  The reason it's monolithic, it is one

4  solid component with stock, grip, etcetera.

5      Q.  And that does not exist in aluminum; correct?

6      A.  I'm not aware of anyone doing that in aluminum,

7  no.

8      Q.  Were you aware of any things that GWACS planned to

9  do to improve the CAV-15 around 2018?

10          MR. CALAWAY:  Object to the form.

11          THE WITNESS:  No.  Because they were not

12  working on the CAV-15.

13  BY MR. BOGAN:

14      Q.  How do you know that?

15      A.  Because they no longer were working with that mold

16  or that product.

17      Q.  Does that mean they were no longer working on the

18  CAV-15?

19      A.  I can't answer that, but I don't believe so.

20      Q.  Did you know that they planned to call their next

21  iteration of the CAV-15 the MK3?

22      A.  I remember that was briefly a case, yes.

23      Q.  So you knew that they were working on developments

24  of the CAV-15; correct?

25      A.  No.

1              MR. CALAWAY:  Let the record reflect

2      Mr. Weger is laughing.

3              MR. WEGER:  Yes, I am.  It's comical.

4              THE WITNESS:  I would say that the Mark III

5      is a moniker used by a number of manufacturers, including

6      Ruger.

7      BY MR. BOGAN:

8          Q.   Turn to Exhibit 58 for me, please.

9          A.   Okay.

10         Q.   Okay.  This is an email.

11              The very top is from Paul Levy, and it's to

12     you and Ian McCollum; correct?

13         A.   Yes.

14         Q.   And if you go to the second page, that's where the

15     first email ends.

16              The bottom of the first page, it says, Hi,

17     Paul, could we arrange a time on Monday to have a

18     conference call about the WWSD guns, specifically the

19     receivers?

20              Do you see that?

21         A.   I do see that.

22         Q.   This is dated September 6, 2018; correct?

23         A.   Yes.

24         Q.   And you said, Russell Phagan at KE Arms, and then

25     in parens it says, a former Cav Arms employee who has

1    extensive knowledge of the manufacturing process, end

2    parens, has a very appealing idea for -- for -- to get

3    things moving with the receiver production.

4                 Do you see that?

5        A.   Yes.

6        Q.   You said that Karl -- I'm sorry.  This is from

7    Ian.

8                 Ian says, Karl and I would like to discuss it

9    with you and him.

10                Do you see that?

11       A.   Yes.

12       Q.   What was the idea?

13       A.   The idea is that we knew someone that had

14   extensive idea about what it took to use injection and

15   polymers to make something.

16       Q.   And so what were you wanting to discuss with

17   Mr. Levy about that?

18       A.   We wanted to discuss the idea of manufacturing a

19   newer, better, different lower on the market that would

20   fulfill the 2022 expectations -- or 2020, excuse me.

21       Q.   And what lower was that?

22       A.   It did not exist as of yet.

23       Q.   Was the plan at that time for KEA to produce a

24   polymer lower?

25       A.   That would have been what we were there to

1    discuss, yes.

2         Q.    Did you actually have that discussion?

3         A.    As I recall, yes.

4         Q.    And that was September 10, 2018; correct?

5         A.    Per this email, that would sound correct.

6         Q.    Was there any discussion on that call about

7    licensing the CAV-15 molds?

8         A.    I cannot recall.

9               MR. CALAWAY:  Object to the form.

10   BY MR. BOGAN:

11        Q.    Do you recall any conversation that you were a

12   party to where it was discussed about licensing the CAV-15

13   molds?

14               MR. CALAWAY:  Object to the form.

15               THE WITNESS:  I do not believe that that was

16   considered in the conversation, because there was no need

17   to license it as it was going to be a new product.

18   BY MR. BOGAN:

19        Q.    Did you have any discussions with Mr. Phagan about

20   KE Arms producing the CAV-15 and doing the cleanup work

21   afterwards?

22               MR. CALAWAY:  Object to the form.

23               THE WITNESS:  I don't fully understand that

24   question.

25   ///

1    BY MR. BOGAN:

2        Q.    Did you and Mr. Phagan have any discussions about

3    KE Arms producing the CAV-15?

4        A.    No.

5        Q.    Did you have any discussions with Mr. Phagan about

6    KE Arms doing secondary work on the CAV-15 after it was

7    produced?

8            MR. CALAWAY:    Object to the form.

9            THE WITNESS:    Can I ask the question for what

10   that means, object to form?

11   BY MR. BOGAN:

12       Q.    Let me explain it.

13            Are you aware that a polymer lower requires

14   some level of work to the receiver after it is -- after the

15   mold is produced?

16            MR. CALAWAY:    And just for the record, and so

17   you understand, yeah, if you don't understand a question,

18   you can -- it's okay to say you don't understand.

19            THE WITNESS:    That's what I'm asking you.

20            MR. CALAWAY:    If that's what you were asking

21   me just now, I wanted to make sure --

22            THE WITNESS:    Yes.    I also want to understand

23   "object to form," what that means.

24            MR. CALAWAY:    Object to the form just means I

25   object to the form of his question, either it's vague or

 1    ambiguous or it's compound or lacks foundation.

 2                 So like he said in the beginning, I'll be

 3    objecting.  Unless I say don't answer, you should answer.

 4                 THE WITNESS:  Okay.  Understood.  I just want

 5    to clarify.  This is new to me.

 6                 MR. CALAWAY:  Try to ignore my -- if I'm

 7    objecting.

 8                 THE WITNESS:  I apologize.  I'm not trying to

 9    interrupt the process.  I just don't understand that.

10                 MR. BOGAN:  You're fine.  I should have told

11    you that earlier.

12                 THE WITNESS:  Okay.

13    BY MR. BOGAN:

14        Q.  If you don't understand a question, please let me

15    know.

16        A.  Okay.  I did not understand that question.  I

17    think you clarified it, but can you please repeat it?

18        Q.  And one more thing, just so we're clear, because

19    we've now had that discussion, I want to make sure you

20    understand that if you do answer a question, I'm going to

21    assume that you understood it.  Okay?

22        A.  Understood.

23        Q.  All right.  So you know that after a polymer

24    lower -- do you know after -- that after a polymer lower

25    mold is produced that there's some secondary cleanup work

1    that has to be done to that product?

2        A.    I am aware of that.    I'm aware that almost in any

3    machining process that there's secondary cleanup work

4    regardless of the material.

5            I am also aware of that because before I ever

6    even worked on InRange, I had known Cav Arms and had done

7    some of the cleanup on earlier Cav Arms' receivers myself.

8        Q.    So did you have any conversations with Mr. Phagan

9    about KEA doing some of that cleanup work --

10            MR. CALAWAY:    Object to the form.

11    BY MR. BOGAN:

12        Q.    -- to the CAV-15?

13            MR. CALAWAY:    Object to the form of the

14    question.    Vague as to time.

15            MR. BOGAN:    No.    Let's not -- we're not going

16    to do speaking objections.

17    BY MR. BOGAN:

18        Q.    My question is: Did you have any discussions with

19    Mr. Phagan about KE Arms doing the secondary cleanup work

20    on the CAV-15 for the WWSD project?

21            MR. CALAWAY:    Object to the form; vague.

22            MR. BOGAN:    Stop with the speaking

23    objections.

24            MR. CALAWAY:    I can make an objection as to

25    vague.

1          THE WITNESS:  I do not recall having a

2    conversation about that.  But I also do not know how that

3    would have been possible because the existing inventory of

4    GWACS lowers had already been manufactured.

5    BY MR. BOGAN:

6        Q.   Did you have any discussions with anybody from KE

7    Arms about KE Arms doing any work at KE Arms on the CAV-15

8    for the WWSD project?

9        A.   I do not recall any conversation like that.

10       Q.   Did you know that Mr. Phagan signed NDAs with

11   GWACS Armory?

12          MR. CALAWAY:  Object to form of the question.

13          THE WITNESS:  I cannot speak for what he has

14   done.  I don't know.

15   BY MR. BOGAN:

16       Q.   So you were not aware of him signing any NDAs?

17       A.   I do not recall.  I don't know.

18       Q.   Do you have any knowledge of Brownells signing an

19   NDA with GWACS Armory?

20       A.   I don't know what they've done.  That would be a

21   question for Brownells.

22       Q.   Do you know anything about KE Arms signing a

23   nondisclosure agreement with GWACS Armory?

24       A.   I do not work for KE Arms; nor did I represent

25   them, so I do not know.

1          Q.    So is it your testimony that nobody told you that

2    they had signed an NDA with GWACS Armory?

3                MR. CALAWAY:   Object to the form of the

4    question.

5                THE WITNESS:   I do not recall anyone telling

6    me about that.

7    BY MR. BOGAN:

8          Q.    If they had told you that, do you think you would

9    recall that?

10         A.    Possible.   This is quite a few years ago.   It's

11   also possible I wouldn't.

12         Q.    Turn to Exhibit 61 for me, please.

13         A.    Okay.

14         Q.    This is an email from Paul Levy dated September

15   11, 2018.   Do you see that?

16         A.    I do.

17         Q.    And you're on this email; correct?

18                MR. CALAWAY:   Hold on just a second.   Let me

19   get to that exhibit.

20                THE WITNESS:   Okay.

21                MR. CALAWAY:   Are we at Exhibit 61?

22                MR. BOGAN:   Yes.

23                MR. CALAWAY:   And where are we looking?

24                THE WITNESS:   It's an email at the very

25   beginning of it.

1   BY MR. BOGAN:

2       Q.   You're on this email; correct?

3       A.   I am on the email.

4       Q.   And if you go down to the bottom of the first

5   page, there's an email on September 10, the same day that

6   you had a conversation with Paul Levy; correct?

7       A.   Okay.  Yes.

8       Q.   And Paul is emailing Shel.

9            And he said, To get the WWSD project off the

10  ground I'd like to run an idea by you.

11           Do you see that?

12      A.   I do.

13      Q.   It says, Given that Karl and Ian have only

14  endorsed the MK2 receiver and there is an existing mold

15  going unused, could Brownells license the use of the MK2

16  mold to have product produced?

17           Do you see that?

18      A.   I do.

19      Q.   He says, We feel we can work with our partners to

20  clean up the part and have it usable for this project in

21  the short term.

22           Do you see that?

23      A.   I do.

24      Q.   And do you know who those partners he was

25  referring to were?

1          MR. CALAWAY:  Object to the form.

2          THE WITNESS:  It's not specified here, so I

3   would not want to -- I would not want to add conjecture.

4   BY MR. BOGAN:

5      Q.   Do you think you knew who the partner that he's

6   referring to was at the time of this email?

7          MR. CALAWAY:  Object to the form.

8          THE WITNESS:  It could be anyone that

9   Brownells works with.

10  BY MR. BOGAN:

11     Q.   And then if you go to the top of the first page of

12  Exhibit 61, Mr. Levy is emailing you guys.

13          And what does he say about his conversation

14  with Mr. Jud Gudgel?

15     A.   He says, I spoke to Jud a few minutes ago.

16  Essentially license the part, having the molds get out of

17  the facility is a non-starter.

18     Q.   Does that refresh your recollection at all about

19  conversations you may have had about licensing the molds?

20          MR. CALAWAY:  Object to the form.

21          THE WITNESS:  I do not actually remember this

22  conversation, but I do remember there were people hoping

23  that the molds could be used again to manufacture products

24  that we could continue with the endeavor.

25  ///

1    BY MR. BOGAN:

2        Q.    And was that to happen at KE Arms?  Do you know?

3        A.    I don't know that that would be possible.  I don't

4    understand the legalities of molds and manufacturing in

5    terms of FFL regulations.  Excuse me.  Manufacturing

6    regulations.  That would be FFL.  That's a question for a

7    firearms lawyer that I don't understand.

8              I know there's a lot of regulation regarding

9    where molds exist and how they get molded and such in terms

10   of ATF regulations.

11       Q.    If you'll turn to Exhibit 62 for me.

12       A.    Uh-huh.

13       Q.    And this is an email from September 11, 2018, that

14   is from Russell Phagan at KE Arms; correct?

15       A.    It is.

16       Q.    And he's sending it to you, Ian, and Paul Levy;

17   correct?

18       A.    I see that.

19       Q.    And he says, Paul, I would agree that seeing the

20   quote from GWACS makes the most sense.  Hopefully it is

21   reasonable and they can deliver in a reasonable time

22   period.

23              Do you see that?

24       A.    I do see that.

25       Q.    He says, If not, we can talk about other options.

1              Do you see that?

2        A.    I do.

3        Q.    And those other options would be KE Arms producing

4    the -- a polymer lower receiver; correct?

5              MR. CALAWAY:  Object to the form.

6              THE WITNESS:  I believe that's a leading

7    question.  I think other options could be that.  It could

8    be many other things, such as another product on the market

9    that we may not be aware of.

10   BY MR. BOGAN:

11       Q.    Okay.  Let me just explain to you that I can ask

12   you leading questions.  Okay?

13       A.    Uh-huh.

14       Q.    So what I'm going off of is your earlier testimony

15   that just the day before you had a conversation about KE

16   Arms producing a polymer lower receiver.

17             So I'm asking you, if this next day when

18   they're discussing other options, if that was for KE Arms

19   to produce a polymer lower receiver?

20             MR. CALAWAY:  Object to the form.

21             THE WITNESS:  I'm not sure how to answer

22   that, because that is a leading question.

23             MR. CALAWAY:  It's okay.  You can answer

24   leading questions if you can understand his question.

25             THE WITNESS:  Okay.

1              MR. CALAWAY:   I've objected to the form of

2     the question.

3              THE WITNESS:   I mean, yes, of course, that

4     was possible.   We had mentioned the idea of that being

5     floated around.   But what you can see here in the email is

6     an attempt, and what I believe is a very good attempt, to

7     hope to get GWACS to actually produce product.

8     BY MR. BOGAN:

9         Q.   Turn to exhibit -- back to -- hang on one second,

10    please.   Turn to Exhibit 88, please.

11        A.   Okay.

12        Q.   And this is talking about a variance.   Do you see

13    that?

14        A.   I do.

15        Q.   Was that a variance with GWACS Armory?

16        A.   I don't know.   I need to read this.   Let me

17    clarify.   I don't remember this email thread.   I apologize.

18              MR. CALAWAY:   I think it's going --

19              THE WITNESS:   I don't know what that is

20    referencing.

21              MR. CALAWAY:   Hold on.   Just so we can look

22    at it, is it starting from the back page forward?

23              THE WITNESS:   That's what I'm doing, yeah.

24    BY MR. BOGAN:

25        Q.   Let's do this.   Let's go to Exhibit 90.

1        A.    Okay.

2        Q.    That says, Variance approved with GWACS.   Once

3    they get retooled, we'll be in business.

4              Do you see that?

5        A.    I see that.

6        Q.    This is June 5, 2018; correct?

7        A.    Yes.

8        Q.    So were you aware of a variance with GWACS for the

9    CAV-15 to be produced under a variance for the WWSD

10   project?

11       A.    I honestly do not know what this is referencing.

12   Variance is normally used in terms of an ATF regulatory

13   element, which I see here, marking variances.

14              I don't recall what the nature of this was.

15   A variance is normally so that someone manufactures

16   something for someone else.

17       Q.    And this was a variance for GWACS; correct?

18       A.    That's what it says, yes.

19              It says, Once they get retooled, we'll be in

20   business, which is, again, referencing the -- getting the

21   mold to be functionable again.

22       Q.    Okay.  Let's turn to Exhibit 91, please.

23       A.    Uh-huh.  Yes.

24       Q.    And this is an email from Russell to Paul Levy,

25   and this email is InRange TV, Info@inrangetv --

1       A.   Yeah, that is my other email.

2       Q.   And then Ian McCollum; correct?

3       A.   Yes.

4       Q.   And it says the subject is MK3/WWSD media/press.

5   Do you see that?

6       A.   I do.

7       Q.   And Russell says, All, I'd like to set up a

8   conference call to discuss the press release of the WWSD

9   rifle/MK3 receiver development.

10           Do you see that?

11      A.   Yes.

12      Q.   It says, I want to make sure we're all on the same

13  page with details and messaging.

14      A.   Yes.

15      Q.   And do you recall that conversation?

16      A.   This is -- essentially what you're seeing here is

17  the discussion of making sure that we're marketing the 2020

18  project.

19      Q.   Instead of marketing the 2017 project under the

20  2020 banner?

21      A.   Well, the 2017 was changed significantly to become

22  the 2020.  So the 2017 was never to be sold as a commercial

23  project.

24      Q.   What was the messaging you discussed?

25      A.   The messaging was strictly to -- this is where you

1    see InRange being used as the main -- excuse me -- what's

2    the right word -- the main marketing element of the

3    project, and this was a conference call, which I don't

4    recall the -- that call, but I remember having discussions

5    like this about InRange marketing the "What Would Stoner

6    Do" do project launch with Brownells.

7        Q.    And in October of 2019, that would have been

8    messaging that they were using the KP-15 as the lower

9    receiver; correct?

10       A.    It would have been, yes.

11       Q.    Do you recall having that discussion at this time?

12       A.    I remember making an announcement about the KP-15,

13   because it was what allowed the 2020 project to continue.

14       Q.    Did you ever compare the KP-15 to the CAV-15

15   publicly?

16       A.    I do not recall ever doing that, no.

17       Q.    Do you recall making any references to the CAV-15

18   in the WWSD 2020 marketing?

19                    MR. CALAWAY:    Object to the form.

20                    THE WITNESS:    I do not recall doing that.

21   But as we -- remember, the beginning of the project started

22   with that being the initial goal.    So it is possible that

23   then, of course, it changed when the product was

24   unavailable.

25   ///

1    BY MR. BOGAN:

2        Q.   Did you have any concern about calling the KP-15

3    an MK3 initially?

4               MR. CALAWAY:   Object to the form.

5               THE WITNESS:   I was not the one making that

6    decision.   I was not part of that decision.

7    BY MR. BOGAN:

8        Q.   Who made that decision?

9        A.   I don't recall.   That must have been something

10   with KE Arms.

11               As -- let me add to that that the "What Would

12   Stoner Do" project is an amalgamation, an aggregation of

13   multiple different manufacturers.   And so I don't really

14   particularly have a concern about what a particular

15   manufacturer calls a thing as long as it fits the goals of

16   the project.

17       Q.   To your knowledge, was there any intent for the

18   KP-15 MK3 to be a reference to the CAV-15 MK3?

19       A.   I would not say that.   Like I said, Mark III is a

20   very common thing you see in the industry, including others

21   like Ruger.   I would say that it was a reference to an

22   evolutionary process.

23       Q.   If you'll turn to this black witness book for me,

24   please.   If you will turn to Exhibit 167, please.

25       A.   167, you said?

```
 1        Q.    Yes.

 2        A.    I'm there.

 3        Q.    And these are emails with Russell Phagan, Paul

 4   Levy, you, and Ian on the WWSD release; correct?

 5        A.    I'm looking.

 6              MR. CALAWAY:    Hold on just a second.    I don't

 7   have past 151, I'm realizing, on my computer.    Do you have

 8   a copy that I can see?

 9              MR. BOGAN:    I don't have another copy.    I'm

10   sorry.

11              MR. CALAWAY:    I guess we can share.    I've got

12   to be able to see what we're talking about.

13              THE WITNESS:    Of course.    I'm just starting

14   from the bottom so I can read this whole thread.

15              MR. CALAWAY:    161, you said?

16              MR. BOGAN:    167.

17              THE WITNESS:    167.    Did you read that?

18              MR. CALAWAY:    There's markings on this.

19              MR. BOGAN:    There are?

20              MR. CALAWAY:    Yeah.    Somebody underlined it.

21   I don't know if that matters.

22              MR. BOGAN:    Okay.    That's okay.

23   BY MR. BOGAN:

24        Q.    So on this first email that we're looking at, it

25   says, Just so I'm clear, the complete rifle's appearance
```

1    and configuration won't be unveiled until the show.

2              Do you see that?

3        A.    I do.

4        Q.    And why was the rifle's appearance and

5    configuration not going to be unveiled until the show?

6        A.    Well, that's normal with SHOT Show.  That's the

7    day that you do a lot of your market blitz.

8        Q.    So prior to SHOT Show 2020, you had not put out

9    any imagery of the WWSD rifle?

10       A.    Well, there was lots of imagery of the 2017.  I do

11   not recall putting anything out of the formalized 2020.

12       Q.    And when was SHOT Show 2020?  When did that occur?

13       A.    Oh, my gosh.  What dates are SHOT Show?  I do not

14   recall the dates of SHOT Show.

15       Q.    January of 2020; correct?

16       A.    That sounds correct.

17       Q.    And then if you go to the email dated October 28,

18   2019.

19       A.    They are all October 28.  I'm assuming you mean

20   the next one.

21       Q.    Yeah.  I'm sorry.  The next one where Russell is

22   emailing Paul.  Do you see that?

23       A.    I do.

24       Q.    He says, We just finalized the design last week,

25   and now it's off to the mold maker for revisions.

1          Do you see that?

2     A.   I do.

3     Q.   So as of October 2019, the design was finalized;

4 is that right?

5     A.   Yes.

6     Q.   Who did that design?

7     A.   The design of the KP-15 would have been KE Arms,

8 although I had input onto what I would want a lower

9 receiver to have as a part of it.

10     Q.   What was that input?

11     A.   There was a number of things.  It required an A1

12 length of pole, which is standard from the 1960s.  The

13 angle of the pistol grip for the user's comfort, the access

14 to the safety from the pistol grip, a QD socket, which is

15 considered essentially an essential part of all modern

16 firearms now, different sling swivel positions, and the

17 ability for it to accept or be cut to accept ambidextrous

18 controls.

19     Q.   And those were all your ideas?

20     A.   Those were all elements that I added to being

21 required to something that I would like to see in my "What

22 Would Stoner Do" 2020 project, yes.

23     Q.   Did you know if -- at that time if GWACS was

24 planning to do any of those additions to the CAV-15?

25     A.   I have no idea what their plans were in that

1    regard, but I will say that all of those things that I

2    suggested are essentially parts of modern firearms across

3    the board, AR-15 or not.

4        Q.    Then it goes on to say, We intend to have 3D

5    printed samples for SHOT Show.

6            Do you see that?

7        A.    Yes.  I remember that.

8        Q.    There was a 3D print sample at SHOT Show; correct?

9        A.    There was, yes.

10        Q.    Do you know who printed that?

11        A.    That would have been done through KE Arms, but I

12    don't know who actually printed it.

13        Q.    Had you seen the CAD files for the KP-15 at that

14    time?

15            MR. CALAWAY:  Object to the form.

16            THE WITNESS:  I do not recall.  But I do

17    remember seeing what it was going to look like.

18    BY MR. BOGAN:

19        Q.    Down at the bottom it says, The intro video will

20    be 3D rendering only.

21            Do you see that?

22        A.    Yes.  I remember there was a 3D animator that

23    rendered something like that.

24        Q.    And do you know who that animator was?

25        A.    I do not, no.

1    Q.   It says, The same CAD files are in the hands of
2    the animator.
3            Do you see that?
4    A.   I do see that.
5            MR. CALAWAY:   Again, there's just -- you've,
6    like, circled things and parenthesized things.   Are you
7    okay with us seeing those notes?
8            MR. BOGAN:   Yeah, that's fine.
9            THE WITNESS:   What I remember in that regard
10   is that I -- that the rendered -- the 3D rendered video was
11   provided to me so I could include it in marketing content.
12   I did not render that, nor do I know who did it, nor do I
13   recall.
14            Let me clarify.   Nor do I recall who did it
15   is a more accurate way to state it.   But I remember us
16   receiving the file to put into my video.   Trying to be
17   precise with my language to make sure I'm saying the right
18   things.
19   BY MR. BOGAN:
20   Q.   I appreciate it.
21            Do you know how long after SHOT Show it took
22   for the rifle -- I'm sorry.   Let me strike that.
23            Do you know how long after the SHOT Show it
24   took for the KP-15 lower receivers to be ready to produce?
25   A.   I do not remember the exact dates between then and

```
 1    then.  No, I do not.

 2         Q.    Do you recall it being longer than expected?

 3                    MR. CALAWAY:   Object to the form.

 4                    THE WITNESS:   Everything in manufacturing is

 5    longer than desired.

 6    BY MR. BOGAN:

 7         Q.    Have you ever heard of a company called Tool and

 8    Design Group?

 9         A.    I have heard of it, yes.

10         Q.    And how did you hear of Tool and Design Group?

11         A.    My understanding is that they're part of the

12    investors to make this possible.

13         Q.    And were you offered to invest in Tool and Design

14    Group?

15                    MR. CALAWAY:   Object to the form.

16                    THE WITNESS:   Yes.

17    BY MR. BOGAN:

18         Q.    Who offered you to invest in Tool and Design

19    Group?

20         A.    I don't know specifics.  I just remember it must

21    have been through KE.

22         Q.    Through KE Arms?

23         A.    Yes.

24         Q.    And were you aware that Ian McCollum invested in

25    Tool and Design Group?
```

1      A.   Yes.

2      Q.   And when did you find that out?

3      A.   I don't recall.

4      Q.   Did you know all along that Ian was an investor in

5    Tool and Design Group?

6      A.   I do not remember when I found that out.   I

7    apologize not knowing exact dates like that.   I think of

8    things in sequence but not dates.   I don't recall.

9      Q.   It's fine if you don't remember an exact date.

10     A.   I don't.

11     Q.   You can also just give general timeframes if you

12   have an idea.

13     A.   I don't really remember.   I am aware of that fact,

14   but I don't remember when I learned it.

15     Q.   And was -- to your knowledge, was it offered to

16   Ian at the same time it was offered to you?   And "it" being

17   investment in Tool and Design Group.

18     A.   I do not know.

19     Q.   Were you upset that Ian McCollum invested in Tool

20   and Design Group?

21     A.   No.

22     Q.   Were you ever sent a nondisclosure agreement from

23   armory -- GWACS Armory?

24     A.   No.   Sent one?

25     Q.   Yes.

1     A.   I may have been sent one.  I do not -- I believe

2  that there may have been an exchange of emails that

3  included one, yes.

4     Q.   Have you removed any marketing that had been put

5  online for the WWSD project?  Have you taken any of that

6  marketing down?

7         MR. CALAWAY:  Object to the form.

8         THE WITNESS:  I apologize.  I'm thinking.  I

9  do not remember removing anything that had been posted.  It

10  has changed -- there are things that I have posted less,

11  but I don't remember removing anything.

12  BY MR. BOGAN:

13     Q.   So you --

14     A.   At the same time -- let me clarify that my video

15  channel is a fluid environment, and sometimes videos change

16  over time just because.  There is like -- that is something

17  that happens as part of videos in general.

18     Q.   But you haven't specifically deleted any videos

19  about the KP-15?

20     A.   I cannot remember ever doing that, no.

21     Q.   Have you deleted any videos about the CAV-15?

22     A.   I don't recall doing that.  The entire 2017

23  project is still up on the channel currently.

24     Q.   In your declaration, which is Exhibit 194, the

25  first one I gave you --

```
 1        A.    Yes.

 2        Q.    You state on paragraph 18 that in or around

 3   January of 2019, GWACS posted to its social media that it

 4   was forced to vacate its building.

 5              Do you see that?

 6        A.    I remember that post from social media, yes.

 7        Q.    You read that post yourself?

 8        A.    I remember seeing the post.

 9        Q.    And how did you remember the date of that post?

10        A.    That would have been in conversation, but I

11   remember seeing the post.

12        Q.    In conversation with whom?

13        A.    In discussion with general counsel.

14        Q.    Discussion with your counsel?

15        A.    Yeah.  We have to remember, but I remember seeing

16   the post.

17        Q.    And --

18              MR. CALAWAY:  Anything we talk about,

19   obviously, I object to you talking about.

20              THE WITNESS:  Okay.

21              MR. CALAWAY:  But I do think we talked about

22   certain exhibits that have been disclosed in this case.

23              THE WITNESS:  Yes.  That's what I mean by

24   that, but yes.

25              MR. CALAWAY:  For your reference, Counsel.
```

1    There might be exhibits that have been -- that we have in

2    front of us if you want to talk about social media posts.

3    BY MR. BOGAN:

4        Q.   What media outlets did you -- did InRange

5    distribute videos on for the WWSD project?

6        A.   InRange is very decentralized in its distribution.

7    Its primary distribution point is YouTube.  However, I am

8    widely distributed across multiple platforms.  I can't even

9    enumerate them all.

10              A small list would be YouTube, BitChute,

11   Facebook.  Recoil at some point has been replicating my

12   content.  Utreon replicates my content.  I don't even know

13   the entire list.  The primary distribution points would be

14   YouTube and Facebook.

15       Q.   Were you aware that somebody from Recoil was an

16   investor in Tool and Design Group?

17       A.   Yes.

18       Q.   Do you know when you learned that?

19       A.   I do not.

20       Q.   Was Recoil an investor in the KP-15 -- or I'm

21   sorry.  Strike that.

22              Was the Recoil gentleman an investor in Tool

23   and Design Group when he was writing articles about the

24   KP-15?

25              MR. CALAWAY:  Object to the form.

1                    THE WITNESS:   I can't answer that.   That

2    would be a question for him.

3    BY MR. BOGAN:

4         Q.    And in paragraph 27 you said that InRange promoted

5    the WWSD rifle by, among other things, posting

6    approximately one to two videos per month discussing and

7    promoting the WWSD rifle.

8                    Do you see that?

9         A.    Yes, I do.

10        Q.    And is it your claim that that changed at some

11   point?

12        A.    Yes, it is.   The initial cease and desist letter

13   and then, of course, subsequently followed up by all the

14   legal action caused a cooling effect on wanting to promote

15   something that may or may not be able to be brought to

16   market.

17        Q.    And so if you continue to paragraph 32, it says,

18   InRange then curtailed its promotion of the WWSD rifle from

19   approximately May 2020 until about August 2020 due to the

20   statements in Armory's letter.

21                   Do you see that?

22        A.    I do.

23        Q.    And that would be the cease and desist letter;

24   correct?

25        A.    Correct.

1      Q.    At that point you said you were producing one to

2   two videos per month and that changed; correct?

3      A.    Yes.

4      Q.    And how many videos did you do per month between

5   May and August of 2020?

6      A.    Let me clarify.   One to two videos regarding this

7   particular topic.   I mean, I put out many videos a month.

8   We're talking about only the "What Would Stoner Do"

9   project.

10     Q.    Yes.   Thank you for clarifying that.

11     A.    Okay.   I don't know the exact number, but it was

12  definitely -- there were -- in trying to put this together

13  accurately, I went back and looked at my content,

14  referencing the fact that nothing has been removed, and

15  there were -- I don't want to give an exact number because

16  I don't want to be held to something.   I believe we were

17  putting out at least two, if not more, videos per month,

18  probably three or four, really promoting this project and

19  this concept.   Not just videos but also social media posts

20  as well.

21     Q.    And do you know how many videos you put out in May

22  of 2020?

23     A.    I do not.

24     Q.    Do you know how many videos you put out in June of

25  2020?

1      A.    I would have to reference that later.   I don't

2   have that right now.   I put out a lot of content.

3      Q.    Are you aware that there were at least one video

4   for the WWSD project posted to YouTube in each month

5   between May and August of 2020?

6      A.    May and August?   So this is the time we're talking

7   about right now about curtailing.   There were videos during

8   that duration of time, but there were less of them as a

9   result of the cooling effect, as I mentioned earlier.

10      Q.    Who made the decision for there to be a cooling

11   effect?

12      A.    Well, there was a general consensus amongst all of

13   us that the project was in jeopardy.   At this point, if it

14   was impossible for the project to move forward because KE

15   pulled out or the monolithic lower could not produced or

16   Brownells were to decide they no longer wanted to

17   promote the -- or work with the project as a result of

18   these issues, then that project would have died.

19            And if the project died, then I would not

20   want to be the one, as the main marketer, as well as -- I

21   won't say creator of the concept, to be the one sitting

22   there talking to my audience about something that never

23   manifested.

24            InRange has had a history of working with

25   manufacturers and other products of which I have no

1   financial holdings, but -- like, examples would be Hudson

2   and the H9, HMG and the StG 44, which never really came to

3   market.

4               And there are certain things that are

5   important as a content creator besides fiduciary concerns,

6   such as being respected and considered a authority in your

7   space.  And putting out content about a product that never

8   makes it to market really diminishes one's social capital.

9               So not only was this a product I was working

10  with, it was a project that I was involved with directly as

11  a content creator with the 2017 project.  And so putting

12  out a -- gathering hype, for lack of a better term, for

13  something that could not or may not manifest as a result of

14  cease and desist and later legal actions based on the

15  pulling out of either one or both of the parties involved

16  to make it possible made me not want to promote something I

17  was going to be standing there trying to explain.

18      Q.    Is it also important for people doing these kind

19  of promotions to disclose whether or not they have a

20  financial interest in the products that they're reviewing

21  and promoting?

22               MR. CALAWAY:  Object to the form.

23               THE WITNESS:  Typically speaking, it is

24  respectable within the industry when you're creating

25  content about a piece of product whether or not you have a

1       financial interest in it.

2                       I will say that when it comes to the "What

3       Would Stoner Do" project, in InRange has been very

4       consistent with its marketing and to its audience about our

5       financial stake in it.  I always talk to my audience about

6       InRange being supported by only two venues, One of which is

7       the direct viewer support and proceeds or -- excuse me.

8       What's the word?

9           Q.   Royalties?

10          A.   Royalties.  Thank you.  From Brownells.  That's

11      always been disclosed to the audience.

12          Q.   Paragraph 31 of your declaration says, After

13      InRange was notified of Armory's letter, InRange initially

14      ceased its promotion of the WWSD rifle to review the

15      veracity of Armory's statements.

16                      Do you see that?

17          A.   I do.

18          Q.   Who notified you of Armory's letter?

19          A.   There was a general conversation between all

20      parties involved.  I cannot remember the first person to

21      mention it.

22          Q.   When you say "all parties involved," who are those

23      people?

24          A.   The people that I can remember would be Brownells

25      and KE Arms.

1    Q.    So there was a conversation between InRange,

2    Brownells, and KE Arms about the cease and desist letter?

3    A.    About the issue that is now facing the project as

4    a result of the letter.

5    Q.    GWACS Armory never sent you a copy of the cease

6    and desist email; correct?

7    A.    I do not recall receiving one.

8    Q.    And what did InRange do to review the veracity of

9    Armory's statements?

10         MR. CALAWAY:    Object to the form.

11         THE WITNESS:    Can you clarify that further?

12   BY MR. BOGAN:

13   Q.    Yeah.

14         Paragraph 31 you said, InRange initially

15   ceased its promotion of the WWSD rifle to review the

16   veracity of Armory's statements.

17   A.    Yeah.    So that would have been part of the general

18   conversation about what the claims were within it.

19   Q.    What did InRange do to review the veracity of

20   those statements?

21   A.    That would have been the conversation that I

22   mentioned earlier amongst all three parties.

23   Q.    So all you did to review the veracity of Armory's

24   statements was have the conversation with KE Arms and

25   Brownells?

1        A.    Yes, that I can recall.

2        Q.    How many conversations did you have with Brownells

3    about the letter, the cease and desist letter?

4        A.    I do not know.  I just know that, of course, as

5    you can imagine, that this was threatening the project as a

6    whole, and it was a very charged moment, emotionally

7    speaking, so I don't recall how many calls.

8        Q.    Did KE Arms inform you that it had sued GWACS

9    Armory before May of 2020?

10            MR. CALAWAY:  Object to the form.

11            THE WITNESS:  I am aware of that happening,

12    but I do not know when I was told or how I found out about

13    it.

14    BY MR. BOGAN:

15        Q.    And you said that you curtailed marketing from May

16    of 2020 until about August of 2020; right?

17        A.    Yeah.  I would say there's even a cooling effect

18    to this day at the moment, but it's not as significant.

19    We've had to move forward, because there was no option but

20    to move forward.

21        Q.    But that started in May of 2020?

22        A.    Around there.

23        Q.    At that time did you know -- when you started this

24    curtailment in May, did you know that KE Arms had filed a

25    lawsuit against GWACS Armory?

1       A.    I do not remember that being the case in May.

2   What I remember was the discussion in general about the

3   threat to the project as a result of the letter and as a --

4   and that's what caused that decision on my part.

5       Q.    And that decision that you're referring to is to

6   produce less videos than you were previously?

7       A.    To not promote a project that may not come to

8   fruition.

9       Q.    But you did continue to promote it; correct?

10      A.    There had to be a need to.    People were asking --

11  the audience -- this has generated a lot of hype since 2017

12  when it was originally a DIY project.    And then when it

13  became commercially marketed and SHOT 2020, there was a lot

14  of interest.    Actually, significant interest.

15          This -- this concept is a little bit unique

16  to the AR-15 industry.    It generated a lot interest and

17  consternation at the same time.

18          So the audience -- I don't know if you've

19  ever been a content creator, but they always demand

20  something right now.    It's very hard to keep them fed.    So

21  there had to be some information coming to them, yes.    So

22  what it did is, it turned into essentially a trickle versus

23  a flood.

24      Q.    But it's not your testimony today that you

25  completely stopped marketing?

1      A.   Did not completely stop, no.

2      Q.   When you curtailed the marketing in May of 2020

3   through August of 2020, did you have a product to sell?

4           MR. CALAWAY:   Object to the form.

5           THE WITNESS:   There was the continued effort

6   to make this a commercially viable product, yes.

7   BY MR. BOGAN:

8      Q.   But it was not a commercially --

9      A.   I do not remember when it -- I'm sorry.   I didn't

10  mean to cut you off.

11     Q.   It was not a commercially viable product at that

12  time; correct?

13     A.   I do not remember when it was -- when we actually

14  hit the Brownells' shelves.   That would be a question --

15  I'd have to go back and look.

16          However, if I recall -- and I don't remember

17  when we started -- Brownells was taking pre-sales and

18  interest, so that would have diminished that as well.

19     Q.   And what's the basis for that opinion?

20     A.   The marketing efforts on InRange are what

21  generated interest in the product.   There's a -- this has

22  been wholly an InRange project, meaning the "What Would

23  Stoner Do" project since 2017, and all of the interest

24  generated in it initially started completely grassroots and

25  organically through my social media and video content.   So

1    the pre-sales on Brownells, unless someone were to

2    accidentally find by clicking on it, probably were brought

3    there by my work.

4        Q.    And what happened to pre-sales when you were doing

5    less marketing between May and August of 2020?

6        A.    That would have to be a question for Brownells as

7    they would be the ones to have that data, but I would have

8    to imagine it had an effect.  Because due to other video

9    content I've done, not only about this but other

10    projects -- in fact, even GWACS, when the 2017 project

11    was -- hit its peak, it is my understanding -- I think I

12    referenced this earlier -- that GWACS had, like, a --

13    essentially a couple-year inventory of lowers in stock.

14    And the 2017 DIY project actually blew out that inventory,

15    which is why there was none left on the market.

16            So while I don't know the exact numbers, for

17    example, of how many lowers were sold for GWACS because I

18    never asked them, nor did they tell me, the reality is it

19    blew out the inventory.  That has been a common trend with

20    work with InRange where I make sure that the -- I've heard

21    people's inventory being depleted or being hit very hard

22    when videos come out or launch.

23            So as a result of that, it is a pretty safe

24    assumption that not marketing the pre-sales had a

25    diminishing effect.

1      Q.   Okay.   Will you turn to Exhibit 173 for me,

2   please.

3      A.   Okay.

4      Q.   Okay.   On Exhibit 173, this is an email from

5   Russell Phagan to Paul Levy, Roy Hill, and InRange TV;

6   correct?

7      A.   It is.

8      Q.   And this is dated February 12, 2020; correct?

9      A.   It is.

10      Q.   And Russell is telling Paul that they've been

11   getting comments on social media that people don't know

12   when to expect delivery of the MK3 lowers/WWSD rifles.

13           Do you see that?

14      A.   I do.

15      Q.   He said, Even though I've been pretty clear on the

16   late quarter two target date, we should probably put

17   something up on the WWSD product page.

18           Do you see that?

19      A.   I do.

20      Q.   So at this time were updates not being put on the

21   product page to tell people when to expect delivery?

22      A.   There was generally a cooling effect on all

23   marketing and product information, yes.

24      Q.   And that's from the cease and desist letter that

25   Armory sent?

1     A.   The general cooling effect was.  I can't speak to

2  these specific dates.

3     Q.  I'm sorry.  Say that again.

4     A.   I cannot speak to these specific dates; right?

5  Because there are other things that can occur within things

6  that would cause something like this to happen.  I mean,

7  manufacturing has its delays of its own accord as well.

8        So as for this particular email, I do not

9  know if this email is referencing that.  I don't believe it

10  is.

11     Q.  But you think there was a cooling effect from that

12  as well; right?

13         MR. CALAWAY:  Object to the form of the

14  question.

15         THE WITNESS:  No.  I would not allow a -- I

16  would not -- here's how I would answer that.  When it comes

17  to manufacturing and the difficulties and challenges that

18  come with manufacturing anything, that's something that I

19  would be more interested in actually sharing with my

20  audience versus a cooling effect, because my audience tends

21  to be technical, and being able to share with them those

22  kind of difficulties actually helps versus hurts marketing

23  and general consumer interest.

24  BY MR. BOGAN:

25     Q.   Were there any other factors that you believe

1  could have been a cooling effect on the WWSD project other

2  than the cease and desist letter that Armory sent to

3  Brownells and KE Arms?

4            MR. CALAWAY:  Object to the form.

5            THE WITNESS:  I believe that there could have

6  been delays in getting a thing to market as a result of

7  manufacturing difficulties and things that occur with

8  manufacturing.

9            But would I use the term cooling effect?  No.

10  The reason I use the word cooling effect is because that

11  letter and subsequent actions were a diminishing -- not

12  only -- frankly, was a demoralizing element to the people

13  that were involved in the project, of which we were excited

14  about, but also the possibility of not being able to bring

15  it to market.

16            The only thing that ever happened in the

17  production of this WWSD 2020 that truly jeopardized this

18  actually coming to market was this.  There were always

19  challenges, like a barrel or a part or things like that,

20  which are part of manufacturing a product, but none of them

21  would have made it impossible to come to market.

22  BY MR. BOGAN:

23      Q.    So looking at Exhibit 173, Russell's telling Paul

24  that they're getting social media messages, though, asking

25  when they can expect to get those pre-orders; correct?

1     A.   Yeah.   Although, this is -- this is early on in

2     the project.   This is right after SHOT Show, and this is

3     before -- this is before the real effect or the concerns

4     about everything going on with GWACS started.

5          So at this time there was a lot of hype

6     because of SHOT Show and all of the marketing that had been

7     going on precursor to our, quote/unquote, cooling effect.

8     Q.   So when he's saying we should put something out on

9     the WWSD product page to make it clear that the expectation

10    is late quarter two, was that not already on the product

11    page?

12    A.   I don't know that there was a specific delivery

13    date on the Brownells page.   I do not control or manage the

14    Brownells page.

15    Q.   Do you know if that had any cooling effect on

16    pre-orders, not knowing when to expect delivery?

17    A.   I do not believe so.   The reason you're seeing

18    this email is because people were clamoring to want to

19    order them.

20    Q.   They were wanting to order them or receive them?

21    A.   Well, of course they want to receive them.   There

22    are people still excited about receiving them today.

23    Q.   Right.

24         And so they're saying -- the comments were

25    they didn't know when to expect delivery, indicating that

1    they were people who had already ordered them; right?

2        A.   Not necessarily.   This is -- probably these could

3    be people on the pre-order.   What happened with this is a

4    lot of people that -- some people that had pre-ordered or

5    people that were going to order or some people -- there are

6    some people that would not pre-order but would want to buy

7    when it's available now, would want to know a target date.

8                    This is not dissimilar to when I will put out

9    an Instagram post about a video I'm going to make and I get

10   five emails in the next two minutes about when is it coming

11   out.   I feel like the audience tends to act this way.

12       Q.   Do you know if you guys produced that content that

13   you're discussing here to give an idea to the audience that

14   it's going to be a quarter two target date?

15       A.   I don't know what Brownells did with their page as

16   a result of this email.   I can't recall that.   But I do

17   know that there were videos -- there definitely were

18   mentions in videos about target dates, sure.

19       Q.   And here in February 2020, the target date was

20   late quarter two of 2020; right?

21       A.   That's what this says, yes.

22       Q.   Do you know if that target date was met?

23            MR. CALAWAY:   Object to the form.

24            THE WITNESS:   I cannot recall.   I do not

25   remember the shipping date.   That would be a question for

1    KE.  I almost feel like I have to apologize for that, but I

2    don't remember.

3    BY MR. BOGAN:

4        Q.  Did -- not knowing when the product was going to

5    be ready, did that have any impact on your marketing?

6            MR. CALAWAY:  Object to the form of the

7    question.

8            THE WITNESS:  No.  As I referenced earlier,

9    delays in manufacturing and difficulties in manufacturing

10   actually create an interest in content.  Some of the

11   instances of things having -- some of that stuff was

12   actually a good way to produce content to market the

13   product.

14   BY MR. BOGAN:

15       Q.  Did you produce any content for the WWSD product

16   talking about production difficulties?

17           MR. CALAWAY:  Object to the form.

18           THE WITNESS:  I know we have talked about

19   issues like, for example, aggregating people, even with

20   Brownells aggregating different manufacturers and things

21   like that as a challenge, because the industry is like

22   that.

23   BY MR. BOGAN:

24       Q.  But for the WWSD 2020 project, did you use that --

25   those challenges that you just discussed as a way to gain

1    interest in views?

2         A.    There are definitely instances in which technical

3    challenges and things like that were used to garner views,

4    yes.

5         Q.    And was that done in videos?

6         A.    There are videos like that, yes.

7         Q.    Was that done on posts?

8         A.    Probably both.

9         Q.    Would you be able to provide us with the videos

10   and posts where you are talking about the manufacturing

11   challenges to your audience?

12              MR. CALAWAY:  I was going to ask if we needed

13   a break.  I'm --

14              MR. BOGAN:  I'm almost done.  We're not going

15   to have much longer.

16              THE WITNESS:  I haven't removed content, so I

17   should be able to do that.  These pages -- my pages on

18   social media and videos are all public.

19   BY MR. BOGAN:

20        Q.    I think we may have touched on this earlier, and I

21   apologize if I did.

22              Did anybody from KE Arms discuss with you

23   Armory's financial needs in relation to the CAV-15?

24              MR. CALAWAY:  Object to the form.

25              THE WITNESS:  I don't recall that at all.

1    BY MR. BOGAN:

2        Q.    Did anyone ever tell you what takedown pins were

3    used for the CAV-15?

4        A.    Well, I was familiar with the CAV-15 as a product

5    before I even heard of GWACS.  So I mean, I knew about

6    those before that.

7        Q.    Who makes the takedown pins?

8        A.    I don't remember the manufacturer, but they're

9    standard issue products that you can buy pretty much for a

10    lot of things.  There's nothing proprietary about them.

11        Q.    Did anybody ever tell you who the manufacturer of

12    the takedown pins for the CAV-15 were?

13        A.    I have been told the name, but I don't recall it

14    right at this moment.

15        Q.    Do you know who told you the name?

16        A.    I probably asked because I was using them or

17    needed to buy a third one or something.

18        Q.    Was it Mr. Phagan that told you the name?

19        A.    Probably.  It could have happened before I even

20    knew about -- before even InRange was a thing.  I have been

21    using the Cav Arms product before I even created InRange.

22        Q.    Do you know who makes the takedown pins for --

23        A.    I don't remember right at the moment, no.

24        Q.    Let me finish.

25             Do you know who makes the takedown pins for

77

1    the KP-15?

2        A.    I don't recall at the moment, no.   They're a

3    standard issue product.

4        Q.    Do you know if it's the same company that made the

5    takedown pins for the CAV-15 --

6        A.    I believe it is.

7        Q.    -- that makes the takedown pins for the KP-15?

8    You believe it is?

9        A.    Uh-huh.

10       Q.    What did KE Arms, which would include

11   Mr. Phagan -- what did they tell you about the similarities

12   between the CAV-15 and the KP-15?

13              MR. CALAWAY:   Object to the form.

14              THE WITNESS:   We've never had a conversation

15   of that nature that I can recall.

16   BY MR. BOGAN:

17       Q.    Did InRange ever disclose publicly that Ian

18   McCollum had an interest in the KP-15 through his

19   investment in Tool and Design Group?

20              MR. CALAWAY:   Object to the form.

21              THE WITNESS:   I do not believe that that has

22   been done.

23   BY MR. BOGAN:

24       Q.    Do you think that should have been done?

25       A.    I don't think that that matters.   That is a -- as

1    it is a subcomponent of the "What Would Stoner Do" project,

2    it is not the "What Would Stoner Do" project in and of

3    itself.

4                    THE WITNESS:    When you have a moment, I would

5    like to use the restroom.    I know you said that we're

6    getting close.

7                    MR. BOGAN:    Actually, let's take -- can we

8    take about a five-minute break?    And then I'll probably be

9    about done.

10                   (A recess ensued.)

11   BY MR. BOGAN:

12        Q.    We're back on the record after a short break.

13              You understand you're still under oath;

14   correct?

15        A.    Yes.

16        Q.    Do you receive any compensation related to the

17   KP-15 other than the royalty agreement you get for the WWSD

18   branded lowers?

19        A.    No.  My royalties are only the "What Would Stoner

20   Do" branded elements.

21        Q.    That is the only compensation that you receive

22   from the KP-15; correct?

23        A.    I receive nothing from the KP-15 directly.

24        Q.    Do you receive any compensation for the WWSD

25   branded rifles other than the royalty?

```
 1        A.   No.
 2        Q.   You mentioned earlier that you had had work done
 3   on an IP agreement?
 4        A.   I'm sorry?
 5        Q.   You mentioned earlier that you had hired counsel
 6   to have work done on an IP agreement.  Do you recall that?
 7             MR. CALAWAY:  Object to the form;
 8   mischaracterizes.
 9   BY MR. BOGAN:
10        Q.   Okay.  Let's go back.
11             When did you first hire Mr. Calaway as your
12   attorney?
13             THE WITNESS:  I'm looking at you because I --
14             MR. CALAWAY:  I know.  I can't give you the
15   answer.  If I had it, I couldn't even tell you.
16             THE WITNESS:  I do not remember the dates.  I
17   apologize.
18   BY MR. BOGAN:
19        Q.   What did you first hire Mr. Calaway to do?
20        A.   I acquired the firm to ensure my trademarks on a
21   number of pieces of intellectual property for InRange.
22        Q.   Okay.  And that's my question.
23             What trademarks were those?
24        A.   There's a couple of them.  I don't remember all of
25   them at the moment.  One of them was -- I'm working with
```

1     making a trademark for Brutality Matches, which are a

2     competition that I run.  InRange itself, InRange -- the

3     logo for InRange, which is iconography, and WWSD.

4          Q.   So you hired Mr. Calaway's firm to get a trademark

5     for you for WWSD?

6          A.   Yes.

7          Q.   Did they do any other intellectual property work

8     for you -- have they done any other intellectual property

9     work for you other than the trademarks?

10         A.   No.  And the reason I hired them, to add something

11    to that, is technically that's something you can sort of

12    pursue yourself, but I am not good with that sort of thing,

13    so I needed help.

14         Q.   And how did you know them?  How did you get

15    referred to their firm?

16         A.   That would have been through Russell, who's

17    familiar with working with them and said they were good

18    guys.

19         Q.   Through Russell Phagan?

20         A.   Yes.

21         Q.   What did Brownells tell you that it was going to

22    do to review the veracity of the statements in the cease

23    and desist letter?

24              MR. CALAWAY:  Object to the form.

25              THE WITNESS:  I can -- I don't recall them

1  telling me what they were going to do, but I do remember

2  having a concern that they might decide to pull out of the

3  project.

4  BY MR. BOGAN:

5      Q.  And what would have happened if Brownells pulled

6  out of the project?

7      A.  I would have had to put out a video canceling the

8  "What Would Stoner Do" project as a commercial endeavor.

9      Q.  Did that happen?

10     A.  No.  They didn't pull out.

11     Q.  Do you know if Brownells canceled any orders for

12  KP-15 lowers?

13     A.  I do not know about their workings with KE besides

14  "What Would Stoner Do."  Excuse me.

15     Q.  Was Brownells upset on that call that you had with

16  Brownells and KE Arms where you were discussing the cease

17  and desist letter?

18     A.  "Upset" is not the word I would use.  I mean, this

19  is all business; right?  Upset is a different thing.  But I

20  would say there was definitely concern.

21     Q.  And how did Brownells express their concern?

22     A.  I think that Brownells is a large company that is

23  essentially used to just marketing non-controversial

24  things, although it is firearms, which is controversial in

25  its own accord, depending on who you are.  But legal

1    controversy like this tends to have, as I said earlier, a

2    chilling or cooling effect on corporate type entities, and

3    Brownells is that.  So that was their concern.  Like -- I'm

4    sorry.  Go ahead.

5        Q.    So what did Brownells say?  How did Brownells

6    express that concern?

7        A.    In general, they didn't know that they wanted to

8    be related to a project, whether or not -- they didn't know

9    if they could continue pursuing a project that had this

10   type of controversy around it or -- and/or whether or not a

11   legal case was frivolous or not didn't make them want to be

12   involved with it -- or may not make them want to be

13   involved with it.

14       Q.    And who from Brownells expressed that?

15       A.    That would have been -- my conversations are

16   entirely with Paul.

17       Q.    So Paul Levy told you that that Brownells was

18   concerned about pursuing this project further?

19       A.    He is my primary contact, and he would have been

20   relaying Brownells' general feelings.

21            MR. BOGAN:  I'll pass the witness.

22

23                    EXAMINATION

24   BY MR. CALAWAY:

25       Q.    Okay.  We'll stick on that subject for a second.

1          You said that Brownells was concerned about

2    the WWSD project after the cease and desist letter?

3        A.    Uh-huh.

4        Q.    I mean, what -- why do you think they were

5    concerned?

6          What was the -- you had conversations with

7    that, and I want to understand what those conversations

8    were like.

9          MR. BOGAN:   Object to form.

10          THE WITNESS:   As I recall, Brownells being a

11   large corporation that's used to dealing with

12   non-controversial type issues or products, a cease and

13   desist letter coming in, whether or not it has veracity or

14   not, is something that makes corporations tend to act --

15   squirrelly would be the word I would use.  And as a result,

16   whether or not there's veracity or not, legal gets

17   involved, probably things get concerned, marketing gets

18   concerned as we saw a chilling effect.  And as a result,

19   Brownells was like, do we want to do this anymore?

20   BY MR. CALAWAY:

21        Q.    And what would have happened if Brownells had

22   pulled out of the project?

23          MR. BOGAN:   Object to form.

24          THE WITNESS:   It would have been the end of

25   the "What Would Stoner Do" 2020 project.  The only way it

1    was commercially viable was due to their ability to

2    aggregate multiple manufacturers.

3    BY MR. CALAWAY:

4         Q.    Okay.   I want to understand why they were crucial.

5              MR. BOGAN:   Object to the form.

6              THE WITNESS:   Brownells is a very large

7    retailer of firearms products across the spectrum.   And the

8    "What Would Stoner Do" project, whether it's the 2017 or

9    the 2020, is an aggregation of multiple divergent

10   manufacturers.   For example, obviously, we're here talking

11   about the KP-15, but the KP-15 is only one component.

12              There's, like, a JP capture spring from JP

13   Enterprises.   There's an ambidextrous bolt release.

14   There's an ambidextrous magazine release.   There's a barrel

15   that's a pencil barrel that has to meet specific

16   specifications.   There's a carbon fiber float tube.   All of

17   these things are from different manufacturers or many

18   different manufacturers.   And trying to get manufacturers

19   to work together in the firearms industry is nigh

20   impossible, and Brownells was going to be the glue.

21   BY MR. CALAWAY:

22        Q.    Understood.

23              You also mentioned earlier -- I don't want to

24   mischaracterize your testimony, but you said something

25   about Brownells being concerned regardless of whether a

1    lawsuit was frivolous or not.  Did I characterize that

2    correctly?

3              MR. BOGAN:  Object to form.

4              THE WITNESS:  I said that, yes.

5    BY MR. CALAWAY:

6        Q.   What do you mean if the -- if it was frivolous or

7    not?  What do you mean by that?

8              MR. BOGAN:  Object to form.

9              THE WITNESS:  What I mean by that is the

10   veracity of the claims have no bearing on the cooling

11   effect that a corporation might have when they see

12   something like that come across their counter.  I mean, it

13   has the effect on a lot of people.

14             If you suddenly open your mail and have a

15   letter in it that has a legal threatening nature of it,

16   whether or not it's true or not, is going to have concern.

17   And when you're dealing with corporations that normally

18   don't have to deal with those types of concerns, they

19   would -- there's a very good likelihood that they might

20   back off from a project.

21   BY MR. CALAWAY:

22       Q.   You also mentioned that you looked into the

23   veracity.

24             I think in Exhibit 194 you reference

25   reviewing the veracity of the statements.  Was that review

1   including whether or not GWACS' assertions were frivolous?

2                    MR. BOGAN:  Object to form.

3                    THE WITNESS:  That would have been in the

4   conversation I said of all the parties involved and the

5   general concerns or points that were made in the letter,

6   yes.

7   BY MR. CALAWAY:

8       Q.   Did you think at the time that GWACS' claims were

9   frivolous?

10                   MR. BOGAN:  Object to form.

11                   THE WITNESS:  Yes, I did.

12  BY MR. CALAWAY:

13      Q.   Why?

14      A.   Because the claims generally being made, whether

15  it was -- I'm having a hard time remembering all of it now

16  because it's over a duration of time.  Many of the claims,

17  as I understand it, are things that are standard elements

18  of an AR-15 product regardless of it being a monolithic

19  polymer lower or not.

20      Q.   And what are those standard elements?

21                   MR. BOGAN:  Object to form.

22                   THE WITNESS:  Some of the standard elements

23  have already been mentioned here today.  But like, for

24  example, an A1 buttstock length, which is a length of pole,

25  which is the -- where the shoulder meets the shooter and

1    when their cheek welds on it for seeing a sight picture is

2    a standard dimensional measurement that has existed in the

3    AR-15 family of weapons since Eugene Stoner designed it in

4    the early 1960s.  So making a claim about A1, for example,

5    is, in my opinion, frivolous because A1 buttstocks have

6    been around since the 1960s.

7    BY MR. CALAWAY:

8         Q.    Okay.  What other firearms have an A1 buttstock?

9              MR. CALAWAY:  Object to form.

10             THE WITNESS:  Well, I would say the A1 length

11   would be the way to put it, which is the length of pole,

12   because A1 is generally a designation to the AR-15 in

13   general.  But the A1 length would be something that we find

14   to be very consistent amongst many firearms, and the reason

15   for that is that that length of pole tends to meet the

16   needs of the widest variety of shooters and heights and

17   styles.

18             So the -- when the M16, AR-15 came out, they

19   measured this out and they made that to be consistent,

20   compatible with the most amount of shooters, being

21   originally a militarily designated firearm.

22             That length of pole, as it is referred to --

23   in fact, I have a video about this and comments about this.

24   People that have adjustable buttstocks on it, I started --

25   for my own interest for the project, started measuring the

1   length of the pole that they had set their adjustable
2   buttstock to, and the vast majority of shooters have it set
3   to A1 length, even though they don't know they're doing
4   it.
5   BY MR. CALAWAY:
6       Q.   Okay.   And did -- does the KP-15 use an A1
7   buttstock?
8       A.   It uses --
9               MR. BOGAN:   Object to the form.
10              THE WITNESS:   It uses an A1 length buttstock,
11  yes.
12  BY MR. CALAWAY:
13      Q.   Okay.   And is that something that you encouraged
14  them to use?
15              MR. BOGAN:   Object to form.
16              THE WITNESS:   It is.   It was an element that
17  I wanted to have part of the product, because I believe the
18  A1 buttstock length to be the proper length of pole for the
19  AR-15, yes.
20  BY MR. CALAWAY:
21      Q.   And does the KP-15 have a trap door compartment in
22  the buttstock?
23              MR. BOGAN:   Object to form.
24              THE WITNESS:   It does, yes.   The original
25  M16A series of weapons and AR-15s, many of them have a trap

1    door compartment on there for storage of supplies, normally

2    a cleaning kit.  And that was part of -- one of the things

3    that I would like to have had be part of the product, yes.

4    And it does.

5    BY MR. CALAWAY:

6         Q.    Are you aware of any other firearms that have

7    that?

8                   MR. BOGAN:  Object to form.

9                   THE WITNESS:  Many firearms have a buttstock

10   cleaning kit compartment, the AR-15 being one of them.  But

11   you can find that across a wide variety of designs.

12   BY MR. CALAWAY:

13        Q.    Do you believe that that's a unique thing to the

14   KP-15 or any other firearm?

15                   MR. BOGAN:  Object to the form.

16                   THE WITNESS:  It is absolutely not unique to

17   have a buttstock compartment for tools or cleaning kits.

18   You can reference that back to the 1860 Henry of the Civil

19   War.

20   BY MR. CALAWAY:

21        Q.    And I'm glad you mentioned that.

22              You're a bit of a historian?

23        A.    My project is generally firearms history, yes.

24        Q.    Okay.  And so you've studied the history of

25   firearms, and that's part of the content you generate?

1    A.    It is a lot of my content.

2    Q.    Okay.  And so you're aware of a lot of features in

3    firearms throughout history; is that fair to say?

4    A.    I would say that is fair.

5    Q.    Okay.  And so when you talk about the A1 buttstock

6    and the trap door compartment, you're pulling from kind of

7    a deep well of historical knowledge about firearms?

8              MR. BOGAN:   Object to form.

9              THE WITNESS:   I would like to think that is

10   the case, yes.

11   BY MR. CALAWAY:

12   Q.    Do you think your audience appreciates that?

13   A.    I think it is the reason my channel is successful.

14   Q.    Okay.  So there's another -- hold on just a

15   moment.

16          What was the carbine length used in the

17   KP-15?

18   A.    I'm sorry.  I do not understood that question.

19              MR. BOGAN:   Object to form.

20   BY MR. CALAWAY:

21   Q.    How common are QD sockets and sling attachments?

22              MR. BOGAN:   Object to form.

23              THE WITNESS:   Sling attachments are --

24   actually, QD sockets and sling attachments are essential

25   parts of all modern firearms design, again going all the

1   way back to even pre-Civil War designs.  QD sockets are, of

2   course, modernized.  But QD sockets are part of almost

3   every modern firearm on the market.

4   BY MR. CALAWAY:

5        Q.   Okay.  Why is that?

6        A.   People like the modularity of it as well as the

7   ability to attach and detach the sling quickly, especially

8   in a competition or a tactic -- in a tactical environment,

9   because you don't necessarily want to be tied to the

10  firearm while you're using it for shooting.

11       Q.   Is there anything unique about QD sockets, in your

12  opinion?

13            MR. BOGAN:   Object to form.

14            THE WITNESS:   There are nothing unique about

15  the QD sockets in the KP-15.

16  BY MR. CALAWAY:

17       Q.   What about the CAV-15 MK2, did that have a QD

18  socket?

19       A.   That design did not have QD socket.  It had a slot

20  across the receiver to loop a sling through.

21       Q.   Okay.  Did the MK1 -- CAV-15 MK1 have a QD socket?

22       A.   I'm trying to think back.  No, it did not.  The

23  MK2 did not.  They would have brought it across.  The MK1

24  even had screws holding it.

25       Q.   Did you ever modify your -- did you own an MK2?

1      A.    I had a number of MK2 Cav Arms lowers, yes.

2      Q.    Did you ever modify your MK2?

3      A.    I modified it in many ways.  I did not actually

4   bore a QD socket into it, but I made it able to take a

5   quickly attached or detached sling, yes.

6      Q.    What other modifications did you make to the MK2?

7            MR. BOGAN:  Object to form.

8            THE WITNESS:  I had replaced the buttstock at

9   one place or another to have a better shoulder grip, would

10  be the term, for proper shouldering and non-slip surface at

11  one point.  I had changed out components like fire control

12  group and things like that, but that's not the actual

13  lower.

14  BY MR. CALAWAY:

15     Q.    And were these things that you thought to yourself

16  as proprietary or just convenience?

17            MR. BOGAN:  Object to form.

18            THE WITNESS:  I never thought of anything

19  about that being proprietary.  It seemed like an AR-15

20  lower to me.

21  BY MR. CALAWAY:

22     Q.    Did you ever witness the manufacturing process of

23  the CAV-15?

24            MR. BOGAN:  Object to form.

25            THE WITNESS:  Yes, I did.  Before InRange TV

1    was ever extant, and because I was a competitive shooter

2    that had known Russell as a result, I had been brought into

3    the manufacturing area to help clean up burs and stuff on

4    currently manufactured parts.   And while you were in there,

5    you could clearly see the manufacturing process.

6    BY MR. CALAWAY:

7        Q.    So that was when it was being run by Shawn Nealon?

8              MR. BOGAN:   Object to form.

9              THE WITNESS:   It would have been, yes.

10   BY MR. CALAWAY:

11       Q.    And when you came in to see the manufacturing

12   process of the CAV-15, I mean, were there any points where

13   it was just you?   I mean, was that something that you did

14   because you had a relationship with Shawn or did he let

15   people in freely?

16             MR. BOGAN:   Object to form.

17             THE WITNESS:   They frequently brought in

18   people from the community to make some extra pay on the

19   side or just to help out in terms of cleaning up, like,

20   molded and welded lower receivers.

21             As we said earlier, there's -- all

22   manufacturing processes leave things behind that need to be

23   cleaned up.   And there's manual labor at each and every one

24   that goes out to the consumer.   So he would bring people in

25   with some regularity.   I would call it lower receiver

94

1   cleaning parties where there might be pizza or even pay to

2   take care of that.

3   BY MR. CALAWAY:

4       Q.    How many people would attend those parties and

5   witness that?

6           MR. BOGAN:   Object to form.

7           THE WITNESS:   I can't give you the entire

8   number.   I know that at times there would be over 10 or 15

9   people at a time.

10  BY MR. CALAWAY:

11      Q.    Did you ever enter into a nondisclosure agreement

12  with Mr. Nealon or Cav Arms?

13      A.    I did not.

14      Q.    CAV Manufacturing?

15      A.    Did not.

16      Q.    Did you ever enter into a nondisclosure agreement

17  with GWACS?

18      A.    Did not.

19      Q.    GWACS Defense?

20      A.    Did not.

21      Q.    KE Arms?

22      A.    No.

23      Q.    Did you ever break a CAV-15?

24          MR. BOGAN:   Object to form.

25          THE WITNESS:   Yes.   I broke a CAV-15 in an

1    attempt to remove the fire control group safety selector

2    lever.

3    BY MR. CALAWAY:

4        Q.    What were you doing that for?

5              MR. BOGAN:    Object to form.

6              THE WITNESS:    When you change the fire

7    control group out of an AR-15, you need to remove the

8    safety to be able to remove the components.    And so on a

9    traditional aluminum AR-15 receiver, you remove the pistol

10   grip to do that.

11             But the monolithic polymer lower is

12   different.    And when you would try to remove the safety

13   selector from the Cav Arms or GWACS for that matter, you

14   have a fairly high risk -- chance of breaking the sidewall

15   of the polymer receiver.

16   BY MR. CALAWAY:

17       Q.    Earlier we discussed -- I'm just trying to give

18   you some background here so -- as we shift gears.

19             We discussed a monolithic polymer lower

20   receiver?

21       A.    Uh-huh.

22       Q.    You're familiar with that?

23       A.    Yes.    That's what we're talking about today.

24       Q.    Okay.    In your opinion, how similar is the Colt

25   monolithic receiver to later monolithic polymer lowers?

1                   MR. BOGAN:   Object to form.

2                   THE WITNESS:   There's only so many ways to

3     design a particular thing based on the material being used.

4     And the Colt monolithic polymer lower is almost identical

5     in every way from -- from my external perception, not as an

6     engineer, but as a user, and I would say historian, not

7     engineer, as the CAV, the GWACS, and now the evolved

8     KP-15.

9     BY MR. CALAWAY:

10        Q.     Did KE Arms adopt the selector -- detent selector

11    design from the Colt?

12                  MR. BOGAN:   Object to form.

13                  THE WITNESS:   One of the deficiencies that

14    was -- existed with the Mark II was that problem.   And the

15    Colt design solved that problem with the way they

16    manufactured or altered some of the components, the pin and

17    the safety selector itself, and that has been included in

18    the KP-15 so that people can remove the safety selector

19    without breaking the sidewall of the receiver, yes.   It's a

20    derivative of the Colt design.

21    BY MR. CALAWAY:

22        Q.     Whose idea was that?

23                  MR. BOGAN:   Object to form.

24                  THE WITNESS:   That came about when we were

25    coming up with the concept of the product because that

1    issue had been extant with the Mark II all along, and I had

2    broken a number of them, as had consumers.  So we wanted to

3    solve that problem.

4    BY MR. CALAWAY:

5        Q.   Had consumers complained to you about that?

6             MR. BOGAN:  Object to form.

7             THE WITNESS:  I don't know that they would

8    have complained to me directly, but I had heard people

9    complaining about it.  And people had complained about it

10    in the 2017 project.

11    BY MR. CALAWAY:

12        Q.   Do you know what buffer tube length is in the

13    KP-15?

14             MR. BOGAN:  Object to form.

15             THE WITNESS:  It is an A1 buttstock length,

16    which is traditionally considered rifle, but it is a

17    carbine length buffer system.

18    BY MR. CALAWAY:

19        Q.   And was that something that you recommended?

20             MR. BOGAN:  Object to form.

21             THE WITNESS:  That would have been extant

22    from the Colt on because of -- once again, when you design

23    something out of a different material, if you go from

24    aluminum to polymer or whatever material or wood for that

25    matter, you have to design it based on the strength of that

1    material.

2         The carbine buffer length, one, is more

3    universal and consistent across AR-15s.  You see very few

4    rifle length buffer systems being made anymore.  People

5    don't generally deal with that.  They're almost all carbine

6    or some carbine derivative, as well as it provides for

7    rigidity in a polymer monolithic lower design.

8    BY MR. CALAWAY:

9        Q.    I want to talk a little bit and switch gears for a

10   second about your marketing efforts for the "What Would

11   Stoner Do" project.

12       A.    Uh-huh.

13       Q.    You talked a little bit about -- just sort of

14   laying foundation here.

15            You talked a little bit about your reputation

16   being tied to this gun.  Do you recall?

17       A.    Yes, this is.  Absolutely.

18       Q.    Okay.  And so when you heard about the cease and

19   desist letter, were you concerned about your own

20   reputation?

21            MR. BOGAN:  Object to form.

22            THE WITNESS:  I would --

23   BY MR. CALAWAY:

24       Q.    Excuse me.  And let me clarify.

25            Your own reputation with respect to InRange?

1              MR. BOGAN:  Object to form.

2              THE WITNESS:  I would answer yes.  Not in

3      that the cease and desist letter would harm the concept,

4      but it might harm the ability to produce something that I

5      told the audience was coming.

6      BY MR. CALAWAY:

7          Q.   I see.

8              And so you stopped or curtailed your

9      promotion of the WWSD rifle; is that true?

10              MR. BOGAN:  Object to form.

11              THE WITNESS:  I did not want to generate more

12      hype over something that may not manifest.

13              It's a lesson that I've learned from other

14      projects I was involved with where I had no personal

15      direct, like, social capital with beyond the fact that by

16      promoting something that doesn't manifest really makes you

17      look -- can give you a bad impression to the audience.

18      BY MR. CALAWAY:

19          Q.   Which is --

20          A.   It diminishes your ability to be perceived as an

21      expert.

22              MR. BOGAN:  Object to form.

23      BY MR. CALAWAY:

24          Q.   Understood.

25              Then you also mentioned in Exhibit 194 that

1    Armory's letter was especially damaging for the WWSD rifle
2    sales because it was sent during a record year for firearm
3    sales in the United States.
4                    What do you mean by that?
5        A.    Well, firearm --
6                    MR. BOGAN:    Object to form.
7                    THE WITNESS:    -- firearm sales are driven by
8    a lot of things, one of which is just the marketing itself.
9    So let me correct -- clarify.
10                   Firearm sales are driven by generally
11   external vectors that have little to do with the marketing,
12   but the marketing is what generates the ones people will
13   buy when they go to buy.
14                   So the things that happen in the world,
15   whatever that may be, bad or good, that generate firearm
16   sales are outside of the control of many of the people
17   selling firearms.    So this -- there has been -- and you can
18   check this with 4473 and NICS, which is --
19                   MR. BOGAN:    Do you have much longer?
20                   MR. CALAWAY:    Yeah.
21                   MR. BOGAN:    You do?
22                   MR. CALAWAY:    Yeah.
23                   MR. BOGAN:    We've got a flight to catch.    So
24   we're going to have to bug out of here pretty soon.    It's
25   your client, so I'm not sure --

1              MR. CALAWAY:  How much longer?

2              MR. BOGAN:  We need to leave now.

3              MR. CALAWAY:  I have about 15 more minutes.

4              MR. BOGAN:  Okay.  I guess go ahead and we'll

5    start packing up while you do that.

6              Are you done with these notebooks.

7              MR. CALAWAY:  Yeah.  Take those.

8              THE WITNESS:  Let me finish that question.

9    NICS is the -- the crime center that does the background

10   checks for firearms transactions.  And any normal

11   commercial sale goes through NICS.

12             And during the duration of time in which we

13   curtailed our efforts was when -- you can statistically

14   look this up -- were some of the highest sales that the

15   country has ever seen in terms of firearms purchases.

16   BY MR. CALAWAY:

17      Q.    Do you believe 2020 was a record year?

18             MR. BOGAN:  Object to form.

19             THE WITNESS:  I believe it has -- it was a

20   record year.  And in 2020, up until then, it had been one

21   of -- it had been the record year for firearm sales, as I

22   understand it.

23   BY MR. CALAWAY:

24      Q.    And so when marketing was curtailed, like you

25   discussed, what -- did it have an effect on capturing that

1       record year of sales?

2                       MR. BOGAN:   Object to form.

3                       THE WITNESS:   Well, I would say that

4       marketing is what generates people purchasing the products.

5       And during a time and situation of highest demand, we were

6       putting the least effort out to market the product.

7       BY MR. CALAWAY:

8           Q.   You also said that InRange felt like it was

9       damaged by Armory's letter in your declaration; is that

10      correct?

11                      MR. BOGAN:   Object to form.

12                      THE WITNESS:   Well, the -- first of all,

13      we've already clarified that InRange, LLC, makes a five

14      percent royalty off of every complete "What Would Stoner

15      Do" product sold, of which 2.5 percent of that is mine.

16      The diminished sales and interest as a result of this

17      absolutely diminished my royalties, yes.

18      BY MR. CALAWAY:

19          Q.   Have you pursued a cause of action against Armory

20      yet?

21                      MR. BOGAN:   Object to form.

22                      THE WITNESS:   I have not.

23      BY MR. CALAWAY:

24          Q.   But you say here in your declaration that you

25      reserve that right?

1          MR. BOGAN:  Object to form.

2          THE WITNESS:  Seems important to reserve

3   one's rights when you have to make a declaration.

4   BY MR. CALAWAY:

5      Q.   Understood.

6          I want to ask you also about -- you said that

7   customers -- I'm pointing to paragraph 23 of Exhibit 194.

8          You talked about firearm consumers are

9   generally suspicious of polymer parts, rifle parts, as

10  opposed to traditional wood, steel, or aluminum.

11         What do you mean they're suspicious?

12         MR. BOGAN:  Object to form.

13         THE WITNESS:  We actually recreated Eugene

14  Stoner's concept more accurately than I expected in terms

15  of experience.  Because when Eugene Stoner designed the

16  AR-15 in the 1950s and '60s, along with Jim Sullivan, they

17  met a lot of opposition by using unique manufacturing

18  materials, aluminum and polymer.

19         When the -- the AR-15 became America's rifle,

20  which was based on aluminum and polymer, up until we

21  started talking about what about if we change that to go

22  back to Eugene Stoner's original concepts, but there have

23  been a lot of very bad polymer products on the market that

24  were defective or fragile.  And as a result, we are -- this

25  project and any monolithic properly designed polymer lower

1    will be going up against what I would call, quote/unquote,

2    known knowledge that is mostly wrong.

3    BY MR. CALAWAY:

4        Q.    Were your marketing efforts --

5                MR. BOGAN:   I'm going to object to form.

6    We're going to adjourn the deposition.

7                MR. CALAWAY:   You can't end it.   I'm not done

8    with my redirect [sic].

9                MR. BOGAN:   You can get his testimony under

10   oath anytime you need to.   We've got to go.

11               MR. CALAWAY:   I'm not ending this deposition

12   yet.   I haven't ended my questions.

13               MR. BOGAN:   I've got a flight to get to.

14   You're asking questions about declarations.   He's your own

15   client, so I'll just do a standing objection to form to the

16   rest of his questions, and we are going.

17               MR. CALAWAY:   I'll reserve the rest of my

18   questions.

19               (At 10:47 a.m., the proceedings continued

     sine die.)

20

21

                        _____

22                          KARL KASARDA

23

24

25

```
 1    STATE OF ARIZONA   )

      COUNTY OF MARICOPA )

 2

 3         BE IT KNOWN that the foregoing deposition was taken

 4    by me pursuant to stipulation of counsel; that I was then

 5    and there a Certified Court Reporter in the State of

 6    Arizona, and by virtue hereof authorized to administer an

 7    oath; that the witness before testifying was duly sworn by

 8    me to testify to the whole truth; pursuant to request,

 9    notification was provided that the deposition is available

10    for review and signature; that the questions propounded by

11    counsel and the answers of the witness thereto were taken

12    down by me in shorthand and thereafter transcribed into

13    typewriting under my direction; that the foregoing pages

14    are a full, true and accurate transcript of all the

15    proceedings had upon the taking of deposition, all done to

16    the best of my skill and ability.

17         I FURTHER CERTIFY that I am in no way related

18    to nor employed by any parties hereto; nor am I in any

19    way interested in the outcome thereof.

20         Dated at Phoenix, Arizona, this 20th day of

21    April, 2022.

22

23         _____

24         CINDY MAHONEY, RPR, RMR NO. 50680

25
```