## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| GWACS ARMORY LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No.:20-cv-341-JDR-SH** |
| KE ARMS, LLC, | ) | **BASE FILE** |
| | ) | Consolidated with: |
| | ) | Case No. 21-cv-107-JDR-SH |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' MOTION FOR ATTORNEY FEES AND COSTS

Defendant KE Arms, LLC ("KEA"), Russell Phagan ("Phagan"), Sinistral Shooting Technologies, LLC ("SST"), Brownells, Inc. ("Brownells"), and Shawn Nealon ("Nealon") (collectively "Defendants"), by and through their attorneys of record, hereby submit their motion for prevailing party attorney fees and costs.

## I.    INTRODUCTION

This is an action alleging misappropriation of trade secrets and breach of a nondisclosure agreement connected to the same alleged trade secrets. Plaintiff GWACS Armory LLC ("GWACS") and defendant KE Arms, LLC ("KEA") entered into a Mutual Nondisclosure Agreement in June 2015 (the "NDA"). Years later, GWACS brought this action against KEA, Phagan, SST, Brownells, and Nealon – all in an effort to avoid having to compete against KEA in the marketplace. For the entirety of this case, GWACS has claimed to own trade secrets related to a monolithic polymer lower receiver called the CAV-15. The jury returned a verdict against GWACS.

1

Critically, the jury found that none of GWACS' purported trade secrets were actually trade secrets and awarded GWACS zero damages. Indeed, the evidence in this case has shown that GWACS initiated this case and persisted in this litigation, despite knowing that the truth did not support its position. Because GWACS brought and maintained its claims in bad faith, KEA is entitled to an award of its reasonable attorney fees under both federal and state trade secret law, in the amount of **$667,822.00.**

Further, Brownells, Phagan, SST, and Nealon incurred attorney fees in the amount of **$139,822.00** and are entitled to an award under the applicable offer of judgment statutes. SST is entitled to an award under its agreement with GWACS in the amount of **$421,720.50**. Therefore, Defendants respectfully request the Court award: KEA its reasonable attorney fees in the amount of **$667,822.00;** Brownells, Phagan, SST, and Nealon in the amount of **$139,822.00;** SST in the amount of **$421,720.50**; and costs in the amount of **$ 51,460.83.**

## II.  FACTUAL BACKGROUND

On July 15, 2020, GWACS commenced this action against KEA for: (1) breach of the NDA, (2) misappropriation of trade secrets, (3) trademark infringement, (4) trade dress infringement, (5) copyright infringement, (6) misappropriation of intellectual property, and (7) breach of the implied covenant of fair dealing. Dkt. 2.

In the same complaint, GWACS brought claims against Mr. Phagan for misappropriation of trade secrets, misappropriation of intellectual property, and breach of the implied covenant of fair dealing. *Id.* GWACS brought claims against SST, for breach of the implied covenant of good faith and fair dealing, breach of an asset purchase agreement dated November 22, 2011 (the "APA"), and misappropriation of intellectual property. *Id.* GWACS brought claims against

2

Brownells for trademark infringement, breach of the implied covenant of fair dealing, and breach of a mutual non-disclosure agreement ("NDA"). *Id.* GWACS brought claims against Mr. Nealon for misappropriation of trade secrets, and misappropriation of intellectual property. *Id.*

On October 7, 2021, Brownells, Phagan, SST, and Nealon made offers of judgment to GWACS. Specifically, Brownells offered $1,500, Nealon offered $1,500, Mr. Phagan offered $1,500, and SST offered $1,500. *Id.* GWACS rejected each of these offers of judgment.

On December 17, 2021, GWACS' claims for trademark infringement claim (third cause of action), trade dress infringement (fourth cause of action), and copyright infringement (fifth cause of action) were dismissed. Dkt. 81.

On February 23, 2023, the Court dismissed GWACS' claims against KEA for misappropriation of intellectual property (sixth cause of action), and breach of the implied covenant of fair dealing (seventh cause of action). Dkt. 191, at pg. 40. The also Court summarily dismissed all of GWACS claims against the Brownells, Phagan, SST, and Nealon, with prejudice, and awarded GWACS zero damages. *Id.*

On February 14, 2025, the jury returned a verdict in favor of the KEA, finding that KEA did not breach the NDA, that none of GWACS' purported trade secrets were actually trade secrets, and awarded GWACS zero damages. Dkt. 272. The jury verdict was entered by the Court on February 20, 2025, thereby adjudicating all of GWACS' remaining claims. *Id.*

KEA as incurred attorney fees in the amount of **$667,822.00,** which is calculated by multiplying the number of hours KEA's attorneys expended on this litigation, **2,323.40**, by the average rate of the billable hourly rate for this matter, **$287.43** dollars per hour. **Ex. 1.** These attorney fee totals are a fair estimate of the combined fee total reasonably incurred by KEA from

the start of the dispute through February 18, 2025. *Id.*

Brownells, Phagan, SST, and Nealon incurred attorney fees in the amount of **$139,822.00,** which is calculated by multiplying the number of hours their attorneys expended on this litigation, **486.45,** by the average rate of the billable hourly rate for this matter, **$287.43** dollars per hour. **Ex. 1.** These attorney fee totals are a fair estimate of the combined fee total reasonably incurred by Brownells, Phagan, SST, and Nealon between October 2021 and February 2023. *Id.*

SST incurred attorney fees in the amount of **$421,720.50**, which is calculated by multiplying the number of hours its attorneys expended on this litigation, **1,467.21**, by the average rate of the billable hourly rate for this matter, **$287.43** dollars per hour. **Ex. 1.** These attorney fee totals are a fair estimate of the combined fee total reasonably incurred by SST between July 2020 and February 2023.

In addition, each of the Defendants seek their attorney fees for the period following February 20, 2025, until the Court enters judgment on this motion, which additional amount will be substantiated by a supplemental filing.

The parties' exhibits admitted at trial are reflected in the Court's Minute Sheet. Dkt. 269. Plaintiffs' Trial Exhibits referenced herein are attached as **Exhibit 3** and referred to herein as "**PEX**". Defendant's Trial Exhibits referenced herein are attached as **Exhibit 4** and referred to herein as "**DEX**".

## III.    <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 54(d)(2), a party may move the Court for an award of attorney's fees if (1) the movant petitions the Court no later than 14 days after the entry of judgment, (2) the movant specifies the judgement and the statute, rule, or other grounds entitling

it to the award, (3) the movant states the amount sought or provides a fair estimate, and (4) the movant discloses, if the court so orders, the terms of any agreement about fees for the services for which the claim is made. Fed. R. Civ. P. 54(d)(2)(B)(i)-(iv).

Oklahoma follows the "American Rule," that is, attorney fees are not ordinarily recoverable in the absence of a statute or an enforceable contract. *SFF-TIR, LLC v. Stephenson*, 452 F. Supp. 3d 1058, 1163 (N.D. Okla. 2020) (quoting *City Nat. Bank and Trust Co. v. Owens*, Okl., 565 P.2d 4 (1977)) (internal quotations omitted). The American Rule does not, however, serve as an absolute bar to the awarding of attorney fees in the absence of statute or contract. *Id.* The Court has inherent equitable authority "to award attorney fees against a party for bad faith litigation misconduct – conduct that is vexatious, wanton or engaged in for oppressive reasons[.]"*State ex rel. Tal v. City of Okla. City*, 2002 OK 97, ¶ 26, 61 P.3d at 247; *See, e.g. Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978) (noting that "even under the American common-law rule attorney's fees may be awarded against [litigants] who [have] proceeded in bad faith").  The Supreme Court of Oklahoma has held that such "[s]anctions exist to ensure the proper functioning of the legal system and there can be no doubt that they primarily deter and punish." *Cities Serv. Co. v. Gulf Oil Corp*., 1999 OK 16, ¶ 8, 976 P.2d 545, 548.

"To determine the reasonableness of a fee request, a court must begin by calculating the so-called 'lodestar amount' of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a 'reasonable' fee." *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). The lodestar is "'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate,' which produces a presumptively reasonable fee that may in rare circumstances be adjusted to account for the presence of special circumstances." *Anchondo v.*

5

*Anderson, Crenshaw & Assoc.*, LLC, 616 F.3d 1098, 1102 (10th Cir. 2010) (quoting He*nsley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 543-44, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010)). Similarly, under Oklahoma law, "the hourly rate times the number of hours spent ... [is] the 'lodestar' of the court's fee determination." *State ex rel. Burk v. City of Okla. City*, 1979 OK 115, 598 P.2d 659, 660-61; *Silver Creek Invs., Inc. v. Whitten Constr. Mgmt., Inc.*, 2013 OK CIV APP 49 ¶ 18, 307 P.3d 360, 367.

The party requesting must establish two components used to calculate the fee award: (i) "the amount of hours spent on the case"; and (ii) "the appropriate hourly rates." *United Phosphorus, Ltd. v. Midland Fumigant, Inc*., 205 F.3d 1219, 1233 (10th Cir. 2000). Once a court makes these two determinations, the fee "claimant is entitled to the presumption that this lodestar amount reflects a reasonable fee." *Robinson v. City of Edmond*, 160 F.3d at 1281 (internal quotation marks omitted).

## IV.   LEGAL ARGUMENT

### A.    KEA IS ENTITLED TO ITS ATTORNEY FEES INCURRED IN DEFENSE OF GWACS' TRADE SECRET CLAIMS.

KEA seeks an award of attorney fees under federal and state trade secrets law. Both the Defend Trade Secrets Act ("DTSA") and the Oklahoma Uniform Trade Secrets Act ("OUTSA") provide independent authority for a court to award attorney's fees to the "prevailing party" if a claim of trade secret misappropriation is made in "bad faith." 18 U.S.C. § 1836(b)(3)(D); Okla. Stat. Ann. tit. 78, § 89. The standard for an award of fees under the DTSA and OUTSA are the same. Okla. Stat. tit. 78, § 89(1).[1]

---

[1] Oklahoma's misappropriation regime, particularly with respect to trade secrets, is based on the Uniform Trade Secrets Act, which has been adopted in nearly all jurisdictions. "[W]here Oklahoma has adopted uniform laws or laws from other jurisdictions, case law from those jurisdictions interpreting such laws are

6

Neither the DTSA nor the OUTSA define "bad faith." However, "courts have developed a two-prong standard to determine whether a claim for trade secret misappropriation was made in bad faith: (1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose." *Cherokee Chem. Co. v. Frazier*, No. CV 20-1757-MWF (ASX), 2022 WL 2036305, at *3 (C.D. Cal. Apr. 27, 2022); *Magnum Mach., LLC v. Terves, LLC*, No. 20-3779, 2021 WL 5772533, at *5 (6th Cir. Dec. 6, 2021) (affirming finding of bad faith where a document "didn't actually contain the elaborate trade secrets presented in [the] complaint"); *Teetex LLC v. Zeetex, LLC*, No. 20-CV-07092-JSW, 2022 WL 2439176, at *4 (N.D. Cal. July 5, 2022) (finding bad faith where "the record shows that much of the allegedly confidential information. . . was publicly available"); *RJB Wholesale, Inc. v. Castleberry*, 788 F. App'x 565, 566 (9th Cir. 2019) (concluding that bad faith exists under Washington law when a party intentionally brings a frivolous claim with improper motive); *Green Bay Packaging, Inc. v. Preferred Packaging, Inc*., 932 P.2d 1091, 1098 (Okla. 1996) (deciding that, under Oklahoma law, bad faith exists "when the claim was made for oppressive, abusive or wasteful reasons").

First, "[o]bjective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." *Cherokee Chem Co*., 2022 WL

---

persuasive authority in our interpretation of such laws." *Cleere v. United Parcel Serv., Inc*., 1983 OK CIV APP 29, ¶ 6, 669 P.2d 785, 788 (emphasis added). "Every state except New York has adopted the Uniform Trade Secrets Act." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 647 (6th Cir. 2019) (Griffin, J., dissenting). Therefore, every such state's jurisprudence on the uniform act's bad faith fee provisions is instructive. Moreover, state law uniform acts also assist in informing the federal court's in the application of the DTSA. *See Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016); *Alfasigma USA, Inc. v. EBM Med., LLC*, 2018 WL 1604961, at *2 (E.D. La. Apr. 3, 2018) (comparing 18 U.S.C. §§ 1836, 1839, with Uniform Trade Secrets Act § 1) ("It is well-accepted that the DTSA is in general comport with state trade secret law."); *Source Prod. & Equip. Co. v. Schehr, No*. CV 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017) ("[E]xisting state law on trade secrets informs the Court's application of the DTSA.").

2036305, at *3 (internal citations and quotation marks omitted); *Magnum Mach., LLC*, 2021 WL 5772533, at *5; *Teetex LLC*, 2022 WL 2439176, at *5. "An award for attorney's fees should not be precluded simply because at the time of filing the action, it appeared that some evidence would be obtained during discovery to support a misappropriation claim." *Id.* Rather, the Court must assess what evidence, if any, was presented to support GWACS' contention that KEA misappropriated its trade secrets. *Id.*

Second, "subjective bad faith may be inferred when a party brings or maintains an objectively specious claim." *Id.* at *5 (quoting *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal.App.4th 1249, 1262 (2002)). "A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." *Id.* As set forth below, GWACS trade secret claims meet both bad faith prongs.

### 1. GWACS' trade secret claims were objectively specious due to the complete lack of evidence establishing the existence of a trade secret.

Both federal and state law define a "trade secret" as information that meets the following requirements: (1) The information derives independent economic value from not being generally known; (2) The information is not readily ascertainable, through proper means, by other persons who can obtain economic value from its disclosure or use; and (3) The information is the subject of reasonable efforts to maintain its secrecy. 18 USC § 1839(3); Okla. Stat. Ann. tit. § 78-21.

To maintain federal and state trade secret claims, it is incumbent upon the party asserting the trade secret to present evidence of: (1) the extent to which the information is known outside the business, (2) the extent to which the information is known by employees and others, (3) the measures taken to guard the secrecy of the information, (4) the value of the information to the business and its competitors, (5) the effort expended in developing the information, and the ease

8

with which the information could be properly acquired or duplicated. *MTG Guarnieri Mfg., Inc. v. Clouatre*, 2010 OK CIV APP 71, ¶ 13, 239 P.3d 202, 209–10 (setting forth six factors adopted from the Restatement of Torts, § 757, Comment b (1939), for use in the analysis of OUTSA claims); *Tri-State Floors, Inc. v. Old Rule Servs., LLC*, No. 19-CV-707-JFH-JFJ, 2022 WL 4653717, at *10-11, *12, n.10 (N.D. Okla. Sept. 30, 2022) (equating evidence applicable in OUTSA and DTSA claims).

In this case, GWACS broadly claimed that all of its "financial, business, scientific, technical, economic and engineering information" related to the CAV-15 were somehow trade secrets. Dkt. 2, at pg. 10. After the Court dismissed all of GWACS trade secret claims related to the CAV-15 MKI and MKII, proceeded to trial on its claims related to the MKIII and MKIV. At trial, however, the Jury found that not a single one of GWACS' eight (8) purported trade secrets were actually trade secrets. Dkt. 272, at pgs. 2-4, 6-8. Indeed, the evidence presented at the week-long trial confirmed that each of GWACS' trade secret claims were objectively specious.

### a.    The enlarged trigger guard design on the CAV-15 MKIII.

GWACS claimed that an "enlarged trigger guard design on the CAV-15 MKIII" was a trade secret. Yet, GWACS presented no evidence at trial showing that GWACS made reasonable efforts to maintain the secrecy of this information. To the contrary, the evidence showed that GWACS publicly disclosed this information in a Brownells marketing catalog. **DEX 102**. (advertising that the CAV-15 MKIII would have an "[l]arge integrated triggerguard for gloved hand operation."). In April 2018, GWACS' own representative, Mr. Jones, provided this information to Brownells, knowing full-well that it would be included in a public catalog. **PEX 159**, pg. 2 ("CAV-15 MKIII . . . expanded trigger guard for use with gloves[.]").

Further, GWACS presented no evidence that this information was not readily ascertainable through proper channels. Instead, the evidence at trial showed that an enlarged trigger guard idea had already been incorporated into other polymer rifle products (**DEX 14, 15, 45, 46**), and was a feature already existing in KEA's pre-existing KE-15 aluminum rifle (**DEX 106**). Mr. Phagan told Mr. Jones about these existing products and features in the market (**DEX 45, 46**). GWACS even admitted on its own website that it incorporated the features recommended by Mr. Phagan into the CAV-15 MKIII (**DEX 80**). While GWACS desperately attempted to discredit Mr. Phagan and his recommendations at trial, GWACS did not (and could not) deny the fact that held Mr. Phagan out to be a "certified GWACS Armory CAV-15 Expert." **DEX 55**, at KEA02859.

Finally, even if, *arguendo*, the enlarged trigger guard concept had been a secret (which it clearly was not), GWACS presented no evidence at trial showing the information derived independent economic value from being secret. Despite knowing that an enlarged trigger guard design on the CAV-15 MKIII was not a trade secret, GWACS maintained this specious claim through trial.

### b.    The QD socket on the CAV-15 MKIII.

GWACS claimed a "QD socket on the CAV-15 MKIII" was a trade secret. Again, GWACS presented no evidence at trial showing that GWACS made reasonable efforts to maintain the secrecy of this information. Conversely, GWACS publicly disclosed that its CAV-15 MKIII added "QD sling swivel sockets[.]" **DEX 102**. Again, GWACS' own employee, Mr. Jones, provided this information to Brownells in April 2018 to be included in the public Brownells catalog. **PEX 159**, pg. 2.

Further, GWACS presented no evidence that this information was not readily ascertainable

through proper channels, because the evidence showed that a QD socket was an existing improvement that had been implemented into the CAV-15 MKII by third-parties since 2010 (**DEX 10, 23**). GWACS was well aware of this, as it readily shared the QD socket upgrade on its own Facebook page. **DEX 55** (KEA002865, KEA002871, KEA002872). Similarly, GWACS presented no evidence at trial showing this information derived independent economic value from being secret. To the contrary, Mr. Phagan had previously designed and integrated QD sockets into other firearms as early as 2003. **DEX 104**. And the testimony of Mr. Phagan and Mr. Kasarda confirmed that integrating a QD socket like incorporating power windows in a modern vehicle. Despite all of this, GWACS still maintained its specious QD socket claim through trial.

### c.    The flared magazine well on the CAV-15 MKIII.

GWACS claimed a "flared magazine well feature of the CAV-15 MKIII" was a trade secret. However, GWACS presented no evidence that it ever planned to include this feature in its CAV-15 MKIII. **PEX 159**, pg. 2. Nothing in GWACS' investor packet indicated that the MKIII would have a flared magazine well feature. **PEX 23**. None of GWACS' renderings of the MKIII included a flared magazine well (*id.* at Armory 0240, Armory 0242), included a flared magazine well feature. To the contrary, Mr. Jones told distributors that GWACS' CAV-15 MKIII would have a "Standard 5.56 mag well[.]" **PEX 159**, at pg. 2. In fact, GWACS only claimed this feature as a trade secret after KEA announced that the KP-15 featured a "[f]lared magwell to make reloads under stress easier to perform." **PEX 38**. For the avoidance of doubt, nothing in GWACS' complaint filed in July 2020 mentions a flared magazine well. *See* Dkt. 2. And in GWACS' July 2021 discovery responses, GWACS did not identify the "flared magazine well" as a feature the KP-15 and MKIII even had in common. **Ex. 2,** attached hereto (GWACS' Response to

11

Interrogatory Nos. 8, 17). Simply put, the evidence shows that GWACS simply concocted this claim to attack the KP-15.

Regardless GWACS presented no evidence that the information was unascertainable through proper channels, or derived independent economic value from being secret. Instead, Mr. Phagan explained that this feature was already existing in KEA's pre-existing KE-15 aluminum rifle (**PEX 106**). Further, it was Mr. Phagan's idea to introduce Mr. Jones to Magpul, a magazine manufacturer, and have the next version of the CAV-15 be compatible with Magpul's popular "P-mags." **DEX 39.** Mr. Phagan told Mr. Jones that prior versions of the CAV-15 had experienced issues with the P-mags, and thus, encouraged Mr. Jones work with Magpul to improve the CAV-15 magazine well. *Id.* To be sure, none of this information was secret, and to the extent it was not readily ascertainable, it was undeniably known to Mr. Phagan the "certified GWACS Armory CAV-15 Expert." **DEX 55**, at KEA02859. Nevertheless, GWACS still maintained this specious claim through trial.

### d. GWACS' inability to produce polymer lower receivers for the market after 2015.

GWACS claimed that its "inability to produce polymer lower receivers for the market after 2015" is a trade secret. But here again, GWACS presented no evidence at trial showing that it made reasonable efforts to maintain the secrecy of this information, nor did it present evidence that such information was not readily ascertainable through proper channels.

Instead, the evidence shows that it was readily ascertainable that GWACS had left the market after 2015. After 2015, GWACS announced to the world on its website that its injection molding had "reached its end of life." **DEX 80**. In 2019, GWACS was listed as "Terminated" by the Oklahoma secretary of state (**DEX 107**), and publicly disclosed on its Facebook page that it

12

had vacated its facility and was going "off grid[.]" **DEX 55** (KEA002877-2887). GWACS own customers surmised that GWACS had left the market, noting publicly available information regarding GWACS federal firearms license (or lack thereof). **DEX 55** at KEA002880. Mr. Jones also openly disclosed GWASC' lack of progress to Mr. Phagan after his NDA with GWACS had expired. **PEX. 63** (Armory-333).

Regardless, GWACS presented no evidence at trial demonstrating how this information derived independent economic value from being secret. Mr. Phagan testified that KEA's interest in developing the KP-15 was driven by "What Would Stoner Do" (or "WWSD") project – not by GWACS' ability to produce polymer lower receivers for the market after 2015. Despite this fact, and despite the complete dearth of supporting evidence, GWACS speciously claimed that its inability to produce polymer lower receivers after 2015 was a trade secret.

### e.    The amount of money GWACS needed to produce the CAV-15 MKIII and MKIV

GWACS claimed the "the amount of money GWACS Armory needed to produce the CAV-15 MKIII and MKIV" is a trade secret. Here, GWACS presented no evidence at trial showing that it made reasonable efforts to maintain the secrecy of this information. Rather, GWACS representative, Jud Gudgel ("Gudgel"), conceded that this this information (which was contained in a April 2015 investor packet) had been disclosed to KEA prior to signing any NDA. Both Mr. Gudgel and Mr. Jones admitted at trial that they never even provided Mike Kenney ("Kenney") with this April 2015 investor packet. Emails between Mr. Jones and Mr. Phagan revealed that GWACS had already disclosed the April 2015 investor packet to Mr. Phagan prior to the KEA signing the NDA. **PEX 233**.

Further, GWACS presented no evidence at trial showing this information derived

13

independent economic value from being secret.  Conversely, Mr. Phagan confirmed at trial that he already knew what it would cost to develop and manufacture a polymer lower receivers, because he had previously helped develop and manufacture the CAV-15 MKII while working for Cavalry Arms Corporation. **PEX 48.** Mr. Phagan's testimony made clear that he was intimately, and independently aware of the costs associated with manufacturing and developing these products. After all, Mr. Phagan was a "certified GWACS Armory CAV-15 Expert." **DEX 55**, at KEA02859.

Similarly, Mr. Kenney confirmed at trial that the information presented in the April 2015 investor packet at trial was worthless, because it did not accurately reflect the actual cost to develop and manufacture polymer products. Mr. Kenney also explained that he was intimately, and independently aware of the costs associated with manufacturing and developing these products, because he has been manufacturing similar products for decades. This testimony starkly contrasted that of Mr. Gudgel, who purportedly created the April 2015 investor packet, which made clear that he knew very little about costs associated with manufacturing and developing these products. Even when pressed, Mr. Gudgel could not explain how he compiled the information or calculations in the April 2015 investor packet. Despite all of this, GWACS maintained its specious claim.

### f.    The pricing of the CAV-15 MKIII as set forth in the April 2015 investment packet.

GWACS claimed that its "pricing of the CAV-15 MKIII as set forth in the April 2015 investment packet (Plaintiff's Ex. 23)" is a trade secret. Here, GWACS presented no evidence at trial showing that it made reasonable efforts to maintain the secrecy of this information, or that the information was not readily ascertainable through proper channels. Conversely, GWACS publicly disclosed the retail pricing for its CAV-15 MKIII and MKIV in the Brownells catalog. **DEX 102**. Again, GWACS' own employee, Mr. Jones, provided this information to Brownells in April 2018,

14

knowing it would be made public Brownells' catalog. **PEX 159**, pg. 2. GWACS readily shared its dealer pricing with Tim McBride outside of an NDA. **DEX. 113**.

Further, it was Mr. Phagan who provided GWACS with the dealer pricing for Brownells in 2013. **DEX 40.** Indeed, Mr. Phagan, the "certified GWACS Armory CAV-15 Expert[,]" was not only independently aware of how the MKIII could be priced (**DEX 55,** at KEA02859), Mr. Phagan readily disclosed this information in its sales packet for the CAV-15 equipment before he even met GWACS. **DEX 108**. Notwithstanding the foregoing, GWACS maintained its specious pricing claim through trial.

g.    **GWACAS' financial projections for the CAV-15 MKIII and MKIV.**

GWACS claimed that its "financial projections for the CAV-15 MKIII and MKIV as set forth in the April 2015 investment packet (Plaintiff's Ex. 23)" is a trade secret. Here again, GWACS presented no evidence at trial showing that it made reasonable efforts to maintain the secrecy of this information. Rather, Mr. Gudgel conceded that this the information contained in its April 2015 investor packet had been disclosed to KEA prior to signing any NDA. Both Mr. Gudgel and Mr. Jones also admitted at trial that they never even provided Mr. Kenney with this April 2015 investor packet. And emails between Mr. Jones and Mr. Phagan revealed that GWACS had already disclosed the April 2015 investor packet to Mr. Phagan prior to the KEA signing the NDA. **PEX 233**.

Regardless, GWACS presented no evidence at trial showing this information derived independent economic value from being secret. For one thing, GWACS' *projected* sales in its April 2015 investor packet widely differed from the *actual* sales projected by Brownells in 2018. *C.f.,* **PEX 23, 161.** Mr. Phagan's testimony also confirmed that the investor packet's financial

15

projections had no independent economic value, because GWACS' sales projections were widely inaccurate. Regardless, Mr. Phagan confirmed at trial that he already knew what it would cost to develop, manufacture, market, and sell polymer lower receivers, because done this for years while working for Cavalry Arms Corporation. **PEX 48**. Again, GWACS attempted to discredit Mr. Phagan's in-depth knowledge at trial, but could not deny its own characterization of Mr. Phagan as a "certified GWACS Armory CAV-15 Expert." **DEX 55**, at KEA02859.

Similarly, Mr. Kenney confirmed at trial that the financial projections in the April 2015 investor packet presented at trial are worthless, because they did not reflect the actual market for firearms. This fact was corroborated by Brownells' projections for GWACS' products. **PEX 161**. Further, Mr. Kenney explained that he is intimately, and independently aware of this market, because he has been manufacturing, developing, and selling firearm products for decades. Mr. Kenney explained that relying on the widely inaccurate financial projections in the investor packet would likely result in financial ruin. Mr. Gudgel, on the other hand, could not explain his widely inaccurate financial projections in the investor packet. And despite the objective speciousness of this claim, GWACS maintained it through trial.

h. **The combination of an enlarged trigger guard, QD Socket, and flared magazine well on the MK III.**

GWACS claimed that the "combination of an enlarged trigger guard, QD Socket, and flared magazine well on the GWACS Armory MK III" was a trade secret. A trade secret can only exist in a combination of components, if the unique combination of components is secret and provides a competitive advantage. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129-31 (10th Cir. 2003). But a party seeking to assert a trade secret in a compilation still must show that the combination of elements is outside the general scope ascertainable by proper means. *Quest Sol., Inc. v. RedLPR*,

16

*LLC,* No. 2:19-CV-437-CW-DBP, 2021 WL 1688644, at *2 (D. Utah Apr. 28, 2021).

As already set forth above in detail, GWACS failed to present any evidence that an enlarged trigger guard, QD socket, and flared magazine meet the requirements of a trade secret. To the contrary, the evidence at trial showed that GWACS publicly disclosed information; and that all of these features were readily ascertainable through proper means. Further, the evidence also shows that GWACS never even planned to include a flared magazine well in its CAV-15 MKIII (**PEX 23**), let alone any combination that might include this feature. And regardless, any combination of these features could not be a trade secret, because the evidence shows they were merely the "features recommended by Russell Phagan[.]" **DEX 80.** To be sure, GWACS incorporated Mr. Phagan's recommended features because, as GWACS pointed out on its Facebook page, Mr. Phagan was a "certified GWACS Armory CAV-15 Expert." **DEX 55**, at KEA02859.

### i.    KEA's independent development of the KP-15

Finally, GWACS ignored all of the evidence of KEA's independent development of the KP-15, and persisted in its baseless trade secret claims. Trade secret law does not offer protection against information that is discovered by fair and honest means, such as by independent invention, accidental disclosure, or reverse engineering (i.e., starting with the known product and working backward to divine the process which aided in its development or manufacture). *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S. Ct. 1879, 1883, 40 L. Ed. 2d 315 (1974).

Here, substantial evidence at trial showed KEA's independent development of the KP-15. This evidence shows that the KP-15 was inspired by the original Colt polymer lower receiver from the 1970s (**DEX 103**); and that KEA spent hundreds of thousands of dollars to design, develop, and manufacture a polymer lower receiver (**PEX 208**). Mr. Phagan explained the complexity and

process of developing the KP-15 molds (**DEX 7**), as well as the process KEA underwent to integrate the existing features of its aluminum KE-15 lower receiver (**DEX 106**) into the KP-15.

To be sure, nothing in trade secret law prevented KEA from "revising" the CAV-15 MKII (**PEX 66**), and GWACS knew that KEA and independently developed the KP-15. Rather than invest in its own product like KEA, GWACS filed its specious lawsuit.

> **2.    GWACS intentionally prolonged this litigation to entrench its competitor, KEA, in this litigation.**

GWACS' persistence in this litigation, despite the clear lack of evidence to support its position, evidences its bad faith. *Pop Top Corp. v. Rakuten Kobo, Inc*., No. 20-cv-04482-DMR, 2022 WL 267407, at *4 (N.D. Cal. Jan. 28, 2022) (citing *Location Based Servs., LLC v. Niantic, Inc.*, No. 17-cv-04413 NC, 2018 WL 7569160, at *1 (N.D. Cal. Feb. 16, 2018)) (noting that courts generally award fees when a plaintiff persists with a clearly untenable claim or adduces no evidence in support of its position). While this alone is sufficient to award attorney fees, GWACS' bad faith is further evidenced by its obvious strategy to harm KEA by prolonging this litigation.

To be sure, GWACS waged a war of attrition in this case by refusing to identify its purported trade secrets with any particularity until the case was about to be submitted to the jury. As this Court knows, "[a] plaintiff that shifts the goalposts (or fails to define them) while litigation is ongoing effectively eliminates its opponent's ability to mount an effective defense." *Double Eagle Alloys, Inc. v. Hooper*, No. 19-CV-243-JDR-CDL, 2024 WL 3166921, at *1 (N.D. Okla. June 25, 2024) (collecting cases); *See, e.g., Next Commc'ns, Inc. v. Viber Media, Inc*., 758 F. App'x 46, 49 (2d Cir. 2018) (noting that the plaintiff had "described its trade secret differently at each stage of the litigation"). Here, GWACS described its trade secrets differently at each stage of the litigation, which allowed it to stretch its baseless claims, as well as KEA's resources, all the way

18

to trial. GWACS' use of this strategy to entrench its competitor only further evidences its bad faith.

First, GWACS intentionally obfuscated its trade secrets from the outset. Courts have held that "vague, general allegations about purportedly confidential information" is evidence of bad faith. *See e.g. Teetex LLC*, 2022 WL 2439176, at *5 (finding bad faith where a plaintiff alleged to own broad categories of information). Here, GWACS' initial demand letter asserted that KEA was "attempting to develop a GWACS CAV-15 M III [sic] in direct conflict with [its] ***intellectual property rights***." **PEX 16** (emphasis added). Then in its complaint, GWACS shifted its allegations to the "financial, business, scientific, technical, economic and engineering information" related to the CAV-15. Dkt. 2, at pg. 10. This shows that GWACS never intended to protect trade secrets or resolve the dispute without protracted litigation. If it had, GWACS would have readily identified its trade secrets. The reality is GWACS was only interested entrenching KEA in this litigation.

Further, knowingly false allegations in a complaint, such as those made by GWACS, evidence bad faith. *See e.g., Magnum Mach., LLC*, 2021 WL 5772533, at *5 (affirming finding of bad faith where a document "didn't actually contain the elaborate trade secrets presented in [the] complaint"). Here, GWACS alleged in its complaint that its trade secrets were contained in an "an investment packet" provided to KEA. Dkt. 2, at pg. 6. In actuality, however, both Mr. Gudgel and Mr. Jones admitted at trial that they never even provided Mr. Kenney with such an investor packet; and the emails between Mr. Jones and Mr. Phagan revealed that GWACS had already disclosed the April 2015 investor packet to Mr. Phagan prior to the KEA signing the NDA. **PEX 233.** Tellingly, after years of extensive discovery, GWACS could not point to a single email, text message, or instance wherein it provided an investor packet to Mr. Kenney. A closer look at the actual investor packet presented at trial (**PEX 23**), reveals that it did not contain the elaborate

19

"financial, business, scientific, technical, economic and engineering information" it alleged in its complaint. Dkt. 2, at pg. 10.

Second, to maintain its claims in bad faith, GWACS further obfuscated its alleged trade secrets in discovery. GWACS identified the following proprietary information to have been disclosed to KEA:

> Armory disclosed the condition of the molds; financial information of Armory; that Armory was seeking investors for continued manufacturing and development; total CAV-15 MKII lower sales volume; CAV-15 MKII sales following In Range videos; its intent to use Marks MKIII and MKIV for future CAV-15 models; financial projections for future CAV-15 production and sales; drawings/ renderings of the CAV-15; the MKIII CAD renderings and functionality improvements to include several features that were included in the KEA polymer receiver; and the MKIV adjustable stock CAD renderings and functionality.

**Ex. 2**, at Interrogatory Response No. 8. To further muddy the water, GWACS then stated that the only similarities between the KP-15 and CAV-15 were the structural ribs inside the buffer tube, the buttstock, and the take down pins. *Id.* at Interrogatory Response No. 17. Once again, had GWACS actually intended to protect trade secrets or proprietary information, it would have simply identified the information it was claiming in discovery, which would advance the merits of the case, or perhaps allow the parties to engage in productive settlement discussions. But again, protecting any legitimate interest was never GWACS' objective in this litigation.

Third, on the eve of trial, this Court ordered GWACS to identify its trade secrets in its proposed jury instructions (Dkt. 241), but GWACS still refused to do so with any particularity. *See* Dkt. 243. Several days into trial, GWACS finally submitted proposed jury instructions identifying the eight purported trade secrets, which the Court ultimately provided to the jury. Dkt.

20

272. Out of GWACS' eight purported trade secrets, the jury did not find a single, protectable trade secret. Dkt. 272, at pgs. 2-4, 6-8. While the jury's verdict finally put an end to GWACS specious claims, it will ultimately be this Court who decides whether GWACS' will be held accountable for its bad faith. From these facts, the Court can reasonably infer subjective bad faith.

As a final consideration, the Court should also consider the impact GWACS' bad faith has had on KEA and its business. Statutes such as 18 U.S.C. § 1836(b)(3)(D) are well-grounded in American jurisprudence as a vital deterrent of bad-faith claims, alongside the inherent authority of courts to police bad faith litigation conduct by requiring payment of attorneys' fees to the victimized party. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980). Courts consistently look favorably on awards of attorneys' fees where the prevailing party was forced to participate in litigation as a result of bad faith conduct by the losing party, including filing or maintaining a case in bad faith. *Republic of Cape Verde v. A&A Partners*, 89 F.R.D. 14, 20–21 (S.D.N.Y. 1980). Fee-shifting rules such as 18 U.S.C. § 18(b)(3)(D) thus serve the valuable purposes of deterring abusive litigation, avoiding harassment, and protecting the integrity of the judicial process. *See Hall v. Cole*, 412 U.S. 1, 15 (1973) (connecting "bad faith" in litigation conduct or in actions leading to lawsuit with the "punishment" rationale of fee-shifting); *cf. Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 420 (1978) (applying similar rationale to fee-shifting provisions in Title II of the Civil Rights Act of 1964). But fee-shifting statutes additionally serve to compensate a party prevailing against a meritless claim for costs which should not have been incurred. *Hall*, 412 U.S. at 15; *see also Copeland v. Martinez*, 603 F.2d 981, 985 (D.C.Cir. 1979) (examining history of the "American Rule" and fee-shifting exceptions in the presence of bad faith).

21

In the context of trade secret litigation in particular, Section 1836(b)(3)(D) appears to have been drafted to address the Congressional finding that "it is important when seizing information to balance the need to prevent or remedy misappropriation with the need to avoid interrupting the—(A) business of third parties; and (B) legitimate interests of the party accused of wrongdoing." PL 114-153, May 11, 2016, at § 5(4). In other words, Congress recognized that, while it is important to provide recourse through the courts for genuine misappropriation of trade secrets, it is also important to provide a safeguard for defendants whose businesses are needlessly put in jeopardy by a bad faith claim of misappropriation. In this context, Section 1836(b)(3)(D) should be applied to compensate defendants like KEA who suffer reverberating consequences as a result of a bad-faith misappropriation claim and the consequential impact on legitimate business of the bad publicity, and it should also be applied to deter plaintiffs like GWACS from asserting misappropriation claims based on information that it knows to be in the public realm.

As already explained above, GWACS never intended to protect any legitimate trade secrets in this lawsuit and was only interested in destroying its competitor via protracted litigation. GWACS achieved its goal in destroying KEA and its business. As further detailed in the Declaration of Mr. Kenney, GWACS' spurious claims have had a very real negative impact on KEA and its business. **Ex. 5.** KEA has lost suppliers, vendors, customers, and millions of dollars in sales as a result of GWACS' lawsuit. *Id.* at ¶5. GWACS lawsuit has had a substantial financial impact on KEA. *Id.* at ¶¶6-7. Notably, KEA has been forced to terminate its employees and liquidate its assets to fund its defense in this case. *Id.* at ¶7.

In sum, the law can and must protect against bad-faith litigants like GWACS. Again, the jury's verdict may have finally put an end to GWACS specious claims, but it will ultimately be

MAC: 16075-001 (#5804422.1)

this Court who decides whether GWACS will be held accountable for its bad faith.

### 3.    KEA's attorney fees are reasonable.

As noted, to determine the reasonableness of KEA's attorney fees, the Court must begin by calculating the so-called "lodestar amount" of the fee. *Robinson*, 160 F.3d at 1281. This amount is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Anchondo*, 616 F.3d at 1102. The product is a "presumptively reasonable fee" and may only be adjusted in rare circumstances "to account for the presence of special circumstances." *Id.*; *State ex rel. Burk*, 598 P.2d at 660-61; *Silver Creek Invs., Inc*, 307 P.3d at 367. In the case, the lodestar amount is equal to **$667,822.00.** This is calculated by multiplying the number of hours KEA's attorneys expended on this litigation, **2,323.40**, by the average rate of the billable hourly rate for this matter, **$287.43** dollars per hour.[2] This amount is supported by the declaration of counsel. **Ex. 1.** Further, the hourly rate charged to, and paid by, KEA is reasonable. As explained in the declaration of counsel, the hourly rate charged is well-below the usual and customary rates in Tulsa, Oklahoma for lawyers and paralegals of comparable skills and experience.[3] Since KEA has established both components of the lodestar amount, KEA is thus entitled to a presumption that the amount reflects a reasonable fee. *Robinson*, 160 F.3d at 1281 (internal quotation marks omitted).

---

[2] In addition, KEA seeks its attorney fees for the period following February 18, 2025, until the Court enters judgment on this motion, which additional amount will be substantiated by a supplemental filing.

[3] Under Oklahoma law, work performed by paralegals is compensable as an award of attorney fees. *State Bank & Trust Co. v. First State Bank of Texas*, 242 F.3d 390, *15 (10th Cir. 2001) (unpublished), citing, *Taylor v. Chubb Group of Ins. Cos.*, 1994 OK 47, ¶12, 874 P.2d 806, 808-09.

MAC: 16075-001 (#5804422.1)

**B.     BROWNELLS, PHAGAN, SST, AND NEALON ARE ENTITLED TO THEIR ATTORNEY FEES AND COSTS UNDER OKLAHOMA'S OFFER OF JUDGMENT STATUTE.**

The United States Court of Appeals for the Tenth Circuit has expressly held that the fee-shifting provisions of the Oklahoma's offer of judgment statute apply in diversity cases as a matter of substantive law under the traditional *Erie* analysis. *Scottsdale Ins. Co. v. Tolliver*, 636 F.3d 1273, 1280 (10th Cir. 2011).[4] Application of the fee-shifting provisions of the Oklahoma's offer of judgment statute is straightforward. Section 1101.1(B)(3) provides that, in any action brought for the recovery of money (with exceptions not here relevant) if (i) a defendant files[5] an offer of judgment, (ii) the offer is then rejected, and (iii) the judgment awarded the plaintiff is less than the amount of the offer of judgment, then the defendant shall be awarded both the defendant's reasonable attorney fees and the defendant's reasonable litigation costs, incurred from the date the offer was made.[6]

Here, the Section 1101.1(B)(3) sequence of events is precisely what occurred in this case. On October 7, 2021, Brownells, Phagan, SST, and Nealon made offers of judgment to GWACS. Specifically, Brownells offered $1,500, Nealon offered $1,500, Mr. Phagan offered $1,500, and SST offered $1,500. *Id.* GWACS rejected these offers of judgment. Thereafter, on February 23,

---

[4] GWACS's brought its claims against Defendants "by way of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) between [GWACS] and Defendants."

[5] n *Scottsdale*, the Tenth Circuit held that the procedural rules governing Rule 68 apply, not the Oklahoma procedure set forth in §1101.1(B). *Id.*, at 1277-78. Thus, although the Oklahoma statute requires the filing of the offer, the Rule 68 provision that the offer only be communicated to the opposing party governs. Consequently, the various offers of judgment were not filed in this case.

[6] In contrast with the interpretation accorded Rule 68, the Oklahoma offer of judgment statute expressly provides that the defendant is entitled to both reasonable fees and reasonable litigation costs. *Hubbard v. Kaiser-Francis Oil Co.*, 2011 OK 50, ¶11, 256 P.3d 69, 73, distinguishing *Delta Air Lines, Inc. v. August*, 450 U.S. 346 (1981).

2023, the Court summarily dismissed all of GWACS claims against Brownells, Phagan, SST, and Nealon, with prejudice, and awarded GWACS zero damages. Dkt. 191.  The jury returned a verdict against GWACS, which was entered by the Court on February 20, 2025, thereby constituting a final adjudication of all remaining claims in the case. Dkt. 272. GWACS failed to recover anything from the jury. Brownells, Phagan, SST, and Nealon are thus entitled to an award of both their reasonable attorney fees and their reasonable litigation costs, which are hereafter discussed.

With respect to fees, the lodestar amount for Brownells, Phagan, SST, and Nealon is equal to **$139,822.00**. This is calculated by multiplying the number of hours Brownells, Phagan, SST, and Nealon's attorneys expended on this litigation, **486.45,** by the average rate of the billable hourly rate for this matter, **$287.43** dollars per hour. This amount is supported by the affidavit of counsel, who calculated the hours reasonably expended on this litigation for Brownells, Phagan, SST, and Nealon from October 2021, to February 2023.[7] **Ex. 1.** The hourly rate charged to Brownells, Phagan, SST, and Nealon is reasonable. *Id.* Further, as explained in the declaration of counsel, the hourly rate charged is well-below the usual and customary rates in Tulsa, Oklahoma for lawyers and paralegals of comparable skills and experience. *Id.* Since Brownells, Phagan, SST, and Nealon have established both components of the lodestar amount, they are thus entitled to a presumption that the amount reflects a reasonable fee. *Robinson*, 160 F.3d at 1281 (internal quotation marks omitted).

---

[7] In addition, Brownells, Phagan, SST, and Nealon seek their attorney fees for the period following February 20, 2025, until the Court enters judgment on this motion, which additional amount will be substantiated by a supplemental filing.

MAC: 16075-001 (#5804422.1)

### C.    SST IS ENTITLED TO ITS ATTORNEY FEES INCURRED IN DEFENSE OF GWACS' CLAIM FOR BREACH OF APA.

First, SST is also entitled to its attorney fees under its agreement with GWACS. Notably, the APA contained the following the following provision: "In any action brought by a party hereto to enforce the obligations of any other party hereto, the prevailing party shall be entitled to collect from the other parties to such action such party's reasonable attorneys' fees, court costs and other expenses incidental to such litigation." **PEX 6.** Here, GWACS revered nothing from SST under its claim against SST under the APA. Accordingly, SST is the prevailing party under the APA, and entitled to recover its reasonable attorney fees and costs incurred in this case from GWACS.

Second, SST's attorney fees are reasonable. In the case, the lodestar amount for SST is equal to **$421,720.50.** This is calculated by multiplying the number of hours SST's attorneys expended on this litigation, **1,467.20**, by the average rate of the billable hourly rate for this matter, **$287.43** dollars per hour. This amount is supported by the affidavit of counsel, who calculated the hours reasonably expended on this litigation for SST from February 2020, to February 2023. **Ex. 1.** The hourly rate charged to SST is reasonable. *Id.* Further, as explained in the declaration of counsel, the hourly rate charged is well-below the usual and customary rates in Tulsa, Oklahoma for lawyers and paralegals of comparable skills and experience. *Id.* Since SST has established both components of the lodestar amount, its thus entitled to a presumption that the amount reflects a reasonable fee. *Robinson*, 160 F.3d at 1281 (internal quotation marks omitted).

### D.    DEFENDANTS' BRIEFING IN SUPPORT OF ITS BILL OF COSTS.

Pursuant to Federal Rule of Civil Procedure 54(d) and Northern District Local Rule 54.1, Defendants provide this further briefing in support of their Bill of Costs, contemporaneously filed herein. Federal Rule of Civil Procedure 54(d)(1) provides "costs other than attorney's fees should

26

be allowed to the prevailing party." As already set forth above, each of the Defendants have prevailed in defending GWACS claims. Dkt. 272. Accordingly, Defendants are "prevailing" parties for purposes of Rule 54(d)(1).

28 U.S.C. § 1920 sets forth the particular costs that may be taxed the Court or its Clerk in favor of the prevailing party." In pertinent part, that statute provides: A judge or clerk of any court of the United States may tax as costs for: (1) fees of the clerk and marshal, (2) fees and disbursements for printing, (3) fees for witnesses, and (4) other itemized costs. *Id.* Here, Defendants apply for an order that GWACS pay Defendants' costs recoverable as prevailing party under 28 U.S.C. § 1920, which are further itemized in detail in their filed Bill of Costs. Defendants respectfully seek reimbursement for all of their costs set forth therein in the amount of **$51,460.83**. Detail regarding that cost (which is reflected on this Court's electronic docket) is attached to the Bill of Costs and incorporated herein by reference.

## V.    CONCLUSION

For the reasons stated herein, Defendants respectfully requests the Court award: KEA its reasonable attorney fees in the amount of **$667,822.00**; Brownells, Phagan, SST, and Nealon in the amount of **$139,822.00**; SST in the amount of **$421,720.50**; and costs in the amount of **$51,460.83**.

27

Dated this 6th day of March 2025.

Respectfully submitted,

**HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.**

 */s/Robert P. Fitz-Patrick*
Robert P. Fitz-Patrick, OBA #14713
521 East 2nd Street, Suite 1200
Tulsa, OK  74120
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
Email:  rfitzpatrick@hallestill.com
**ATTORNEYS FOR DEFENDANT**

**-AND-**

**MARQUIS AURBACH**

*/s/ Alexander K. Calaway*
Brian R. Hardy, Esq.
Nevada Bar No. 10068
*Admitted Pro Hac Vice*
Alexander K. Calaway, Esq.
Nevada Bar No. 15188
*Admitted Pro Hac Vice*
10001 Park Run Drive
Las Vegas, Nevada 89145
Tel: 702-382-0711
bhardy@maclaw.com
acalaway@maclaw.com

**ATTORNEYS FOR DEFENDANT**

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 6th day of March, 2025. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

James E. Weger, Esq.
Todd J.P. Bogan, Esq.
JONES, GOTCHER & BOGAN, P.C.
3800 First Place Tower, 15 East Fifth St.
Tulsa, OK 74103
ATTORNEYS FOR THE PLAINTIFF,
GWACS GWACS, LLC

_____ */s/ C. Hatfield*_____

29